# Exhibit 1

```
 1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF TEXAS
 2                    HOUSTON DIVISION
 3      ----------------------------------:
        AIMS INSTITUTE, PLLC, et al.,     :
 4                                        :
                   Plaintiffs,            :
 5                                        : Civil Action:
            vs.                           : 4:22-cv-02396
 6                                        :
        MERRICK GARLAND, et al.,          :
 7                                        :
                   Defendants.            :
 8      ----------------------------------:
 9
10       VIDEO-RECORDED DEPOSITION OF KELLEIGH MILLER
11
12      DATE:            Thursday, January 5, 2023
13      TIME:            9:37 a.m.
14      LOCATION:        United States Attorney's Office
                         2100 Jamieson Avenue
15                       Alexandria, Virginia 22314
16
17      REPORTED BY:     Erick M. Thacker
                         Reporter, Notary
18
19
20
21              Veritext Legal Solutions
             1250 Eye Street, NW, Suite 350
22                Washington, D.C. 20005

                                          Page 1
```

1     Q   -- in the processing unit?
2     A   -- four government information
3   specialists assigned to that team right now and a
4   GS-14 unit chief that supervises.
5     Q   And what is a government information
6   specialist?
7     A   So these are -- these are employees
8   that process FOIA cases.  So government
9   information specialist is the title of the
10   majority of the folks in our office.
11     Q   Okay.  And then legal and external, how
12   many folks work in legal and external?
13     A   I have two government information
14   specialists assigned to that team right now, and
15   I have one GS-14 unit chief running that unit.
16     Q   And her name is Angela Hertel, right?
17     A   Correct.
18     Q   And she's been working there for, I
19   guess, a few years, right?
20     A   Over -- she's been part of our FOIA
21   office for a little over ten years, I believe.
22     Q   Interestingly, she's usually the

Page 26

1   witness that the agency puts up in a FOIA case.
2   This is a privilege for me to be able to have the
3   chief.
4         So -- and so this is -- these are the
5   three units, and then you supervise these three
6   units, correct?
7     A   Correct.
8     Q   And who do you report to?
9     A   So I report to the section chief of the
10   FOIA and information law section at DEA.
11     Q   Okay.  And who is that?
12     A   That is Brooke DuBois.
13     Q   Okay.  And is that -- is that in a
14   different DOJ component?
15     A   No.  So we are part of the Office of
16   Chief Counsel, and so the FOIA and information
17   law section is one of the many sections within
18   the Office of Chief Counsel that we report up to.
19     Q   So -- so when you say "we" and --
20   because you're here representing DOJ and -- and
21   DEA, so I just want the record to be clear.
22         Are you saying that the DEA FOIA office

Page 27

1   is part of the DOJ chief -- could you just --
2     A   Sure.
3     Q   -- explain that to me --
4     A   I can clarify.
5     Q   -- a little bit.
6     A   We are --
7     Q   Yeah.
8     A   -- part of the DEA's Office of Chief
9   Counsel.
10     Q   Okay.  So you guys are part of the
11   Office of Chief Counsel, but you report to
12   Ms. DuBois, who is at DOJ --
13     A   DEA.
14     Q   Oh, at --
15     A   Yes.
16     Q   -- DEA.
17         THE REPORTER:  You-all are starting to
18   speak over each other.  If you could --
19         THE WITNESS:  Sorry.
20         THE REPORTER:  -- just wait for the --
21         THE WITNESS:  Sorry.
22         THE REPORTER:  -- end of the question.

Page 28

1   BY MR. ZORN:
2     Q   Okay.  So -- so you report to
3   Ms. DuBois, who's in the DEA's chief counsel
4   office?
5     A   Correct.
6     Q   And then Ms. DuBois reports to?
7     A   Sandra Stevens, who is the deputy chief
8   of the Office of Chief Counsel at DEA.
9     Q   Okay.  And Ms. Stevens reports to?
10     A   Hallie Hoffman, who is the chief
11   counsel for DEA.
12     Q   And I will assume that Ms. Hoffman
13   reports to the administrator, correct?
14     A   Correct.
15     Q   What are you responsibilities as the
16   chief FOIA officer for DEA?
17     A   So my responsibilities are to oversee
18   the overall administration of the FOIA and the
19   Privacy Act at DEA.
20     Q   Okay.  And -- and the responsibilities
21   that you have are in the FOIA statute, right?
22     A   Correct.

Page 29

8 (Pages 26 - 29)

1     MR. ZORN:  And why don't we pull that
2  up.  So I'm going to introduce -- I'm going to
3  get creative.  I'm going to call this Exhibit
4  FOIA.  Let's see.
5     All right.  I have introduced into the
6  folder Exhibit capital F-O-I-A.
7     (Deposition Exhibit FOIA
8     was marked for identification.)
9     MR. RODRIGUEZ:  Sorry.
10    THE WITNESS:  That's okay.
11  BY MR. ZORN
12    Q   And can we turn to -- it's page 25 of
13  the document.  You can see at the bottom right --
14  well, first, can you confirm for me at least as
15  for the first page that this is 5 U.S. Code
16  section 552?
17    A   It is.
18    Q   And that's -- that's the FOIA --
19    A   Correct.
20    Q   -- citation?
21    A   Yes.
22    Q   And this is from -- I think I got it

1  from the Cornell U.S. law U.S. code.
2     Have you ever been to that --
3    A   I have been to this.  Typically, when I
4  want to look up 552, I will go to the
5  electronic -- or I'm sorry -- the -- I'll just go
6  to the United States code website to get it.
7    Q   But it's a statute that -- that DOJ and
8  DEA is -- is familiar with?
9    A   Correct.
10    Q   Okay.  So if you can scroll to page 25,
11  and I want to look at -- on page 25, I want to
12  look at (j)(2).  And just tell me when you're
13  there.
14     So it says, "The Chief FOIA Officer of
15  each agency shall, subject to the authority of
16  the head of the agency."
17     I want to stop there.  So the chief
18  FOIA officer is --
19    MR. RODRIGUEZ:  Could you hold on?
20    MR. ZORN:  Yes.
21    MR. RODRIGUEZ:  Let me -- let us get to
22  the page --

1     MR. ZORN:  Sure.
2    MR. RODRIGUEZ:  -- here.
3    MR. ZORN:  Sure.
4    MR. RODRIGUEZ:  Sorry about that.
5  Yeah, we're good now.
6  BY MR. ZORN
7    Q   Okay.  So the chief -- I'm going to
8  read it again.
9     "The Chief FOIA Officer of each agency
10  shall, subject to the authority of the head of
11  the agency."
12     Did I read (j)(2) correctly?
13    A   You did.
14    Q   And the chief FOIA officer of DEA is
15  you, Ms. Kelleigh Miller, correct?
16    A   Correct.
17    Q   And we can agree that the Drug
18  Enforcement Administration is an agency, correct?
19    A   It is.
20    Q   So in (j)(2), the chief FOIA officer of
21  DEA is you?
22    A   Correct.

1    Q   Okay.  And A is "have agency-wide
2  responsibility for efficient and appropriate
3  compliance with this section."
4     As the chief FOIA officer, that is one
5  of your responsibilities, correct?
6    A   Correct.
7    Q   That's statutory?
8    A   Correct.
9    Q   B, "monitor implementation of this
10  section throughout the agency and keep the head
11  of the agency, the chief legal officer of the
12  agency, and the Attorney General appropriately
13  informed of the agency's performance in
14  implementing this section."
15     That's one of your responsibilities,
16  correct?
17    A   It is.
18    Q   And that's because you are the chief
19  FOIA officer of DEA?
20    A   Correct.
21    Q   Okay.  C, "recommend to the head of the
22  agency such" -- and I'll just pause there.  That

1  in this case is -- is the Honorable Anne Milgram,
2  correct?
3      A   Correct.
4      Q   "Such adjustments to agency practices,
5  policies, personnel, and funding as may be
6  necessary to improve its implementation of the
7  section."
8          That's something you do, right?
9      A   Correct.
10     Q   And is it something you do through this
11 chain of command, or do you -- do you actually
12 get to speak to Ms. Milgram?
13     A   No.  This is done through my chain of
14 command.
15     Q   Okay.  So you don't get to speak to
16 Ms. Milgram, like -- because I'm having trouble
17 with that, too --
18     A   Generally, no.
19     Q   -- I would say.  Okay.
20         So -- so let's do D.
21         "Review and report to the Attorney
22 General, through the head of the agency, at such

Page 34

1  times and in which formats as the Attorney
2  General may direct, on the agency's performance
3  in implementing this section."
4          And so I'll just make this open-ended.
5  That's something you do, true?
6      A   We do that.
7      Q   And how does the agency do that?
8      A   We accomplish this through our annual
9  reporting through the -- the -- I'm sorry -- the
10 annual FOIA reports and the chief FOIA officer
11 report that we complete every year and we send
12 through our chain of command to the Department of
13 Justice.  And then they prepare the DOJ chief
14 office -- chief officer reports and annual FOIA
15 reports that gets submitted to the attorney
16 general.
17     Q   And the DOJ chief FOIA officer
18 is Associate Attorney General Vanita Gupta,
19 right?
20     A   Could you ask the question again?  I'm
21 sorry.
22     Q   The DE- -- the DOJ's chief FOIA

Page 35

1  officer, her name is Vanita Gupta, right?
2      A   I am forgetting, because I actually
3  deal primarily with Bobby Talebian, who is the
4  chief of the Office of Information Policy, but I
5  forget the name of the DOJ's chief FOIA officer.
6  I don't have any interaction with that
7  individual.
8      Q   Okay.  So you don't interact with the
9  chief FOIA officer of the Department of Justice,
10 and you, meaning Kelleigh Miller, the chief FOIA
11 officer of DEA, doesn't interact with the chief
12 FOIA officer of DOJ, assuming it is Vanita Gupta?
13     A   I do not.
14     Q   Okay.  You -- you, as in Kelleigh Ms.
15 Miller, does interact with a gentleman named
16 Bobby Talebian, correct?
17     A   Bobby Talebian, but primarily his
18 staff.  That's the Office of Information Policy.
19 This is essentially the FOIA office for DOJ.  We
20 have a lot of interaction with that office, yes.
21     Q   Okay.  And what -- what types of
22 matters do you discuss with the DOJ?

Page 36

1      A   Sure.  So the Office of Information
2  Policy, otherwise known as OIP, handles all of
3  the administrative appeals.  So any time a
4  requester is unsatisfied with our determination
5  to their FOIA request, they have the right to
6  file an administrative appeal.
7          The department will come back to us and
8  ask us for all the background materials on the
9  request.  They may have some questions for us.
10 So we -- we deal with them heavily on the
11 administrative appeal process.
12         We also participate in trainings that
13 OIP conducts throughout the year.  We attend
14 various meetings that OIP hosts and things like
15 that.
16     Q   Have you attended the Chief FOIA
17 Officers Council?
18     A   I have, yes.
19     Q   Okay.  And that's run by
20 Mr. Talebian --
21     A   It is --
22     Q   -- true?

Page 37

10 (Pages 34 - 37)

1     A   -- I believe, yes.
2     Q   I've learned more about FOIA than I
3   ever wanted to know.
4         So let's just continue here.
5         So, E, "facilitate public understanding
6   of the purposes of the statutory exemptions of
7   this section by including concise descriptions of
8   the exemptions in both the agency's handbook
9   issued under subsection (g) and the agency's
10   annual report on this section, and by providing
11   an overview, where appropriate, of certain
12   general categories of agency records to which
13   those exemptions apply."
14         Did I read that correctly?
15     A   You did.
16     Q   Okay.  And that's -- that's your
17   responsibility as the chief FOIA officer of DEA,
18   true?
19     A   It is.
20     Q   Okay.  And, F, "offer training to
21   agency staff regarding their responsibilities."
22         And you, as the chief FOIA officer,

Page 38

1     Q   And who is that?
2     A   That is Desheila Wallace.
3     Q   Okay.  Are you a senior official at
4   DEA?
5     A   I would -- well, I'm -- I mean, I'm a
6   section chief, so I would consider it to be a
7   senior manager.
8     Q   Would you consider yourself to be a
9   senior official at the -- well, let me say:  Does
10   DEA and -- and/or DOJ consider you to be a senior
11   official?
12     A   I believe so.
13     Q   Okay.  Why?
14     A   I think because of my role as the --
15   the chief FOIA officer for DEA, because of my
16   grade level in the government, and my
17   responsibilities.
18     Q   Okay.  Are you a political appointee?
19     A   I am not.
20     Q   Were you -- are you at the assistant
21   secretary or equivalent level?
22     A   I am not.

Page 40

1   offer training?
2     A   We do.
3     Q   Okay.  And I cut off the last three
4   words of that.  I just want the record to be
5   clear.  It says "under this section."  I
6   didn't -- I didn't put that in.
7         So, G, "serve as the primary agency
8   liaison with the Office of Government Information
9   Services and the Office of Information Policy."
10         Did I read that correctly?
11     A   You did.
12     Q   And when we were talking about OIP,
13   that's the Office of Information Policy, correct?
14     A   Correct.
15     Q   Okay.  And then the final point of this
16   (j)(2) is H, "designate 1 or more FOIA public
17   liaisons."
18         Did I read that correctly?
19     A   You did.
20     Q   And the DEA has a FOIA public liaison,
21   correct?
22     A   We do.

Page 39

1     Q   Okay.  Who at DEA is at the assistant
2   secretary or equivalent level?
3     A   I would consider that to be our SES
4   personnel.
5     Q   Okay.
6     A   Senior executives.
7     Q   And who are those?
8     A   Those are generally the individuals
9   that run the divisions at DEA.
10     Q   Okay.  And can you -- can you name them
11   for me?
12     A   I mean, I can give you titles probably
13   better.  Like the chief of the intelligence
14   division, the chief of operations, the chief
15   counsel.
16     Q   Okay.
17     A   Our special agents in charge in the
18   field, perhaps.
19     Q   So did it ever occur to you that you're
20   being underpaid?
21     A   No.
22     Q   Can we look at (j)(1)?  It's right

Page 41

11 (Pages 38 - 41)

1  above (j)(2).
2      Can you read (j)(1)?
3      A   Would you like me to read (j)(1)?
4      Q   Yes.  Yes, please.
5      A   "Each agency shall designate a Chief
6  FOIA Officer who shall be a senior official of
7  each agency (at the Assistant Secretary or
8  equivalent level)."
9      Q   You're the chief FOIA officer of DEA,
10 true?
11     A   Correct.
12     Q   You are not at the assistant secretary
13 or equivalent level, are you?
14     A   I am --
15         MR. RODRIGUEZ:  Objection.  Calls for
16 legal conclusion.
17         You can still answer.
18         THE WITNESS:  I am not.
19 BY MR. ZORN
20     Q   Okay.  So let's -- let's assume -- with
21 your counsel's objection, let's assume you're
22 correct.  Then DEA currently has a chief FOIA

Page 42

1  officer that is contrary to what this says, true,
2  under the assumption that your prior answer is
3  correct, that you are not the assistant secretary
4  or equivalent level?
5      A   True.
6      Q   Okay.  And, in fact, there's an Office
7  of Legal Counsel opinion on this.
8          Have you ever read it?
9      A   I have not.
10     Q   Well, the Department of Justice has
11 read it, right?
12     A   I am unsure.
13     Q   Because the office of -- do you know
14 what the Office of Legal Counsel is?
15     A   Yes.
16     Q   Okay.  So what is the Office of Legal
17 Counsel?
18     A   Meaning the Office of Legal Counsel at
19 DOJ or -- or DEA?  Maybe I misunderstood.  I'm
20 sorry.
21     Q   The DOJ Office of Legal Counsel, are
22 you familiar with that?

Page 43

1          And it's a little bit beyond the scope
2  of the -- the topics, so if -- I'm not going to
3  suggest that you're unprepared, but just for
4  foundation, do you know what the Office of Legal
5  Counsel at the Department of Justice is?
6      A   Maybe I do not.
7      Q   Okay.  So do you know what an OLC
8  opinion is?
9      A   No.
10     Q   Okay.  Well -- so you don't know about
11 an OLC opinion by a person named Paul Colborn?
12     A   I am not familiar with that, no.
13     Q   Okay.  Well, I'm going to do something
14 very unorthodox.
15         You represent -- you're here today on
16 behalf of the Department of Justice, correct?
17     A   Yes.
18     Q   Okay.  And I'm going to give you a FOIA
19 request here for that OLC opinion.
20         (Deposition Exhibit OLC
21         was marked for identification.)
22         MR. RODRIGUEZ:  I object to the extent

Page 44

1  that she's here to provide testimony on the
2  topics that you've designated.  She's not here as
3  a representative of the Department of Justice at
4  large.
5          MR. ZORN:  Fair enough.  I'm going
6  to -- I'm going to -- I'll submit -- after the
7  deposition, I'll submit it normally.
8  BY MR. ZORN
9      Q   But -- but could you just read my
10 request out there?
11     A   "I hereby request the OLC document
12 containing the opinion/agency conclusion about 5
13 USC 552(j)(2)," signed Matthew Zorn.
14     Q   Oh, sorry.  It should be (j)(1).  Let
15 me -- let me --
16     A   Okay.
17     Q   -- correct this exhibit.  Okay.  I'm
18 not going to make you reread this.
19     A   Okay.
20         MR. ZORN:  Okay.  So -- but let's --
21 let's move to a different exhibit.  I'm going to
22 introduce Exhibit 8.

Page 45

12 (Pages 42 - 45)

1    memo, and Exhibit 2, which is the statute.
2         MR. ZORN:  So I -- there should be an
3    Exhibit 2 - 30(b)(6) depo notice.pdf --
4         MR. GRAY:  Refresh the --
5         MR. ZORN:  -- uploaded.  If you -- you
6    have to refresh --
7         MR. RODRIGUEZ:  Okay.
8         MR. ZORN:  -- and it's -- it's -- I
9    kind of pre-titled some of them, and I'm
10   switching around the order.  So the confusion is
11   my --
12        MR. RODRIGUEZ:  Now we have it.
13        THE WITNESS:  Okay.
14        MR. RODRIGUEZ:  So I needed to refresh
15   the folder.
16        MR. ZORN:  I needed to title these
17   things better, so multiple -- all right.
18   BY MR. ZORN
19        Q    So we have 30(b)(6).  This is 9:32 a.m.
20   And just let me know when you have it up.
21        A    We do.
22        Q    Okay.  So do you see that this is a

Page 54

1    notice of deposition 30(b)(6) to the U.S.
2    Department of Justice and U.S. Drug Enforcement
3    Administration?
4         A    Yes.
5         Q    And at the top of the page, you see
6    there's a blue header; is that correct?  The very
7    top of the page.
8         A    Yes.
9         Q    All right.  And let's go to page 3 of
10   the document and just confirm for me that it says
11   Exhibit A at the -- towards the top of the page.
12        A    It does.
13        Q    Okay.  And then if we go to page 4,
14   you'll see there's a list of 30(b)(6) topics for
15   DOJ and DEA.  Do you see that?
16        A    I do.
17        Q    And these are the topics that you are
18   prepared for and are prepared to testify today on
19   behalf of DOJ and DEA, true?
20        A    Correct.
21        Q    And the first topic, A1, is "The
22   structure and operation of DEA FOIA office,"

Page 55

1    fair?
2         A    Correct.
3         Q    The second is "The description of DEA's
4    FOIA processing office, including its location,
5    its general contents, and the employees working
6    in the FOIA processing office."
7         Did I read that correctly?
8         A    You did.
9         Q    And earlier we -- since -- since --
10   since we're on the topic, earlier, we spoke about
11   the structure of the DEA FOIA office, didn't we?
12        A    We did.
13        Q    And we said -- and you testified that
14   there was an intake office, and then there was a
15   processing office, and those two were different.
16        A    We have three units, so I oversee three
17   units, one being the intake subunit, the
18   processing subunit, and the legal and external
19   affairs subunit --
20        Q    All right.
21        A    -- that make up the FOIA Privacy Act
22   unit at DEA.

Page 56

1         Q    And I actually want to skip around
2    here.  I'm just curious.  Who makes the unusual
3    circumstances determination?
4         A    Generally, the intake unit.
5         Q    Okay.  And what is that determination
6    based on?
7         A    So at DEA, we will invoke unusual
8    circumstances any time we have to search for
9    records that are outside of our office, meaning
10   we do not have possession of all of DEA's
11   records.
12        We have many offices throughout
13   headquarters, the field.  We have offices in
14   about 90 foreign countries.  So we do not have
15   access to all of those records in my own office.
16   We have to rely on the record custodians to
17   retrieve those records for us.
18        Q    So by office in your answer, you mean
19   the FOIA office?
20        A    The FOIA office.
21        Q    So any time a record that is requested
22   in a FOIA request that is not in the FOIA office

Page 57

15 (Pages 54 - 57)

1  presents the unusual circumstances exception?
2      A   Correct.
3      Q   And we'll get into the documents in a
4  moment, but what percentage of requests raise
5  unusual circumstances at the Drug Enforcement
6  Administration?
7      A   So we do not track the actual
8  percentage.  However, the data that reflects how
9  often we invoke unusual circumstances is captured
10  in the annual FOIA reports that are available on
11  the OIP -- the Department of Justice Office of
12  Information Policy website.
13         There is a column there where you can
14  see 20 or 30 days.  30 days indicates that we
15  have invoked unusual circumstances for those
16  cases for that particular fiscal year.
17      Q   Is a complex request always going to
18  raise unusual circumstances?
19      A   So the definition of complex and simple
20  is different than unusual circumstances.
21         While there may be a close proxy there,
22  complex and -- you know, to -- I would -- the
Page 58

1  uses, you know, the paper-based filing systems
2  that our offices all over the United States, you
3  know, utilize.
4         So we -- when we receive a FOIA
5  request, oftentimes, we are searching for paper
6  and electronic records.  We simply don't have
7  access to all that.
8         Now, if for some reason I did have
9  access to a record because maybe that record has
10  been requested by another individual previously,
11  we would have access.  I would not be invoking
12  unusual circumstances because I already have
13  access.  I'm just going to review it and release
14  it again, if that makes sense.
15      Q   So the office has access to records
16  that have been previously requested?
17      A   Correct.
18      Q   And if those records get requested a
19  third time, then they have to get posted
20  publicly?
21      A   We are supposed to post them, correct.
22      Q   So really the only time that I can tell
Page 60

1  best way I can put this is that we define a
2  complex case by any time that we feel it's going
3  to take us more than a month to process records.
4  The reason for that is, the records may involve a
5  high volume.  If we have hundreds of pages or
6  thousands of pages for review, we're not going to
7  be able to produce it within 30 days.  So
8  anything that takes us longer than 30 days, we
9  deem that to be complex.
10      Q   Now, when you say in the FOIA office,
11  are you talking about, like, physically, like,
12  sitting in the FOIA office?
13      A   Yes.  So I may need you to clarify,
14  though, what you're asking me.
15      Q   Like, I'm curious about, like,
16  electronic documents.  So, like, you know --
17  like -- well, I don't know.  What do you mean --
18      A   Sure.
19      Q   -- by in the FOIA -- like, when is
20  something located in the FOIA office?
21      A   Sure.  So in my office, we do not have
22  access to the hundreds of IT systems that DEA
Page 59

1  that a record's going to be located in the FOIA
2  office and not made available to the public is
3  the second time that document is requested?
4      A   I'm -- I'm sorry.  I'm not following
5  that one.  You may have to ask the question
6  again.
7      Q   Well, you've testified -- and correct
8  me if I'm wrong.  You've testified that the FOIA
9  office doesn't have access to basically DEA writ
10  large documents, true?
11      A   That is true.
12      Q   In fact, it has access to surprisingly
13  few documents, fair?
14      A   We do not have access to the majority
15  of records that are requested by the public.  We
16  have to rely on the owners, the offices that own
17  those records to retrieve them for us, to provide
18  them to us so that we can process them and
19  release them to a requester.
20      Q   Well, when you say you own the records,
21  well, how does one part of DEA own a record that
22  the other part of -- like where does this concept
Page 61

16 (Pages 58 - 61)

1   of ownership come from?
2       A   So we have, for example, I believe
3   somewhere around 150 different IT systems in DEA
4   that hold records.  If you work, let's say, in
5   the Office of Diversion, you may have your own
6   record systems.  We are not experts in how those
7   systems operate, or we would not even have the
8   knowledge on how to obtain access to the records
9   that are in those systems.  There are hundreds of
10  systems.
11      So we have to again rely on the subject
12  matter experts in DEA from the, you know,
13  hundreds of offices that we have to locate what
14  we're asking for.  We send them a copy of the
15  FOIA request and a search memo, and -- and we ask
16  them to provide the material to us, responsive
17  material to us.
18      Q   And that's not unusual, is it?
19      A   No.  We do this every day.
20      Q   Right.  So those aren't unusual
21  circumstances.  Those are the -- almost always
22  the circumstances?

Page 62

1       A   Well --
2           MR. RODRIGUEZ:  Objection.  Calls for
3   legal conclusion, but you can answer.
4           THE WITNESS:  The only time we're going
5   to assert unusual circumstances is if I have to
6   go outside of my office, meaning I do not have
7   access in my own records system.
8           I utilize one system.  It's called
9   FOIAXpress.  This houses everything from start to
10  finish of every FOIA case.  If I don't have
11  access to those records in that system, I then
12  have to go to the record custodian or the
13  division that owns the material to get it.
14  BY MR. ZORN
15      Q   And the only way you would have access
16  to that record in FOIAXpress is if you've gotten
17  that record previously?
18      A   That exact request and exact timeline
19  previously.
20      Q   How physically big is your office?
21      A   Are you talking about like --
22      Q   I --

Page 63

1       A   -- personnel size, like --
2       Q   And I --
3       A   -- personnel --
4       Q   And just to be clear, sensitive to
5   national security, I don't want to know, like,
6   the location or anything.  I just want to know,
7   like, how big is it physically.
8       A   I don't know that I know the answer to
9   how large it is, but I can tell you that right
10  now, in terms of staff size, I have 18 employees.
11  So there are 18 employees including myself right
12  now.  We have a large number of staff vacancies
13  right now.  I currently have 20 vacancies that
14  I'm trying to get filled.
15      Q   Okay.  And -- and to be clear, those
16  employees, they have, like, physical, like,
17  office locations, cubicles?  Like, what is it
18  that they --
19      A   Cubicles, or pods, as we call them.
20      Q   And they don't actually, like, keep
21  stacks of, like, records in their offices, do
22  they?

Page 64

1       A   No.
2       Q   So when you -- so the records in the
3   FOIA office are almost exclusively the records in
4   FOIAXpress, fair?
5       A   Correct.
6       Q   And I'm not trying to repeat, but I
7   just -- the only time a record is in the FOIA
8   office if it is in FOIAXpress, right?
9       A   Correct.
10      Q   And the only time a record is in
11  FOIAXpress is if it's been previously requested?
12      A   Correct.
13      Q   And that's because the DEA FOIA office
14  doesn't have access to any of the other systems
15  in which DEA keeps documents, fair?
16      A   That is correct.
17      Q   Okay.  Does -- you know, by any chance,
18  do you know why the DEA FOIA office doesn't have
19  access to these other systems?
20      A   I don't know if I can answer the
21  question as to why, but I can tell you again, we
22  are not the subject matter experts in all the

Page 65

17 (Pages 62 - 65)

1  various things that DEA does.
2      So if I had to, for example, go to the
3  Office of Diversion to pull material -- I mean,
4  we would have to become experts in all the
5  various offices, their records systems.  You
6  know, we'd have to have a thorough understanding
7  of the content of those records.  That is just
8  not feasible with a staff of 18.  We -- we are
9  struggling as it is to keep up with the sheer
10  volume of FOIA requests that come to DEA, so we
11  again have to really rely on the subject matter
12  experts to provide what we are asking them to
13  provide, you know, the material responsive to
14  these FOIA requests.
15     Q   Would it -- would it help if the FOIA
16  office were allocated more money?
17     A   Right now, what we need is staff.  We
18  need to fill our vacancies.  I think our budget
19  is fairly adequate.  However, we are struggling
20  right now with the lack of personnel resources.
21     Q   Well, everyone, DEA's hiring, so -- but
22  back -- back to this.  Okay.

Page 66

1  the DEA Museum.
2      Q   Never been to the museum.  Don't know
3  what's in there.
4      So -- so -- hold on.  So -- okay.  So
5  Stacey -- what was --
6     A   Strayer.
7     Q   Strayer.  And do you know where this
8  understanding of unusual circumstances came from?
9     A   Well, it is captured in the DOJ FOIA
10  regulations, which can be found at 28 -- excuse
11  me -- 28 CFR part 16.  It defines unusual
12  circumstances.
13     Q   How does it define unusual
14  circumstances?
15     A   There are three prongs to this.  The
16  first prong is the one that will primarily invoke
17  at DEA, which is any time that we need to search
18  for records that are physically outside of our
19  own office, we would invoke unusual
20  circumstances.
21      For example, we have offices all over
22  the country are, 200 and -- 239 offices across

Page 68

1      So this understanding of unusual
2  circumstances, was that in place when you became
3  the chief FOIA officer --
4     A   Yes.
5     Q   -- in 2017?
6     A   Yes.
7     Q   And who was the chief before you?
8     A   It was a gentleman by the name of
9  Stacey Strayer.
10     Q   All right.  And how long have you been
11  working in DEA FOIA?
12     A   In FOIA, since 2017.
13     Q   Didn't you work in records before that?
14     A   So -- yes.  I used to be the section
15  chief over FOIA, records management and
16  investigative records.
17      After I had been in this role for two
18  years, I had -- I wrote a proposal asking upper
19  management to split our section.  I wanted to
20  basically turn FOIA into a section with three
21  units, which we did.  And we hired someone else
22  to run records, investigative records, and now

Page 67

1  the United States that are part of 23 field
2  divisions.  We don't have access to their
3  records.  We have to rely on the owners to
4  provide the material to us.  So we primarily
5  invoke it for the first prong.
6      There are two other prongs, one being
7  any time that we have to consult with other
8  agencies that may have equities in the documents.
9  That also would qualify under the unusual
10  circumstances.
11     Q   Well, so -- and I want to break down
12  your answer there because -- and you've read the
13  FOIA statute, right?
14     A   Yes.
15     Q   It uses the word "establishments,"
16  right?
17     A   Uh-huh.
18     Q   Like establishments separate from the
19  office processing the request?
20     A   Yes.
21     Q   And it talks about field offices as
22  well.  So --

Page 69

18 (Pages 66 - 69)

| | |
|---|---|
| 1   A  Yes. | 1   A  It would apply.  And if I could share |
| 2   Q  -- different physical locations | 2  one more example. |
| 3  elsewhere in the country, that -- let's put that | 3   Q  Sure. |
| 4  into one bucket.  Do you follow me? | 4   A  We have some offices that are part of |
| 5   A  Yes. | 5  headquarters that are not physically located in |
| 6   Q  But as I understand what you're -- | 6  the same buildings as the FOIA office.  They are |
| 7  where -- where is -- like what building is the | 7  located in other parts of Virginia. |
| 8  DEA FOIA office in? | 8       For example, our Information Technology |
| 9   A  We're part of DEA headquarters in | 9  Division.  If I get a FOIA request specifically |
| 10  Arlington, Virginia. | 10  for e-mail records, I cannot access anyone's |
| 11   Q  Okay.  And there other DEA divisions | 11  e-mail records.  I have to rely on the |
| 12  that are physically in headquarters, right? | 12  Information Technology Division to do that |
| 13   A  That is correct. | 13  search.  They are physically located outside of |
| 14   Q  And the way I understand what you're | 14  headquarters in another part of Virginia.  They |
| 15  saying is that the agency interprets unusual | 15  are the office that would provide those |
| 16  circumstances to mean -- across the hallway is | 16  responsive materials to us. |
| 17  unusual circumstances if that's not the DEA FOIA | 17   Q  Is that the Morrissette building? |
| 18  office; is that fair? | 18   A  No.  That's -- that's actually our |
| 19   A  Yes. | 19  mailing address.  So that's -- that's not |
| 20   Q  Okay.  So if I had a -- if I took my | 20  where -- that's not our physical address. |
| 21  outline here and walked across the hallway and | 21   Q  But that's a building that you're |
| 22  put it in someone else's office and that person | 22  referring to in Northern Virginia? |
| Page 70 | Page 72 |

| | |
|---|---|
| 1  worked in some other division, we're now in -- | 1   A  It is a building in Northern Virginia. |
| 2  in -- we're now outside the FOIA office, right? | 2   Q  Right.  That's like 30 minutes away |
| 3   A  Uh-huh.  Correct. | 3  from headquarters -- |
| 4   Q  Okay.  And that's like 10 feet away. | 4   A  Uh-huh. |
| 5   A  Correct. | 5   Q  -- or less, right? |
| 6   Q  Is that fair? | 6   A  But that is not where the Information |
| 7   A  Correct. | 7  Technology Division is located -- |
| 8   Q  Okay.  So this is a game of inches, | 8   Q  Okay.  Well -- |
| 9  right? | 9   A  -- no. |
| 10      MR. RODRIGUEZ:  Objection. | 10   Q  -- we don't need to get into -- |
| 11  Argumentative. | 11   A  Right. |
| 12      MR. ZORN:  Okay. | 12   Q  -- specifically where it is, but it's |
| 13      MR. RODRIGUEZ:  You can answer. | 13  in the same state, though, right? |
| 14      MR. ZORN:  No.  I withdraw the | 14   A  In the same state. |
| 15  question. | 15   Q  So -- but obtaining those records from |
| 16  BY MR. ZORN: | 16  the IT Division is -- is done over the Internet, |
| 17   Q  You -- any -- any time you venture -- | 17  true? |
| 18  no matter how far outside the FOIA office one is, | 18   A  It is done through an electronic means. |
| 19  whether cyberspace or physically, if you are | 19   Q  So no one's physically going down and, |
| 20  outside the FOIA office but in the same building, | 20  like, picking up, like, a box of records or even |
| 21  you're -- the unusual circumstances applies, | 21  a USB drive, right? |
| 22  according to the agency? | 22   A  Not for e-mail records, no. |
| Page 71 | Page 73 |

19 (Pages 70 - 73)

1    Q   Okay.  So it's really, you know -- and
2  maybe you can't answer this -- but it's not any
3  more or less convenient than if it were in the
4  same building, because it's transmitted the same
5  way, right?
6    A   The process would be the same if they
7  were physically located inside of our -- meaning
8  a part of headquarters in Arlington.
9    Q   Right.  So would you say that -- that
10  invoking the unusual circumstances would be
11  necessary to process a request that was
12  electronically transmitted outside versus one
13  that would be electronically processed inside?
14    A   Correct.
15    Q   There's no, like, additional cost or
16  time based on where the documents are located if
17  the transfer is going to be electronic; is that
18  fair?
19    A   That's fair.
20    Q   But there is -- there is an access
21  concern, and that's kind of what you've been
22  testifying about, right?  Like you personally --

Page 74

1  sorry.  Let me -- let me just -- I'll just strike
2  all that, and let me reask the question.
3         Like you, Ms. Miller, can't access
4  those records, right?
5    A   Correct.
6    Q   You need to reach out to another
7  division within DEA to get access to the records,
8  right?
9    A   Correct.
10    Q   And that necessarily takes additional
11  time, right?
12    A   It takes time.  It does.
13    Q   So there is a -- and you did not create
14  that process, did you?
15    A   The search process?
16    Q   Well, just even the way this is
17  structured.  Like, that was in place when you got
18  there.
19    A   That was in place when I arrived.
20    Q   Right.  So -- and so that wasn't like a
21  design choice that Ms. Kelleigh Miller made about
22  the way DEA keeps its records, right?

Page 75

1    A   No, it was not.
2    Q   And maybe it just grew over time; fair?
3    A   I just want to make sure I'm following
4  the line of questioning here.
5         So if we're talking about the vast --
6  like the sheer volume of record systems that are
7  out there, yes, we do -- we do not -- I did not
8  create that, right?
9    Q   Right.
10    A   But, again, I don't -- we do not -- the
11  FOIA office does not have access to the material
12  that is in all of those 150-plus systems.
13    Q   So do you happen to know when DEA
14  adopted this interpretation of unusual
15  circumstances?
16    A   We have been following this for --
17  again, we follow the DOJ FOIA regulations.  All
18  of the components under DOJ are following the
19  same regulations.
20         So our interpretation and OIP's
21  interpretation of the statute is that if we have
22  to -- if we do not have access to the records, we

Page 76

1  have to go, you know, physically outside of our
2  office to gain access to those records, we would
3  invoke unusual circumstances.
4    Q   So this is not a DEA policy.  It is a
5  Department of Justice --
6    A   Department-wide.
7    Q   Okay.  So this is -- the entire
8  Department of Justice, it is its position that if
9  a record is outside the FOIA office that unusual
10  circumstances applies?
11    A   Correct.
12    Q   That's -- the United States Department
13  of Justice is taking that -- that position under
14  oath today in this -- this room?
15    A   We have consulted with OIP on this
16  issue, and their position is that, yes, if it is
17  outside of our own office -- again, we don't have
18  access to the material.  We have to rely on
19  offices across DEA -- that unusual circumstances
20  does apply.
21    Q   And, again, I'm not suggesting that
22  anyone at DEA intentionally structured the office

Page 77

20 (Pages 74 - 77)

BY MR. ZORN
Q    Okay.  So -- so forgetting about how --
how records are filed and just talking about
records that have already been filed in these
administrative proceedings, you say that those
are kept in the ALJ offices; true?
A    Yes.
Q    And how does the public access those
records?
A    They would have to file a FOIA request.
Q    And the only way a public -- a member
of the public can get access to those records is
by filing a FOIA request; true?
A    Yes, with the exception of things like
the -- any decision or order by the
administrative law judge is posted on DEA.gov, so
that information is accessible to the public, but
anything beyond that, we would -- they would have
to submit a FOIA request to DEA for --
Q    So --
A    -- access.
Q    And we've established that these FOIA

Page 86

requests -- that -- that request would
necessarily raise unusual circumstances, true?
A    It would.
Q    So we're talking about more than 30
days to deliver that request?
A    Yes.
Q    So I want to -- I want to kind of
construct a hypothetical, and I'm going to ask if
you follow me.  I -- I represent client A.
Do you follow me?
A    Uh-huh.
Q    I'm in a --
A    Yes.
Q    -- DEA administrative proceeding.
Do you follow me?
A    Yes.
Q    The administrative law judge sets a
timed hearing three months from now.
Do you follow me?
A    Yes.
Q    And I believe that there is a useful
record in a prior administrative proceeding that

Page 87

will help my client -- I don't know -- escape
charges from the DEA.
Do you -- do you follow me?
A    Yes.
Q    Okay.  I can't get those records any
other way except through FOIA, right?
A    That is correct.
Q    But the likelihood I'm going to get
that record before the hearing is slim, right?
A    Depending on, again, the volume and the
complexity and what's being asked, I mean, I
probably would be difficult to produce in 30
days.
Q    In fact, it's almost -- are you
familiar with how these administrative hearings
work?  If you're not, then --
A    I'm not an expert in this, no.
Q    Okay.  Well, let's assume from a
hypothetical that the administrative law judge
requires each side to declare their evidence
within 90 days of the hearing.
Do you follow me?

Page 88

A    Uh-huh.
Q    So now we're talking a month and a half
of getting -- getting records that I believe are
going to exculpate my client.
Do you follow my hypothetical?
A    Yes.
Q    There's -- there's almost no way that I
can get any of those records from the ALJ's
office, is there?
A    Not directly from the ALJ's office, no.
Q    No.  And if I ask -- well, so I'd have
to file a FOIA request with your office?
A    Yes.
Q    Your office is going to say there are
unusual circumstances; true?
A    Uh-huh.  Yes.
Q    And it's going to take more than 90
days for me to get those records; true?
A    Yes.  I would say it's definitely going
to take more than 30 days.
Q    Okay.  And you're going to -- if I'm
representing a client that isn't the news media

Page 89

23 (Pages 86 - 89)

1    was -- I gave this presentation publicly.  So
2    there's no reason for me to at that point, right,
3    review and determine do I need to place
4    exemptions.  We released everything to you in
5    full.
6        Q   Right.  And so I'm saying, wouldn't
7    that same process apply to documents filed
8    publicly in an administrative proceeding?
9        A   Generally, yes, but, again, we'd have
10   to identify -- we have to be able to identify
11   which records have been publicly filed.
12       Q   And there's no -- there's no way to
13   identify that?
14       A   It's part of the -- it's part of the
15   review process, yes.
16       Q   And that's because the administrative
17   law judge's office doesn't put any, like, marker
18   on the documents, right?
19       A   I can't say a marker, but we probably
20   would be having a conversation with them about
21   which records were publicly filed.  That would be
22   part of that review process.

Page 94

1        Q   Has anyone ever just -- and you may not
2    know this, but just in your personal knowledge,
3    if Jimmy will give me the latitude, I mean, has
4    anyone ever discussed, like, this issue with them
5    of, like, the records that they keep in making
6    filings, like, straightforward to request since
7    the only way to get them is through FOIA?
8        A   Again, I'm not sure I'm following the
9    question.  I'm sorry.
10       Q   Well, it sounds like that the reason --
11   and just correct me if I'm wrong -- the reason
12   that your office needs to review these documents
13   is because you can't look at the document on its
14   face and determine if it was a public filing,
15   right?
16       A   That is generally true, right.  We need
17   to rely on the -- again, the experts, the subject
18   matter experts to tell us, has this been publicly
19   filed.
20       Q   Right.  And so I noticed in the
21   notes -- and that's one of the documents I have
22   selected today -- but you spoke to Ms. Cotter,

Page 95

1    who's a judicial law clerk for ALJ Wallbaum,
2    correct?
3        A   I spoke to Cotter?
4        Q   Sorry.  Some FOIA -- the FOIA staff
5    spoke to Ms. Cotter in response to one of my
6    requests to discuss psilocybin, and she is a
7    judicial law clerk in the ALJ's office for
8    Ms. Wallbaum.  If you don't recall now, we'll get
9    the document out --
10       A   Yeah, I don't recall.
11       Q   -- and it will be -- it will be better
12   to do it that way.
13           But -- but more generally, your office
14   will interface with the ALJ's office --
15       A   Yes.
16       Q   -- and then ask them if these were
17   public or not.  Is that a fair --
18       A   That is correct.
19       Q   And that's just -- if they had
20   something on the document that said this was
21   filed, you wouldn't need to do that --
22       A   Correct.

Page 96

1        Q   -- would you?  Okay.
2            So -- well, that answers that.  Okay.
3            So -- and there's no -- there's no
4    electronic filing system that you're aware of for
5    the DEA administrative proceedings, are there --
6    is there?
7        A   I am not intimately familiar with their
8    system, but I know they have an electronic system
9    that they utilize that's fairly new, and they
10   also maintain a large number of records at the
11   Federal Records Center.
12           So, oftentimes, when we're sending FOIA
13   requests to their office, they have to pull those
14   from the Federal Records Center for us, the paper
15   files.
16       Q   Okay.  And -- but are you aware of --
17   there's no, like, electronic -- when you're
18   talking about getting records, you're asking them
19   to collect the records for you, right?
20       A   Correct.
21       Q   There's no way for you to log into any
22   system and get the records for yourself, right?

Page 97

25 (Pages 94 - 97)

1     A    That is correct.
2     Q    And is there any -- any office within
3   DEA that -- that -- that -- where you can just
4   log in to some document system and get the
5   documents for yourself?
6     A    We can in one circumstance, and this
7   generally has to do with our investigative
8   matters, which is somewhat sensitive, so I won't
9   give a lot of detail.  But my staff does have
10  access to those, and we can generally handle
11  certain types of requests for investigative
12  matters quicker.
13    Q    Right.  But there's no system where --
14  well, okay.  Let me -- let me then take a step
15  back.
16         Who -- when a FOIA request comes in and
17  you need to go to another office -- do you follow
18  me?
19    A    Yes.
20    Q    You reach out to that office.  Is
21  that --
22    A    We send them what we call a search memo

Page 98

1     Q    And potentially more complete, right?
2     A    Correct.
3     Q    In fact, you know, is there -- is there
4   any agency mechanism to check to see if a
5   records -- a custodian of records accurately gave
6   you the -- the right set of records?
7     A    Well, this is exactly why my preference
8   has been to go to the Information Technology
9   Division.  I do not -- as of now, I don't rely on
10  the individual to pull their own records.  I
11  don't believe that it's -- it's as accurate.
12    Q    Yeah.  And has that actually been the
13  FOIA office's experience that it sometimes isn't
14  accurate?
15    A    That has -- we have had some -- some
16  issues, minor issues in the past with this.
17    Q    Has there ever -- I'm getting a little
18  far afield here, but has there ever been an
19  instance where the records were omitted without
20  cause?
21    A    So I cannot think of a specific
22  instance of this, but, again, I think if we allow

Page 100

1   along with a copy of the request letter, and
2   sometimes we, you know, even specifically tell
3   them what we're looking for.
4     Q    Right.  And then that office is the
5   office that does the search for responsiveness.
6   Is that fair?
7     A    Correct.
8     Q    Like, the FOIA office isn't the one
9   that actually determines the initial set of what
10  records are responsive?
11    A    Generally, no.
12    Q    So if I wanted Theresa Carbonaro's
13  e-mails -- do you follow me?
14    A    Yes.
15    Q    Theresa Carbonaro's going to be the one
16  searching her own e-mails, right?
17    A    Potentially, yes, but we will go to
18  the -- generally, we will go to the office of --
19  I'm sorry -- it's the Information Systems
20  Division -- to have them do the e-mail search
21  because we believe that the search would be more
22  accurate if we let the IT experts do it.

Page 99

1   a tool, an IT tool to do the work for us, it will
2   be much more accurate than letting a human do it.
3     Q    Okay.  But right now there is some --
4   still some human element to this collection
5   process, correct?
6     A    For things that are outside of e-mail.
7     Q    Okay.  Where was I?
8         MR. RODRIGUEZ:  I think we were done.
9         MR. ZORN:  I'm learning -- I'm learning
10  so much here.  I was looking -- okay.
11  BY MR. ZORN:
12    Q    So -- so, you know, I do want to look
13  here at Topic 3C.  I believe A and B have been
14  covered.
15    A    Pardon me.
16    Q    No, it's all good.
17    A    I just dropped something.  I'll get it.
18        MR. RODRIGUEZ:  So I have a hard copy
19  of the notice, and I'm going to let the witness
20  look at it.  I think it's just --
21        MR. ZORN:  I have no objection to that.
22        THE WITNESS:  Thank you.

Page 101

26 (Pages 98 - 101)

1  BY MR. ZORN

2     Q    So the percentage or proportion of FOIA

3  requests that were marked by DEA as raising

4  unusual circumstances in 2020, 2021 and 2022,

5  we're going to pull up the document, the FY

6  documents that were produced, but I just want to

7  be clear about my thinking in this, which is --

8  so complex is not necessarily unusual

9  circumstances?

10    A    Close proxy, but not necessarily,

11  because, again, these definitions are very

12  different.

13    Q    Okay.  And let's just skip to D, then,

14  which is -- so the only time a request isn't

15  going to raise unusual circumstances is when that

16  document is in the FOIAXpress?

17    A    That's one example, and then we have

18  other types of requests.

19        Like if we already know upon receipt of

20  the request that we would not have access to

21  that, or maybe a member of the public is asking

22  for records that DEA simply does not maintain --

Page 102

1  that's one example -- we're not going to assert

2  unusual circumstances.  We're simply going to try

3  to cut a letter and get it out to the requester

4  as fast as possible to inform them that we don't

5  have -- you know, we don't maintain records on

6  this topic.

7     Q    And I've asked this question, but I

8  think I want to drill down on it.  So when is the

9  unusual circumstances determination made?

10    A    When?  It's made -- so when a request

11  comes in through our intake unit -- intake

12  handles that -- you know, that -- the beginning,

13  basically, the initial process of reviewing a

14  request, determining that, you know, we're ready

15  to move forward with a search.

16        So they're -- if they determine that we

17  have to go outside of our own office -- we don't

18  have access to those records in our system -- we

19  then -- they will invoke the unusual

20  circumstances.

21        So they send an acknowledgment e-mail

22  to the requester, and within that acknowledgment,

Page 103

1  they will tell them that we are invoking unusual

2  circumstances, and they tell them why, because we

3  have to go outside of our own office.

4     Q    And it's a -- it's a totally binary

5  determination in the sense that if it's one

6  document somewhere else, it's the same as 100

7  documents somewhere else, right?  The --

8     A    Yes.

9     Q    The actual burden of -- of what's being

10  requested is not evaluated except where the

11  documents are, right?

12    A    Could you ask that again?  I'm sorry.

13  I want to make sure I'm following.

14    Q    Okay.  So the -- the -- it's -- it

15  doesn't -- the agency doesn't evaluate how

16  burdensome it would be to produce records or,

17  frankly, even just make a determination as to

18  whether it will produce records.  The only

19  determination is:  Where are the records?

20    A    No, that is not accurate.  I think that

21  we do -- we do consider how burdensome a request

22  is.

Page 104

1        And I'll -- just to share an example,

2  we use what we call multi-track processing.  So

3  let's say we've invoked unusual circumstances.

4  We've collected the records.  We will designate

5  requests based on, basically, three categories,

6  whether it's simple, complex or expedited.  So if

7  something has been granted expedited treatment,

8  we have to prioritize those.  We're generally

9  working to get these requests completed first,

10  right?

11    Q    Sure.

12    A    Requests are generally handled in a

13  first-in, first-out basis based on the queue that

14  we've placed them in, but simple requests, I

15  mean, I do not want to have a one or two-page

16  response sitting in a queue for a year, right?

17  That is not helpful to the public.

18        So we have set up particular buckets or

19  queues, if you will, so that the management team

20  and I can keep eyes on these and we can get these

21  out faster.  So even if we had to invoke unusual

22  circumstances and I get two pages back from the

Page 105

27 (Pages 102 - 105)

1    field, it's going in a queue so that I know I
2    need to get these out.  These are -- these are
3    small cases.  We don't want to be hanging on to
4    those.
5       Q   So two pages from the field, that's
6    unusual circumstances?
7       A   It would be, because, again, we don't
8    have access to the system the material is housed,
9    and we need to rely on them to provide it to us
10   for processing.
11      Q   And we can agree that the unusual
12   circumstances determination isn't about searching
13   or collecting records.  It's about whether or not
14   the agency will produce records, right?
15      A   I don't think that's accurate, no.
16      Q   Well, there's -- there's -- there are
17   different parts of the FOIA process.  There's the
18   determination at the beginning of whether or not
19   the agency is going to search and collect
20   records, right?
21      A   So that would happen at the intake
22   stage.

Page 106

1       Q   Right.
2       A   We receive a request.  The staff has
3    reviewed the request thoroughly, and they
4    determine it's time to conduct a search.  So we
5    send a search memo out to whichever office would
6    own the material being requested.
7       Q   Right.
8       A   And that's the first process -- the
9    first step.
10      Q   Right.  And -- but -- but -- sorry.
11   I'm cutting you off.  That's rude.
12      A   No, you're fine.
13      Q   Okay.  I just -- I want to go to, like,
14   in the statute what the unusual circumstance
15   is -- and I don't know want if you want to pull
16   the statute up.  That was -- it was, what,
17   Exhibit FOIA?
18      A   Uh-huh.
19          MR. RODRIGUEZ:  I'm going to object
20   probably that you're asking for a legal
21   conclusion.  I think we've established what the
22   DEA's practice is and that she's testified

Page 107

1    that in consultation with the OIP that -- when
2    DEA invokes unusual circumstances.
3           I understand you -- you strongly
4    disagree whether that's appropriate under the
5    statute, but I think that we're --
6           MR. ZORN:  Well, I'm --
7           MR. RODRIGUEZ:  I don't want -- I don't
8    want you to try to get her to concede a legal
9    point.
10          MR. ZORN:  I'm not asking a legal
11   question here.  I'm trying to use the statute to
12   illustrate what exactly is being deferred when
13   the unusual circumstances is being invoked.
14   BY MR. ZORN
15      Q   And, like, it's the -- it's like a
16   determination on the FOIA request, right?  It's
17   not the actual production of records.
18          In other words --
19      A   It's not the actual production.  It's
20   simply the fact that I have to go search for
21   those records --
22      Q   Right.

Page 108

1       A   -- outside of my own office.  Once
2    those records are collected, it then moves on to
3    a different unit.
4           The processing unit is now reviewing
5    for responsiveness, determining what's
6    releasable, you know, to the requester under the
7    FOIA, placing redactions on records.  So that's
8    what that team does.
9           But intake is doing the initial -- you
10   know, they're the ones that are invoking unusual
11   circumstances, if that's what you're asking.
12      Q   Yeah, and -- but I'm saying what --
13   what is the -- what timeline here is getting
14   extended?
15          It's not like -- the agency, whether
16   unusual circumstances apply or not, can frankly
17   take its time reviewing records and producing
18   records.  What's being extended when the
19   exception is invoked is the determination on,
20   okay, here's how much you need to pay me to get
21   me to search -- sorry -- to get me to review
22   these records, right?

Page 109

28 (Pages 106 - 109)

1     A     This is the DEA's FOIA and Privacy Act
2   policy, internal policy.
3     Q     So this is -- this is an internal
4   policy of DEA, true?
5     A     Yes.
6     Q     Okay.  And at the top of the first
7   page, it says:  This document and its contents
8   are the property of the Drug Enforcement
9   Administration and may not be disseminated
10  outside DEA (or if loaned outside of DEA, further
11  disseminated) without the express written
12  permission of the Office of Chief FOIA counsel.
13        Did I read that correctly?
14    A     My -- the last little bit there, Office
15  of Chief Counsel, yes.  Yeah.
16    Q     And so what's -- what's the purpose
17  of -- well, let me take a step back.
18        Is this the complete document, or is
19  this a chapter in a larger document?
20    A     This is a policy that can be found in
21  our administrative manual.  So it's a -- it's a
22  subsection, if you will, of the admin manual.

Page 114

1     A     Yes.
2     Q     Do you know where this document is
3   published?
4     A     When?
5     Q     Where?
6     A     Oh, where.  I'm sorry.  This is
7   published in the administrative manual, which is
8   accessible to all agency staff.
9     Q     Okay.  Is it accessible to the public?
10    A     It is not.
11    Q     Okay.  And you're familiar with the
12  FOIA statute, aren't you?
13    A     Yes.
14    Q     Should this be accessible to the
15  public?
16    A     It should be, and it is definitely part
17  of our list of priorities and things that we
18  would like to get published.
19        Due to the lack of resources I have
20  right now and our primary focus being just able
21  to fulfill FOIA requests, we've had struggle
22  getting policies and other things posted, but it

Page 116

1     Q     Okay.  And have you read that admin
2   manual before?
3     A     Yes.
4     Q     Okay.  And is this header across the
5   entire manual?
6     A     It's across all manuals --
7     Q     Okay.
8     A     -- in DEA.
9     Q     Okay.  And are those manuals that
10  instruct staff members on how to carry out their
11  jobs and duties?
12    A     That is correct.
13    Q     Okay.  And you would agree that this
14  portion of the manual relates to FOIA requests
15  and processing of FOIA requests, correct?
16    A     That is correct.
17    Q     And, inherently, a FOIA request is
18  responding to a request made by a member of the
19  public, true?
20    A     True.
21    Q     And so responding to FOIA requests
22  affect the public, right?

Page 115

1   is definitely a goal of ours.
2     Q     Okay.  So disseminating this particular
3   chapter outside of DEA shouldn't raise any agency
4   concerns, right?
5     A     In my opinion, it should not.
6     Q     Okay.  Because it's not a confidential
7   document because the FOIA presumably makes it
8   public, right?
9     A     If this were to be requested by the
10  public, we would produce it.  Second to that,
11  like I mentioned, my goal would be to eventually
12  publish this and other administrative policies
13  online.
14    Q     And that would be a simple request now.
15  Because of my litigation, it's in the FOIAXpress
16  database, right?
17    A     Are you saying if I were to get a
18  request for this right now, I would consider it
19  simple?
20    Q     Yes.
21    A     So how we define simple and complex,
22  again, right --

Page 117

30 (Pages 114 - 117)

1     Q    And let me qualify this by -- like if
2  you discussed with, like, an attorney, I don't
3  want to run into privilege issues.  I'm really
4  more talking about, like, chief FOIA officer
5  counsel type discussions.  So --
6     A    Yes.
7     Q    -- like, has this ever been discussed
8  in, like, meetings sort of at DOJ?
9     A    If you're talking about the definition
10 of unusual circumstances, yes, I have discussed
11 this with an attorney at OIP.
12    Q    And I don't -- I can't ask you about
13 the contents of those discussions, so I won't,
14 but you have -- this has been discussed?
15    A    It has been discussed.
16    Q    Was it -- and now I'm just asking when.
17 Was it discussed before or after I filed this
18 lawsuit?
19    A    After.
20    Q    Okay.  And so you have been in touch
21 with OIP since I filed this lawsuit?
22    A    Yes, I have.

Page 122

1     A    Yes.  Their interpretation is the same
2  as mine.
3     Q    Okay.  Let's move on to something else.
4        MR. RODRIGUEZ:  And to be clear so -- I
5  think it will head off maybe any future issue.
6  It was a communication with an attorney at OIP,
7  and so we would consider the details of the
8  communication to be privileged.  I just didn't
9  want you to turn around and ask me like, where is
10 that?  It exists.
11       MR. ZORN:  Yeah.
12       MR. RODRIGUEZ:  It was via e-mail, or
13 at least I've seen an e-mail.
14       MR. ZORN:  I think it's -- I think it's
15 privileged, so I'm not --
16       MR. RODRIGUEZ:  Okay.
17       MR. ZORN:  From what I've heard, it
18 sounds --
19       MR. RODRIGUEZ:  Yeah.  There's no
20 issue.
21       MR. ZORN:  -- sounds privileged, and
22 I'm not -- I'm not going to go into the contents

Page 124

1     Q    Okay.  And so OIP is aware of this
2  lawsuit?
3     A    I have informed them that -- I'm trying
4  to remember how the conversation started.
5        I was -- I went to them to get clarity
6  on the definition of unusual circumstances.  I
7  wanted to make sure that our interpretation was
8  the department's interpretation.  So that was
9  the -- so I reached out to them, obviously, after
10 the lawsuit was filed to get clarification on
11 this.
12    Q    Oh, so, I mean, you're here
13 representing the Department of Justice, and the
14 Office of Information Policy has confirmed that
15 this is the Department of Justice --
16    A    Yes.
17    Q    -- policy?
18       And by "this," I mean the
19 interpretation --
20    A    The --
21    Q    -- we've been discussing of unusual
22 circumstances.

Page 123

1  of it.  There might be some argument under FOIA
2  that it isn't, but I'm not -- I'm not going to go
3  there.
4  BY MR. ZORN:
5     Q    Okay.  Why don't -- why don't we talk a
6  little bit about fees.  I'm interested in how
7  fees are calculated.
8        So I'll start with that, which is just
9  an open ended:  How are fees calculated?
10    A    We, like I mentioned earlier, do not
11 charge search fees any longer.  It's very rare
12 for us to charge search fees due to the statutory
13 time limits.
14       Review fees, however, are charged only
15 to commercial use requesters.  So when we receive
16 a request and we've determined that it is, in
17 fact, commercial use, we will continue to -- we
18 will do the search, collect the records.
19       Once the records come back, we -- the
20 staff has a little calculation that we file to
21 determine how long the review time is going to
22 take, you know, what the labor hours are going to

Page 125

32 (Pages 122 - 125)

1  be, and then we follow the fee provision that's
2  in the DOJ FOIA regulations, which says that we
3  charge $40 per hour.
4       MR. ZORN:  Okay.  And so I've
5  introduced an exhibit.  It's annotated, and
6  it's -- it should be in the folder as 10A.
7       THE WITNESS:  Okay.
8       MR. ZORN:  And we can pull this up.
9       (Deposition Exhibit Number 10A
10      was marked for identification.)
11  BY MR. ZORN:
12     Q   When you have this up, just let me
13  know.
14     A   Yes, I do.
15     Q   So this is -- and there's highlighting
16  on the page, and I just want to be clear for the
17  record.  It wasn't produced to me with the
18  highlighting.  That's highlighting I've done to
19  help us sort of be clear on the questioning.
20      But at the top, it's "22-00585-F
21  Request Notes."
22      Is that -- did I read that correctly?

Page 126

1     A   Yes.
2     Q   And is it a fair characterization to
3  say that these are internal DEA request notes
4  from a request that I filed?
5     A   Correct.
6     Q   Okay.  And looking at the first page,
7  I've highlighted that there's 2,190 pages of
8  potentially responsive records.
9      Did I --
10     A   Correct.
11     Q   Okay.  And then -- and this isn't
12  highlighted, but it's on the next line -- seven
13  minutes per page for review.
14      Is that the standard agency seven
15  minutes per page?
16     A   That is what our office has -- uses,
17  yes, for the determination of the review time.
18     Q   Where did that number come from?
19     A   So that number came from a series of --
20  let me back up.
21      During 20- -- early 2022, I determined
22  there was a need to standardize this process in

Page 127

1  how we're calculating review fees, because I had
2  noticed some variability between teams in how the
3  staff and supervisors were calculating what they
4  believed, you know, in good faith, was -- how
5  long it was going to take them to complete a
6  review.  So I wanted to standardize this.
7      So we drafted an SOP, and I had several
8  meetings with the unit chiefs to sit down -- we
9  sat down in a room and worked together in
10  determining how long on average does it take you
11  to review a page, place redactions on a page, and
12  we came up with seven minutes on average.
13     Q   And what's an SOP?
14     A   I'm sorry.  Standard operating
15  procedures.
16     Q   Okay.
17     A   So we wanted to put a guidance document
18  together for the office in an effort to
19  standardize this process and be more transparent
20  and be consistent in how we're calculating review
21  fees.
22     Q   And -- and is that -- was that

Page 128

1  produced --
2     A   Yes.
3     Q   -- the SOP?
4     A   It was.
5     Q   Okay.  Was it titled standard
6  operating -- did I miss it?
7     A   It was, and it was titled "Calculating
8  of Review Fees."
9     Q   Okay.  So the seven minutes comes from
10  just -- was there any, like -- who -- was it --
11  how was seven minutes arrived at?  Just a guess
12  of what the average time was?
13     A   It was myself and three other managers,
14  yes, that sat together and talked through this
15  SOP, and we came up with, on average, that we
16  believe it takes us about seven minutes to
17  process a page, meaning I'm reviewing a page, I'm
18  using a tool to place redactions, place codes on
19  the document.  It's about seven minutes per page.
20     Q   Okay.  And then -- and you're not --
21  so -- so the estimate's not based on what -- how
22  long it would take to actually read a page.  It's

Page 129

33 (Pages 126 - 129)

1   just --
2      A   Oh, it's reading as well, yeah.  I'm
3   reading the page, and I'm placing redactions on
4   protected information and asserting the exemption
5   code, placing the exemption code on the document.
6   That's all part of the --
7      Q   And so I'm still kind of at a loss.  So
8   how -- you guys just agreed on seven minutes?  I
9   don't --
10     A   Yes.
11     Q   Was there any -- did you kind of like
12  do any experiments or --
13     A   We did not do an experiment, per se,
14  no.  This was a conversation over several
15  meetings, you know, in putting this SOP together,
16  and just from our -- our experience and years of
17  practice in this area, we came up with the seven
18  minutes.
19     Q   Because the difference between seven
20  minutes and six minutes is a lot -- it's a lot of
21  money when you multiply it by a lot of pages.
22     A   And, again, that's why, you know, it is

Page 130

1   an estimate.  You know, this -- this fee, it's an
2   estimate.  So we estimate that it takes, on
3   average, seven minutes.
4      Q   And three -- so three people came up
5   with this?
6      A   I think four of us.  There were --
7      Q   Four.
8      A   -- four of us.
9      Q   Okay.  And so there are multiple layers
10  of review as well, true?
11     A   Generally, it's two.  So it would be
12  the individual in our office that we assign to
13  process the case.  Then when that individual is
14  finished with the case, it moves up to a manager
15  for review.
16         So we are assessing the review fee for
17  both the professional administrative staff's time
18  and the supervisor time.
19     Q   Okay.  And -- and looking at the
20  document here, the management review time is
21  estimated to be 20 percent less than the -- than
22  the initial reviewer's time; is that fair?

Page 131

1      A   Correct.
2      Q   Why are there two levels of review?
3      A   So our subordinate staff does the
4   majority of the processing.  We have to -- it has
5   to be reviewed by a manager before we can
6   authorize release to the public, right?
7         Oftentimes, the managers, when they're
8   doing final review, myself included, are making
9   slight adjustments to those records.  Obviously,
10  if it's a lot of adjustments, it's going back to
11  the processor to finalize.
12         But, generally, a manager is tweaking
13  redactions, making sure that this has been
14  properly processed, that the redaction codes are
15  proper.  If -- if something was incorrectly
16  redacted, we're lifting redactions.  So the
17  manager is doing review work and also sometimes
18  minor corrections.
19     Q   And why is the manager 20 percent?
20     A   Because we're not doing the full
21  processing that the subordinate staff is doing,
22  right?  We're not going -- we're not placing

Page 132

1   redactions on the entire document.  That's
2   already been done.
3         When it gets to our level, we're just
4   going through the document, reading every page,
5   making sure that the redactions are correct, and
6   making adjustments if need be.
7      Q   If a manager has to review everything,
8   why even have the initial review?
9      A   Because we would then have to place all
10  the redactions, all the exemption codes.  It is a
11  lot of work.  So we have subordinate staff to do
12  that initial processing for us.  We're just final
13  review.  We're just making sure that it's been
14  properly redacted and it's ready for release to
15  the public.
16     Q   But you're charging for -- the agency
17  charges $40 per hour of -- of both the initial
18  review and the manager review?
19     A   That is correct.
20     Q   And the purpose of the initial review
21  is to save that 20 percent that's going to happen
22  with the manager review; is that fair?

Page 133

34 (Pages 130 - 133)

1  we call stop the clock.
2      So if a request is not perfected,
3  meaning there's an issue with the request and we
4  have to go back to requester, we stop the clock
5  because we don't want that counting towards
6  the -- you know, the statutory deadlines.  And
7  once, again, we've perfected the request, we --
8  we basically turn the clock back on, if you will.
9      Q    Okay.  Then to track, we've discussed
10  that?
11      A    Uh-huh.
12      Q    And so there are three tracks, right?
13  There's -- there's complex, expedited and simple?
14      A    Correct.
15      Q    Okay.  What is the expedited track?
16      A    Expedited track is any time a requester
17  requests expedited treatment and because they
18  feel there is a compelling need for the
19  information sought.
20      So there is some criteria, obviously,
21  that has to be met in order to meet the
22  compelling needs standard.  One example would be

Page 162

1  maybe an inmate on death row has asked for
2  records on themself, and, you know, we would
3  grant expedited treatment in that scenario.
4      Q    And who makes the determination
5  to grant expedited treatment?
6      A    Generally, our intake unit.
7      Q    Okay.  And is -- is a journalist making
8  a request for information -- is that given
9  expedited treatment?
10      A    They would -- we would consider the
11  request.  If they ask for expedited treatment, of
12  course, we would consider the request.  It's --
13  it's incumbent upon the requester to basically
14  tell us which standard under expedited treatment
15  they feel that they meet.
16      Q    Okay.  And, otherwise, the requests are
17  prioritized on a first-in, first-out type basis?
18      A    Generally, yes.
19      Q    So we're looking at the spreadsheet.
20  We looked at this April 2018 request.
21      That is -- that is still being
22  processed, so there's -- there's more than four

Page 163

1  years' worth of FOIA requests ahead of anything
2  that gets filed now?
3      A    I'm sorry.  I want to make sure I'm not
4  losing track of the question here.  So I've moved
5  away.  I'm at the -- I'm now at the top row.
6      Are you asking about a specific --
7      Q    I'm just --
8      A    -- entry or no?  Just generally --
9      Q    No, just --
10      A    -- you're asking --
11      Q    -- generally.  We did look -- we looked
12  at an entry, right, that was unfulfilled from
13  April of 2018, true?
14      A    Yes.
15      Q    And DEA processes FOIA requests on a
16  first-in, first-out type basis?
17      A    Uh-huh.
18      Q    Fair?
19      A    Yes.
20      Q    And that one is still being reviewed,
21  presumably, true?
22      A    The one that we looked at had to do

Page 164

1  with antitrust, so if -- but if you're asking
2  about a DEA request that's from 2018 that's still
3  open, I mean, we definitely have some requests
4  from 2018, 2019, that are open.
5      Q    Okay.  And so -- so -- well, I'm
6  looking -- I'm looking now at the -- I don't know
7  if it was antitrust.  I mean, 18-00710 is -- I
8  have it as a DEA request.
9      A    Okay.  Sorry.  We moved away from the
10  line that you were asking about.  That's why
11  we're back at the top row.
12      Q    Yeah.  Sorry.
13      A    I think it was, what, 17 --
14      Q    Yeah.  If you get to the 116166 area,
15  yeah, we have a number of requests from 2018 that
16  are -- are empty.
17      And I'll -- when you tell me when
18  you're there, I'll give you a precise question
19  and answer.
20      A    Could you kindly give me the number
21  again?
22      Q    Sure.  It's the Excel row 16167.

Page 165

42 (Pages 162 - 165)

1      A    Actually, just give me a minute.  Just
2    looking for the data.  I'm trying to get this not
3    to move so fast.
4          MR. RODRIGUEZ:  Yeah.  My --
5          THE WITNESS:  It's difficult.
6          MR. RODRIGUEZ:  The interface --
7          THE WITNESS:  I'm sorry.
8          MR. RODRIGUEZ:  -- is very jumpy on my
9    pad.  I don't usually use that.  And I brought a
10   mouse --
11         THE WITNESS:  That's okay.
12         MR. RODRIGUEZ:  -- but for whatever
13   reason, it's not working.
14         THE WITNESS:  161 --
15         MR. ZORN:  16167.
16         THE WITNESS:  67.  All right.  I'm
17   almost there.  There we go.  All right.
18   BY MR. ZORN:
19      Q    So this is a DEA request?
20      A    Correct.
21      Q    It is 18-00710.  True?
22      A    Yes.

1      Q    And it's a FOIA request, dash F?
2      A    Yes.
3      Q    Okay.  And -- and just moving to the
4    right, it's opened May 2018 and perfected that
5    same day, right?
6      A    Yes.
7      Q    And it's still open, right?
8      A    It's still open.
9      Q    And with your screen there, you know,
10   looking down the page, you can see there are --
11     A    Yes.
12     Q    -- like almost a dozen requests from
13   2018 that are still open.
14     A    Correct.
15     Q    And they're complex, so the volume is
16   probably more than -- than -- than a simple
17   request?
18     A    Right.
19     Q    And these are all still open?
20     A    Yes.
21     Q    And so in the first-in, first-out
22   system, unless a request is expedited, it's after

1    these requests in line, right?
2      A    Typically, yes.  But having said that,
3    I have set up a number of queues in the office to
4    try to flag or keep eyes on things that are
5    simple.
6          So if I have a request from 2018 and
7    it's two pages, we shouldn't have that, right?
8    We want to make sure that we're getting requests
9    out that are simple quicker.  And by doing so,
10   we've actually reduced our simple case processing
11   time about 52 percent in the last two years.
12         Complex is definitely far more
13   challenging, and it's because it involves
14   hundreds, sometimes thousands of pages of records
15   to review, and, again, we have a very small team
16   to process this.  So we do have a backlog.
17     Q    And so anyone who makes -- well, what's
18   the threshold between simple and complex
19   page-wise?
20     A    Approximately 20 pages.  So we said
21   anything that's 20 pages and less, we dump into
22   one particular queue.  That just really helps the

1    management team keep eyes on those so we can work
2    together to close them faster.
3      Q    So -- and are requests ever batched
4    together?
5          So if I make two requests for two
6    documents, will that be treated -- would that be
7    treated -- let's say the documents I request are
8    ten apiece.  Do you follow me?
9      A    Okay.
10     Q    Well, actually, no.  15 apiece.
11     A    Okay.
12     Q    If I were to batch that together, there
13   would be 30 pages, and that would be complex,
14   right?
15     A    So -- but you -- well, you have filed
16   them as two separate requests, and they were --
17     Q    I filed --
18     A    -- 15 pages each, so we would -- when
19   we're done with the processing, we would put
20   those into one of the simple queues I spoke of.
21   That way, again, we're keeping eyes on those, and
22   we're trying to get them out faster to you.

43 (Pages 166 - 169)

1     MR. ZORN:  Yeah.
2     THE WITNESS:  Thank you.
3  BY MR. ZORN
4     Q    Okay.  So -- and the agency doesn't
5  have a benchmark sort of aiming to have a certain
6  percentage of simple versus complex, does it?
7     A    No.  And I guess I'm struggling with
8  this because, like, I don't know how we can get
9  around a case that is legitimately -- it's
10  complex.
11     If I am -- if my staff has to process
12  hundreds, sometimes thousands of pages, the only
13  workaround to reduce that -- the size of that
14  case would be to have a conversation with the
15  requester and see if we could narrow scope.
16     Q    I follow you, and you're talking about
17  thousands of pages, but I guess what -- what I'm
18  kind of getting at is -- okay.  And you've said
19  it's not a hard and fast rule, and I accept that.
20     But if the threshold for what sort of
21  crosses into complex or simple were raised, you
22  know, potentially, there would be a different

Page 186

1  the number of pages, the length of time it's
2  going to take us to process.
3     You know, low staffing numbers also
4  impact this, right?  It just -- the ability to
5  produce something quickly nowadays with such
6  limited resources is difficult.
7     Q    So -- well, how does the staffing
8  affect the complexity of a request?
9     A    So if a case -- if we deem a case
10  complex -- again, it's generally due to the size
11  of the case, and I only have 16 staff members in
12  total to work on these cases -- earlier I said
13  18.  I'm taking myself out of this and our
14  secretary.  Okay.  So legitimately people to do
15  FOIA processing work, 16 people.
16     So if we've deemed a request complex
17  because it's -- the volume is high, I mean, I
18  have 16 staff members to work on those cases.  We
19  received 16 -- over 1,600 requests just in 2022,
20  16 people to work on all of that, with the
21  majority being complex.
22     Q    So -- so a simple request is -- so,

Page 188

1  alignment of sort of requests in the simple
2  bucket versus the complex bucket, because, I
3  mean, we can agree that there are some documents,
4  just single individual documents that are more
5  than 20 pages, right?
6     A    Yes.
7     Q    And if someone -- there's no way to
8  narrow a request that's -- you know, even if I --
9  if I were to request the DEA staff manual -- we
10  were looking at that earlier.
11     A    Right.
12     Q    And that's a big document, isn't it?
13     A    Uh-huh.
14     Q    And let's say I narrowed my request to
15  like three chapters, right?
16     A    Uh-huh.
17     Q    I'm already over 20 pages.  Do you
18  follow me?
19     A    I do.
20     Q    But that's not really a complex
21  request, is it?
22     A    It's not.  Again, it would be based on

Page 187

1  really, the difference between simple and
2  complex, as I understand it, is just the amount
3  of time it's going to take to respond, fair?
4     A    Yes.
5     Q    Okay.  And --
6     A    If we feel we can produce it in 30 days
7  or less, we categorize it as simple.
8     Q    Okay.  And it might still raise unusual
9  circumstances, but it could be simple, right?
10     A    Let me walk this through in my head.
11  Yes, that is true.  If I have to search another
12  field office and what comes back is two pages and
13  I'm able to get it out in ten days, we would deem
14  that as simple.
15     Q    But if you can get it out that quickly,
16  it's not really necessary to have extra time to
17  be able to complete that request, right?
18     A    Well, the reason, again, why we would
19  have to invoke the extra time is we have to go
20  outside of the FOIA office.  Sometimes we have to
21  go to another state to get the records, right?
22     So we don't have access.  That's why

Page 189

48 (Pages 186 - 189)

1   pronounce her last name.  This is the -- a

2   couple -- it's the bottom of page 4 out of 5,

3   just if you can tell me when --

4      A    Okay.

5      Q    -- you're there.

6      A    Let's see.  Page 4.  Yes, I'm there.

7      Q    And "Check with SC."

8      What's "SC"?

9      A    Section chief.  She's speaking of me.

10     Q    "If these still apply because case is

11  past 30 days," right?

12     A    Uh-huh.

13     Q    And -- and the fees here that

14  wouldn't -- would not be due are the search fees,

15  right?

16     A    We would not have -- you're right.  We

17  would not charge search fees for this case or --

18     Q    Because --

19     A    -- any case, really, nowadays because

20  of the amendment.  The change in 2016, like I

21  said, really limited our ability to charge search

22  fees.

1     Q    But it doesn't limit the ability to

2  charge review fee or processing fees?

3     A    There isn't a processing fee, per se,

4  but it's review and duplication.  Duplication, we

5  don't charge, either --

6     Q    Right.

7     A    -- because the days of Xeroxing records

8  is really over.  It's all electronically done.

9     Q    And it says -- and there were draft

10  letters and e-mails from the share drive.

11     And, actually, let's turn back down to

12  yours, because you say, "Drafts need to be

13  closely reviewed under (B)(5).

14     Do you see that?

15     A    I need to see -- which page is that on?

16  Page 4?  I'm sorry.

17     Q    Sorry.  Now we're back on page 5.  This

18  is back --

19     A    Okay.

20     Q    -- on -- on your comment.  It's a

21  May 10th, 2022, 2:27 p.m. comment.

22     A    Yes.

1     Q    And it says, "Drafts need to be closely

2  reviewed under (B)(5)."

3     It's the last sentence.  Now, (B)(5) is

4  the deliberative process privilege, true?

5     A    Yes.

6     Q    And generally speaking, draft agency

7  documents are -- are almost always going to be a

8  deliberative process?

9     A    Yes.  Anything that's pre-decisional

10  or -- yes.

11     Q    Now, if a document, on its face, the

12  first page is pre-decisional or deliberative

13  process -- do you follow me?

14     A    Yes.

15     Q    Would the DEA end up charging for

16  reviewing the rest of the document?

17     A    If the entire document has been

18  deemed -- meaning the entire document is

19  pre-decisional, we're withholding it in full.

20     Q    Yeah.  I mean, hypothetically, let's

21  say we have like a draft, like what you're -- in

22  your comment, you talk of drafts, and it doesn't

1  really go beyond that.  But just say draft.

2  Okay?

3     A    Uh-huh.

4     Q    A draft letter.

5     A    Yes.

6     Q    The reviewer looks at it.  It's a draft

7  letter.  It's a (B)(5) withholding.

8     When DEA goes to calculate the review

9  time, is that -- you know, is that sort of

10  calculated -- like line by line is reviewed of a

11  (B)(5) withholding?

12     A    So you have to keep in mind that the

13  review has not been done yet.  When the -- when

14  the fee is calculated, we are simply looking at

15  how many pages do we have that we're going to --

16  you know, have to review and process, meaning

17  review -- read the document, determine what is

18  exempt, place (B)(5) exemptions on.  That hasn't

19  occurred yet.  That comes later, right?

20     Q    Understood.  But what I'm -- where I'm

21  going with this is the seven-minute-a-page

22  estimate is sort of predicated on the notion that

1    every single page is going to be read, reviewed,
2    redacted.  In practice, that never happens when
3    there's withholdings like the one I'm describing
4    now, right?
5       A   I mean, if you're telling me one --
6    you're talking about one page, two pages that
7    we're going to exempt in full under (B)(5).  We
8    still have to -- there's a -- we have to read the
9    document and place the redaction on the document.
10      Q   Well, if the -- well, first -- wait.
11    So a (B)(5) withholding is, like, produced as
12    just like a big black box?
13      A   We basically have to mark the document
14    in a manner that it's very clear that it's being
15    withheld in full under (B)(5).  We have to do
16    that in the event that we're appealed or sued by
17    a requester.
18        We want -- at the administrative level,
19    we want it to be very clear about our
20    decision-making in these withholdings, so, yes,
21    there is a redaction -- a blanket redaction, if
22    you will, placed on the document.

Page 198

1      Q   And that takes seven minutes to put
2    that on?
3      A   Not on a single page, no.
4      Q   Okay.  But -- and you're talking about
5    like a one to two-page document, but, you know,
6    if you have like a 20-page draft memo, then it's
7    just all 20 pages.  Fair?
8      A   Yes.  We would place the blanket, and
9    it should apply to all pages.
10      Q   And it's not going to take seven
11    minutes to go through and read those documents
12    line by line because they're being withheld,
13    right?
14      A   Right.
15      Q   And so when DEA produces its fee
16    estimate that needs to be paid up front, right,
17    that's effectively a max -- that's a maximal --
18    that's like the most -- assuming DEA went through
19    and reviewed every single page and it was -- and
20    assuming seven minutes a page is an accurate
21    reflection, like, this is the most that you're
22    going to have to pay, right?

Page 199

1      A   Yes.  And that's why it's called a fee
2    estimate.  So if we -- if we overcharged or
3    overestimated, we would owe money back to the
4    requester in the end.
5      Q   What if someone can't afford the
6    estimate?  Is there any -- any way to --
7      A   Unfortunately -- and, again, this only
8    applies to commercial use requesters -- you know,
9    we -- there are fees that have to be paid for
10    this -- for the process.
11        And when you're talking, again,
12    thousands and thousands of pages for review,
13    unfortunately, with the lack of resources, I
14    don't have the ability to just waive the fees
15    there.
16      Q   Well, how do you determine if someone's
17    a commercial use requester?
18      A   So we would take a look at what is
19    submitted in the request letter, and if we
20    determine that there is a commercial trade or
21    profit interest in the records sought, we would
22    determine that it's commercial use.

Page 200

1      Q   And does it -- does DEA make the
2    determination that it's predominantly a
3    commercial use or just any -- any commercial use?
4      A   I'm sorry.  I don't know that I'm
5    following the question.
6      Q   Well, something could have a commercial
7    use, but also a non-commercial use.  Is that --
8    is that fair?
9      A   Potentially, yes.
10      Q   So -- and is -- is it the agency's
11    position that in deciding who to charge fees, its
12    based on if there's any commercial use of the --
13      A   It's based --
14      Q   -- records?
15      A   -- on information that's provided by
16    the requester.  So it has to be clear to us that
17    there's a commercial use.  Again, it's really on
18    the requester to tell us -- you know, if they
19    feel they're not a commercial use requestor, they
20    need to articulate that so we can review it.
21      Q   So -- and -- and I think there are sort
22    of contrasting examples in the record here

Page 201

51 (Pages 198 - 201)

1    submitted publicly.  What would have been the
2    basis to not release their names on the document?
3        A    So, generally, we do not release the
4    names of DEA employees on any document unless
5    that document has already been made publicly
6    available.  So we protect -- there is a privacy
7    concern, and so we generally -- excuse me -- we
8    redact those under FOIA exemptions (B)(6) and
9    (7)(C).
10            In this circumstance, I didn't -- I did
11   not believe we were going to withhold their
12   names, but as a courtesy to them, I picked up the
13   phone and I just made sure there were no
14   concerns.  And I, you know, had the conversation
15   about it was -- this document, I understand, has
16   already been released in full, you know, just
17   wanted to make sure they had no concerns.  But we
18   did not withhold their names.
19       Q    So -- so what is the (B)(6) exemption?
20       A    This -- oh, excuse me.  This is --
21   protects -- it's a personal privacy exemption, so
22   names -- you know, we redact the names of all of

Page 210

1    our employees under that exemption with the
2    exception of SES personnel.  So SES names, we do
3    not redact.
4        Q    So is that a -- is that a policy of
5    the --
6        A    This is actually a DOJ policy --
7        Q    It's --
8        A    -- that we follow.
9        Q    It's not even written down, right?
10       A    It's -- it was captured in a memo that
11   OIP put out a couple of years ago about
12   protecting the names of certain agency, you know,
13   staff, and so we've been following those
14   guidelines ever since.
15       Q    Do you know where I can find that OIP
16   memo?
17       A    If it's not on their website, you might
18   have to file a FOIA request.  I apologize to say.
19   I don't know if that is actually publicly
20   available.
21       Q    And if it weren't publicly available,
22   that would be another FOIA violation of the day,

Page 211

1    right?
2        A    In what regard?  I'm sorry.
3        Q    Well, the FOIA requires that -- that --
4            MR. RODRIGUEZ:  Objection.  Calls for
5    legal conclusion.
6    BY MR. ZORN
7        Q    Yeah.  FOIA requires that -- that
8    substantive statements of policy be -- be made
9    affirmatively available, right?
10       A    It does.
11       Q    And so that that -- what you've
12   described sounds like a substantive policy that
13   the agencies are following, right?
14       A    Yes.
15       Q    And just to be clear about the
16   implication of this policy, would that apply to,
17   like, an e-mail?
18       A    It would apply to e-mails.  It would
19   apply to all records.
20       Q    So it's -- and, you know, if you need
21   to pull up the statute, then that's fine, but I
22   just want to read Exemption 6.

Page 212

1            It's the position of the United States
2    Department of Justice that names are personnel
3    and medical files and similar files, the
4    disclosure of which would constitute a clearly
5    unwarranted invasion of personal privacy; is that
6    right?
7        A    That is --
8            MR. RODRIGUEZ:  Objection.  Calls for
9    legal conclusion.
10           You can try to answer.
11           THE WITNESS:  That is correct.
12   BY MR. ZORN
13       Q    And as a matter of policy, names are
14   being redacted because it's the Department of
15   Justice's contention that those are personnel
16   files?
17       A    They're personnel, medical or other
18   files, which basically means it could be any
19   file.  So for us, a lot of our records are law
20   enforcement sensitive, and we want to protect the
21   names of our agents, our intel analysts, so on
22   and so forth.  We do believe that they have a

Page 213

54 (Pages 210 - 213)

1    privacy right.

2        Q    Well -- and to be fair, there's a

3    completely different exemption for law

4    enforcement officers, right?

5        A    We use the combination of (B)(6) and

6    (7)(C) to protect their names, yes.

7        Q    But Theresa Carbonaro is not a -- she

8    wasn't -- she isn't and wasn't law enforcement?

9        A    She is a pharmacologist, as far as I

10   know, but we still, depending on the type of

11   document, would protect her name under (B)(6) and

12   (7)(C).

13       Q    Which --

14       A    Not in this circumstance.

15       Q    So -- but -- and 7 is records or

16   information compiled for law enforcement

17   purposes?

18       A    Uh-huh.

19       Q    But only to the extent the production

20   of such law enforcement records or information --

21   and then getting down to C -- could reasonably be

22   expected to constitute an unwarranted invasion of

Page 214

1    personal privacy; is that fair?

2        A    That is correct.

3        Q    Now, when a person is serving as a

4    government servant, what expectation of personal

5    privacy is there?

6        A    So, again, if -- in the -- this has

7    been the policy across the department.  If --

8    generally, employees that are not at the SES

9    level, we don't consider to be public facing at

10   the same level, and so they have a right to

11   privacy, and we want to protect the names of

12   those employees.

13            Obviously, they work in very

14   sensitive -- sensitive matters for the DEA, and

15   so our general practice is to redact their names

16   below SES level.

17       Q    Okay.  So -- but -- and we can

18   certainly agree that there are many, many

19   individuals at DEA who do very sensitive law

20   enforcement tasks.

21            We can agree on that, right?

22       A    Yes.

Page 215

1        Q    But we can also agree that not everyone

2    at DEA is working on law enforcement or sensitive

3    tasks with respect to everything that they do; is

4    that fair?

5        A    That is fair.

6        Q    Okay.  And, you know, for example, a

7    pharmacologist is not performing law enforcement

8    functions in everything that he or she does; is

9    that fair?

10       A    Fair.

11       Q    But it is the agency's policy, per the

12   Department of Justice, not -- not -- this is not

13   DEA policy.  This is DOJ policy.

14            Do you follow me?

15       A    Uh-huh.

16       Q    That -- that that person's name needs

17   to be redacted regardless of the function they're

18   performing?

19       A    That is correct.

20       Q    And do you know when this policy

21   started?

22       A    I want to say it was sometime during

Page 216

1    2019.

2        Q    Do you know who created the policy?

3        A    This was captured in a memo that was

4    issued from the former director of Office of

5    Information Policy.

6        Q    And what's that person's name?

7        A    Melanie Pustay.

8        Q    Okay.  And was that signed off on by

9    Ms. -- this would have been during the Trump

10   administration, right?

11       A    Yes.

12       Q    And who was -- do you know who the DOJ

13   chief FOIA officer was in 2019?

14       A    That I do not.

15       Q    Okay.  So we're getting a little far

16   field.  So let me --

17            MR. RODRIGUEZ:  Yeah.  And we'll go off

18   the record?

19            MR. ZORN:  Yeah.

20            (Brief off-the-record discussion.)

21            MR. ZORN:  Okay.  So there's no

22   question pending, so why don't I introduce

Page 217

55 (Pages 214 - 217)

1   draft up what we call a search memo.  We would
2   send the memo along with a request letter to our
3   point of contact that sits in the office of --
4   the Information Technology Division.
5        We would have them -- they reach out to
6   another unit within that division to actually
7   conduct this -- the e-mail search.  They use a
8   particular tool called Intela to capture these
9   responsive e-mails.
10       And then once the search is done -- we
11  give the offices five days to complete a search.
12  So once we get those records or we're notified
13  that the records are ready, my team will go into
14  that Intela site and take -- take the e-mails and
15  load them into our own case management system,
16  FOIAXpress, to begin processing.
17       Q   So -- and what -- do you have any
18  conception of what percentage of FOIA requests
19  are for e-mails?
20       A   I do not have the percentage, no.  I
21  wouldn't be able to tell you off the top of my
22  head.

Page 230

1        Q   And so is it your understanding -- and
2   maybe you don't know, but -- but that there is a
3   centralized server with DEA e-mails?
4        A   Probably.  I don't know exactly how
5   it's all kept.  You know, I'm not -- I admit I'm
6   not an IT expert, so --
7        Q   Okay.  And I'm not saying it is or
8   isn't the case, but let's just assume there is a
9   single server that has all DEA e-mails or some
10  database that allows a centralized repository.
11       Do you follow me?
12       A   Yes.
13       Q   It's still the position of DEA and DOJ,
14  for that matter, that because that server isn't
15  in the FOIA office, unusual circumstances
16  every -- every time?
17       A   Correct.  And the unit that runs the
18  e-mails -- does the e-mail searches for us sits
19  in another city in Virginia.  They're not located
20  in our headquarters buildings in Arlington where
21  the FOIA office is located.
22       Q   Could -- is it possible -- I mean, it

Page 231

1   might not be a fair question, but is there any
2   specialized training required to operate this --
3   this other system?
4        A   For Intela, there was.  I had to take
5   my team out to the office where -- I had to take
6   them to that part of Virginia where the
7   intelligence -- I'm sorry -- the Information
8   Systems Division sits to train them how to use
9   the tool to pull those e-mails and bring them
10  into our case management system.
11       And there was an SOP written on this,
12  and so, yes, there was some training for my staff
13  in how to utilize that system.
14       Q   And -- wait.  So the staff knows how to
15  use -- the FOIA staff --
16       A   So --
17       Q   -- knows how to use --
18       A   -- let me --
19       Q   -- that system?
20       A   -- clarify.  So the experts -- the
21  subject matter experts that sit in our IT
22  division are the ones that actually do the search

Page 232

1   for the e-mails, and they load them into a tool
2   called Intela.  Once that process is done, they
3   notify my team it's complete, and then we have to
4   log into Intela to pull those responsive records
5   out.
6        So they're not searching for records,
7   my team.  They're basically retrieving the
8   material that's already been placed into Intela
9   for them, if that makes sense.
10       Q   And the accessing Intela by the FOIA
11  staff is done remotely, right?
12       A   It's -- right.  It's done in Arlington
13  where we sit, right.
14       Q   And then you're saying that this IT
15  staff is in some other -- and we don't want to
16  talk about the location --
17       A   Sure.
18       Q   -- but we're just saying it's some
19  other location, right?
20       A   Correct.
21       Q   Does this process change at all if,
22  instead, the FOIA office were on the third floor

Page 233

59 (Pages 230 - 233)

1   and the IT office is on the first floor?
2       A   No.  It would be the same process.
3       Q   So it's unusual circumstances -- well,
4   if it were the first and third floor, it would
5   still be unusual circumstance, right?
6       A   It would be, again, because we just
7   simply don't have access to the e-mail records.
8   We don't have access to the tool to retrieve
9   employees' e-mail records.  We have to rely on
10  someone else to do that for us.
11      Q   Well, now, retrieving e-mail records is
12  a -- it's certainly a function to search and
13  produce for FOIA purposes, right?
14      A   Yes.
15      Q   I imagine a congressional subpoena
16  might be another instance where e-mails had to be
17  searched and produced?
18      A   Uh-huh.  Yes.
19      Q   Are you aware of any other reason that
20  the agency would search and produce e-mail
21  records other than to respond to a FOIA request
22  or subpoena?

Page 234

1   know, let's say they get a request to collect all
2   the e-mails belonging to so and so, that there's
3   a good chance that that's because of a FOIA
4   request.
5           MR. RODRIGUEZ:  Objection.  Foundation.
6           THE WITNESS:  Yes, it could be.  Yes.
7   BY MR. ZORN
8       Q   Okay.  And there are other
9   circumstances in which that -- that employee
10  might be searching for and producing e-mails,
11  fair?
12      A   Yes.
13      Q   Like I said, a court subpoena or even
14  in this case, we had requests for production.
15  This wasn't a FOIA request, fair?
16      A   Fair.
17      Q   But a FOIA request is one of the
18  situations?
19      A   Yes.
20      Q   Okay.  And, in fact, it's not an
21  uncommon situation?
22      A   It's not uncommon.

Page 236

1       A   I mean, I can't speak to that.  I can
2   only speak to my functions in FOIA.
3       Q   It seems to me that a large part of the
4   job of -- of -- if not the predominant part of
5   the job of searching this in Intela or --
6   sorry -- even gathering the e-mails is FOIA, like
7   that -- would you agree?
8       A   Could you rephrase that question?  I'm
9   sorry.
10      Q   This particular function that we've
11  been discussing of collecting e-mails to produce,
12  it seems to me that a major reason one would do
13  that is to respond to a FOIA request.
14          MR. RODRIGUEZ:  Objection.  Foundation.
15  You can try to answer.
16          THE WITNESS:  It -- I mean, it
17  represents a percentage, yes, of all FOIA
18  requests I receive per year.  I wouldn't say
19  every request requires us to pull e-mails.
20  BY MR. ZORN
21      Q   And do -- well, no, and I'm talking
22  sort of from the IT side of things, which is, you

Page 235

1       Q   In fact, I would venture to say that
2   happens multiple times a month that your office
3   is asking for e-mails to respond to FOIA
4   requests, right?
5       A   Yes.
6       Q   What about on a weekly basis?  How many
7   times a week?
8       A   So, again, I don't have those
9   statistics to tell you, I mean, and it varies
10  week to week.
11      Q   And you know -- you know the folks over
12  there by their names.  I'm not going to ask them,
13  but you do know them --
14      A   I do.
15      Q   -- right?
16          Because you -- you interface with them
17  fairly regularly, right?
18      A   We do.
19      Q   Okay.  And, in fact, you've met these
20  people, right?
21      A   I have.
22      Q   They don't work in your office, but you

Page 237

60 (Pages 234 - 237)

CERTIFICATE OF NOTARY PUBLIC

1
2    I, ERICK M. THACKER, the officer before whom
3 the foregoing deposition was taken, do hereby
4 certify that the witness whose testimony appears
5 in the foregoing deposition was duly sworn by me;
6 that the testimony of said witness was taken by
7 me in stenotype and thereafter reduced to
8 typewriting under my direction; that said
9 deposition is a true record of the testimony
10 given by said witness; that I am neither counsel
11 for, related to, nor employed by any of the
12 parties to the action in which this deposition
13 was taken; and, further, that I am not a relative
14 or employee of any counsel or attorney employed
15 by the parties hereto, nor financially or
16 otherwise interested in the outcome of this
17 action.

18      ERICK M. THACKER
19      Notary Public in and for the
20      District of Columbia
21 My commission expires:
22 June 30, 2024

Page 258

---

1 jimmy.rodriguez2@usdoj.gov
2      January 19, 2023
3 RE: AIMS Institute, PLLC, Et Al. v. Garland, Merrick, Et Al.
4 DEPOSITION OF: Kelleigh Miller 5645328
5    The above-referenced witness transcript is
6 available for read and sign.
7    Within the applicable timeframe, the witness
8 should read the testimony to verify its accuracy. If
9 there are any changes, the witness should note those
10 on the attached Errata Sheet.
11    The witness should sign and notarize the
12 attached Errata pages and return to Veritext at
13 errata-tx@veritext.com.
14    According to applicable rules or agreements, if
15 the witness fails to do so within the time allotted,
16 a certified copy of the transcript may be used as if
17 signed.
18      Yours,
19      Veritext Legal Solutions
20
21
22

Page 260

---

1 AIMS Institute, PLLC, Et Al. v. Garland, Merrick, Et Al.
2 Kelleigh Miller 5645328
3      ACKNOWLEDGEMENT OF DEPONENT
4    I, Kelleigh Miller, do hereby declare that I
5 have read the foregoing transcript, I have made any
6 corrections, additions, or changes I deemed necessary as
7 noted above to be appended hereto, and that the same is
8 a true, correct and complete transcript of the testimony
9 given by me.
10
11 _____  _____
12 Kelleigh Miller      Date
13 *If notary is required
14      SUBSCRIBED AND SWORN TO BEFORE ME THIS
15 _____ DAY OF _____, 20___.
16
17
18 _____
19      NOTARY PUBLIC
20
21
22

Page 259

---

1 AIMS Institute, PLLC, et al. vs. Merrick Garland, et al.
2 Kelleigh Miller (#5645328)
3      E R R A T A  S H E E T
4 PAGE____LINE____CHANGE_____
5 _____
6 REASON_____
7 PAGE____LINE____CHANGE_____
8 _____
9 REASON_____
10 PAGE____LINE____CHANGE_____
11 _____
12 REASON_____
13 PAGE____LINE____CHANGE_____
14 _____
15 REASON_____
16 PAGE____LINE____CHANGE_____
17 _____
18 REASON_____
19 _____
20
21
22 KELLEIGH MILLER      Date

Page 261

66 (Pages 258 - 261)