# Exhibit A

```
 1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF TEXAS
 2                    HOUSTON DIVISION
 3     -----------------------------------:
       AIMS INSTITUTE, PLLC, et al.,       :
 4                                         :
                   Plaintiffs,             :
 5                                         : Civil Action:
            vs.                            : 4:22-cv-02396
 6                                         :
       MERRICK GARLAND, et al.,            :
 7                                         :
                   Defendants.            :
 8     -----------------------------------:
 9
10        VIDEO-RECORDED DEPOSITION OF KELLEIGH MILLER
11
12     DATE:            Thursday, January 5, 2023
13     TIME:            9:37 a.m.
14     LOCATION:        United States Attorney's Office
                        2100 Jamieson Avenue
15                      Alexandria, Virginia 22314
16
17     REPORTED BY:     Erick M. Thacker
                        Reporter, Notary
18
19
20
21              Veritext Legal Solutions
             1250 Eye Street, NW, Suite 350
22              Washington, D.C. 20005

                                          Page 1
```

APPEARANCES

On behalf of Plaintiffs:
MATTHEW C. ZORN, ESQUIRE
Yetter Coleman LLP
811 Main Street
Suite 4100
Houston, Texas 77002
mzorn@yettercoleman.com

On behalf of Defendants:
JIMMY ANTHONY RODRIGUEZ, ESQUIRE
Assistant United States Attorney
United States Department of Justice
Southern District of Texas
1000 Louisiana
Suite 2300
Houston, Virginia 77002
jimmy.rodriguez2@usdoj.gov

ALSO PRESENT:
Glenn Gray, Esq., Agency Counsel
Ellen Hebert, Video Technician

---

CONTENTS

EXAMINATION BY:                    PAGE
Counsel for Plaintiffs             7
Counsel for Defendants             255

EXHIBITS

NUMBER      DESCRIPTION            PAGE

Deposition-1   Letter dated 1/5/2022 Re: AIMS   13
   v. Garland, 22-cv-02396
Deposition-2   Plaintiffs' 30(b)(6) Notice of   53
   Deposition of U.S. Department
   of Justice and U.S. Drug
   Enforcement Administration

Deposition-3   DEA Freedom of Information and   112
   Privacy Act Policy Number 0770
Deposition-4   FSRN meeting agenda, DEA000097   226
   - 101

Deposition-6   Department of Justice Chief   239
   FOIA Officer Report 2022
Deposition-7   Memorandum from the Attorney   250
   General dated 3/15/2022

Deposition-8   Chief FOIA Officer Memo dated   46
   1/30/2019
Deposition-9   Letter dated 8/17/2022 from   218
   America First Legal

Deposition-10A  22-00585-F Request Notes   126
   DEA000370 - 371

---

CONTENTS (Continued)

EXHIBITS

NUMBER      DESCRIPTION            PAGE

Deposition-10B  22-00592-F Request Notes   190
   DEA000372 - 376

Deposition-10C  22-00845-F Request Notes   207
   DEA000385

Deposition-15   2021 Annual FOIA Report Raw   151
   Data for the Department of
   Justice
Deposition-16   FY 2021 Report Raw Data   151
   (edited)

Deposition-17   FY 2022 Raw Data   180

Deposition-FOIA 5 U.S. Code 552   30

Deposition-OLC  FOIA Request from Matthew Zorn   44
   dated 1/5/2023

(*Exhibits attached to transcript.)

---

PROCEEDINGS

VIDEO TECHNICIAN:  Good morning.  We are going on the record at 9:37 a.m.  Today is January 5th, 2023.  Please note that the microphones are sensitive and may pick up whispering and private conversations.  Please mute your phones at this time.  Audio and video recording will continue to take place unless all parties agree to go off the record.

This is Media Unit No. 1 of the video-recorded deposition of Kelleigh Miller, taken by counsel for the plaintiff in the matter of AIMS Institute, PLLC, et al. v. Merrick Garland, et al., filed in the United States District Court, Southern District of Texas, Houston Division, Civil Action No. 4:22-cv-02396.

The location of the deposition is the United States Attorney's Office at 2100 Jamieson Avenue, Alexandria, Virginia 22314.

My name is Ellen Hebert, representing Veritext.  I am the videographer.  The court reporter is Erick Thacker from Veritext.

Veritext Legal Solutions
346-293-7000

1      If there are any objections to
2  proceeding, please state them at the time of your
3  appearance.  Counsel and all present will now
4  state their appearances and affiliations for the
5  record, beginning with the noticing attorney.
6      MR. ZORN:  Matthew Zorn.  I work at
7  Yetter Coleman LLP.  I represent plaintiffs, and
8  I have no objections.
9      THE WITNESS:  Kelleigh Miller.  I'm the
10  chief FOIA officer for DEA.
11      MR. RODRIGUEZ:  Jimmy Rodriguez from
12  the U.S. Attorney's Office in the Southern
13  District of Texas.  I'm here on behalf of the
14  United States of America.
15      MR. GRAY:  Glenn Gray on behalf of DEA,
16  agency counsel.
17      VIDEO TECHNICIAN:  Thank you.  Will the
18  court reporter please swear in the witness, and
19  then counsel may proceed.
20  WHEREUPON,
21          KELLEIGH MILLER
22  called as a witness, and having been first duly

Page 6

1  sworn, was examined and testified as follows:
2      EXAMINATION BY COUNSEL FOR PLAINTIFFS
3  BY MR. ZORN:
4      Q   Ms. Miller, good morning.
5      A   Good morning.
6      Q   How are you?
7      A   I'm doing well.  Thank you.
8      Q   Thank you for preparing for and
9  attending today's deposition.
10      Have you been deposed before?
11      A   I have not.
12      Q   So I'm going to go over a few ground
13  rules.  Perhaps the most important is to give
14  verbal answers to my questions.
15      Do you understand?
16      A   Yes.
17      Q   If you don't understand anything in my
18  question, please ask me.  Do you understand?
19      A   I do.
20      Q   I would wait after my question for your
21  counsel who may object to a question.  So do you
22  understand that?

Page 7

1      A   I do.
2      Q   And you are here today not in your
3  personal capacity.  Do you understand that?
4      A   Yes.  Correct.
5      Q   You represent the United States
6  Department of Justice.  True?
7      A   Yes.
8      Q   And you are also here on behalf of the
9  Drug Enforcement Administration --
10      A   Yes.
11      Q   -- correct?
12      A   Correct.
13      Q   Okay.  And you don't represent them
14  sort of in everything, but the notice topics in
15  today's 30(b)(6) deposition.  Is that fair?
16      A   Correct.
17      Q   And you've reviewed that notice, true?
18      A   I have.
19      Q   And you've prepared to testify on the
20  topics in that notice?
21      A   Yes, I have.
22      Q   And I'll introduce the notice in a

Page 8

1  moment.  But we discussed that you've never been
2  deposed before?
3      A   I have not.
4      Q   Okay.  And did you prepare for today's
5  deposition?
6      A   I did prepare.
7      Q   How did you prepare for today's
8  deposition?
9      A   I reviewed the topics that we were
10  going to discuss today and thought through my
11  answers and then prepared accordingly for today.
12      Q   Have you reviewed the documents
13  produced ahead of today's deposition?
14      A   I have.
15      Q   Did you prepare with anyone for today's
16  deposition?
17      A   I did.
18      Q   And I don't want to know the content of
19  those conversations, but who did you speak with?
20      A   I prepared with Mr. Rodriguez and
21  Mr. Gray.
22      Q   Okay.  And how long duration-wise did

Page 9

3 (Pages 6 - 9)

1    you speak with Mr. Rodriguez?
2        A   I would say a couple of hours.
3        Q   Okay.  How long did you speak with
4    Mr. Gray?
5        A   The same.  We were in conversation
6    together.
7        Q   Okay.  Was that an in-person
8    conversation?
9        A   It was on partially virtual since
10   Mr. Rodriguez is in Houston.
11       Q   And when was that conversation?
12       A   We had about three conversations over
13   the course of, I believe, the last three weeks.
14       Q   Okay.  If you need to take a break at
15   any point in this deposition, please just let me
16   know.
17       A   Will do.
18       Q   Even if I'm in a line of questioning, I
19   think it's -- if you need a break, just take one.
20       A   Thank you.
21       Q   Is there any health reason or any other
22   reason that you're aware of that would prevent

1        Q   -- in the Southern District of Texas,
2    right?
3        A   Yes.
4        Q   And there are two other plaintiffs, but
5    Matthew Zorn is one of those three plaintiffs?
6        A   Yes.
7        Q   And I brought a pattern or practice
8    claim, true?
9        A   Yes.
10       Q   I would say the -- well, one of the
11   claims is that the Drug Enforcement
12   Administration and the Department of Justice have
13   an unlawful policy or practice of marking
14   requests as raising unusual circumstances when
15   they don't.
16           That's -- that's my allegation, right?
17       A   Understood.  Yes.
18       Q   And are you aware that I made an offer
19   to the agency to settle this case?
20       A   I am aware.
21       Q   Okay.  And I made that offer months
22   ago, right?

1    you from testifying truthfully today on behalf
2    of -- I'm going to say DOJ and DEA, and you
3    understand what I mean, correct?
4        A   Yes, I do.
5        Q   Okay.  So --
6        A   No -- no issue.
7        Q   Okay.  So is there anything that you
8    are aware of that would prevent you from
9    testifying truthfully on behalf of DEA --
10       A   No.
11       Q   -- and DOJ?  Okay.
12           So -- and as -- as DOJ and DEA, do you
13   have any understanding of why we are here today?
14       A   I do.
15       Q   Okay.  Why are we here today?
16       A   We are here to discuss the pattern and
17   practice lawsuit that you have filed against the
18   Department and DEA.
19       Q   Yeah.  So -- so I sued DEA, right?
20       A   (Nodding.)  Yes.
21       Q   I sued DEA --
22       A   Sorry.

1        A   To my knowledge, yes.
2        Q   And just so the record is clear, I made
3    an offer to settle my case as Matthew Zorn.
4            Are you aware of that?
5        A   I am aware of that, yes.
6        Q   And that offer was not accepted.  True?
7        A   To my knowledge, it was not accepted.
8        Q   Is there was no counteroffer.  Fair?
9        A   There was no counteroffer to my
10   knowledge.
11       Q   So in some senses, part of the reason
12   we're here is because the parties have not
13   settled this case, right?
14       A   Correct.
15           MR. ZORN:  Okay.  So I'm going to
16   introduce as Exhibit 1, if you could pull this up
17   on the computer.
18           (Deposition Exhibit Number 1
19           was marked for identification.)
20           MR. RODRIGUEZ:  And which folder should
21   I be looking at here?
22           MR. ZORN:  This is a --

1      MR. RODRIGUEZ:  The marked?
2      MR. ZORN:  This is a marked exhibit.
3      MR. RODRIGUEZ:  Okay.
4      THE WITNESS:  Okay.
5  BY MR. ZORN
6      Q    And can you confirm for me that there
7  is a document dated January 5th, 2022, in the top
8  right?
9      A    Yes.
10     Q    And that's today's date, January 5th,
11  2022?
12     A    That is not today's date.
13     Q    Sorry.  It should be January 5th, 2023.
14  That is a typo, but I will represent to you that
15  this is my latest settlement offer --
16     A    Understood.
17     Q    -- Exhibit 1.  It's something I wrote
18  over the past couple days, and I'm introducing it
19  now as Exhibit 1.
20         And I was going to have you read the
21  letter --
22     A    Okay.

Page 14

1      Q    -- but I think that's a little
2  obnoxious, so I'm just going to read the letter.
3  And just confirm that what I'm reading is correct
4  on this document.
5          And I'm just going to start with "Dear
6  Administrator Milgram."
7          "Dear Administrator Milgram, After
8  reviewing DEA's recent December 2022 document
9  production in this matter, two items are now
10  clear to me."
11         Bullet point 1:  "First, despite
12  patently unlawful FOIA policies and practices at
13  issue in this case, it is evident that, overall,
14  DEA's FOIA staff has worked diligently on my FOIA
15  requests."
16         Bullet point 2:  "Second, the merits of
17  my case remain strong; and in view of my earlier
18  settlement offer, DEA's decision to litigate this
19  matter continues to be an enormous waste of
20  taxpayer money, agency resources, court
21  resources, and my resources."
22         Did I read up to that point correctly?

Page 15

1      A    Correct.
2      Q    I'm going to continue.
3          "Let me explain the second point."
4          "In the fall, I made DEA and DOJ an
5  offer to dispose of my case.  Before the Court
6  ordered a 30(b)(6) deposition and document
7  production, I asked for an opportunity to speak
8  with senior DEA/DOJ officials to raise certain
9  policy matters/issues/concerns.  In exchange, I
10  offered to drop my case.  My offer was contingent
11  on nothing.  I agreed to dismiss this suit no
12  matter the outcome of those meetings.  In
13  response, I received no counteroffer and no
14  response to my settlement offer.  Just silence."
15         Did I read those two paragraphs
16  correctly?
17     A    Yes, you did read them correctly.
18     Q    Next paragraph.  And I'll address the
19  footnote at the end.
20         Next paragraph:  "Surely, my offer was
21  not unreasonable.  It was a sincere gesture I
22  made in good faith to avoid wasting agency

Page 16

1  resources, including the time of Ms. Miller,
2  Mr. Rodriguez, and the Court while furthering the
3  interests of my client base.  With increasing
4  frequency, I appear before this agency and
5  confront an outdated, unlawful, and often
6  recalcitrant administrative process.  In these
7  endeavors, I represent groups with serious
8  grievances but without deep pockets that have to
9  negotiate with this administrative state:
10  Researchers, veterans, terminally-ill patients,
11  start-ups, and so on.  I've taken most of these
12  representations pro bono; many simply want to
13  legally research or access controlled substances
14  to save lives.  None of them are drug pushers or
15  culpable actors in the opioid epidemic, for
16  example.  In fact, some are trying to address
17  substance abuse issues.  And in many cases, I
18  believe the issues could be better addressed with
19  fewer lawyers, less adversariness, and improved
20  communication and dialogue from this agency."
21         Did I read to that point correctly?
22     A    Correct.  You did.

Page 17

5 (Pages 14 - 17)

1    Q    Next paragraph: Thus, it is also my
2  belief that these communities should be heard
3  directly by the decisionmakers of this agency,
4  unfiltered by federal bureaucracy and convoluted
5  administrative processes. If I can deliver for
6  that -- sorry. Let me start that sentence over.
7      "If I can deliver that for them here, I
8  will be satisfied. But if not, I will continue
9  to use processes provided by law and litigate
10  cases when the agency disregards the rules to the
11  detriment of my clients, the public interest, and
12  public safety.
13      Did I read that paragraph correctly?
14    A    You did.
15    Q    Thanks.
16      "After reviewing DEA's production, I
17  believe the merits of my case to be stronger than
18  ever. Nonetheless, I hold out hope that the
19  agency will agree to a more productive and
20  cost-efficient resolution to my grievances. The
21  agency's initial reception of my unorthodox yet
22  highly efficient settlement offer appears to be
Page 18

1  microcosmic of the problems I'm dealing with -- a
2  reflexive, institutional resistance to the notion
3  that quite possibly, a different way of doing
4  things might deliver better results."
5      Did I read that correctly?
6    A    You did.
7    Q    Next paragraph: My settlement offer
8  today remains substantially the same as it was
9  months ago: a meeting with the Administrator so
10  that some of these less endowed constituencies
11  can present and be heard directly by leadership,
12  unfiltered. And since I've now put in
13  considerably more time and energy into this case
14  than I did when I made my first settlement offer,
15  that settlement offer -- sorry -- that settlement
16  must also include reimbursing some small measure
17  of the time I've spent litigating this case.
18      Did I read that correctly?
19    A    You did.
20    Q    "Finally, while I understand the
21  agency's interest in keeping information elicited
22  in this case confidential, I do not believe its
Page 19

1  non-disclosure request to be proper. This case
2  presents at least two matters of public interest,
3  and multiple mainstream news organizations have
4  expressed some interest in the FOIA issues. From
5  a legal standpoint, the non-disclosure request
6  has no merit. Not only is there no Rule 11 basis
7  for either party to file material related to DOJ
8  and DEA's implementation of FOIA under seal, but
9  there is no justification for a federal agency to
10  conceal processes it uses to instruct its staff
11  on how to process FOIA requests. The notion is
12  antithetical to FOIA itself and the principles
13  laid down in the Garland Memo."
14      Did I read that correctly?
15    A    You did.
16    Q    I'll read the last sentence in a
17  moment, but let's just quickly go in the
18  footnote, so I can get this in the record.
19    A    Okay.
20    Q    This is footnote 1 back on the page.
21      "As of December 2022, I also represent
22  former DEA Special Agent Anthony Armour of DEA's
Page 20

1  Tactical Diversion Squad. DEA fired SA Armour
2  for using what everyone agrees was publicly held
3  out to be a CBD-oil product as many in this
4  country do, Armour used the product to treat his
5  back pain and to avoid use of more severe pain
6  killers such as opioids. Unfortunately, the
7  product he used tested at .35 percent THC -- a
8  sliver above the .30 legal threshold -- but with
9  a margin and error of plus and minus .08. Nobody
10  disputes SA Armour believed he was taking a
11  product within the legal limits and that only
12  immediately after his positive drug test did DEA
13  issue warnings and subsequent remedial guidance
14  documents to employees on the dangers of using
15  CBD products which could test high. Under these
16  circumstances, why DEA middle management deemed
17  it necessary to discharge an employee working in
18  tactical diversion in good standing -- and who
19  unintentionally used a hot CBD product instead of
20  opioids -- is beyond mystifying. It is a case I
21  look forward to presenting."
22      Did I read that correctly?
Page 21

6 (Pages 18 - 21)

1     A   You did.
2     Q   Now let me just read the last sentence
3   of the letter.
4         "I urge the agency to reconsider my
5   good faith offer."
6         Did I read that correctly?
7     A   You did.
8     Q   And I would here at this deposition
9   urge the agency to reconsider my offer.
10        But since we're here and it's a
11  deposition, I need to ask you questions and you
12  need to give me answers, so --
13        MR. RODRIGUEZ:  Can I ask for
14  clarification on your letter?
15        MR. ZORN:  Yes.
16        MR. RODRIGUEZ:  When you state that you
17  will dismiss the case, to be clear, you're
18  talking about dismissing your claims, or are you
19  now authorized to offer a dismissal of the entire
20  action?
21        MR. ZORN:  I can certainly talk to the
22  other -- I can talk to the other parties in the
                                              Page 22

1   case.  I'm only, I guess, prepared and authorized
2   at this exact moment to dismiss my case.
3         MR. RODRIGUEZ:  Okay.
4         MR. ZORN:  But I can certainly, during
5   a break, if that's -- if this is a serious
6   entertaining of my offer, then we can certainly
7   look into that.
8         MR. RODRIGUEZ:  And then the other
9   point of clarification, when we initially
10  spoke -- we can go off the record if you -- if
11  you --
12        MR. ZORN:  Yeah.  Can we go off the
13  record?
14        VIDEO TECHNICIAN:  Going off the
15  record, the time is 9:53 a.m.
16        (Recess 9:53 a.m. to 9:56 a.m.)
17        VIDEO TECHNICIAN:  Going back on the
18  record, the time is 9:56 a.m.
19  BY MR. ZORN
20    Q   Ms. Miller, you -- you introduced
21  yourself today as DEA's chief FOIA officer,
22  didn't you?
                                              Page 23

1     A   I did.
2     Q   And when did you become the chief FOIA
3   officer for DEA?
4     A   In March of 2017.
5     Q   Okay.  And there was a reorganization
6   of the FOIA division at DEA at one point,
7   correct?
8     A   Correct.
9     Q   That was in 2021, correct?
10    A   2020.
11    Q   2020?
12    A   Yes.
13    Q   When was it completed?
14    A   So I initiated a request during 2019 to
15  completely restructure the FOIA unit, and it took
16  effect October 1 of 2020.
17    Q   Why did you do that?
18    A   I did this because I had recognized
19  shortly after my arrival in this position that we
20  were just not structured to be successful, and I
21  wanted to create specific units to handle certain
22  types of requests and really better divide the
                                              Page 24

1   overall labor of work in the office.
2     Q   And so how is the DEA FOIA office
3   structured today?
4     A   So we have three specific subunits, we
5   call them, one being the intake unit -- subunit,
6   the second being the processing subunit, and the
7   third is legal and external affairs subunit.
8     Q   Okay.  And how many people work in the
9   intake unit?
10    A   So I have a lot of staff vacancies
11  right now.  So right now, we have four -- excuse
12  me -- five staff members assigned to the intake
13  unit.
14    Q   Okay.  Is -- I don't know -- is
15  Mr. Polk one in the intake unit?
16    A   He is, but he just left DEA.
17    Q   He just left DEA.  Well, but he was --
18    A   He was --
19    Q   -- in the intake unit?
20        And then the processing unit, how many
21  folks work --
22    A   I have --
                                              Page 25

1    Q    -- in the processing unit?
2    A    -- four government information
3  specialists assigned to that team right now and a
4  GS-14 unit chief that supervises.
5    Q    And what is a government information
6  specialist?
7    A    So these are -- these are employees
8  that process FOIA cases.  So government
9  information specialist is the title of the
10  majority of the folks in our office.
11    Q    Okay.  And then legal and external, how
12  many folks work in legal and external?
13    A    I have two government information
14  specialists assigned to that team right now, and
15  I have one GS-14 unit chief running that unit.
16    Q    And her name is Angela Hertel, right?
17    A    Correct.
18    Q    And she's been working there for, I
19  guess, a few years, right?
20    A    Over -- she's been part of our FOIA
21  office for a little over ten years, I believe.
22    Q    Interestingly, she's usually the

Page 26

1  witness that the agency puts up in a FOIA case.
2  This is a privilege for me to be able to have the
3  chief.
4        So -- and so this is -- these are the
5  three units, and then you supervise these three
6  units, correct?
7    A    Correct.
8    Q    And who do you report to?
9    A    So I report to the section chief of the
10  FOIA and information law section at DEA.
11    Q    Okay.  And who is that?
12    A    That is Brooke DuBois.
13    Q    Okay.  And is that -- is that in a
14  different DOJ component?
15    A    No.  So we are part of the Office of
16  Chief Counsel, and so the FOIA and information
17  law section is one of the many sections within
18  the Office of Chief Counsel that we report up to.
19    Q    So -- so when you say "we" and --
20  because you're here representing DOJ and -- and
21  DEA, so I just want the record to be clear.
22        Are you saying that the DEA FOIA office

Page 27

1  is part of the DOJ chief -- could you just --
2    A    Sure.
3    Q    -- explain that to me --
4    A    I can clarify.
5    Q    -- a little bit.
6    A    We are --
7    Q    Yeah.
8    A    -- part of the DEA's Office of Chief
9  Counsel.
10    Q    Okay.  So you guys are part of the
11  Office of Chief Counsel, but you report to
12  Ms. DuBois, who is at DOJ --
13    A    DEA.
14    Q    Oh, at --
15    A    Yes.
16    Q    -- DEA.
17        THE REPORTER:  You-all are starting to
18  speak over each other.  If you could --
19        THE WITNESS:  Sorry.
20        THE REPORTER:  -- just wait for the --
21        THE WITNESS:  Sorry.
22        THE REPORTER:  -- end of the question.

Page 28

1  BY MR. ZORN:
2    Q    Okay.  So -- so you report to
3  Ms. DuBois, who's in the DEA's chief counsel
4  office?
5    A    Correct.
6    Q    And then Ms. DuBois reports to?
7    A    Sandra Stevens, who is the deputy chief
8  of the Office of Chief Counsel at DEA.
9    Q    Okay.  And Ms. Stevens reports to?
10    A    Hallie Hoffman, who is the chief
11  counsel for DEA.
12    Q    And I will assume that Ms. Hoffman
13  reports to the administrator, correct?
14    A    Correct.
15    Q    What are you responsibilities as the
16  chief FOIA officer for DEA?
17    A    So my responsibilities are to oversee
18  the overall administration of the FOIA and the
19  Privacy Act at DEA.
20    Q    Okay.  And -- and the responsibilities
21  that you have are in the FOIA statute, right?
22    A    Correct.

Page 29

Veritext Legal Solutions
346-293-7000

1          MR. ZORN:  And why don't we pull that
2   up.  So I'm going to introduce -- I'm going to
3   get creative.  I'm going to call this Exhibit
4   FOIA.  Let's see.
5          All right.  I have introduced into the
6   folder Exhibit capital F-O-I-A.
7          (Deposition Exhibit FOIA
8          was marked for identification.)
9          MR. RODRIGUEZ:  Sorry.
10         THE WITNESS:  That's okay.
11  BY MR. ZORN
12     Q    And can we turn to -- it's page 25 of
13  the document.  You can see at the bottom right --
14  well, first, can you confirm for me at least as
15  for the first page that this is 5 U.S. Code
16  section 552?
17     A    It is.
18     Q    And that's -- that's the FOIA --
19     A    Correct.
20     Q    -- citation?
21     A    Yes.
22     Q    And this is from -- I think I got it

1   from the Cornell U.S. law U.S. code.
2          Have you ever been to that --
3     A    I have been to this.  Typically, when I
4   want to look up 552, I will go to the
5   electronic -- or I'm sorry -- the -- I'll just go
6   to the United States code website to get it.
7     Q    But it's a statute that -- that DOJ and
8   DEA is -- is familiar with?
9     A    Correct.
10    Q    Okay.  So if you can scroll to page 25,
11  and I want to look at -- on page 25, I want to
12  look at (j)(2).  And just tell me when you're
13  there.
14         So it says, "The Chief FOIA Officer of
15  each agency shall, subject to the authority of
16  the head of the agency."
17         I want to stop there.  So the chief
18  FOIA officer is --
19         MR. RODRIGUEZ:  Could you hold on?
20         MR. ZORN:  Yes.
21         MR. RODRIGUEZ:  Let me -- let us get to
22  the page --

1          MR. ZORN:  Sure.
2          MR. RODRIGUEZ:  -- here.
3          MR. ZORN:  Sure.
4          MR. RODRIGUEZ:  Sorry about that.
5   Yeah, we're good now.
6   BY MR. ZORN
7     Q    Okay.  So the chief -- I'm going to
8   read it again.
9          "The Chief FOIA Officer of each agency
10  shall, subject to the authority of the head of
11  the agency."
12         Did I read (j)(2) correctly?
13    A    You did.
14    Q    And the chief FOIA officer of DEA is
15  you, Ms. Kelleigh Miller, correct?
16    A    Correct.
17    Q    And we can agree that the Drug
18  Enforcement Administration is an agency, correct?
19    A    It is.
20    Q    So in (j)(2), the chief FOIA officer of
21  DEA is you?
22    A    Correct.

1     Q    Okay.  And A is "have agency-wide
2   responsibility for efficient and appropriate
3   compliance with this section."
4          As the chief FOIA officer, that is one
5   of your responsibilities, correct?
6     A    Correct.
7     Q    That's statutory?
8     A    Correct.
9     Q    B, "monitor implementation of this
10  section throughout the agency and keep the head
11  of the agency, the chief legal officer of the
12  agency, and the Attorney General appropriately
13  informed of the agency's performance in
14  implementing this section."
15         That's one of your responsibilities,
16  correct?
17    A    It is.
18    Q    And that's because you are the chief
19  FOIA officer of DEA?
20    A    Correct.
21    Q    Okay.  C, "recommend to the head of the
22  agency such" -- and I'll just pause there.  That

1   in this case is -- is the Honorable Anne Milgram,
2   correct?
3        A    Correct.
4        Q    "Such adjustments to agency practices,
5   policies, personnel, and funding as may be
6   necessary to improve its implementation of the
7   section."
8            That's something you do, right?
9        A    Correct.
10       Q    And is it something you do through this
11  chain of command, or do you -- do you actually
12  get to speak to Ms. Milgram?
13       A    No.  This is done through my chain of
14  command.
15       Q    Okay.  So you don't get to speak to
16  Ms. Milgram, like -- because I'm having trouble
17  with that, too --
18       A    Generally, no.
19       Q    -- I would say.  Okay.
20           So -- so let's do D.
21           "Review and report to the Attorney
22  General, through the head of the agency, at such

1   times and in which formats as the Attorney
2   General may direct, on the agency's performance
3   in implementing this section."
4           And so I'll just make this open-ended.
5   That's something you do, true?
6        A    We do that.
7        Q    And how does the agency do that?
8        A    We accomplish this through our annual
9   reporting through the -- the -- I'm sorry -- the
10  annual FOIA reports and the chief FOIA officer
11  report that we complete every year and we send
12  through our chain of command to the Department of
13  Justice.  And then they prepare the DOJ chief
14  office -- chief officer reports and annual FOIA
15  reports that gets submitted to the attorney
16  general.
17       Q    And the DOJ chief FOIA officer
18  is Associate Attorney General Vanita Gupta,
19  right?
20       A    Could you ask the question again?  I'm
21  sorry.
22       Q    The DE- -- the DOJ's chief FOIA

1   officer, her name is Vanita Gupta, right?
2        A    I am forgetting, because I actually
3   deal primarily with Bobby Talebian, who is the
4   chief of the Office of Information Policy, but I
5   forget the name of the DOJ's chief FOIA officer.
6   I don't have any interaction with that
7   individual.
8        Q    Okay.  So you don't interact with the
9   chief FOIA officer of the Department of Justice,
10  and you, meaning Kelleigh Miller, the chief FOIA
11  officer of DEA, doesn't interact with the chief
12  FOIA officer of DOJ, assuming it is Vanita Gupta?
13       A    I do not.
14       Q    Okay.  You -- you, as in Kelleigh Ms.
15  Miller, does interact with a gentleman named
16  Bobby Talebian, correct?
17       A    Bobby Talebian, but primarily his
18  staff.  That's the Office of Information Policy.
19  This is essentially the FOIA office for DOJ.  We
20  have a lot of interaction with that office, yes.
21       Q    Okay.  And what -- what types of
22  matters do you discuss with the DOJ?

1        A    Sure.  So the Office of Information
2   Policy, otherwise known as OIP, handles all of
3   the administrative appeals.  So any time a
4   requester is unsatisfied with our determination
5   to their FOIA request, they have the right to
6   file an administrative appeal.
7           The department will come back to us and
8   ask us for all the background materials on the
9   request.  They may have some questions for us.
10  So we -- we deal with them heavily on the
11  administrative appeal process.
12          We also participate in trainings that
13  OIP conducts throughout the year.  We attend
14  various meetings that OIP hosts and things like
15  that.
16       Q    Have you attended the Chief FOIA
17  Officers Council?
18       A    I have, yes.
19       Q    Okay.  And that's run by
20  Mr. Talebian --
21       A    It is --
22       Q    -- true?

1     A   -- I believe, yes.

2     Q   I've learned more about FOIA than I

3   ever wanted to know.

4         So let's just continue here.

5         So, E, "facilitate public understanding

6   of the purposes of the statutory exemptions of

7   this section by including concise descriptions of

8   the exemptions in both the agency's handbook

9   issued under subsection (g) and the agency's

10   annual report on this section, and by providing

11   an overview, where appropriate, of certain

12   general categories of agency records to which

13   those exemptions apply."

14        Did I read that correctly?

15    A   You did.

16    Q   Okay.  And that's -- that's your

17   responsibility as the chief FOIA officer of DEA,

18   true?

19    A   It is.

20    Q   Okay.  And, F, "offer training to

21   agency staff regarding their responsibilities."

22        And you, as the chief FOIA officer,

1   offer training?

2     A   We do.

3     Q   Okay.  And I cut off the last three

4   words of that.  I just want the record to be

5   clear.  It says "under this section."  I

6   didn't -- I didn't put that in.

7         So, G, "serve as the primary agency

8   liaison with the Office of Government Information

9   Services and the Office of Information Policy."

10        Did I read that correctly?

11    A   You did.

12    Q   And when we were talking about OIP,

13   that's the Office of Information Policy, correct?

14    A   Correct.

15    Q   Okay.  And then the final point of this

16   (j)(2) is H, "designate 1 or more FOIA public

17   liaisons."

18        Did I read that correctly?

19    A   You did.

20    Q   And the DEA has a FOIA public liaison,

21   correct?

22    A   We do.

1     Q   And who is that?

2     A   That is Desheila Wallace.

3     Q   Okay.  Are you a senior official at

4   DEA?

5     A   I would -- well, I'm -- I mean, I'm a

6   section chief, so I would consider it to be a

7   senior manager.

8     Q   Would you consider yourself to be a

9   senior official at the -- well, let me say:  Does

10   DEA and -- and/or DOJ consider you to be a senior

11   official?

12    A   I believe so.

13    Q   Okay.  Why?

14    A   I think because of my role as the --

15   the chief FOIA officer for DEA, because of my

16   grade level in the government, and my

17   responsibilities.

18    Q   Okay.  Are you a political appointee?

19    A   I am not.

20    Q   Were you -- are you at the assistant

21   secretary or equivalent level?

22    A   I am not.

1     Q   Okay.  Who at DEA is at the assistant

2   secretary or equivalent level?

3     A   I would consider that to be our SES

4   personnel.

5     Q   Okay.

6     A   Senior executives.

7     Q   And who are those?

8     A   Those are generally the individuals

9   that run the divisions at DEA.

10    Q   Okay.  And can you -- can you name them

11   for me?

12    A   I mean, I can give you titles probably

13   better.  Like the chief of the intelligence

14   division, the chief of operations, the chief

15   counsel.

16    Q   Okay.

17    A   Our special agents in charge in the

18   field, perhaps.

19    Q   So did it ever occur to you that you're

20   being underpaid?

21    A   No.

22    Q   Can we look at (j)(1)?  It's right

1    above (j)(2).
2        Can you read (j)(1)?
3    A    Would you like me to read (j)(1)?
4    Q    Yes.  Yes, please.
5    A    "Each agency shall designate a Chief
6    FOIA Officer who shall be a senior official of
7    each agency (at the Assistant Secretary or
8    equivalent level)."
9    Q    You're the chief FOIA officer of DEA,
10   true?
11   A    Correct.
12   Q    You are not at the assistant secretary
13   or equivalent level, are you?
14   A    I am --
15       MR. RODRIGUEZ:  Objection.  Calls for
16   legal conclusion.
17       You can still answer.
18       THE WITNESS:  I am not.
19   BY MR. ZORN
20   Q    Okay.  So let's -- let's assume -- with
21   your counsel's objection, let's assume you're
22   correct.  Then DEA currently has a chief FOIA

Page 42

1    officer that is contrary to what this says, true,
2    under the assumption that your prior answer is
3    correct, that you are not the assistant secretary
4    or equivalent level?
5    A    True.
6    Q    Okay.  And, in fact, there's an Office
7    of Legal Counsel opinion on this.
8        Have you ever read it?
9    A    I have not.
10   Q    Well, the Department of Justice has
11   read it, right?
12   A    I am unsure.
13   Q    Because the office of -- do you know
14   what the Office of Legal Counsel is?
15   A    Yes.
16   Q    Okay.  So what is the Office of Legal
17   Counsel?
18   A    Meaning the Office of Legal Counsel at
19   DOJ or -- or DEA?  Maybe I misunderstand.  I'm
20   sorry.
21   Q    The DOJ Office of Legal Counsel, are
22   you familiar with that?

Page 43

1        And it's a little bit beyond the scope
2    of the -- the topics, so if -- I'm not going to
3    suggest that you're unprepared, but just for
4    foundation, do you know what the Office of Legal
5    Counsel at the Department of Justice is?
6    A    Maybe I do not.
7    Q    Okay.  So do you know what an OLC
8    opinion is?
9    A    No.
10   Q    Okay.  Well -- so you don't know about
11   an OLC opinion by a person named Paul Colborn?
12   A    I am not familiar with that, no.
13   Q    Okay.  Well, I'm going to do something
14   very unorthodox.
15       You represent -- you're here today on
16   behalf of the Department of Justice, correct?
17   A    Yes.
18   Q    Okay.  And I'm going to give you a FOIA
19   request here for that OLC opinion.
20       (Deposition Exhibit OLC
21       was marked for identification.)
22       MR. RODRIGUEZ:  I object to the extent

Page 44

1    that she's here to provide testimony on the
2    topics that you've designated.  She's not here as
3    a representative of the Department of Justice at
4    large.
5        MR. ZORN:  Fair enough.  I'm going
6    to -- I'm going to -- I'll submit -- after the
7    deposition, I'll submit it normally.
8    BY MR. ZORN
9    Q    But -- but could you just read my
10   request out there?
11   A    "I hereby request the OLC document
12   containing the opinion/agency conclusion about 5
13   USC 552(j)(2)," signed Matthew Zorn.
14   Q    Oh, sorry.  It should be (j)(1).  Let
15   me -- let me --
16   A    Okay.
17   Q    -- correct this exhibit.  Okay.  I'm
18   not going to make you reread this.
19   A    Okay.
20       MR. ZORN:  Okay.  So -- but let's --
21   let's move to a different exhibit.  I'm going to
22   introduce Exhibit 8.

Page 45

12 (Pages 42 - 45)

1          (Deposition Exhibit Number 8
2          was marked for identification.)
3          MR. RODRIGUEZ:  I'm going to lodge an
4   objection to the serving of the FOIA request.
5   Judge Hughes has authorized this deposition on
6   the specific topics that were identified.  He's
7   not authorized this deposition for the purpose of
8   serving FOIA requests on the 30(b)(6) designee.
9          Our position is that this is an attempt
10  to harass this witness and to avert the proper
11  purpose of this deposition, and we reserve our
12  right to file a motion for protective order and
13  stop the deposition and to contact Judge Hughes
14  or Magistrate Bray and describe what has occurred
15  up to this point.
16         MR. ZORN:  Okay.  Understood.  I -- one
17  of the notice topics was the structure and
18  operation of DEA's FOIA office, and I've been
19  asking questions about whether Ms. Miller is the
20  chief of the DEA.  And -- and, obviously, she
21  holds herself out to be, and she performs the
22  functions and the duties of the office, but there

Page 46

1   does seem to be a conflict with what the statute
2   says.  And so I think it is proper for me to
3   inquire what it is the Department of Justice
4   thinks about whether she is lawfully serving in
5   that office, which obviously relates to the
6   policies and practices at issue in the case.
7          I will say I'm done with the OLC.
8   We're -- that's behind me.  I'm putting --
9          MR. RODRIGUEZ:  Yeah.
10         MR. ZORN:  -- a different document --
11         MR. RODRIGUEZ:  No, what -- what topic
12  that you've identified authorizes you to serve a
13  FOIA request during the deposition on this
14  witness?
15         MR. ZORN:  Well, I don't think it's
16  effective, so I'm going to actually submit it to
17  OLC and ask for the OLC opinion from OLC.  It's
18  not really proper for me to give it to DEA --
19         MR. RODRIGUEZ:  Correct.
20         MR. ZORN:  -- but --
21         MR. RODRIGUEZ:  And it was done, from
22  my perspective, as a form to harass this witness.

Page 47

1   There's no purpose according to this topics for
2   what Judge Hughes has authorized for you to do
3   something like that.
4          MR. ZORN:  Ms. Miller, do you feel --
5          MR. RODRIGUEZ:  And if that's an
6   indication of where we're going today, then I'm
7   more than happy to talk to Judge Hughes about
8   this.
9   BY MR. ZORN
10     Q   Ms. Miller, do you feel harassed at
11  this point?
12     A   I would say I think that the questions
13  that I'm being asked are not the things that I
14  prepared for for today.
15     Q   Okay.  If you feel uncomfortable,
16  please just let me know.  It's not my aim to
17  harass you.  You're here as a representative of
18  the Department of Justice, Drug Enforcement
19  Administration.  I'm here to learn a little bit
20  about the implementation of FOIA, and if you feel
21  like I'm veering, please let me know.
22         That is not -- my goal here is not to

Page 48

1   make you uncomfortable, and, understandably,
2   there might be certain things that you just --
3   you just don't know, and we can deal with that
4   later.  But that's not my objective here today.
5          Do you understand that?
6      A   Understood.
7          MR. ZORN:  Jimmy --
8          MR. RODRIGUEZ:  And if --
9          MR. ZORN:  -- if you think I'm --
10         MR. RODRIGUEZ:  -- you -- if you
11  believe that she's not properly appointed under
12  the statute, I mean, that's a legal question.
13  I'm fine with you asking what is her position,
14  what's her grade level.
15         And if your legal position is she does
16  not qualify for this position under the statute,
17  then of course you can raise that with the Court.
18  But to argue with the witness about whether she
19  is or is not an assistant secretary or equivalent
20  level, it, in my view, serves no discovery
21  purpose in this lawsuit.
22

Page 49

13 (Pages 46 - 49)

BY MR. ZORN

Q   Ms. Miller, do you feel like I'm arguing with you?

A   I do not.

Q   Okay.  So, again, if you feel like I'm arguing with you, let me know.  That is -- again, is also not the purpose of this deposition.  I'm here just to learn information about what are the contentions and, frankly, the facts of DEA and DOJ -- part of this deposition is about the contentions, legal contentions, as far as unusual circumstances, but, understandably, this is a little bit different from that.  But I am here to -- to discover a little bit about contentions.

But again, Ms. Miller, if you feel like I'm arguing with you, that's not productive, and let's not do that, and just let me know.

Is that all right?

A   Understood.

Q   Okay.  So I'd like to pull up Exhibit 8, though.  And when you have that up, if you could just let me know.

Page 50

And -- and so I'm not going to read the entire document.  I'll give you a chance to just read it and just let me know when you've read the document.

A   I have read the document.

Q   Okay.  So -- and you started serving as the DEA's chief FOIA officer in 2017, correct?

A   Correct.

Q   Is this a document that you have reviewed prior to today's deposition?

A   I have seen this document before, yes.

Q   And -- and one of the sentences in this document is requesting that "each agency review its Chief FOIA Officer designation and make any necessary adjustment to ensure that the designated official is at the Assistant Secretary level or its equivalent, as required by the Freedom of Information Act."

Did I read that correctly?

A   Yes.

Q   And it says that "The Department of Justice," who you represent today in the capacity

Page 51

of a 30(b)(6) deponent, "will require agencies to report whether their designations meet this statutory requirement in their 2019 Chief FOIA Officer Reports."

Did I read that correctly?

A   You did.

Q   Did DEA report whether it met the statutory requirement?

A   I do not specifically remember that.

MR. ZORN:  Okay.  Do you want to take a break?  I mean, we've been going --

MR. RODRIGUEZ:  Yeah.

THE WITNESS:  Whatever you want --

MR. RODRIGUEZ:  That's fine.

THE WITNESS:  -- to do.

MR. ZORN:  Okay.

VIDEO TECHNICIAN:  Going off the record, the time is 10:24 a.m.

(Recess 10:24 a.m. to 10:47 a.m.)

VIDEO TECHNICIAN:  Going back on the record, the time is 10:47 a.m.

Page 52

BY MR. ZORN

Q   Welcome back, Ms. Miller.

A   Thank you.

MR. ZORN:  Let's -- I'm going to ask you to pull up Exhibit 2.  Before the break, we were talking a little bit about the scope of the deposition, and I just wanted to put the notice.

(Deposition Exhibit Number 2 was marked for identification.)

BY MR. ZORN

Q   And is that Exhibit 2?

A   One moment, please.  Okay.

MR. RODRIGUEZ:  I have Exhibit 2 as the FOIA statute.

MR. ZORN:  Oh, that was the second exhibit I introduced, but I put in -- shoot.  It's --

MR. RODRIGUEZ:  Is it Exhibit 1?

MR. ZORN:  It's -- it should be --

MR. RODRIGUEZ:  So I have three exhibits in the file.  Exhibit 1 is the FOIA letter final.  Exhibit 8, chief FOIA officer

Page 53

14 (Pages 50 - 53)

1  memo, and Exhibit 2, which is the statute.
2       MR. ZORN:  So I -- there should be an
3  Exhibit 2 - 30(b)(6) depo notice.pdf --
4       MR. GRAY:  Refresh the --
5       MR. ZORN:  -- uploaded.  If you -- you
6  have to refresh --
7       MR. RODRIGUEZ:  Okay.
8       MR. ZORN:  -- and it's -- it's -- I
9  kind of pre-titled some of them, and I'm
10  switching around the order.  So the confusion is
11  my --
12      MR. RODRIGUEZ:  Now we have it.
13      THE WITNESS:  Okay.
14      MR. RODRIGUEZ:  So I needed to refresh
15  the folder.
16      MR. ZORN:  I needed to title these
17  things better, so multiple -- all right.
18  BY MR. ZORN
19    Q   So we have 30(b)(6).  This is 9:32 a.m.
20  And just let me know when you have it up.
21    A   We do.
22    Q   Okay.  So do you see that this is a

Page 54

1  notice of deposition 30(b)(6) to the U.S.
2  Department of Justice and U.S. Drug Enforcement
3  Administration?
4    A   Yes.
5    Q   And at the top of the page, you see
6  there's a blue header; is that correct?  The very
7  top of the page.
8    A   Yes.
9    Q   All right.  And let's go to page 3 of
10  the document and just confirm for me that it says
11  Exhibit A at the -- towards the top of the page.
12    A   It does.
13    Q   Okay.  And then if we go to page 4,
14  you'll see there's a list of 30(b)(6) topics for
15  DOJ and DEA.  Do you see that?
16    A   I do.
17    Q   And these are the topics that you are
18  prepared for and are prepared to testify today on
19  behalf of DOJ and DEA, true?
20    A   Correct.
21    Q   And the first topic, A1, is "The
22  structure and operation of DEA FOIA office,"

Page 55

1  fair?
2    A   Correct.
3    Q   The second is "The description of DEA's
4  FOIA processing office, including its location,
5  its general contents, and the employees working
6  in the FOIA processing office."
7      Did I read that correctly?
8    A   You did.
9    Q   And earlier we -- since -- since --
10  since we're on the topic, earlier, we spoke about
11  the structure of the DEA FOIA office, didn't we?
12    A   We did.
13    Q   And we said -- and you testified that
14  there was an intake office, and then there was a
15  processing office, and those two were different.
16    A   We have three units, so I oversee three
17  units, one being the intake subunit, the
18  processing subunit, and the legal and external
19  affairs subunit --
20    Q   All right.
21    A   -- that make up the FOIA Privacy Act
22  unit at DEA.

Page 56

1    Q   And I actually want to skip around
2  here.  I'm just curious.  Who makes the unusual
3  circumstances determination?
4    A   Generally, the intake unit.
5    Q   Okay.  And what is that determination
6  based on?
7    A   So at DEA, we will invoke unusual
8  circumstances any time we have to search for
9  records that are outside of our office, meaning
10  we do not have possession of all of DEA's
11  records.
12      We have many offices throughout
13  headquarters, the field.  We have offices in
14  about 90 foreign countries.  So we do not have
15  access to all of those records in my own office.
16  We have to rely on the record custodians to
17  retrieve those records for us.
18    Q   So by office in your answer, you mean
19  the FOIA office?
20    A   The FOIA office.
21    Q   So any time a record that is requested
22  in a FOIA request that is not in the FOIA office

Page 57

Veritext Legal Solutions
346-293-7000

1  presents the unusual circumstances exception?

2      A    Correct.

3      Q    And we'll get into the documents in a

4  moment, but what percentage of requests raise

5  unusual circumstances at the Drug Enforcement

6  Administration?

7      A    So we do not track the actual

8  percentage.  However, the data that reflects how

9  often we invoke unusual circumstances is captured

10  in the annual FOIA reports that are available on

11  the OIP -- the Department of Justice Office of

12  Information Policy website.

13          There is a column there where you can

14  see 20 or 30 days.  30 days indicates that we

15  have invoked unusual circumstances for those

16  cases for that particular fiscal year.

17      Q    Is a complex request always going to

18  raise unusual circumstances?

19      A    So the definition of complex and simple

20  is different than unusual circumstances.

21          While there may be a close proxy there,

22  complex and -- you know, to -- I would -- the

Page 58

1  best way I can put this is that we define a

2  complex case by any time that we feel it's going

3  to take us more than a month to process records.

4  The reason for that is, the records may involve a

5  high volume.  If we have hundreds of pages or

6  thousands of pages for review, we're not going to

7  be able to produce it within 30 days.  So

8  anything that takes us longer than 30 days, we

9  deem that to be complex.

10      Q    Now, when you say in the FOIA office,

11  are you talking about, like, physically, like,

12  sitting in the FOIA office?

13      A    Yes.  So I may need you to clarify,

14  though, what you're asking me.

15      Q    Like, I'm curious about, like,

16  electronic documents.  So, like, you know --

17  like -- well, I don't know.  What do you mean --

18      A    Sure.

19      Q    -- by in the FOIA -- like, when is

20  something located in the FOIA office?

21      A    Sure.  So in my office, we do not have

22  access to the hundreds of IT systems that DEA

Page 59

1  uses, you know, the paper-based filing systems

2  that our offices all over the United States, you

3  know, utilize.

4          So we -- when we receive a FOIA

5  request, oftentimes, we are searching for paper

6  and electronic records.  We simply don't have

7  access to all that.

8          Now, if for some reason I did have

9  access to a record because maybe that record has

10  been requested by another individual previously,

11  we would have access.  I would not be invoking

12  unusual circumstances because I already have

13  access.  I'm just going to review it and release

14  it again, if that makes sense.

15      Q    So the office has access to records

16  that have been previously requested?

17      A    Correct.

18      Q    And if those records get requested a

19  third time, then they have to get posted

20  publicly?

21      A    We are supposed to post them, correct.

22      Q    So really the only time that I can tell

Page 60

1  that a record's going to be located in the FOIA

2  office and not made available to the public is

3  the second time that document is requested?

4      A    I'm -- I'm sorry.  I'm not following

5  that one.  You may have to ask the question

6  again.

7      Q    Well, you've testified -- and correct

8  me if I'm wrong.  You've testified that the FOIA

9  office doesn't have access to basically DEA writ

10  large documents, true?

11      A    That is true.

12      Q    In fact, it has access to surprisingly

13  few documents, fair?

14      A    We do not have access to the majority

15  of records that are requested by the public.  We

16  have to rely on the owners, the offices that own

17  those records to retrieve them for us, to provide

18  them to us so that we can process them and

19  release them to a requester.

20      Q    Well, when you say own the records,

21  well, how does one part of DEA own a record that

22  the other part of -- like where does this concept

Page 61

1  of ownership come from?
2      A   So we have, for example, I believe
3  somewhere around 150 different IT systems in DEA
4  that hold records.  If you work, let's say, in
5  the Office of Diversion, you may have your own
6  record systems.  We are not experts in how those
7  systems operate, or we would not even have the
8  knowledge on how to obtain access to the records
9  that are in those systems.  There are hundreds of
10  systems.
11      So we have to again rely on the subject
12  matter experts in DEA from the, you know,
13  hundreds of offices that we have to locate what
14  we're asking for.  We send them a copy of the
15  FOIA request and a search memo, and -- and we ask
16  them to provide the material to us, responsive
17  material to us.
18      Q   And that's not unusual, is it?
19      A   No.  We do this every day.
20      Q   Right.  So those aren't unusual
21  circumstances.  Those are the -- almost always
22  the circumstances?

Page 62

1      A   Well --
2          MR. RODRIGUEZ:  Objection.  Calls for
3  legal conclusion, but you can answer.
4          THE WITNESS:  The only time we're going
5  to assert unusual circumstances is if I have to
6  go outside of my office, meaning I do not have
7  access in my own records system.
8          I utilize one system.  It's called
9  FOIAXpress.  This houses everything from start to
10  finish of every FOIA case.  If I don't have
11  access to those records in that system, I then
12  have to go to the record custodian or the
13  division that owns the material to get it.
14  BY MR. ZORN
15      Q   And the only way you would have access
16  to that record in FOIAXpress is if you've gotten
17  that record previously?
18      A   That exact request and exact timeline
19  previously.
20      Q   How physically big is your office?
21      A   Are you talking about like --
22      Q   I --

Page 63

1      A   -- personnel size, like --
2      Q   And I --
3      A   -- personnel --
4      Q   And just to be clear, sensitive to
5  national security, I don't want to know, like,
6  the location or anything.  I just want to know,
7  like, how big is it physically.
8      A   I don't know that I know the answer to
9  how large it is, but I can tell you that right
10  now, in terms of staff size, I have 18 employees.
11  So there are 18 employees including myself right
12  now.  We have a large number of staff vacancies
13  right now.  I currently have 20 vacancies that
14  I'm trying to get filled.
15      Q   Okay.  And -- and to be clear, those
16  employees, they have, like, physical, like,
17  office locations, cubicles?  Like, what is it
18  that they --
19      A   Cubicles, or pods, as we call them.
20      Q   And they don't actually, like, keep
21  stacks of, like, records in their offices, do
22  they?

Page 64

1      A   No.
2      Q   So when you -- so the records in the
3  FOIA office are almost exclusively the records in
4  FOIAXpress, fair?
5      A   Correct.
6      Q   And I'm not trying to repeat, but I
7  just -- the only time a record is in the FOIA
8  office if it is in FOIAXpress, right?
9      A   Correct.
10      Q   And the only time a record is in
11  FOIAXpress is if it's been previously requested?
12      A   Correct.
13      Q   And that's because the DEA FOIA office
14  doesn't have access to any of the other systems
15  in which DEA keeps documents, fair?
16      A   That is correct.
17      Q   Okay.  Does -- you know, by any chance,
18  do you know why the DEA FOIA office doesn't have
19  access to these other systems?
20      A   I don't know if I can answer the
21  question as to why, but I can tell you again, we
22  are not the subject matter experts in all the

Page 65

17 (Pages 62 - 65)

1   various things that DEA does.
2       So if I had to, for example, go to the
3   Office of Diversion to pull material -- I mean,
4   we would have to become experts in all the
5   various offices, their records systems.  You
6   know, we'd have to have a thorough understanding
7   of the content of those records.  That is just
8   not feasible with a staff of 18.  We -- we are
9   struggling as it is to keep up with the sheer
10  volume of FOIA requests that come to DEA, so we
11  again have to really rely on the subject matter
12  experts to provide what we are asking them to
13  provide, you know, the material responsive to
14  these FOIA requests.
15      Q   Would it -- would it help if the FOIA
16  office were allocated more money?
17      A   Right now, what we need is staff.  We
18  need to fill our vacancies.  I think our budget
19  is fairly adequate.  However, we are struggling
20  right now with the lack of personnel resources.
21      Q   Well, everyone, DEA's hiring, so -- but
22  back -- back to this.  Okay.

Page 66

1       So this understanding of unusual
2   circumstances, was that in place when you became
3   the chief FOIA officer --
4       A   Yes.
5       Q   -- in 2017?
6       A   Yes.
7       Q   And who was the chief before you?
8       A   It was a gentleman by the name of
9   Stacey Strayer.
10      Q   All right.  And how long have you been
11  working in DEA FOIA?
12      A   In FOIA, since 2017.
13      Q   Didn't you work in records before that?
14      A   So -- yes.  I used to be the section
15  chief over FOIA, records management and
16  investigative records.
17      After I had been in this role for two
18  years, I had -- I wrote a proposal asking upper
19  management to split our section.  I wanted to
20  basically turn FOIA into a section with three
21  units, which we did.  And we hired someone else
22  to run records, investigative records, and now

Page 67

1   the DEA Museum.
2       Q   Never been to the museum.  Don't know
3   what's in there.
4       So -- so -- hold on.  So -- okay.  So
5   Stacey -- what was --
6       A   Strayer.
7       Q   Strayer.  And do you know where this
8   understanding of unusual circumstances came from?
9       A   Well, it is captured in the DOJ FOIA
10  regulations, which can be found at 28 -- excuse
11  me -- 28 CFR part 16.  It defines unusual
12  circumstances.
13      Q   How does it define unusual
14  circumstances?
15      A   There are three prongs to this.  The
16  first prong is the one that we primarily invoke
17  at DEA, which is any time that we need to search
18  for records that are physically outside of our
19  own office, we would invoke unusual
20  circumstances.
21      For example, we have offices all over
22  the country are, 200 and -- 239 offices across

Page 68

1   the United States that are part of 23 field
2   divisions.  We don't have access to their
3   records.  We have to rely on the owners to
4   provide the material to us.  So we primarily
5   invoke it for the first prong.
6       There are two other prongs, one being
7   any time that we have to consult with other
8   agencies that may have equities in the documents.
9   That also would qualify under the unusual
10  circumstances.
11      Q   Well, so -- and I want to break down
12  your answer there because -- and you've read the
13  FOIA statute, right?
14      A   Yes.
15      Q   It uses the word "establishments,"
16  right?
17      A   Uh-huh.
18      Q   Like establishments separate from the
19  office processing the request?
20      A   Yes.
21      Q   And it talks about field offices as
22  well.  So --

Page 69

18 (Pages 66 - 69)

1    A   Yes.

2    Q   -- different physical locations

3  elsewhere in the country, that -- let's put that

4  into one bucket.  Do you follow me?

5    A   Yes.

6    Q   But as I understand what you're --

7  where -- where is -- like what building is the

8  DEA FOIA office in?

9    A   We're part of DEA headquarters in

10  Arlington, Virginia.

11    Q   Okay.  And there other DEA divisions

12  that are physically in headquarters, right?

13    A   That is correct.

14    Q   And the way I understand what you're

15  saying is that the agency interprets unusual

16  circumstances to mean -- across the hallway is

17  unusual circumstances if that's not the DEA FOIA

18  office; is that fair?

19    A   Yes.

20    Q   Okay.  So if I had a -- if I took my

21  outline here and walked across the hallway and

22  put it in someone else's office and that person

Page 70

1  worked in some other division, we're now in --

2  in -- we're now outside the FOIA office, right?

3    A   Uh-huh.  Correct.

4    Q   Okay.  And that's like 10 feet away.

5    A   Correct.

6    Q   Is that fair?

7    A   Correct.

8    Q   Okay.  So this is a game of inches,

9  right?

10    MR. RODRIGUEZ:  Objection.

11  Argumentative.

12    MR. ZORN:  Okay.

13    MR. RODRIGUEZ:  You can answer.

14    MR. ZORN:  No.  I withdraw the

15  question.

16  BY MR. ZORN:

17    Q   You -- any -- any time you venture --

18  no matter how far outside the FOIA office one is,

19  whether cyberspace or physically, if you are

20  outside the FOIA office but in the same building,

21  you're -- the unusual circumstances applies,

22  according to the agency?

Page 71

1    A   It would apply.  And if I could share

2  one more example.

3    Q   Sure.

4    A   We have some offices that are part of

5  headquarters that are not physically located in

6  the same buildings as the FOIA office.  They are

7  located in other parts of Virginia.

8        For example, our Information Technology

9  Division.  If I get a FOIA request specifically

10  for e-mail records, I cannot access anyone's

11  e-mail records.  I have to rely on the

12  Information Technology Division to do that

13  search.  They are physically located outside of

14  headquarters in another part of Virginia.  They

15  are the office that would provide those

16  responsive materials to us.

17    Q   Is that the Morrissette building?

18    A   No.  That's -- that's actually our

19  mailing address.  So that's -- that's not

20  where -- that's not our physical address.

21    Q   But that's a building that you're

22  referring to in Northern Virginia?

Page 72

1    A   It is a building in Northern Virginia.

2    Q   Right.  That's like 30 minutes away

3  from headquarters --

4    A   Uh-huh.

5    Q   -- or less, right?

6    A   But that is not where the Information

7  Technology Division is located --

8    Q   Okay.  Well --

9    A   -- no.

10    Q   -- we don't need to get into --

11    A   Right.

12    Q   -- specifically where it is, but it's

13  in the same state, though, right?

14    A   In the same state.

15    Q   So -- but obtaining those records from

16  the IT Division is -- is done over the Internet,

17  true?

18    A   It is done through an electronic means.

19    Q   So no one's physically going down and,

20  like, picking up, like, a box of records or even

21  a USB drive, right?

22    A   Not for e-mail records, no.

Page 73

19 (Pages 70 - 73)

1   Q   Okay.  So it's really, you know -- and
2   maybe you can't answer this -- but it's not any
3   more or less convenient than if it were in the
4   same building, because it's transmitted the same
5   way, right?
6   A   The process would be the same if they
7   were physically located inside of our -- meaning
8   a part of headquarters in Arlington.
9   Q   Right.  So would you say that -- that
10   invoking the unusual circumstances would be
11   necessary to process a request that was
12   electronically transmitted outside versus one
13   that would be electronically processed inside?
14   A   Correct.
15   Q   There's no, like, additional cost or
16   time based on where the documents are located if
17   the transfer is going to be electronic; is that
18   fair?
19   A   That's fair.
20   Q   But there is -- there is an access
21   concern, and that's kind of what you've been
22   testifying about, right?  Like you personally --

Page 74

1   sorry.  Let me -- let me just -- I'll just strike
2   all that, and let me reask the question.
3   Like you, Ms. Miller, can't access
4   those records, right?
5   A   Correct.
6   Q   You need to reach out to another
7   division within DEA to get access to the records,
8   right?
9   A   Correct.
10   Q   And that necessarily takes additional
11   time, right?
12   A   It takes time.  It does.
13   Q   So there is a -- and you did not create
14   that process, did you?
15   A   The search process?
16   Q   Well, just even the way this is
17   structured.  Like, that was in place when you got
18   there.
19   A   That was in place when I arrived.
20   Q   Right.  So -- and so that wasn't like a
21   design choice that Ms. Kelleigh Miller made about
22   the way DEA keeps its records, right?

Page 75

1   A   No, it was not.
2   Q   And maybe it just grew over time; fair?
3   A   I just want to make sure I'm following
4   the line of questioning here.
5   So if we're talking about the vast --
6   like the sheer volume of record systems that are
7   out there, yes, we do -- we do not -- I did not
8   create that, right?
9   Q   Right.
10   A   But, again, I don't -- we do not -- the
11   FOIA office does not have access to the material
12   that is in all of those 150-plus systems.
13   Q   So do you happen to know when DEA
14   adopted this interpretation of unusual
15   circumstances?
16   A   We have been following this for --
17   again, we follow the DOJ FOIA regulations.  All
18   of the components under DOJ are following the
19   same regulations.
20   So our interpretation and OIP's
21   interpretation of the statute is that if we have
22   to -- if we do not have access to the records, we

Page 76

1   have to go, you know, physically outside of our
2   office to gain access to those records, we would
3   invoke unusual circumstances.
4   Q   So this is not a DEA policy.  It is a
5   Department of Justice --
6   A   Department-wide.
7   Q   Okay.  So this is -- the entire
8   Department of Justice, it is its position that if
9   a record is outside the FOIA office that unusual
10   circumstances applies?
11   A   Correct.
12   Q   That's -- the United States Department
13   of Justice is taking that -- that position under
14   oath today in this -- this room?
15   A   We have consulted with OIP on this
16   issue, and their position is that, yes, if it is
17   outside of our own office -- again, we don't have
18   access to the material.  We have to rely on
19   offices across DEA -- that unusual circumstances
20   does apply.
21   Q   And, again, I'm not suggesting that
22   anyone at DEA intentionally structured the office

Page 77

20 (Pages 74 - 77)

1   the way it did.  But let's say an office did
2   intentionally structure it that way.  It --
3   the -- basically, there's nothing to stop an
4   agency from creating a FOIA office and divesting
5   it of records, is there?
6          MR. RODRIGUEZ:  Objection.  Foundation.
7          THE WITNESS:  I'm not sure I understand
8   the question.  I'm sorry.
9   BY MR. ZORN
10      Q   Well, let me -- let me lay some
11  foundation.
12          So the way DOJ processes requests is it
13  farms out to its components; fair?
14      A   At DEA, yes.  We --
15      Q   DOJ --
16      A   -- farm out --
17      Q   DOJ.  So DOJ doesn't -- DOJ doesn't
18  actually have a FOIA office, right?
19      A   Well, the Office of Information Policy,
20  I would consider to be their FOIA office.
21      Q   Right.  And there are documents
22  produced in this case that break down by

Page 78

1   different DOJ components, such as ATF, FBI, DEA,
2   and each of those components handles their own --
3       A   Their own --
4       Q   -- FOIA requests?
5       A   Uh-huh.
6       Q   Yeah.  So -- and what you said about
7   the policy today, testifying as Department of
8   Justice, that's the policy across every component
9   in the -- the --
10      A   We --
11      Q   -- Department of Justice?
12      A   We all follow the Department of Justice
13  FOIA regulations, yes.
14      Q   Okay.  So that's -- that's the ATF's
15  policy.
16      A   Uh-huh.
17      Q   And I'm mindful of Judge Hughes's sort
18  of limitation, but I'm just talking about the DOJ
19  policy here.  That's the FBI policy.  It's the
20  ATF policy.  Fair?
21      A   Yes.
22      Q   Okay.  And -- and, you know, do you

Page 79

1   happen to know if any of those other components
2   have FOIA offices like DEA?
3       A   They all have FOIA offices, but I can't
4   speak to their record systems and operations
5   specifically.
6       Q   And you're not here to testify on
7   behalf of those.
8          But, you know, my question is, you
9   know -- you know, there's nothing that restricts
10  an agency from being able to have a FOIA office
11  with no records, right?
12      A   There -- I'm not sure how to best
13  answer this.  There's nothing that restricts,
14  but, again, when you're talking about an office
15  of 18 people, it would be next to impossible for
16  us to gain access to 150 systems, know how they
17  operate, know where to find, locate their
18  records.
19          This is an impossible operation.  I
20  would have to have a much larger staff and -- and
21  the ability to learn the ins and outs of all the
22  various systems.  It just doesn't make a lot of

Page 80

1   sense.
2       Q   But -- but I guess my question is
3   just -- there's -- there's -- there's no --
4   there's nothing in the law that -- that precludes
5   an agency such as DEA that you are aware of from
6   just not keeping any records at all, right?
7       A   The records that we have would be
8   housed in FOIAXpress.  So as we mentioned -- as I
9   mentioned previously, there are a number of
10  requests that we receive.  We've gotten that
11  exact request in the past.  We would go into the
12  system, reproduce and release those records.
13          There are -- there are other
14  circumstances where, again, we would not invoke
15  unusual circumstances.  For example, if there are
16  no -- if there are no records, if we know from
17  the beginning of the receipt of that request, I
18  don't have any records on this matter, a letter
19  is going to go out to the requester telling them
20  that.  I'm not invoking unusual circumstances.
21      Q   Well, interestingly, though -- let's --
22  let's start on that, because one of the topics

Page 81

21 (Pages 78 - 81)

1   noticed today are my requests.  And one of my
2   requests, there wasn't any responsive records.
3         Do you recall that?
4      A   You had -- I believe there were two
5   that we did searches and -- which yielded no
6   records.
7      Q   In fact, one of those records related
8   to -- one of those requests related to
9   transcripts from a 1975 proceeding.  Do you -- do
10  you --
11     A   I do --
12     Q   -- recall that?
13     A   -- recall that, yes.
14     Q   Yes.  And there were no records on
15  that, but the agency did invoke unusual
16  circumstances, didn't it?
17     A   Yes.
18     Q   And so, in fact, there are situations
19  where the agency invokes unusual circumstances,
20  but there are no records, right?
21     A   Yeah.  So that situation is a little
22  different than what I was just describing.  So,

1   again, in this situation, we have to do a
2   search -- we'd have to go to the Office of the
3   Administrative Law Judges.  Again, we have no
4   access to their records.  Their records are
5   maintained both electronically, and some of their
6   records are even housed in the Federal Records
7   Center, which is in another state.
8         So, again, we have to rely on the
9   owners in that office, the custodians, record
10  custodians, to retrieve all of that -- all of the
11  responsive material and provide it to our office.
12     Q   So, you know, I want to go back to all
13  this, but now that we're talking about the ALJ's
14  office, this is another topic, which is
15  administrative proceedings.
16        So are all records from administrative
17  proceedings kept in the ALJ's office?
18     A   Yes.
19     Q   So this is not kept at DEA outside of
20  the ALJ's office, are they?
21     A   To my knowledge -- and, again, if we
22  receive a FOIA request asking for proceedings,

1   you know, or transcripts from an ALJ case, yes,
2   I'm going to the Office of Administrative Law
3   Judge to get those records.
4      Q   And filings in DEA administrative cases
5   are done through an e-mail inbox, true?
6      A   I do not have any knowledge of that.
7      Q   Okay.  Well, this is a noticed topic,
8   and I don't want to dwell on it, but I believe --
9   let's see.  We have the exhibit, the notice, up,
10  right, which is records from DEA proceedings,
11  which is -- I guess I can ask the question
12  differently and maybe -- maybe you will know.
13  This is F13 and 14, but --
14        MR. RODRIGUEZ:  Yeah.  Just to be
15  clear --
16        MR. ZORN:  Yeah.
17        MR. RODRIGUEZ:  -- I mean, we
18  interpreted these topics as they relate to FOIA.
19  I mean, to the extent that you want her to speak
20  to recordkeeping in administrative proceedings
21  unrelated to FOIA, I mean, we didn't prepare for
22  that, and I don't -- I don't --

1         MR. ZORN:  Yeah.  And to be fair,
2   Jimmy, I'm reading exactly what the topic is, and
3   I think she is providing the --
4         MR. RODRIGUEZ:  Okay.
5         MR. ZORN:  -- information which is --
6   she's talking -- basically, the topic is records
7   already filed.  So I'm not expecting her to be
8   knowledgeable about the filing process because
9   that wasn't, you know --
10        MR. RODRIGUEZ:  But, I mean, you're
11  certainly welcome to ask, and if she has personal
12  knowledge --
13        MR. ZORN:  That -- that's fine.
14        MR. RODRIGUEZ:  Yeah.
15        MR. RODRIGUEZ:  I'm not -- like I said, I'm
16  not here to quiz you on what you are or are not
17  prepared.  I'm genuinely interested in learning.
18        MR. RODRIGUEZ:  And I think on the
19  topics where you have actual FOIA requests
20  pending related to that, I mean, I think it's
21  only fair that you're entitled to more leeway
22  there.

BY MR. ZORN

Q   Okay.  So -- so forgetting about how -- how records are filed and just talking about records that have already been filed in these administrative proceedings, you say that those are kept in the ALJ offices; true?

A   Yes.

Q   And how does the public access those records?

A   They would have to file a FOIA request.

Q   And the only way a public -- a member of the public can get access to those records is by filing a FOIA request; true?

A   Yes, with the exception of things like the -- any decision or order by the administrative law judge is posted on DEA.gov, so that information is accessible to the public, but anything beyond that, we would -- they would have to submit a FOIA request to DEA for --

Q   So --

A   -- access.

Q   And we've established that these FOIA

requests -- that -- that request would necessarily raise unusual circumstances, true?

A   It would.

Q   So we're talking about more than 30 days to deliver that request?

A   Yes.

Q   So I want to -- I want to kind of construct a hypothetical, and I'm going to ask if you follow me.  I -- I represent client A.

Do you follow me?

A   Uh-huh.

Q   I'm in a --

A   Yes.

Q   -- DEA administrative proceeding.

Do you follow me?

A   Yes.

Q   The administrative law judge sets a timed hearing three months from now.

Do you follow me?

A   Yes.

Q   And I believe that there is a useful record in a prior administrative proceeding that

will help my client -- I don't know -- escape charges from the DEA.

Do you -- do you follow me?

A   Yes.

Q   Okay.  I can't get those records any other way except through FOIA, right?

A   That is correct.

Q   But the likelihood I'm going to get that record before the hearing is slim, right?

A   Depending on, again, the volume and the complexity and what's being asked, I mean, it probably would be difficult to produce in 30 days.

Q   In fact, it's almost -- are you familiar with how these administrative hearings work?  If you're not, then --

A   I'm not an expert in this, no.

Q   Okay.  Well, let's assume from a hypothetical that the administrative law judge requires each side to declare their evidence within 90 days of the hearing.

Do you follow me?

A   Uh-huh.

Q   So now we're talking a month and a half of getting -- getting records that I believe are going to exculpate my client.

Do you follow my hypothetical?

A   Yes.

Q   There's -- there's almost no way that I can get any of those records from the ALJ's office, is there?

A   Not directly from the ALJ's office, no.

Q   No.  And if I ask -- well, so I'd have to file a FOIA request with your office?

A   Yes.

Q   Your office is going to say there are unusual circumstances; true?

A   Uh-huh.  Yes.

Q   And it's going to take more than 90 days for me to get those records; true?

A   Yes.  I would say it's definitely going to take more than 30 days.

Q   Okay.  And you're going to -- if I'm representing a client that isn't the news media

1   or a nonprofit or non-commercial, you're going to
2   charge me for that, right?
3      A   We only charge what we call review
4   fees.  We have search and review fees.  DEA
5   generally does not charge search fees any longer.
6      Q   Okay.
7      A   This is because the -- the FOIA
8   Improvement Act of 2016 really limited our
9   ability to charge search fees.  I would have to
10  be able to produce the records within 30 days in
11  order to maintain the fee.  There are some
12  exceptions to that rule, but generally we do not
13  charge requesters search any longer.
14         Review fees are only charged to
15  commercial use requesters.  So if a requester
16  has, again, a profit, trade or commercial
17  interest and use for the records, we would -- we
18  would charge a review fee.  That is done after
19  we've collected all the records and we have the
20  ability to assess that fee.  We need to see how
21  much, what's the volume of -- you know, of
22  records that we're going to be -- that we will

Page 90

1   need to process.
2      Q   And we'll -- we'll talk about that.
3   We'll talk about the review fees.  I think that
4   was -- that's one of the topics.
5         But just -- just as a general kind of,
6   you know, yes -- yes, no, is -- the agency will
7   charge my -- my hypothetical commercial client
8   for the review and production of records that
9   were filed in an administrative proceeding,
10  right?
11     A   (Nodding.)
12     Q   Is that fair?
13     A   Yes.
14     Q   Aren't these proceedings public?
15     A   To my knowledge, they are open to the
16  public.
17     Q   What -- what FOIA exemption would apply
18  to any of the material filed in a public
19  proceeding?
20     A   So there are a lot of records that we
21  get from the ALJ's office.  In fact, one of your
22  requests, I think we received over 5,000 -- I had

Page 91

1   three boxes, 3 cubic feet of records that were
2   provided to our office.
3         And we have to go through all of the
4   material to see, you know, what it -- what is
5   responsive, what is releasable to you, what may
6   require redactions, is there third-party
7   information within any of the records.  So there
8   is a very heavy and labor-intensive review
9   process that has to, you know, occur with the
10  review here.
11     Q   And I hear what you're saying, but we
12  can agree that filings in an administrative
13  proceeding are -- these are public proceedings,
14  right?
15     A   Yes.
16     Q   And some filings are sometimes made
17  under seal.  Do you know what that is?
18     A   Yes.
19     Q   Okay.  But public filings are public
20  documents, right?
21     A   Yes.
22     Q   Why -- why does the DEA FOIA office

Page 92

1   need to review those for exemptions?
2         MR. RODRIGUEZ:  Objection.  It's asked
3   and has been answered, but you can answer again.
4         THE WITNESS:  So is the -- I'm sorry.
5   Could you ask the question again?
6   BY MR. ZORN:
7      Q   Let me phrase it a little bit
8   differently and get more directly to what I'm
9   asking.
10        Is there any threshold determination at
11  DEA to determine whether or not, like, a review
12  needs to be conducted on a document because it's
13  a -- it's a public document?
14     A   So if we know that the document has
15  already been made publicly available, we are
16  releasing it to you in full, and we actually did
17  that for one of your cases.  I know that you had
18  asked for records that were relative to some
19  training that was given at a university.
20        When I spoke -- and I personally spoke
21  to the record custodian to make sure that we had
22  everything and she said, yes, this was -- this

Page 93

24 (Pages 90 - 93)

1    was -- I gave this presentation publicly.  So
2    there's no reason for me to at that point, right,
3    review and determine do I need to place
4    exemptions.  We released everything to you in
5    full.
6        Q   Right.  And so I'm saying, wouldn't
7    that same process apply to documents filed
8    publicly in an administrative proceeding?
9        A   Generally, yes, but, again, we'd have
10   to identify -- we have to be able to identify
11   which records have been publicly filed.
12       Q   And there's no -- there's no way to
13   identify that?
14       A   It's part of the -- it's part of the
15   review process, yes.
16       Q   And that's because the administrative
17   law judge's office doesn't put any, like, marker
18   on the documents, right?
19       A   I can't say a marker, but we probably
20   would be having a conversation with them about
21   which records were publicly filed.  That would be
22   part of that review process.

Page 94

1        Q   Has anyone ever just -- and you may not
2    know this, but just in your personal knowledge,
3    if Jimmy will give me the latitude, I mean, has
4    anyone ever discussed, like, this issue with them
5    of, like, the records that they keep in making
6    filings, like, straightforward to request since
7    the only way to get them is through FOIA?
8        A   Again, I'm not sure I'm following the
9    question.  I'm sorry.
10       Q   Well, it sounds like that the reason --
11   and just correct me if I'm wrong -- the reason
12   that your office needs to review these documents
13   is because you can't look at the document on its
14   face and determine if it was a public filing,
15   right?
16       A   That is generally true, right.  We need
17   to rely on the -- again, the experts, the subject
18   matter experts to tell us, has this been publicly
19   filed.
20       Q   Right.  And so I noticed in the
21   notes -- and that's one of the documents I have
22   selected today -- but you spoke to Ms. Cotter,

Page 95

1    who's a judicial law clerk for ALJ Wallbaum,
2    correct?
3        A   I spoke to Cotter?
4        Q   Sorry.  Some FOIA -- the FOIA staff
5    spoke to Ms. Cotter in response to one of my
6    requests to discuss psilocybin, and she is a
7    judicial law clerk in the ALJ's office for
8    Ms. Wallbaum.  If you don't recall now, we'll get
9    the document out --
10       A   Yeah, I don't recall.
11       Q   -- and it will be -- it will be better
12   to do it that way.
13           But -- but more generally, your office
14   will interface with the ALJ's office --
15       A   Yes.
16       Q   -- and then ask them if these were
17   public or not.  Is that a fair --
18       A   That is correct.
19       Q   And that's just -- if they had
20   something on the document that said this was
21   filed, you wouldn't need to do that --
22       A   Correct.

Page 96

1        Q   -- would you?  Okay.
2            So -- well, that answers that.  Okay.
3            So -- and there's no -- there's no
4    electronic filing system that you're aware of for
5    the DEA administrative proceedings, are there --
6    is there?
7        A   I am not intimately familiar with their
8    system, but I know they have an electronic system
9    that they utilize that's fairly new, and they
10   also maintain a large number of records at the
11   Federal Records Center.
12           So, oftentimes, when we're sending FOIA
13   requests to their office, they have to pull those
14   from the Federal Records Center for us, the paper
15   files.
16       Q   Okay.  And -- but are you aware of --
17   there's no, like, electronic -- when you're
18   talking about getting records, you're asking them
19   to collect the records for you, right?
20       A   Correct.
21       Q   There's no way for you to log into any
22   system and get the records for yourself, right?

Page 97

25 (Pages 94 - 97)

1    A    That is correct.

2    Q    And is there any -- any office within

3  DEA that -- that -- that -- where you can just

4  log in to some document system and get the

5  documents for yourself?

6    A    We can in one circumstance, and this

7  generally has to do with our investigative

8  matters, which is somewhat sensitive, so I won't

9  give a lot of detail.  But my staff does have

10  access to those, and we can generally handle

11  certain types of requests for investigative

12  matters quicker.

13    Q    Right.  But there's no system where --

14  well, okay.  Let me -- let me then take a step

15  back.

16        Who -- when a FOIA request comes in and

17  you need to go to another office -- do you follow

18  me?

19    A    Yes.

20    Q    You reach out to that office.  Is

21  that --

22    A    We send them what we call a search memo

Page 98

1    Q    And potentially more complete, right?

2    A    Correct.

3    Q    In fact, you know, is there -- is there

4  any agency mechanism to check to see if a

5  records -- a custodian of records accurately gave

6  you the -- the right set of records?

7    A    Well, this is exactly why my preference

8  has been to go to the Information Technology

9  Division.  I do not -- as of now, I don't rely on

10  the individual to pull their own records.  I

11  don't believe that it's -- it's as accurate.

12    Q    Yeah.  And has that actually been the

13  FOIA office's experience that it sometimes isn't

14  accurate?

15    A    That has -- we have had some -- some

16  issues, minor issues in the past with this.

17    Q    Has there ever -- I'm getting a little

18  far afield here, but has there ever been an

19  instance where the records were omitted without

20  cause?

21    A    So I cannot think of a specific

22  instance of this, but, again, I think if we allow

Page 100

1  along with a copy of the request letter, and

2  sometimes we, you know, even specifically tell

3  them what we're looking for.

4    Q    Right.  And then that office is the

5  office that does the search for responsiveness.

6  Is that fair?

7    A    Correct.

8    Q    Like, the FOIA office isn't the one

9  that actually determines the initial set of what

10  records are responsive?

11    A    Generally, no.

12    Q    So if I wanted Theresa Carbonaro's

13  e-mails -- do you follow me?

14    A    Yes.

15    Q    Theresa Carbonaro's going to be the one

16  searching her own e-mails, right?

17    A    Potentially, yes, but we will go to

18  the -- generally, we will go to the office of --

19  I'm sorry -- it's the Information Systems

20  Division -- to have them do the e-mail search

21  because we believe that the search would be more

22  accurate if we let the IT experts do it.

Page 99

1  a tool, an IT tool to do the work for us, it will

2  be much more accurate than letting a human do it.

3    Q    Okay.  But right now there is some --

4  still some human element to this collection

5  process, correct?

6    A    For things that are outside of e-mail.

7    Q    Okay.  Where was I?

8        MR. RODRIGUEZ:  I think we were done.

9        MR. ZORN:  I'm learning -- I'm learning

10  so much here.  I was looking -- okay.

11  BY MR. ZORN

12    Q    So -- so, you know, I do want to look

13  here at Topic 3C.  I believe A and B have been

14  covered.

15    A    Pardon me.

16    Q    No, it's all good.

17    A    I just dropped something.  I'll get it.

18        MR. RODRIGUEZ:  So I have a hard copy

19  of the notice, and I'm going to let the witness

20  look at it.  I think it's just --

21        MR. ZORN:  I have no objection to that.

22        THE WITNESS:  Thank you.

Page 101

26 (Pages 98 - 101)

BY MR. ZORN

1 Q   So the percentage or proportion of FOIA
2 requests that were marked by DEA as raising
3 unusual circumstances in 2020, 2021 and 2022,
4 we're going to pull up the document, the FY
5 documents that were produced, but I just want to
6 be clear about my thinking in this, which is --
7 so complex is not necessarily unusual
8 circumstances?
9 A   Close proxy, but not necessarily,
10 because, again, these definitions are very
11 different.
12 Q   Okay.  And let's just skip to D, then,
13 which is -- so the only time a request isn't
14 going to raise unusual circumstances is when that
15 document is in the FOIAXpress?
16 A   That's one example, and then we have
17 other types of requests.
18 Like if we already know upon receipt of
19 the request that we would not have access to
20 that, or maybe a member of the public is asking
21 for records that DEA simply does not maintain --

Page 102

1 they will tell them that we are invoking unusual
2 circumstances, and they tell them why, because we
3 have to go outside of our own office.
4 Q   And it's a -- it's a totally binary
5 determination in the sense that if it's one
6 document somewhere else, it's the same as 100
7 documents somewhere else, right?  The --
8 A   Yes.
9 Q   The actual burden of -- of what's being
10 requested is not evaluated except where the
11 documents are, right?
12 A   Could you ask that again?  I'm sorry.
13 I want to make sure I'm following.
14 Q   Okay.  So the -- the -- it's -- it
15 doesn't -- the agency doesn't evaluate how
16 burdensome it would be to produce records or,
17 frankly, even just make a determination as to
18 whether it will produce records.  The only
19 determination is:  Where are the records?
20 A   No, that is not accurate.  I think that
21 we do -- we do consider how burdensome a request
22 is.

Page 104

1 that's one example -- we're not going to assert
2 unusual circumstances.  We're simply going to try
3 to cut a letter and get it out to the requester
4 as fast as possible to inform them that we don't
5 have -- you know, we don't maintain records on
6 this topic.
7 Q   And I've asked this question, but I
8 think I want to drill down on it.  So when is the
9 unusual circumstances determination made?
10 A   When?  It's made -- so when a request
11 comes in through our intake unit -- intake
12 handles that -- you know, that -- the beginning,
13 basically, the initial process of reviewing a
14 request, determining that, you know, we're ready
15 to move forward with a search.
16 So they're -- if they determine that we
17 have to go outside of our own office -- we don't
18 have access to those records in our system -- we
19 then -- they will invoke the unusual
20 circumstances.
21 So they send an acknowledgment e-mail
22 to the requester, and within that acknowledgment,

Page 103

1 And I'll -- just to share an example,
2 we use what we call multi-track processing.  So
3 let's say we've invoked unusual circumstances.
4 We've collected the records.  We will designate
5 requests based on, basically, three categories,
6 whether it's simple, complex or expedited.  So if
7 something has been granted expedited treatment,
8 we have to prioritize those.  We're generally
9 working to get these requests completed first,
10 right?
11 Q   Sure.
12 A   Requests are generally handled in a
13 first-in, first-out basis based on the queue that
14 we've placed them in, but simple requests, I
15 mean, I do not want to have a one or two-page
16 response sitting in a queue for a year, right?
17 That is not helpful to the public.
18 So we have set up particular buckets or
19 queues, if you will, so that the management team
20 and I can keep eyes on these and we can get these
21 out faster.  So even if we had to invoke unusual
22 circumstances and I get two pages back from the

Page 105

27 (Pages 102 - 105)

1    field, it's going in a queue so that I know I
2    need to get these out.  These are -- these are
3    small cases.  We don't want to be hanging on to
4    those.
5        Q   So two pages from the field, that's
6    unusual circumstances?
7        A   It would be, because, again, we don't
8    have access to the system the material is housed,
9    and we need to rely on them to provide it to us
10   for processing.
11       Q   And we can agree that the unusual
12   circumstances determination isn't about searching
13   or collecting records.  It's about whether or not
14   the agency will produce records, right?
15       A   I don't think that's accurate, no.
16       Q   Well, there's -- there's -- there are
17   different parts of the FOIA process.  There's the
18   determination at the beginning of whether or not
19   the agency is going to search and collect
20   records, right?
21       A   So that would happen at the intake
22   stage.

Page 106

1        Q   Right.
2        A   We receive a request.  The staff has
3    reviewed the request thoroughly, and they
4    determine it's time to conduct a search.  So we
5    send a search memo out to whichever office would
6    own the material being requested.
7        Q   Right.
8        A   And that's the first process -- the
9    first step.
10       Q   Right.  And -- but -- but -- sorry.
11   I'm cutting you off.  That's rude.
12       A   No, you're fine.
13       Q   Okay.  I just -- I want to go to, like,
14   in the statute what the unusual circumstance
15   is -- and I don't know want if you want to pull
16   the statute up.  That was -- it was, what,
17   Exhibit FOIA?
18       A   Uh-huh.
19           MR. RODRIGUEZ:  I'm going to object
20   probably that you're asking for a legal
21   conclusion.  I think we've established what the
22   DEA's practice is and that she's testified

Page 107

1    that in consultation with the OIP that -- when
2    DEA invokes unusual circumstances.
3            I understand you -- you strongly
4    disagree whether that's appropriate under the
5    statute, but I think that we're --
6            MR. ZORN:  Well, I'm --
7            MR. RODRIGUEZ:  I don't want -- I don't
8    want you to try to get her to concede a legal
9    point.
10           MR. ZORN:  I'm not asking a legal
11   question here.  I'm trying to use the statute to
12   illustrate what exactly is being deferred when
13   the unusual circumstances is being invoked.
14   BY MR. ZORN
15       Q   And, like, it's the -- it's like a
16   determination on the FOIA request, right?  It's
17   not the actual production of records.
18           In other words --
19       A   It's not the actual production.  It's
20   simply the fact that I have to go search for
21   those records --
22       Q   Right.

Page 108

1        A   -- outside of my own office.  Once
2    those records are collected, it then moves on to
3    a different unit.
4            The processing unit is now reviewing
5    for responsiveness, determining what's
6    releasable, you know, to the requester under the
7    FOIA, placing redactions on records.  So that's
8    what that team does.
9            But intake is doing the initial -- you
10   know, they're the ones that are invoking unusual
11   circumstances, if that's what you're asking.
12       Q   Yeah, and -- but I'm saying what --
13   what is the -- what timeline here is getting
14   extended?
15           It's not like -- the agency, whether
16   unusual circumstances apply or not, can frankly
17   take its time reviewing records and producing
18   records.  What's being extended when the
19   exception is invoked is the determination on,
20   okay, here's how much you need to pay me to get
21   me to search -- sorry -- to get me to review
22   these records, right?

Page 109

28 (Pages 106 - 109)

1    A    Only -- only for commercial use --
2    Q    Right.
3    A    -- yes, that would be true.
4    Q    Okay.  And --
5    A    And review fees, yes, are applied.
6    Q    Right.  And it's not -- the unusual
7   circumstances is not -- it's not extending the
8   time to produce documents.  This is the -- what
9   the agency's doing, it's extending the time by
10  which, you know, the requester gets a letter
11  saying, like, we've searched for records, right?
12   A    So the way the statute reads, it's
13  we're extending the ten-day statutory response
14  time.
15   Q    Right.
16   A    In theory, right, if we're all
17  following the statute, I should be producing all
18  these records in 30 days.
19       The reality in the federal
20  government -- and this is across the
21  government -- is that we simply do not have
22  enough resources to be able to produce documents

Page 110

1   in 30 days.  Many of our requests are considered
2   complex, involve hundreds, if not thousands of
3   pages.
4        So the ability for a very small FOIA
5   team to produce all of these requests in 30 days
6   is just simply not feasible.  We certainly do the
7   best that we can, and we set up, like I
8   explained, certain types of buckets to try to
9   keep eyes on things that are manageable to get
10  out the door faster, but, yes, it's a very
11  difficult, very challenging process.
12   Q    It sounds like a statute Congress
13  should fix, right?
14   A    Well, it is -- that or we should get
15  more resources somehow.
16       MR. ZORN:  Have we -- how long have we
17  been on?
18       VIDEO TECHNICIAN:  One hour and 44
19  minutes.
20       MR. ZORN:  Okay.  I'm at a breaking
21  point.  I don't know if you guys --
22       THE WITNESS:  Okay.

Page 111

1        MR. ZORN:  -- want to take a break.
2        MR. RODRIGUEZ:  Yeah.
3        MR. ZORN:  All right.
4        VIDEO TECHNICIAN:  Going off the
5   record, the time is 11:39 a.m.
6        (Recess 11:39 a.m. to 11:55 a.m.)
7        VIDEO TECHNICIAN:  Going back on the
8   record, the time is 11:55 a.m.
9        MR. ZORN:  Welcome back, Ms. Miller.
10       THE WITNESS:  Thank you.
11       MR. ZORN:  Can we -- if you pull up
12  your exhibits, I introduced Exhibit 3, so I guess
13  we need to refresh.
14       (Deposition Exhibit Number 3
15       was marked for identification.)
16       MR. RODRIGUEZ:  Let me try one more
17  time.  I'm sorry.  Let's go off the record.  My
18  system has prompted me that my password is due to
19  be changed.  Sorry about this.
20       VIDEO TECHNICIAN:  Going off the
21  record, the time is 11:56 a.m.
22       (Recess 11:56 a.m. to 11:59 a.m.)

Page 112

1        VIDEO TECHNICIAN:  Going back on the
2   record, the time is 11:59 a.m.
3   BY MR. ZORN
4    Q    All right.  Ms. Miller, do you have
5   Exhibit 3 in front of you?
6    A    Yes, I do.
7    Q    And this is a document.  It's hard to
8   see because of the sticker, but if you look at
9   the very bottom, do you see the number DEA --
10  maybe if you just look at the second page of the
11  document, you'll see DEA, and then there are one,
12  two, three, four, five, five leading zeros and
13  then a two.  Do you see that?
14   A    I do.
15   Q    Do you recognize that as a Bates
16  number?
17   A    Yes.
18   Q    Okay.  And this is a document that --
19  that DEA has produced in advance of this
20  deposition.  True?
21   A    True.
22   Q    What is this document?

Page 113

29 (Pages 110 - 113)

1    A    This is the DEA's FOIA and Privacy Act
2    policy, internal policy.
3    Q    So this is -- this is an internal
4    policy of DEA, true?
5    A    Yes.
6    Q    Okay.  And at the top of the first
7    page, it says:  This document and its contents
8    are the property of the Drug Enforcement
9    Administration and may not be disseminated
10   outside DEA (or if loaned outside of DEA, further
11   disseminated) without the express written
12   permission of the Office of Chief FOIA counsel.
13        Did I read that correctly?
14   A    My -- the last little bit there, Office
15   of Chief Counsel, yes.  Yeah.
16   Q    And so what's -- what's the purpose
17   of -- well, let me take a step back.
18        Is this the complete document, or is
19   this a chapter in a larger document?
20   A    This is a policy that can be found in
21   our administrative manual.  So it's a -- it's a
22   subsection, if you will, of the admin manual.

1    A    Yes.
2    Q    Do you know where this document is
3    published?
4    A    When?
5    Q    Where?
6    A    Oh, where.  I'm sorry.  This is
7    published in the administrative manual, which is
8    accessible to all agency staff.
9    Q    Okay.  Is it accessible to the public?
10   A    It is not.
11   Q    Okay.  And you're familiar with the
12   FOIA statute, aren't you?
13   A    Yes.
14   Q    Should this be accessible to the
15   public?
16   A    It should be, and it is definitely part
17   of our list of priorities and things that we
18   would like to get published.
19        Due to the lack of resources I have
20   right now and our primary focus being just able
21   to fulfill FOIA requests, we've had struggle
22   getting policies and other things posted, but it

1    Q    Okay.  And have you read that admin
2    manual before?
3    A    Yes.
4    Q    Okay.  And is this header across the
5    entire manual?
6    A    It's across all manuals --
7    Q    Okay.
8    A    -- in DEA.
9    Q    Okay.  And are those manuals that
10   instruct staff members on how to carry out their
11   jobs and duties?
12   A    That is correct.
13   Q    Okay.  And you would agree that this
14   portion of the manual relates to FOIA requests
15   and processing of FOIA requests, correct?
16   A    That is correct.
17   Q    And, inherently, a FOIA request is
18   responding to a request made by a member of the
19   public, true?
20   A    True.
21   Q    And so responding to FOIA requests
22   affect the public, right?

1    is definitely a goal of ours.
2    Q    Okay.  So disseminating this particular
3    chapter outside of DEA shouldn't raise any agency
4    concerns, right?
5    A    In my opinion, it should not.
6    Q    Okay.  Because it's not a confidential
7    document because the FOIA presumably makes it
8    public, right?
9    A    If this were to be requested by the
10   public, we would produce it.  Second to that,
11   like I mentioned, my goal would be to eventually
12   publish this and other administrative policies
13   online.
14   Q    And that would be a simple request now.
15   Because of my litigation, it's in the FOIAXpress
16   database, right?
17   A    Are you saying if I were to get a
18   request for this right now, I would consider it
19   simple?
20   Q    Yes.
21   A    So how we define simple and complex,
22   again, right --

1      Q   Sorry.  Yeah.

2      A   Yeah.  Now, if I had a full staff right

3   now, like, my goal would be to get this out in a

4   day, right?  In theory, that's what we should be

5   doing.  I need staff to be able to do it.

6      Q   No unusual circumstances here, though,

7   right?

8      A   No, because we own this record, so -- I

9   actually wrote this -- this policy.

10     Q   Okay.  So -- and when did you write the

11  policy?

12     A   So this policy was completely rewritten

13  in 2019.  I believe this got published in 2020.

14     Q   Okay.  And let's -- looking at the

15  content of this, can we turn to the Bates ending

16  in 10?  Can we look at the D, "Statutory Time

17  Limits"?

18     A   D, yes.

19     Q   And I just want to confirm.  This is

20  DEA's -- this is, in fact, a policy?

21     A   This is an internal agency policy.

22     Q   Okay.  And under 1, it says, "FSR."

Page 118

1   What does that stand for?

2      A   So this was our old acronym for our

3   office.  It used to be part of the Office of

4   Administration.  The acronym was FS.  Our

5   specific acronym was FSR.

6      Q   Okay.  And that stands for?

7      A   FSR stood for the Freedom of

8   Information and Records Management Section.

9      Q   Okay.  And so that section has 20

10  business days to respond to a FOIA/PA -- PA being

11  Privacy Act, correct?

12     A   Yes.

13     Q   -- request unless the request falls

14  within unusual circumstances.

15        And we'll get to the remainder in a

16  moment, but just pausing here, again, this is

17  what we were discussing before about the unusual

18  circumstances exception or provision applies to

19  responding to a request, true?

20     A   It does.

21     Q   Okay.  It's not necessarily a

22  production of records?

Page 119

1      A   It is not necessarily the production of

2   records.  It has to do with -- again, I have to

3   search outside of my own office to locate those

4   records, and as such, I'm invoking the extra ten

5   days, you know, so, essentially, I'm expanding

6   the statutory response time.

7      Q   And, you know, I'm not trying to beat a

8   dead horse here, but just because this is the

9   written policy --

10     A   Sure.

11     Q   -- here, we have -- unusual

12  circumstances are defined as -- and focusing on

13  "a" -- "The need to search for records from the

14  field offices," that's the first part in the

15  statute relating to field offices, fair?

16     A   Uh-huh.  Yes.

17     Q   And then the second part is truncated

18  into the words "other locations," right?

19     A   (Nodding.)

20     Q   And so --

21     A   Yes.

22     Q   -- just to summarize in a nutshell,

Page 120

1   DEA's view of the statute is that the

2   establishment separate from the office processing

3   the request is "other locations," fair?

4      A   Correct.

5      Q   And that's the view of the entire

6   Department of Justice, in fact?

7      A   No.  That's the view of the entire DEA.

8      Q   Okay.

9      A   So all of DEA, whether it's the 239

10  field offices, the 90 offices in the foreign

11  countries, the 150-plus headquarters components.

12     Q   I'm just talking about the -- this

13  policy about what unusual circumstances means is

14  not a localized policy to -- this is the DEA

15  policy manual, but this policy we're discussing

16  is -- the entire Department of Justice subscribes

17  to this view?

18     A   This -- yes, because this is in the

19  statute.

20     Q   Okay.  And have you ever discussed this

21  policy with anyone at the Department of Justice?

22     A   The unusual circumstances policy or --

Page 121

31 (Pages 118 - 121)

1    Q   And let me qualify this by -- like if
2  you discussed with, like, an attorney, I don't
3  want to run into privilege issues.  I'm really
4  more talking about, like, chief FOIA officer
5  counsel type discussions.  So --
6    A   Yes.
7    Q   -- like, has this ever been discussed
8  in, like, meetings sort of at DOJ?
9    A   If you're talking about the definition
10  of unusual circumstances, yes, I have discussed
11  this with an attorney at OIP.
12    Q   And I don't -- I can't ask you about
13  the contents of those discussions, so I won't,
14  but you have -- this has been discussed?
15    A   It has been discussed.
16    Q   Was it -- and now I'm just asking when.
17  Was it discussed before or after I filed this
18  lawsuit?
19    A   After.
20    Q   Okay.  And so you have been in touch
21  with OIP since I filed this lawsuit?
22    A   Yes, I have.

1    A   Yes.  Their interpretation is the same
2  as mine.
3    Q   Okay.  Let's move on to something else.
4    MR. RODRIGUEZ:  And to be clear so -- I
5  think it will head off maybe any future issue.
6  It was a communication with an attorney at OIP,
7  and so we would consider the details of the
8  communication to be privileged.  I just didn't
9  want you to turn around and ask me like, where is
10  that?  It exists.
11    MR. ZORN:  Yeah.
12    MR. RODRIGUEZ:  It was via e-mail, or
13  at least I've seen an e-mail.
14    MR. ZORN:  I think it's -- I think it's
15  privileged, so I'm not --
16    MR. RODRIGUEZ:  Okay.
17    MR. ZORN:  From what I've heard, it
18  sounds --
19    MR. RODRIGUEZ:  Yeah.  There's no
20  issue.
21    MR. ZORN:  -- sounds privileged, and
22  I'm not -- I'm not going to go into the contents

1    Q   Okay.  And so OIP is aware of this
2  lawsuit?
3    A   I have informed them that -- I'm trying
4  to remember how the conversation started.
5    I was -- I went to them to get clarity
6  on the definition of unusual circumstances.  I
7  wanted to make sure that our interpretation was
8  the department's interpretation.  So that was
9  the -- so I reached out to them, obviously, after
10  the lawsuit was filed to get clarification on
11  this.
12    Q   Oh, so, I mean, you're here
13  representing the Department of Justice, and the
14  Office of Information Policy has confirmed that
15  this is the Department of Justice --
16    A   Yes.
17    Q   -- policy?
18    And by "this," I mean the
19  interpretation --
20    A   The --
21    Q   -- we've been discussing of unusual
22  circumstances.

1  of it.  There might be some argument under FOIA
2  that it isn't, but I'm not -- I'm not going to go
3  there.
4  BY MR. ZORN:
5    Q   Okay.  Why don't -- why don't we talk a
6  little bit about fees.  I'm interested in how
7  fees are calculated.
8    So I'll start with that, which is just
9  an open ended:  How are fees calculated?
10    A   We, like I mentioned earlier, do not
11  charge search fees any longer.  It's very rare
12  for us to charge search fees due to the statutory
13  time limits.
14    Review fees, however, are charged only
15  to commercial use requesters.  So when we receive
16  a request and we've determined that it is, in
17  fact, commercial use, we will continue to -- we
18  will do the search, collect the records.
19    Once the records come back, we -- the
20  staff has a little calculation that we file to
21  determine how long the review time is going to
22  take, you know, what the labor hours are going to

1    be, and then we follow the fee provision that's
2    in the DOJ FOIA regulations, which says that we
3    charge $40 per hour.
4         MR. ZORN:  Okay.  And so I've
5    introduced an exhibit.  It's annotated, and
6    it's -- it should be in the folder as 10A.
7         THE WITNESS:  Okay.
8         MR. ZORN:  And we can pull this up.
9         (Deposition Exhibit Number 10A
10        was marked for identification.)
11   BY MR. ZORN:
12   Q    When you have this up, just let me
13   know.
14   A    Yes, I do.
15   Q    So this is -- and there's highlighting
16   on the page, and I just want to be clear for the
17   record.  It wasn't produced to me with the
18   highlighting.  That's highlighting I've done to
19   help us sort of be clear on the questioning.
20        But at the top, it's "22-00585-F
21   Request Notes."
22        Is that -- did I read that correctly?

Page 126

1    how we're calculating review fees, because I had
2    noticed some variability between teams in how the
3    staff and supervisors were calculating what they
4    believed, you know, in good faith, was -- how
5    long it was going to take them to complete a
6    review.  So I wanted to standardize this.
7         So we drafted an SOP, and I had several
8    meetings with the unit chiefs to sit down -- we
9    sat down in a room and worked together in
10   determining how long on average does it take you
11   to review a page, place redactions on a page, and
12   we came up with seven minutes on average.
13   Q    And what's an SOP?
14   A    I'm sorry.  Standard operating
15   procedures.
16   Q    Okay.
17   A    So we wanted to put a guidance document
18   together for the office in an effort to
19   standardize this process and be more transparent
20   and be consistent in how we're calculating review
21   fees.
22   Q    And -- and is that -- was that

Page 128

1    A    Yes.
2    Q    And is it a fair characterization to
3    say that these are internal DEA request notes
4    from a request that I filed?
5    A    Correct.
6    Q    Okay.  And looking at the first page,
7    I've highlighted that there's 2,190 pages of
8    potentially responsive records.
9         Did I --
10   A    Correct.
11   Q    Okay.  And then -- and this isn't
12   highlighted, but it's on the next line -- seven
13   minutes per page for review.
14        Is that the standard agency seven
15   minutes per page?
16   A    That is what our office has -- uses,
17   yes, for the determination of the review time.
18   Q    Where did that number come from?
19   A    So that number came from a series of --
20   let me back up.
21        During 20- -- early 2022, I determined
22   there was a need to standardize this process in

Page 127

1    produced --
2    A    Yes.
3    Q    -- the SOP?
4    A    It was.
5    Q    Okay.  Was it titled standard
6    operating -- did I miss it?
7    A    It was, and it was titled "Calculating
8    of Review Fees."
9    Q    Okay.  So the seven minutes comes from
10   just -- was there any, like -- who -- was it --
11   how was seven minutes arrived at?  Just a guess
12   of what the average time was?
13   A    It was myself and three other managers,
14   yes, that sat together and talked through this
15   SOP, and we came up with, on average, that we
16   believe it takes us about seven minutes to
17   process a page, meaning I'm reviewing a page, I'm
18   using a tool to place redactions, place codes on
19   the document.  It's about seven minutes per page.
20   Q    Okay.  And then -- and you're not --
21   so -- so the estimate's not based on what -- how
22   long it would take to actually read a page.  It's

Page 129

33 (Pages 126 - 129)

1    just --
2       A   Oh, it's reading as well, yeah.  I'm
3    reading the page, and I'm placing redactions on
4    protected information and asserting the exemption
5    code, placing the exemption code on the document.
6    That's all part of the --
7       Q   And so I'm still kind of at a loss.  So
8    how -- you guys just agreed on seven minutes?  I
9    don't --
10      A   Yes.
11      Q   Was there any -- did you kind of like
12   do any experiments or --
13      A   We did not do an experiment, per se,
14   no.  This was a conversation over several
15   meetings, you know, in putting this SOP together,
16   and just from our -- our experience and years of
17   practice in this area, we came up with the seven
18   minutes.
19      Q   Because the difference between seven
20   minutes and six minutes is a lot -- it's a lot of
21   money when you multiply it by a lot of pages.
22      A   And, again, that's why, you know, it is

Page 130

1    an estimate.  You know, this -- this fee, it's an
2    estimate.  So we estimate that it takes, on
3    average, seven minutes.
4       Q   And three -- so three people came up
5    with this?
6       A   I think four of us.  There were --
7       Q   Four.
8       A   -- four of us.
9       Q   Okay.  And so there are multiple layers
10   of review as well, true?
11      A   Generally, it's two.  So it would be
12   the individual in our office that we assign to
13   process the case.  Then when that individual is
14   finished with the case, it moves up to a manager
15   for review.
16          So we are assessing the review fee for
17   both the professional administrative staff's time
18   and the supervisor time.
19      Q   Okay.  And -- and looking at the
20   document here, the management review time is
21   estimated to be 20 percent less than the -- than
22   the initial reviewer's time; is that fair?

Page 131

1       A   Correct.
2       Q   Why are there two levels of review?
3       A   So our subordinate staff does the
4    majority of the processing.  We have to -- it has
5    to be reviewed by a manager before we can
6    authorize release to the public, right?
7          Oftentimes, the managers, when they're
8    doing final review, myself included, are making
9    slight adjustments to those records.  Obviously,
10   if it's a lot of adjustments, it's going back to
11   the processor to finalize.
12          But, generally, a manager is tweaking
13   redactions, making sure that this has been
14   properly processed, that the redaction codes are
15   proper.  If -- if something was incorrectly
16   redacted, we're lifting redactions.  So the
17   manager is doing review work and also sometimes
18   minor corrections.
19      Q   And why is the manager 20 percent?
20      A   Because we're not doing the full
21   processing that the subordinate staff is doing,
22   right?  We're not going -- we're not placing

Page 132

1    redactions on the entire document.  That's
2    already been done.
3          When it gets to our level, we're just
4    going through the document, reading every page,
5    making sure that the redactions are correct, and
6    making adjustments if need be.
7       Q   If a manager has to review everything,
8    why even have the initial review?
9       A   Because we would then have to place all
10   the redactions, all the exemption codes.  It is a
11   lot of work.  So we have subordinate staff to do
12   that initial processing for us.  We're just final
13   review.  We're just making sure that it's been
14   properly redacted and it's ready for release to
15   the public.
16      Q   But you're charging for -- the agency
17   charges $40 per hour of -- of both the initial
18   review and the manager review?
19      A   That is correct.
20      Q   And the purpose of the initial review
21   is to save that 20 percent that's going to happen
22   with the manager review; is that fair?

Page 133

34 (Pages 130 - 133)

1    A   I don't know if I understood the last
2    part of the question. I'm sorry.
3    Q   You're saying the reason that the
4    manager review time is estimated to be 20 percent
5    less is because the manager doesn't have to go
6    through and apply all the redactions; is that
7    right?
8    A   That is correct.
9    Q   And the reason there are two levels of
10   review is so that the manager doesn't have to do
11   all of those redactions, right?
12   A   That isn't necessarily why there's two
13   levels of review. The first level is really the
14   processing.
15       The second-level review is I'm ensuring
16   that this is ready for release to the publish.
17   If it's a high profile topic or something, maybe,
18   you know, a litigation matter, it may even be
19   reviewed by a third individual. Maybe an
20   attorney would have to review it.
21       But, generally, this is the process for
22   the regular run-of-the-mill FOIA cases. It's one

Page 134

1    individual. A subordinate staff member is doing
2    all the processing. We do the final review.
3    Q   Well, there's at least two levels of
4    review in every FOIA case.
5    A   Every case.
6    Q   Right. And, again, the manager is
7    reviewing everything line by line just like the
8    initial reviewer, fair?
9    A   Yes.
10   Q   And the only real difference between
11   the two is the manager is not applying the
12   initial set of redactions and processing --
13   A   Correct.
14   Q   -- right?
15       And that's the theory behind why
16   manager review time is 20 percent less, fair?
17   A   Yes.
18   Q   And if we were to calculate that out in
19   dollars, that means that, you know, manager time
20   is, I guess, what, 80 -- 80 percent of the
21   initial bill.
22   A   Uh-huh.

Page 135

1    Q   Fair?
2    A   Yes.
3    Q   But the purpose of the -- so is the
4    purpose of having an initial review to save that
5    time that otherwise the manager would have to --
6    to do? I mean, do you get where I'm going with
7    this?
8    A   Yeah. The management team would not be
9    able to -- we have four managers, including
10   myself. We would not be able to process all the
11   requests that come to DEA, right? We have staff
12   to do that work.
13   Q   Right.
14   A   We are the final review layer, if you
15   will. We're making sure the record is proper,
16   properly redacted, and is ready for release to
17   the requester.
18       So there has to be a QC in place,
19   right? And that's what the manager's job is.
20   Q   But you're -- but for this QC, then,
21   it's 80 -- you're charging 80 percent of what the
22   initial review time is for -- and -- fair?

Page 136

1    A   Uh-huh. Yes.
2    Q   So, effectively, a request comes in,
3    and a reviewer -- for every five hours that an
4    initial reviewer spends, the manager's going to
5    end up spending four hours doing QC, right?
6    A   Yes. And the reality of this line of
7    work is that it is a line-by-line review. There
8    is no tool that the government has that's going
9    to tell me that I have effectively redacted all
10   of the things that are protected.
11       So we have two people involved in the
12   process, the initial processor that does really
13   the bulk of the work, and then the manager has to
14   do the final review.
15   Q   Well, why not just -- why can't the
16   manager just -- rather than have five hours of
17   initial review and four hours of -- of QC, why
18   not just have the manager do five hours of review
19   and then not -- not have the initial review?
20   Doesn't that get you to the same place?
21   A   So I don't know if we're -- let me make
22   sure I understand. So maybe we this isn't coming --

Page 137

35 (Pages 134 - 137)

1   this part is not very clear.
2       So let's say I receive 500 pages of
3   records today.
4       Q   Yeah.
5       A   It's going to a subordinate staff
6   member to do the full review and redaction
7   process.
8           And then let's say it takes this person
9   a month to do the 500 pages, right?  It now is
10  getting pushed up to the unit chief or myself.
11  This case is ready to go.  You know, the
12  manager's reviewing all of the documents to make
13  sure that it is ready for release.  If it is, I
14  sign a cover letter, and we release it.
15      Q   No, I'm following this precisely, and
16  that's what I'm saying is, if you didn't have the
17  initial review -- let's say that didn't exist --
18      A   Yes.
19      Q   -- then the manager's doing all of that
20  work --
21      A   All of that work.
22      Q   -- right?

Page 138

1       A   Yeah.
2       Q   And since -- but it's only going to
3   take the manager 20 percent more time to do that
4   work according to the way DEA --
5       A   Less.
6       Q   Sorry.  It takes -- it takes the
7   manager review time 20 percent less when the
8   manager's doing QC?
9       A   Uh-huh.
10      Q   But let's say the manager is the
11  initial and final level of review, fair?  So then
12  it's just 100 percent of the time.
13          Do you follow me?
14      A   Not exactly, no.  I'm sorry.
15      Q   Well, you're saying the job of doing QC
16  is essentially 80 percent of the hours it takes
17  to do an initial review.  Is that --
18      A   Yes.
19      Q   -- accurate?
20      A   Yeah.
21      Q   If the manager were to undertake the
22  initial review, it would be 100 percent of the

Page 139

1   time to do the initial review.  Is that fair?
2       A   Yes.
3       Q   And then you don't need the initial
4   review, correct?
5       A   You wouldn't, but the management team
6   would not be able to do any work in the lanes of
7   leading change, leading people and doing final
8   review of all these cases, because now we would
9   become a government information specialist and be
10  processing cases day in, day out.  So that's why
11  I'm having a little trouble following this.
12  Like, we have subordinates that do the bulk of
13  the work, right?
14          We are the -- we are the QC.  We're
15  making sure everything is correct.  We have to go
16  page by page to review everything.  If there's a
17  mistake or something needs to be fixed, we're
18  reconciling all of this before it gets released
19  to the public.
20      Q   Well, why not just replace some of the
21  initial review team with just managers and -- I
22  mean, the managers --

Page 140

1       A   So the manager's job is not to do FOIA
2   processing work.  That's not the manager's job.
3       Q   I agree.  I'm just trying to grasp why
4   it is that a manager is re-reviewing all of the
5   documents line by line, doing effectively the
6   same task of the initial reviewer, but,
7   effectively, the only difference is the actual,
8   like -- like, redaction, like processing; is --
9       A   Well, the --
10      Q   -- that right?
11      A   -- other -- yes.  And the other thing I
12  haven't mentioned is that, you know, we deal with
13  some highly sensitive records at DEA.  I cannot
14  rely on a GS-9 or 11 or 12 to just -- you handle
15  the case and let me know when you're done and
16  we're going to release it.  That's just not how
17  it works.
18          We have to make sure that DEA's
19  equities have been properly protected if we
20  are -- you know, if there's information that
21  is -- that we are to protect under the FOIA,
22  right?  So it -- all of the work requires a

Page 141

36 (Pages 138 - 141)

1   higher level of review before it's released to
2   the public.
3       Q   And I hear you, but do you need to
4   review a document page by page and line by
5   line to know that it might have -- in other
6   words, would -- strike that.  That's not really a
7   question.
8           The process we're looking at here in
9   Exhibit 10A is applied to every document that is
10  requested and reviewed regardless -- just every
11  document, this is -- this is the baseline level
12  of review, true?
13      A   It is.  I just want to make sure we're
14  not combining fees and this.  This is the -- this
15  is the general process for all FOIA requests.  We
16  have a subordinate staff member process.  We have
17  a manager review and authorize release, yes.
18      Q   So one of my other requests -- and
19  maybe we'll make the deposition shorter and we
20  don't get to it, but -- but recall that one of my
21  requests at issue in this case is all marijuana
22  rescheduling petitions.

Page 142

1       A   So I -- again, I haven't gone through
2   the documents, you know, line by line yet, but
3   I've been advised that we are getting close to
4   making a release to you on this particular case.
5   But I was told that there are third-party names
6   contained in the documents.
7           I personally have not reviewed them
8   yet, but if that -- if that is true, we most
9   likely would release -- I'm sorry -- redact those
10  names from the document.
11      Q   Under what exemption?
12      A   B6.
13      Q   Which -- what is B6?
14      A   This is -- this protects personal
15  privacy.
16      Q   But it's a public rulemaking petition,
17  isn't it?  I'm not trying --
18      A   So, again --
19      Q   -- to get argumentative --
20      A   -- I don't --
21      Q   -- but --
22      A   Because I haven't reviewed the

Page 144

1           On its face, you would agree that
2   doesn't raise any sensitive information, right?
3       A   It shouldn't, but if there are
4   third-party names contained within those records,
5   that would be redacted.
6           I'm actually very familiar with this
7   particular request that you filed, and that
8   request, we -- again, looking at this and fees,
9   we are -- we are most likely not going to charge
10  you fees for that request because the
11  threshold -- we're not going to meet the
12  threshold.  If it's -- if it doesn't reach $25,
13  we're not going to charge you fees.
14      Q   Well, why would the public -- why --
15  it's a public rulemaking petition, right?  Sorry.
16  That --
17      A   I think --
18      Q   My question was not very clear.
19          Those three petitions were public
20  rulemaking petitions submitted by other parties?
21      A   That is what I recall, yes.
22      Q   Why would any names be redacted?

Page 143

1   documents yet, I don't want to, you know, say
2   whether we will or will not.  I think I need
3   to -- we need to review it for final, but --
4       Q   Okay.  So -- and I would argue,
5   frankly, the reason I requested those, I need
6   those names, but -- but set that aside for a
7   moment.
8           My broader concern here and the real
9   reason I'm asking about this is:  It doesn't seem
10  like a public rulemaking petition would have
11  sensitive information, no?
12          MR. RODRIGUEZ:  Objection.
13  Argumentative.
14          You can try to answer.
15          THE WITNESS:  What I would say is,
16  because I have not had the opportunity to review
17  those documents yet, I wouldn't feel comfortable
18  answering that question.
19          If -- if this document is publicly
20  available, we would not redact anything in the
21  document.  We would simply release it to you.
22  But I am not aware right now whether that

Page 145

37 (Pages 142 - 145)

1    document or those documents have been made
2    publicly available already.
3    BY MR. ZORN
4        Q    They haven't.  That's why I requested
5    them.
6        A    Okay.
7        Q    But -- but the point I'm trying to get
8    at here is, that request goes through this --
9    this double-layer review process, true?
10       A    It does, but in this case, because my
11   recollection is it doesn't involve a high number
12   of pages, I had my unit chief complete the
13   review.  There's not going to be a secondary
14   review.
15           If I've had a senior-level person
16   review it, I'm comfortable with that, and I'm
17   likely going to just release it.  I'm not going
18   to do a secondary review.
19       Q    Okay.
20       A    Nor charge fees.  That's what we're
21   leaning towards, not charging fees, because it
22   doesn't meet the threshold is what I'm told.

Page 146

1        Q    Okay.  So -- okay.  Well, that --
2    that's interesting, and I certainly appreciate
3    that, but -- so -- but I guess what I'm really
4    trying to get at is, the character of the
5    request -- so a request for a document that is
6    made public or should be made public or is like a
7    filing -- like this review process is going to
8    apply even if it was a public document, right?
9        A    Not if it's a public document.
10       Q    Well, so, like, the ALJ filing that we
11   were talking about earlier, do you recall --
12       A    Yes.
13       Q    -- that?
14           So you find out that -- that these --
15   the records were filed in an ALJ proceeding,
16   fair?
17       A    Uh-huh.  Yes.
18       Q    That needs to be reviewed twice and
19   paid for, and the hours are going to be counted
20   twice?
21       A    If we are assessing fees on the
22   records -- and, again, I'm thinking of the one

Page 147

1    request that you filed that involves over 5,000
2    pages -- we have to go through that to figure out
3    what is releasable, right?
4        I don't have you know intimate
5    knowledge of what documents have been publicly
6    filed.  That has to be -- we'd have to look at
7    that.
8        Q    But if you asked, for instance,
9    Ms. Cotter, like, where did these documents come
10   from, and she's like, the parties submitted it,
11   why -- why -- at that point, it was submitted --
12   you know it was submitted in a public ALJ
13   proceeding.  It wasn't filed under seal.
14           Why -- what -- what is there to review
15   as far as exemptions are concerned?
16       A    I -- again, we were given three boxes
17   of records from that office.  I don't think that
18   everything in those boxes has been publicly
19   filed, so we have to do some work on this case.
20       Q    But -- but the estimates that DEA --
21   and that's what this is.  Let's start over.
22           This is not -- this is an estimate --

Page 148

1    this is a calculation of an estimate it would
2    take to review all of the documents, and that's
3    what we're looking at, Exhibit 10A, so the record
4    is clear, right?
5        A    Yes.
6            MR. RODRIGUEZ:  Can we go off the
7    record?
8            MR. ZORN:  Yeah.  Sure.
9            MR. RODRIGUEZ:  I just want to make
10   sure --
11           VIDEO TECHNICIAN:  Going off the
12   record, the time is 12:31 p.m.
13           (Whereupon, at 12:31 p.m., a
14           luncheon recess was taken.)
15
16
17
18
19
20
21
22

Page 149

38 (Pages 146 - 149)

1    A F T E R N O O N   S E S S I O N

2                    (1:42 p.m.)

3         VIDEO TECHNICIAN:  Going back on the

4    record, the time is 13:42 p.m.

5    WHEREUPON,

6         KELLEIGH MILLER

7    was called for continued examination, and having

8    been previously duly sworn, was examined and

9    testified further as follows:

10        EXAMINATION BY COUNSEL FOR PLAINTIFFS

11        CONTINUED

12   BY MR. ZORN

13        Q   Welcome back, Ms. Miller.

14        A   Thank you.

15        Q   Let's -- let's -- I put two exhibits in

16   the exhibit folder.  They're Exhibits 15 and 16.

17   They're -- one is the spreadsheet that was

18   produced, the FY 2021 raw data.  It's 15.

19        And then 16 is a little Excel

20   calculation I did with the worksheet.  And if you

21   could just download that -- if you could download

22   those, because it's going to be easier to look at

Page 150

1    the Excel in the native.  I think, at least, it

2    is.

3         (Deposition Exhibits Number 15 and 16

4    were marked for identification.)

5         THE WITNESS:  So download 15 and 16,

6    yes?

7         MR. ZORN:  Yes.

8         THE WITNESS:  Okay.

9         MR. RODRIGUEZ:  15 and 16?

10        MR. ZORN:  Yes.

11        MR. RODRIGUEZ:  Okay.

12        THE WITNESS:  Okay.

13        MR. RODRIGUEZ:  I think you can just

14   click on that.

15   BY MR. ZORN

16        Q   Okay.  So why don't we start with 15

17   and see if I can just get some foundational

18   questions here.

19        So do you recognize Exhibit 15?

20        A   I do.

21        Q   What is Exhibit 15?

22        A   This is the annual FOIA report raw

Page 151

1    data.  It is submitted to Department of Justice

2    every year by all the various agencies.

3         Q   And how is this created?

4         A   How is it created?

5         Q   Yes.

6         A   This is a template.  It starts as a

7    template that they send to us, and we have to

8    populate the fields.  Information is obviously

9    derived from our case management system to fill

10   this in.

11        Q   Okay.  And so let's walk through the

12   different column headers here just so I can

13   understand them.

14        The first is -- do you see

15   "Component/Office"?

16        A   Yes.

17        Q   What does that mean?

18        A   So this is the office with -- or the

19   agency within the Department of Justice that

20   submitted this data.

21        Q   Okay.  And then the second is "Request

22   Number."  What is that?

Page 152

1         A   So that is the number that is assigned

2    to a particular FOIA request.

3         Q   And then the next one is, "Is This A

4    Consultation?"

5         What does that mean?

6         A   That means has this FOIA -- was this

7    FOIA request received from another federal

8    agency, meaning -- I can better explain this by

9    giving an example.

10        So if I receive a document from the FBI

11   and I've received it because the document

12   contains DEA's equities, that's a consultation.

13        Q   Okay.  Now, the next column here is

14   "Days Allowed," right?

15        A   Yes.

16        Q   What does that mean?

17        A   So this means -- whether or not we

18   determined that we were going to invoke unusual

19   circumstances, that's where you would see 30 in

20   that column, or you'll see 20.  So this has to do

21   with the statutory timelines, whether we're, you

22   know, saying that we're going to process in 20 or

Page 153

1  30 days.
2      Q   Okay.  So -- so if I see 20 -- and, in
3  fact, there are requests here that are 20 -- that
4  means it would not be an unusual circumstances
5  case?
6      A   Correct.
7      Q   Okay.  And if it's 30, it is an unusual
8  circumstance?
9      A   Yes.
10     Q   So -- and just -- just so this is clear
11  for sort of later -- later discussion, 20 means
12  no unusual circumstances; 30 means there are
13  unusual circumstances?
14     A   Correct.
15     Q   Okay.  What is the next column,
16  "Exemption 3 Statutes"?
17     A   So this indicates whether or not any of
18  these agencies invoked an exemption 3 statute.
19  Exemption 3 basically means that there is another
20  federal statute that prohibits -- prohibits us
21  from disclosing records.
22     Q   Okay.  So some -- some statute other

1  than FOIA?
2      A   Correct.
3      Q   The next column is "Information
4  Withheld."
5          What does that mean?
6      A   Where is that?
7      Q   It's column G.
8      A   Oh, sorry.
9      Q   Oh, no, sorry.  The next one is column
10  F.  I made a mistake.  And that's other exemption
11  3 statutes.
12         So there's -- there's one column that's
13  exemption 3 statutes and then there's another
14  one, which is other exemption 3 statutes.
15     A   That one -- I apologize -- I am
16  forgetting what that means.  I have an
17  instruction sheet that we follow when we fill
18  this in.  That looks blank here on the
19  spreadsheet.
20     Q   It's not really important for this
21  case --
22     A   Okay.

1      Q   -- so I'm not too worried about it.
2      A   All right.
3      Q   I am interested in the "Information
4  Withheld" column.
5      A   Which also appears to be blank.  Again,
6  I would have to refer to the instruction sheet
7  for that column, but it appears blank.
8      Q   Okay.  "Case Citation," do you know
9  what that is?
10     A   No.  Again, I'd have to refer to the
11  instruction sheet for those blank columns.
12     Q   Okay.  Well, I actually don't think
13  most of those are important, so we don't need
14  to --
15     A   Okay.
16     Q   -- dwell on those.
17         This one is, which is "Date Initially
18  Received."
19         What does that mean?
20     A   That means the date that the request
21  was accepted by the FOIA office.
22     Q   Okay.  And then the "Date Perfected"

1  means?
2      A   So that will generally be the same date
3  if we are able to move forward with the FOIA.
4          If there were any discrepancies with
5  the FOIA request that required us to communicate
6  with the requester and that could take a couple
7  of days, that date would be different.
8          So that date -- date perfected, if it's
9  different than the date in the column I, just
10  means that is the date that we deem the request
11  was perfected and ready to move forward.
12     Q   And then the date completed is the
13  date --
14     A   That we closed the case -- released the
15  records requester and closed the case.
16     Q   Okay.  And what happens if there's
17  no -- like a lot of these entries don't have any
18  date completed.  It's just date received,
19  perfected, and there's no date completed.
20         What does that mean?
21     A   That means that the request is still
22  open.

1    Q   Okay.  So -- and does that always mean
2  the request is still open or --
3    A   To my knowledge, yes, that is what --
4  that is the only thing that I'm aware of that
5  that would indicate.  If it's blank there, it
6  means that the agency has not closed the case
7  yet.  It's still open.
8    Q   So I'm going to ask you a question,
9  which is:  Can you go to row 16150?
10   A   Sorry.  Bear with me one moment.
11  16150?
12   Q   Yeah, the Excel row.  It's Request No.
13  18-00070-PR.
14   A   Almost there.  16150.  18-0070?
15   Q   Yes.
16   A   Okay.
17   Q   Dash PR.
18   A   Yeah.
19   Q   So my first question is:  What does
20  "PR" mean?
21   A   "PR" means that this was a Privacy Act
22  request, and "R" means it was a referral.  So

Page 158

1  unusual circumstances because we didn't have to
2  search for records.  They were already provided
3  to us by another federal agency.
4    Q   Okay.  So -- so if another federal
5  agency provides you the records, then there's no
6  unusual circumstances because it's now in the
7  FOIA office because some agency just gave you the
8  records?
9    A   That is correct.
10   Q   And so -- but it's complex because
11  there's a lot of volume of --
12   A   A high volume.
13   Q   Okay.  So -- interesting.  That answers
14  some of my questions.  Let's see.
15       Can you look at -- this is 20-00682.
16  It's row 17218 on the spreadsheet.
17   A   One second.  172.  What did you say?
18  172 --
19   Q   Yeah.  17218 is the row.
20   A   I'm sorry.  17218.  Here we go.
21   Q   And it -- it's -- so it took -- this
22  is -- it says a duplicate request in the column

Page 160

1  what that indicates is that we received a request
2  from another agency.  They -- another --
3  basically, another agency received a FOIA request
4  that really was for DEA records, so they referred
5  it back to our office to handle and we would
6  handle that directly with the requester.
7    Q   Okay.  So then what I see here is that
8  this is not a consultation.  Is that -- that's
9  right?
10   A   Not a consultation.
11   Q   It's a simple request because it's only
12  20 days allowed.
13   A   Uh-huh.
14   Q   It was received in April of 2018,
15  right?
16   A   Yes.
17   Q   And it's still open?
18   A   And it's still open.  It looks like we
19  deemed it complex, which probably means it
20  involves a high number of pages, a high volume of
21  pages.
22       We didn't go out -- we didn't invoke

Page 159

1  N, and so I would assume that what that means is,
2  like, there's been -- that this is a duplicate of
3  a request that's already been made at some
4  point --
5    A   Yes.
6    Q   -- before.  Okay.
7        Like an exact duplicate?
8    A   Yes.
9    Q   Okay.  And so let's -- I guess let's go
10  to the very top of the spreadsheet again, because
11  I want to just move, I guess, through just a
12  couple --
13   A   Okay.
14   Q   -- more of the headers, which is --
15  so -- so "Date Completed" is -- what if a request
16  is withdrawn?  Is that -- then is that noted in
17  the -- as completed if it's --
18   A   It would have a closure date, yes.
19  There should be -- there should be a date there.
20   Q   Okay.  And then "Days Tolled" means
21  what?
22   A   This is any time that we have to what

Page 161

41 (Pages 158 - 161)

1    we call stop the clock.
2        So if a request is not perfected,
3    meaning there's an issue with the request and we
4    have to go back to requester, we stop the clock
5    because we don't want that counting towards
6    the -- you know, the statutory deadlines.  And
7    once, again, we've perfected the request, we --
8    we basically turn the clock back on, if you will.
9        Q    Okay.  Then to track, we've discussed
10   that?
11       A    Uh-huh.
12       Q    And so there are three tracks, right?
13   There's -- there's complex, expedited and simple?
14       A    Correct.
15       Q    Okay.  What is the expedited track?
16       A    Expedited track is any time a requester
17   requests expedited treatment and because they
18   feel there is a compelling need for the
19   information sought.
20       So there is some criteria, obviously,
21   that has to be met in order to meet the
22   compelling needs standard.  One example would be

Page 162

1    maybe an inmate on death row has asked for
2    records on themself, and, you know, we would
3    grant expedited treatment in that scenario.
4        Q    Okay.  And who makes the determination
5    to grant expedited treatment?
6        A    Generally, our intake unit.
7        Q    Okay.  And is -- is a journalist making
8    a request for information -- is that given
9    expedited treatment?
10       A    They would -- we would consider the
11   request.  If they ask for expedited treatment, of
12   course, we would consider the request.  It's --
13   it's incumbent upon the requester to basically
14   tell us which standard under expedited treatment
15   they feel that they meet.
16       Q    Okay.  And, otherwise, the requests are
17   prioritized on a first-in, first-out type basis?
18       A    Generally, yes.
19       Q    So we're looking at the spreadsheet.
20   We looked at this April 2018 request.
21       That is -- that is still being
22   processed, so there's -- there's more than four

Page 163

1    years' worth of FOIA requests ahead of anything
2    that gets filed now?
3        A    I'm sorry.  I want to make sure I'm not
4    losing track of the question here.  So I've moved
5    away.  I'm at the -- I'm now at the top row.
6        Are you asking about a specific --
7        Q    I'm just --
8        A    -- entry or no?  Just generally --
9        Q    No, just --
10       A    -- you're asking --
11       Q    -- generally.  We did look -- we looked
12   at an entry, right, that was unfulfilled from
13   April of 2018, true?
14       A    Yes.
15       Q    And DEA processes FOIA requests on a
16   first-in, first-out type basis?
17       A    Uh-huh.
18       Q    Fair?
19       A    Yes.
20       Q    And that one is still being reviewed,
21   presumably, true?
22       A    The one that we looked at had to do

Page 164

1    with antitrust, so if -- but if you're asking
2    about a DEA request that's from 2018 that's still
3    open, I mean, we definitely have some requests
4    from 2018, 2019, that are open.
5        Q    Okay.  And so -- so -- well, I'm
6    looking -- I'm looking now at the -- I don't know
7    if it was antitrust.  I mean, 18-00710 is -- I
8    have it as a DEA request.
9        A    Okay.  Sorry.  We moved away from the
10   line that you were asking about.  That's why
11   we're back at the top now.
12       Q    Yeah.  Sorry.
13       A    I think it was, what, 17 --
14       Q    Yeah.  If you get to the 116166 area,
15   yeah, we have a number of requests from 2018 that
16   are -- are empty.
17       And I'll -- when you tell me when
18   you're there, I'll give you a precise question
19   and answer.
20       A    Could you kindly give me the number
21   again?
22       Q    Sure.  It's the Excel row 16167.

Page 165

1    A    Actually, just give me a minute.  Just
2  looking for the data.  I'm trying to get this not
3  to move so fast.
4        MR. RODRIGUEZ:  Yeah.  My --
5        THE WITNESS:  It's difficult.
6        MR. RODRIGUEZ:  The interface --
7        THE WITNESS:  I'm sorry.
8        MR. RODRIGUEZ:  -- is very jumpy on my
9  pad.  I don't usually use that.  And I brought a
10  mouse --
11        THE WITNESS:  That's okay.
12        MR. RODRIGUEZ:  -- but for whatever
13  reason, it's not working.
14        THE WITNESS:  161 --
15        MR. ZORN:  16167.
16        THE WITNESS:  67.  All right.  I'm
17  almost there.  There we go.  All right.
18  BY MR. ZORN
19    Q    So this is a DEA request?
20    A    Correct.
21    Q    It is 18-00710.  True?
22    A    Yes.

Page 166

1    Q    And it's a FOIA request, dash F?
2    A    Yes.
3    Q    Okay.  And -- and just moving to the
4  right, it's opened May 2018 and perfected that
5  same day, right?
6    A    Yes.
7    Q    And it's still open, right?
8    A    It's still open.
9    Q    And with your screen there, you know,
10  looking down the page, you can see there are --
11    A    Yes.
12    Q    -- like almost a dozen requests from
13  2018 that are still open.
14    A    Correct.
15    Q    And they're complex, so the volume is
16  probably more than -- than -- than a simple
17  request?
18    A    Right.
19    Q    And these are all still open?
20    A    Yes.
21    Q    And so in the first-in, first-out
22  system, unless a request is expedited, it's after

Page 167

1  these requests in line, right?
2    A    Typically, yes.  But having said that,
3  I have set up a number of queues in the office to
4  try to flag or keep eyes on things that are
5  simple.
6        So if I have a request from 2018 and
7  it's two pages, we shouldn't have that, right?
8  We want to make sure that we're getting requests
9  out that are simple quicker.  And by doing so,
10  we've actually reduced our simple case processing
11  time about 52 percent in the last two years.
12        Complex is definitely far more
13  challenging, and it's because it involves
14  hundreds, sometimes thousands of pages of records
15  to review, and, again, we have a very small team
16  to process this.  So we do have a backlog.
17    Q    And so anyone who makes -- well, what's
18  the threshold between simple and complex
19  page-wise?
20    A    Approximately 20 pages.  So we said
21  anything that's 20 pages and less, we dump into
22  one particular queue.  That just really helps the

Page 168

1  management team keep eyes on those so we can work
2  together to close them faster.
3    Q    So -- and are requests ever batched
4  together?
5        So if I make two requests for two
6  documents, will that be treated -- would that be
7  treated -- let's say the documents I request are
8  ten apiece.  Do you follow me?
9    A    Okay.
10    Q    Well, actually, no.  15 apiece.
11    A    Okay.
12    Q    If I were to batch that together, there
13  would be 30 pages, and that would be complex,
14  right?
15    A    So -- but you -- well, you have filed
16  them as two separate requests, and they were --
17    Q    I filed --
18    A    -- 15 pages each, so we would -- when
19  we're done with the processing, we would put
20  those into one of the simple queues I spoke of.
21  That way, again, we're keeping eyes on those, and
22  we're trying to get them out faster to you.

Page 169

43 (Pages 166 - 169)

1    Q   So -- so split -- so the DEA doesn't,
2  like, batch -- like, doesn't look at a requester
3  and be like, oh, you've divided up documents and,
4  you know -- that encourages requesters to be
5  precise, right?
6    A   Right.  And we look -- we -- you know,
7  we treat each one as an individual request.
8        Now, if you submitted a FOIA request
9  that was on the same exact topic, we would then
10 tell you that we're aggregating your requests, so
11 that happens on occasion.
12   Q   So I have a question about one of the
13 requests, one of the Tucker requests, which is --
14 it was administratively closed.  Who did that?
15   A   That was done by the intake unit.
16 Uh-huh.
17   Q   Do we -- do we know why?
18   A   So the intake unit made an error in
19 closing that.  We reopened it.  I actually sent
20 her a letter telling her we were reopening that
21 case.
22   Q   Okay.  And processing notes are -- are

1  one of the -- one of the records that the FOIA
2  office itself actually has, right?
3    A   We do have processing notes, yes.
4    Q   So the processing notes shouldn't be
5  unusual circumstances?
6    A   We did not invoke unusual for that one.
7    Q   I noticed that.  And so -- so -- but
8  turning back here, so a complex request is
9  anything more than 20 pages, right?
10   A   So the way that we define simple and
11 complex is really -- has to do with the volume.
12 So -- I'm sorry.  The volume -- volume, but also
13 the length of time it's going to take us to
14 process.
15       So by definition, we basically say a
16 complex request is anything that's going to take
17 us longer -- 30 days or longer to process.
18 Simple cases are those cases that generally take
19 us about a month to process.
20   Q   Okay.  Now, you're here on behalf of
21 both DOJ and DEA.  And is it -- do you know if
22 this is the same sort of triage system that DOJ

1  uses with complex, simple and expedited?
2    A   The -- well, those definitions are
3  covered in the DOJ FOIA regulations.  So you can
4  find it under what they call the multitrack
5  processing section of the regulations, and it
6  talks about, you know, how we defined simple and
7  complex, and, yes, the volume and the length of
8  time it's going to take us to process is wrapped
9  into that definition.
10   Q   But this sort of 20 -- this 20-page
11 threshold or 30 days, is that a -- is that a DEA
12 sort of rule of thumb, or is that like a
13 Department of Justice --
14   A   No.  So the 20-page rule, if you
15 will -- and, again, this is just one of many
16 buckets or queues that we have created.  We did
17 that for the -- so for the 20-page cases, I have
18 one particular queue where all of those cases are
19 going to help us to keep eyes on them so we can
20 close them faster.
21       I have other buckets -- so while we
22 have this, you know, simple, complex and

1  expedited, you know, within this, you know, we
2  have the actual queues that we set up, right?
3        So, yes, DEA generally handles these
4  cases in a first-in, first-out approach, but
5  having said that, again, I set up specific work
6  queues so that we can identify and, you know,
7  categorize certain types of requests in an effort
8  to get these out the door faster.
9    Q   And there's a Zorn work queue now,
10 right?
11   A   Well, I'm -- I can't call it a queue,
12 but I am familiar with all of your requests, and
13 I am working with the team to try to get these
14 things to you.
15   Q   I noticed there was -- and I will say,
16 you know, I withdrew one of my requests, and
17 there were certain requests that related to a
18 proceeding that by the time my requests were
19 processed no longer existed, so I wasn't
20 interested in it.  So I'm not just throwing
21 requests out.
22       But I will say that I noticed in the

1   documents that there was a sort of description of
2   Zorn request.  Is that -- were -- are my requests
3   being sort of grouped together by the requester?
4   In other words --
5       A   No.
6       Q   Okay.
7       A   I'm not sure what you're speaking of.
8   I'd have to see that, but we don't -- you know,
9   when I -- I have a case management system, so --
10      Q   Sure.
11      A   -- if I go into my system and I type in
12  "Matthew Zorn," all the requests that you've
13  submitted to DEA would show up on that page for
14  me, but we don't categorize individuals --
15      Q   Right.
16      A   -- you know.
17      Q   Now, there are -- there are requester
18  categories, though, right, in the -- the
19  software?  I noticed that.
20      A   Yes.
21      Q   And there's commercial.  There's
22  noncommercial, right?

Page 174

1       A   (Nodding.)
2       Q   There's a lot more than that, though,
3   right?
4       A   So requester categories are basically
5   broken down into your media representatives, your
6   non-commercial scientific institutions, your
7   educational institutions, and then anything
8   outside of that is categorized as what we call
9   all others.
10      Q   So there is a document -- let me just
11  pull it up.  I might need to -- this is the --
12  there is -- the FOIAXpress, I guess, manual or
13  whatnot, what was produced, and there was a
14  screen -- I don't know if it means anything --
15  but of listing the types of requesters, right?
16      A   Yeah.  If you have that document, I
17  could look at it.  I'm not sure what you -- which
18  one that is.
19      Q   I'm not sure this is too important, so
20  why don't we not -- not waste everyone's time
21  with something I don't think is terribly
22  important.  Let's get back to the spreadsheet --

Page 175

1       A   Okay.
2       Q   -- that's in front of you.  Okay.
3       So back to the sort of simple, complex,
4   and just so the record here is clear, there's a
5   general -- and, you know, subject to what you
6   were saying before, if there are sort of more
7   finer groupings, but generally speaking, there's
8   a simple line, there's a complex line, and
9   there's an expedited line.
10      A   Correct.
11      Q   Is that fair?
12      A   Uh-huh.
13      Q   And then each one is, generally
14  speaking, a first-in, first-out basis, subject to
15  sort of a little more discretion in terms of
16  processing things?
17      A   Correct.
18      Q   Okay.  Now, let's open up Exhibit 16.
19  And I will represent to you that I created
20  Exhibit 16 by doing a pivot table of the data
21  that was in Exhibit 15 and summing up complex,
22  expedited, simple, and that the grand total was

Page 176

1   the total number of requests for each of the
2   different divisions or -- sorry -- the different
3   components or agencies on the left.  And that
4   column I there is the percentage of requests that
5   were -- that were -- percentage of requests
6   categorized as simple.
7       So in the case of ATF, for example,
8   that 25 percent is because 491 out of 1,936 --
9   and it's rounded, but 491 over 1,936, that's
10  25 percent of the 1,936 requests that ATF got
11  according to my pivot table were categorized as
12  simple.
13      Do you follow me?
14      A   Yes.
15      Q   And do you see here that DEA
16  categorized just -- and this is in 20 -- of the
17  2021 spreadsheet, just 3 percent of the requests
18  as simple?
19      A   I see that, but I would tell you that I
20  worry about the data that is depicted here,
21  because the previous chart that we looked at or
22  spreadsheet, that is the annual report data for

Page 177

45 (Pages 174 - 177)

| | |
|---|---|
| 1  2021, I believe, which includes cases that were | 1      VIDEO TECHNICIAN:  Going off the |
| 2  received prior to 2021. | 2  record, the time is 14:12 p.m. |
| 3      Q   Right. | 3      (Recess 2:12 p.m. to 2:23 p.m.) |
| 4      A   So we're basically looking at -- I | 4      VIDEO TECHNICIAN:  Going back on the |
| 5  think it goes back to 2018 on that spreadsheet | 5  record, the time is 14:23 p.m. |
| 6  for DEA.  It's anything that is basically -- that | 6      MR. ZORN:  All right.  Thanks for your |
| 7  had remained open during that reporting period, | 7  patience.  I'm introducing Exhibit 17 into the |
| 8  2021. | 8  folder.  It's another spreadsheet. |
| 9      So, like, I think what we're looking at | 9      (Deposition Exhibit Number 17 |
| 10  here is all cases that were open as of 2021, and | 10  was marked for identification.) |
| 11  you're saying it's 3 -- only 3 percent of all of | 11  BY MR. ZORN |
| 12  that data simple -- it's 3 -- simple cases were | 12      Q   And if you tell me when you have it |
| 13  just 3 percent of that total number. | 13  open -- |
| 14      Q   Right.  And I'm just looking at the | 14      A   Yes, we have it open. |
| 15  other agencies, and with the exception of -- it | 15      Q   So there are two different sheets in |
| 16  does look like here that -- that USMS is -- is | 16  this spreadsheet, and I'll represent to you that |
| 17  zero percent. | 17  the first sheet is the document that was produced |
| 18      And then OJP, which is, I think, what, | 18  to me, which is the FY 2022 raw data for DEA. |
| 19  Office of Justice Programs, is 7 percent, but -- | 19      Does this look like -- like that would |
| 20  but the DEA is -- is -- is a lot lower -- | 20  be -- like that's the raw -- |
| 21  categorizes a lot more requests according to the | 21      A   Yes. |
| 22  spreadsheet data than the other components or | 22      Q   -- data?  Okay. |
| Page 178 | Page 180 |

| | |
|---|---|
| 1  agencies. | 1      Now, there's another sheet there.  It |
| 2      And maybe I don't understand the -- the | 2  says Sheet 1 at the bottom. |
| 3  data that was produced to me, and I would welcome | 3      A   Uh-huh.  Yes. |
| 4  a clarification, but that seems to be what's | 4      Q   And if you have it open, I'll represent |
| 5  showing up here. | 5  to you, over the break, I created a pivot table |
| 6      A   Yeah.  I think it would be a clearer | 6  of the data to track the -- by different years. |
| 7  picture for me -- and this is not how we report | 7  Those years correspond to the -- when the request |
| 8  as DOJ, right?  If I saw per fiscal year of all | 8  was received. |
| 9  the requests I received just for, let's say, | 9      A   Okay. |
| 10  fiscal year 2022, how many of those -- what was | 10      Q   And the different column labels there, |
| 11  the percentage of simple versus complex? | 11  the "C" is for complex, the "E" is for expedited, |
| 12      Again, this is not a stat that we're | 12  and the "S" is for simple. |
| 13  required to track, but this is -- we've lumped | 13      Do you follow me? |
| 14  in, basically, prior year requests.  This is -- | 14      A   I do. |
| 15  anything that remained open during the 2021 | 15      Q   And it looks here like that the -- |
| 16  reporting period is what you've put together | 16  there are -- 213 out of 1,215 requests were |
| 17  here, and I think that the statistics could get a | 17  simple. |
| 18  little skewed here potentially. | 18      Did I read that off the spreadsheet |
| 19      MR. ZORN:  Okay.  So can we just go off | 19  correctly? |
| 20  the record quickly?  Because we do have the 2022, | 20      A   Yes. |
| 21  and I just want to quickly do it, because, you | 21      Q   Okay.  And so just to give us an idea |
| 22  know -- | 22  percentage-wise, that's around 17.5 percent. |
| Page 179 | Page 181 |

46 (Pages 178 - 181)

1        Does that -- in your experience as the
2   chief FOIA officer, would that -- that be roughly
3   accurate?
4        A    Again, we don't -- this is not a stat
5   that we track, right, separate from the data you
6   saw in the annual FOIA report.  What you've put
7   together here, though, I mean, you've pulled it
8   from that -- you've extracted this data from that
9   raw data sheet.  This appears to be correct.
10       Q    Is there any sort of agency target as
11  to how many requests should be deemed simple
12  versus complex?
13       A    No, because, again, that is really
14  based on the complexity and the volume involved
15  in these cases.  We're talking about a highly
16  complex, a highly -- I'm sorry -- a large volume
17  of records.  It's being -- we will deem it
18  complex.
19       Q    So when you're creating the -- and the
20  statute provides for -- for -- the statute and
21  regulations certainly permit multiple tracks.  In
22  fact, I think they direct the creation of

Page 182

1        A    It depends.  So -- and I can think of
2   another example.  So if I receive a request for
3   records on a person and we go to the field and we
4   access those records and the records -- it ends
5   up being 500 pages, right?  It's going to take me
6   longer than 30 days to process that material.  If
7   we -- I'm sorry.  If we determine that we're not
8   going to be able to release the records because,
9   let's say, it's part of an active investigation,
10  we're doing a denial.
11       So it still will be deemed complex
12  because, you know, one, we're going to have to go
13  out and get the -- go out to the field to get the
14  records.  There's a high volume involved.
15       But once we receive the records and we
16  recognize that we actually can't disclose this
17  information, then we're -- we're cutting a letter
18  and telling the requester that no records are
19  being released.
20       Q    But in terms of what is ultimately
21  going to be reviewed and produced -- do you
22  follow me?

Page 184

1   multiple tracks.
2        And I guess what -- how -- how does
3   the -- how did -- how did the agency determine
4   that -- that 20 pages or whatever is the -- sort
5   of the cutoff between simple and complex?
6        A    So, again, I want to make sure this is
7   clear.  This is just one bucket of a simple
8   request, the 20 pages.  I have other types of
9   simple requests, things that are going to be
10  closed in a relatively short amount of time,
11  right, that are in a separate bucket, anything
12  that is like a no record response, misdirect
13  request, you know, any categorical denials.  So
14  these are requests that we generally also can
15  close in less than 30 days.
16       Q    So -- so the simple count is
17  effectively counting more than requests that are
18  actually going to require review and production,
19  fair?
20       A    Yes.
21       Q    And those -- but the complex wouldn't
22  include, like, a denial, would it?

Page 183

1        A    Uh-huh.
2        Q    There's a higher percentage of requests
3   according to the statistics in the simple bucket
4   that aren't going to require review and
5   production than the complex bucket?
6        A    That is correct.
7        Q    Okay.
8        MR. RODRIGUEZ:  Are you okay?  Do you
9   need to take a break?
10       THE WITNESS:  No.  I'm good.  Thank
11  you.
12       MR. RODRIGUEZ:  Okay.
13       THE WITNESS:  Yeah.
14       MR. RODRIGUEZ:  I heard --
15       THE WITNESS:  Yeah.  It's --
16       MR. RODRIGUEZ:  -- a device went off.
17       THE WITNESS:  -- going to make a noise
18  for a little bit, but we're good.
19       MR. RODRIGUEZ:  Okay.
20       MR. ZORN:  Well, if you need to take a
21  break, just let us know.
22       THE WITNESS:  I'll let you know.

Page 185

47 (Pages 182 - 185)

1        MR. ZORN:  Yeah.
2        THE WITNESS:  Thank you.
3    BY MR. ZORN
4        Q    Okay.  So -- and the agency doesn't
5    have a benchmark sort of aiming to have a certain
6    percentage of simple versus complex, does it?
7        A    No.  And I guess I'm struggling with
8    this because, like, I don't know how we can get
9    around a case that is legitimately -- it's
10   complex.
11       If I am -- if my staff has to process
12   hundreds, sometimes thousands of pages, the only
13   workaround to reduce that -- the size of that
14   case would be to have a conversation with the
15   requester and see if we could narrow scope.
16       Q    I follow you, and you're talking about
17   thousands of pages, but I guess what -- what I'm
18   kind of getting at is -- okay.  And you've said
19   it's not a hard and fast rule, and I accept that.
20       But if the threshold for what sort of
21   crosses into complex or simple were raised, you
22   know, potentially, there would be a different

Page 186

1    the number of pages, the length of time it's
2    going to take us to process.
3        You know, low staffing numbers also
4    impact this, right?  It just -- the ability to
5    produce something quickly nowadays with such
6    limited resources is difficult.
7        Q    So -- well, how does the staffing
8    affect the complexity of a request?
9        A    So if a case -- if we deem a case
10   complex -- again, it's generally due to the size
11   of the case, and I only have 16 staff members in
12   total to work on these cases -- earlier I said
13   18.  I'm taking myself out of this and our
14   secretary.  Okay.  So legitimately people to do
15   FOIA processing work, 16 people.
16       So if we've deemed a request complex
17   because it's -- the volume is high, I mean, I
18   have 16 staff members to work on those cases.  We
19   received 16 -- over 1,600 requests just in 2022,
20   16 people to work on all of that, with the
21   majority being complex.
22       Q    So -- so a simple request is -- so,

Page 188

1    alignment of sort of requests in the simple
2    bucket versus the complex bucket, because, I
3    mean, we can agree that there are some documents,
4    just single individual documents that are more
5    than 20 pages, right?
6        A    Yes.
7        Q    And if someone -- there's no way to
8    narrow a request that's -- you know, even if I --
9    if I were to request the DEA staff manual -- we
10   were looking at that earlier.
11       A    Right.
12       Q    And that's a big document, isn't it?
13       A    Uh-huh.
14       Q    And let's say I narrowed my request to
15   like three chapters, right?
16       A    Uh-huh.
17       Q    I'm already over 20 pages.  Do you
18   follow me?
19       A    I do.
20       Q    But that's not really a complex
21   request, is it?
22       A    It's not.  Again, it would be based on

Page 187

1    really, the difference between simple and
2    complex, as I understand it, is just the amount
3    of time it's going to take to respond, fair?
4        A    Yes.
5        Q    Okay.  And --
6        A    If we feel we can produce it in 30 days
7    or less, we categorize it as simple.
8        Q    Okay.  And it might still raise unusual
9    circumstances, but it could be simple, right?
10       A    Let me walk this through in my head.
11   Yes, that is true.  If I have to search another
12   field office and what comes back is two pages and
13   I'm able to get it out in ten days, we would deem
14   that as simple.
15       Q    But if you can get it out that quickly,
16   it's not really necessary to have extra time to
17   be able to complete that request, right?
18       A    Well, the reason, again, why we would
19   have to invoke the extra time is we have to go
20   outside of the FOIA office.  Sometimes we have to
21   go to another state to get the records, right?
22       So we don't have access.  That's why

Page 189

48 (Pages 186 - 189)

| | |
|---|---|
| 1 we're -- we're invoking unusual circumstances. | 1 asked me about, basically what it's doing, the |
| 2 We feel that we meet the definition of unusual | 2 system is basically recalculating the timeline |
| 3 circumstances, particularly prong 1 for the | 3 for completion, right, whether it's 20 or 30 |
| 4 majority of our cases. | 4 days. So we must have -- I have to look to see |
| 5    Q   Okay. So for the -- there are unusual | 5 when this request was received so I can -- oh, |
| 6 circumstances for the majority of the cases | 6 did I jump off? Stop the clocks at -- I went to |
| 7 that -- | 7 the wrong one. Sorry. |
| 8    A   I would say for the -- | 8       Okay. I believe we received this |
| 9    Q   -- the agency -- | 9 request in the beginning of May. I don't have |
| 10    A   -- majority. | 10 the date on the first entry here, but, really, |
| 11    Q   The vast majority? | 11 what that's showing you is that, you know, we |
| 12    A   Yes. | 12 were -- we had stopped the clock at some point, |
| 13       MR. ZORN: Okay. Thank you. I think | 13 and then it was restarted. The fees weren't |
| 14 I've got some understanding here now. Let's -- | 14 paid. Once we had passed the 30-day timeline for |
| 15 I'm going to move to a different exhibit. Why | 15 response, we closed the case. |
| 16 don't I do this one? All right. So let's -- I | 16    Q   And so looking at the May 10th, 2022, I |
| 17 put in exhibit -- this is 10B. | 17 see, "Review fees must be assessed before we |
| 18       (Deposition Exhibit Number 10B | 18 process records," and that's in caps with a star. |
| 19       was marked for identification.) | 19       Do you see that? |
| 20       THE WITNESS: 10B. Okay. Okay. I | 20    A   Yes. |
| 21 have that. | 21    Q   And that's -- that's basically |
| 22 | 22 instructing others that before the DEA engages in |
| Page 190 | Page 192 |

| | |
|---|---|
| 1 BY MR. ZORN: | 1 any review, there needs to be payment; is that |
| 2    Q   Okay. So -- so this is the request | 2 fair? |
| 3 notes for 22-0059. Is that fair? | 3    A   Yes. |
| 4    A   00592, yes. | 4    Q   And does -- does the DEA actually keep |
| 5    Q   Yes. Sorry. 592. And I want to look | 5 track of how much -- like, let's say the |
| 6 at the second -- the second part of this. | 6 payment's made. Do you follow me? |
| 7       The -- sorry. The second from the top | 7    A   Uh-huh. |
| 8 on the first page -- and I understand it's in | 8    Q   Does the DEA then actually keep track |
| 9 reverse chron order, but just for clarification, | 9 of how, like, its reviewer's actually reviewing? |
| 10 what is -- what is the -- sort of the target | 10    A   Of the time that they're actually -- |
| 11 date? | 11 like how much time they've -- yes. |
| 12    A   This is generated by my system, and | 12    Q   And -- and if the review time is |
| 13 this basically gets generated. When we enter a | 13 different from the estimate, what -- is money |
| 14 FOIA request, we put in the date we received it. | 14 paid back? |
| 15 The -- the clock is now running, right? | 15    A   We are supposed -- yes, we are to pay |
| 16       So I guess here what happened was, we | 16 it back. |
| 17 stopped the clock at some point, I believe -- I'm | 17    Q   Okay. But the DEA practice is to pay |
| 18 going to have to look at this, because fees, I | 18 money up front before the review? |
| 19 think, were assessed and were not paid. Let me | 19    A   If the request -- the review fee is |
| 20 just -- let me just double check. Yes. It looks | 20 more than $250, yes, advanced payment is |
| 21 like the clock was stopped on August 31st. | 21 required. |
| 22       So moving back to the line that you | 22    Q   Okay. And just -- Jenrette -- I can't |
| Page 191 | Page 193 |

49 (Pages 190 - 193)

1    pronounce her last name.  This is the -- a
2    couple -- it's the bottom of page 4 out of 5,
3    just if you can tell me when --
4         A    Okay.
5         Q    -- you're there.
6         A    Let's see.  Page 4.  Yes, I'm there.
7         Q    And "Check with SC."
8              What's "SC"?
9         A    Section chief.  She's speaking of me.
10        Q    "If these still apply because case is
11   past 30 days," right?
12        A    Uh-huh.
13        Q    And -- and the fees here that
14   wouldn't -- would not be due are the search fees,
15   right?
16        A    We would not have -- you're right.  We
17   would not charge search fees for this case or --
18        Q    Because --
19        A    -- any case, really, nowadays because
20   of the amendment.  The change in 2016, like I
21   said, really limited our ability to charge search
22   fees.

Page 194

1         Q    But it doesn't limit the ability to
2    charge review fee or processing fees?
3         A    There isn't a processing fee, per se,
4    but it's review and duplication.  Duplication, we
5    don't charge, either --
6         Q    Right.
7         A    -- because the days of Xeroxing records
8    is really over.  It's all electronically done.
9         Q    And it says -- and there were draft
10   letters and e-mails from the share drive.
11             And, actually, let's turn back down to
12   yours, because you say, "Drafts need to be
13   closely reviewed under (B)(5).
14             Do you see that?
15        A    I need to see -- which page is that on?
16   Page 4?  I'm sorry.
17        Q    Sorry.  Now we're back on page 5.  This
18   is back --
19        A    Okay.
20        Q    -- on -- on your comment.  It's a
21   May 10th, 2022, 2:27 p.m. comment.
22        A    Yes.

Page 195

1         Q    And it says, "Drafts need to be closely
2    reviewed under (B)(5)."
3              It's the last sentence.  Now, (B)(5) is
4    the deliberative process privilege, true?
5         A    Yes.
6         Q    And generally speaking, draft agency
7    documents are -- are almost always going to be a
8    deliberative process?
9         A    Yes.  Anything that's pre-decisional
10   or -- yes.
11        Q    Now, if a document, on its face, the
12   first page is pre-decisional or deliberative
13   process -- do you follow me?
14        A    Yes.
15        Q    Would the DEA end up charging for
16   reviewing the rest of the document?
17        A    If the entire document has been
18   deemed -- meaning the entire document is
19   pre-decisional, we're withholding it in full.
20        Q    Yeah.  I mean, hypothetically, let's
21   say we have like a draft, like what you're -- in
22   your comment, you talk of drafts, and it doesn't

Page 196

1    really go beyond that.  But just say draft.
2    Okay?
3         A    Uh-huh.
4         Q    A draft letter.
5         A    Yes.
6         Q    The reviewer looks at it.  It's a draft
7    letter.  It's a (B)(5) withholding.
8              When DEA goes to calculate the review
9    time, is that -- you know, is that sort of
10   calculated -- like line by line is reviewed of a
11   (B)(5) withholding?
12        A    So you have to keep in mind that the
13   review has not been done yet.  When the -- when
14   the fee is calculated, we are simply looking at
15   how many pages do we have that we're going to --
16   you know, have to review and process, meaning
17   review -- read the document, determine what is
18   exempt, place (B)(5) exemptions on.  That hasn't
19   occurred yet.  That comes later, right?
20        Q    Understood.  But what I'm -- where I'm
21   going with this is the seven-minute-a-page
22   estimate is sort of predicated on the notion that

Page 197

50 (Pages 194 - 197)

1   every single page is going to be read, reviewed,
2   redacted.  In practice, that never happens when
3   there's withholdings like the one I'm describing
4   now, right?
5       A   I mean, if you're telling me one --
6   you're talking about one page, two pages that
7   we're going to exempt in full under (B)(5).  We
8   still have to -- there's a -- we have to read the
9   document and place the redaction on the document.
10      Q   Well, if the -- well, first -- wait.
11  So a (B)(5) withholding is, like, produced as
12  just like a big black box?
13      A   We basically have to mark the document
14  in a manner that it's very clear that it's being
15  withheld in full under (B)(5).  We have to do
16  that in the event that we're appealed or sued by
17  a requester.
18          We want -- at the administrative level,
19  we want it to be very clear about our
20  decision-making in these withholdings, so, yes,
21  there is a redaction -- a blanket redaction, if
22  you will, placed on the document.

Page 198

1       Q   And that takes seven minutes to put
2   that on?
3       A   Not on a single page, no.
4       Q   Okay.  But -- and you're talking about
5   like a one to two-page document, but, you know,
6   if you have like a 20-page draft memo, then it's
7   just all 20 pages.  Fair?
8       A   Yes.  We would place the blanket, and
9   it should apply to all pages.
10      Q   And it's not going to take seven
11  minutes to go through and read those documents
12  line by line because they're being withheld,
13  right?
14      A   Right.
15      Q   And so when DEA produces its fee
16  estimate that needs to be paid up front, right,
17  that's effectively a max -- that's a maximal --
18  that's like the most -- assuming DEA went through
19  and reviewed every single page and it was -- and
20  assuming seven minutes a page is an accurate
21  reflection, like, this is the most that you're
22  going to have to pay, right?

Page 199

1       A   Yes.  And that's why it's called a fee
2   estimate.  So if we -- if we overcharged or
3   overestimated, we would owe money back to the
4   requester in the end.
5       Q   What if someone can't afford the
6   estimate?  Is there any -- any way to --
7       A   Unfortunately -- and, again, this only
8   applies to commercial use requesters -- you know,
9   we -- there are fees that have to be paid for
10  this -- for the process.
11          And when you're talking, again,
12  thousands and thousands of pages for review,
13  unfortunately, with the lack of resources, I
14  don't have the ability to just waive the fees
15  there.
16      Q   Well, how do you determine if someone's
17  a commercial use requester?
18      A   So we would take a look at what is
19  submitted in the request letter, and if we
20  determine that there is a commercial trade or
21  profit interest in the records sought, we would
22  determine that it's commercial use.

Page 200

1       Q   And does it -- does DEA make the
2   determination that it's predominantly a
3   commercial use or just any -- any commercial use?
4       A   I'm sorry.  I don't know that I'm
5   following the question.
6       Q   Well, something could have a commercial
7   use, but also a non-commercial use.  Is that --
8   is that fair?
9       A   Potentially, yes.
10      Q   So -- and is -- is it the agency's
11  position that in deciding who to charge fees, its
12  based on if there's any commercial use of the --
13      A   It's based --
14      Q   -- records?
15      A   -- on information that's provided by
16  the requester.  So it has to be clear to us that
17  there's a commercial use.  Again, it's really on
18  the requester to tell us -- you know, if they
19  feel they're not a commercial use requestor, they
20  need to articulate that so we can review it.
21      Q   So -- and -- and I think there are sort
22  of contrasting examples in the record here

Page 201

51 (Pages 198 - 201)

| | |
|---|---|
| 1 depending on the different plaintiffs, so I just | 1   Q   -- the requester's responsibility. |
| 2 kind of want to tease this out a little bit. | 2 Okay.  That makes sense. |
| 3       In the case of AIMS, that was a | 3       Okay.  So I am curious -- when we look |
| 4 commercial request, right? | 4 at August 22nd, 2022, this is -- this is |
| 5   A   As far as I understand, yes. | 5 Stephanie Evans. |
| 6   Q   And that's because it was DEA's | 6       And just -- just to kind of set some |
| 7 position that AIMS was going to use the record to | 7 atmospherics here, this is Ms. Tucker's request |
| 8 do what? | 8 on -- relating to records about the right to try |
| 9   A   So my understanding is that AIMS is a | 9 psilocybin.  Fair? |
| 10 palliative care clinic, and, you know, clearly, | 10   A   Yes. |
| 11 there would be a profit interest in the records | 11   Q   And there's notes here about a meeting |
| 12 sought.  My understanding is that they are trying | 12 with Ms. Anne Cotter, judicial law clerk to Judge |
| 13 to obtain access to psilocybin to treat patients. | 13 Teresa Wallbaum. |
| 14 My belief is that there certainly would be a | 14   A   Uh-huh. |
| 15 profit interest down the line. | 15   Q   Do you see that? |
| 16   Q   So under the right to trial law, | 16       Like, am I missing something?  What -- |
| 17 that's -- that's the -- | 17 what did this request have to do with -- with -- |
| 18   A   I mean, I can't speak to that -- the | 18 with Judge Wallbaum or Ms. Cotter? |
| 19 law.  That's certainly not my area of expertise. | 19   A   Let me take a look at this real quick. |
| 20 But when I'm evaluating whether a request -- a | 20       So for this particular request, our |
| 21 requester is commercial use or not, that's what | 21 staff had already begun processing some of the |
| 22 we glean from the request letter. | 22 records before we assessed this review fee. |
| Page 202 | Page 204 |
| 1   Q   Okay.  That's totally fair. | 1 Management realized that we were -- we were -- |
| 2   A   Okay. | 2 again, we were proceeding without that. |
| 3   Q   And -- now, I made a couple requests, | 3       So what you're seeing here is, she had |
| 4 and I kind of clearly laid out, like, I wanted to | 4 a conversation with the staff and the |
| 5 write, like, a journalism story, and that's been | 5 administrative law judge about the records that |
| 6 treated as non-commercial, right? | 6 we received.  She was trying to process.  We -- |
| 7   A   Absolutely.  One of your requests in | 7 management team kind of put the brakes on this |
| 8 particular -- and I think you'll recall you and I | 8 and said, wait a second, we haven't assessed the |
| 9 kind of spoke on a few just because I wanted to | 9 review fee yet, we shouldn't be continuing with |
| 10 clarify -- | 10 the processing. |
| 11   Q   Yeah. | 11       So for this particular request, we |
| 12   A   -- your requestor category and make | 12 actually shaved off the time that was already |
| 13 sure that I was proper in that assessment. | 13 invested in this case.  We did not roll that into |
| 14       So for one in particular, you did | 14 the review fee.  We backed that out of there. |
| 15 provide the requirements or the necessary | 15 But that's what you're seeing here.  So any |
| 16 information to meet media status, so we did | 16 conversation they have internally at DEA, I mean, |
| 17 categorize you as such. | 17 we use the notes as best as we can to document |
| 18   Q   Okay.  So there is a -- this is not | 18 actions in these cases. |
| 19 a -- there is a deliberate process that the | 19   Q   And just for the record, tryptamine is |
| 20 agency goes through and takes into consideration | 20 not a psychedelic drug, but -- and psilocybin is |
| 21 facts when presented by the requester.  It's -- | 21 a tryptamine, so there appears to be some |
| 22   A   Absolutely. | 22 misunderstanding here, but I set that aside. |
| Page 203 | Page 205 |

52 (Pages 202 - 205)

1        I guess -- I guess I'm just kind of
2   curious as to -- because I -- I was in front of
3   Judge Wallbaum, and I can only assume that this
4   related to that proceeding, but I just don't know
5   how this -- I mean, how -- I don't know how to
6   ask this of, like, what's going on here?
7        Like, why is -- is that part of this
8   sort of investigation here?
9        A   So, again, I -- and I wasn't part of
10  this conversation, but my -- from reading this
11  note, my assessment is that if our team is
12  reading a document that they thoroughly don't
13  understand, they're generally going to pick up
14  the phone and call the record owner and say,
15  explain to me what I'm reading here.  So I want
16  to make sure that --
17       Q   Okay.
18       A   -- I'm processing this correctly, is
19  this responsive, these types of things.
20       Q   Okay.
21       A   Yeah.
22       Q   So that's helpful.  So sometimes the

1   FOIA staff talks to other groups to understand
2   the document and have a better idea as to whether
3   something's responsive or exemption or so on and
4   so forth?
5        A   Yes, all the time.
6        Q   Okay.  And that -- that goes into the
7   seven-minute sort of estimate as well, right?
8        A   No.  No.
9        Q   Okay.
10       A   Those conversations don't get rolled
11  into the estimate.  The estimate is really just
12  purely based on how many records do I have for
13  review, how long is it going to take me to do the
14  processing now.
15       MR. ZORN:  All right.  That's helpful.
16  Okay.  Let's see.  All right.  I'm going to
17  introduce 10C.
18       (Deposition Exhibit Number 10C
19       was marked for identification.)
20  BY MR. ZORN:
21       Q   And so this is request 22 -- the
22  request notes for 22-00845-F, correct?

1        A   Correct.
2        Q   And just looking at the document -- and
3   there's an annotation I made about releasing
4   their names on the document, and I'll get to that
5   question in a moment, but -- but my first
6   question is, based on the context of this
7   document, you can tell that this is the request
8   for the two presentations that were -- and
9   I'll --
10       A   Yes.
11       Q   -- represent for the record that this
12  was timely collected and produced.  I got this
13  fairly quickly.
14       But you can recall that this was marked
15  as unusual circumstances, right?
16       A   It was.
17       Q   And that's because, as we've discussed
18  throughout the day, Theresa Carbonaro does not
19  sit inside the FOIA office?
20       A   Correct.  I don't have access to her
21  records.
22       Q   Right.  And so it was a fairly simple

1   request to complete, true?
2        A   Yes.  Simple.
3        Q   Just reached out to her, and she sent
4   the documents, right?
5        A   Yes.
6        Q   And -- and it was -- I don't even know
7   if it was characterized as simple, complex or
8   anything, right?
9        A   I would check -- I would have to
10  confirm my system, but we should have deemed it
11  simple, because we produced it to you in 21 days,
12  under the 30 days.  So --
13       Q   That sounds --
14       A   -- we would have --
15       Q   -- right, yeah.
16       A   Yeah.
17       Q   And so my last question here is -- you
18  know, there's -- I see they're releasing their
19  names on the documents, and that's what I
20  highlighted.
21       And I guess what would be -- what would
22  have been the basis -- let's assume they weren't

Veritext Legal Solutions
346-293-7000

1  submitted publicly.  What would have been the
2  basis to not release their names on the document?
3      A   So, generally, we do not release the
4  names of DEA employees on any document unless
5  that document has already been made publicly
6  available.  So we protect -- there is a privacy
7  concern, and so we generally -- excuse me -- we
8  redact those under FOIA exemptions (B)(6) and
9  (7)(C).
10         In this circumstance, I didn't -- I did
11  not believe we were going to withhold their
12  names, but as a courtesy to them, I picked up the
13  phone and I just made sure there were no
14  concerns.  And I, you know, had the conversation
15  about it was -- this document, I understand, has
16  already been released in full, you know, just
17  wanted to make sure they had no concerns.  But we
18  did not withhold their names.
19      Q   So -- so what is the (B)(6) exemption?
20      A   This -- oh, excuse me.  This is --
21  protects -- it's a personal privacy exemption, so
22  names -- you know, we redact the names of all of

*Page 210*

1  our employees under that exemption with the
2  exception of SES personnel.  So SES names, we do
3  not redact.
4      Q   So is that a -- is that a policy of
5  the --
6      A   This is actually a DOJ policy --
7      Q   It's --
8      A   -- that we follow.
9      Q   It's not even written down, right?
10      A   It's -- it was captured in a memo that
11  OIP put out a couple of years ago about
12  protecting the names of certain agency, you know,
13  staff, and so we've been following those
14  guidelines ever since.
15      Q   Do you know where I can find that OIP
16  memo?
17      A   If it's not on their website, you might
18  have to file a FOIA request.  I apologize to say.
19  I don't know if that is actually publicly
20  available.
21      Q   And if it weren't publicly available,
22  that would be another FOIA violation of the day,

*Page 211*

1  right?
2      A   In what regard?  I'm sorry.
3      Q   Well, the FOIA requires that -- that --
4         MR. RODRIGUEZ:  Objection.  Calls for
5  legal conclusion.
6  BY MR. ZORN
7      Q   Yeah.  FOIA requires that -- that
8  substantive statements of policy be -- be made
9  affirmatively available, right?
10      A   It does.
11      Q   And so that that -- what you've
12  described sounds like a substantive policy that
13  the agencies are following, right?
14      A   Yes.
15      Q   And just to be clear about the
16  implication of this policy, would that apply to,
17  like, an e-mail?
18      A   It would apply to e-mails.  It would
19  apply to all records.
20      Q   So it's -- and, you know, if you need
21  to pull up the statute, then that's fine, but I
22  just want to read Exemption 6.

*Page 212*

1         It's the position of the United States
2  Department of Justice that names are personnel
3  and medical files and similar files, the
4  disclosure of which would constitute a clearly
5  unwarranted invasion of personal privacy; is that
6  right?
7      A   That is --
8         MR. RODRIGUEZ:  Objection.  Calls for
9  legal conclusion.
10         You can try to answer.
11         THE WITNESS:  That is correct.
12  BY MR. ZORN
13      Q   And as a matter of policy, names are
14  being redacted because it's the Department of
15  Justice's contention that those are personnel
16  files?
17      A   They're personnel, medical or other
18  files, which basically means it could be any
19  file.  So for us, a lot of our records are law
20  enforcement sensitive, and we want to protect the
21  names of our agents, our intel analysts, so on
22  and so forth.  We do believe that they have a

*Page 213*

1  privacy right.
2      Q   Well -- and to be fair, there's a
3  completely different exemption for law
4  enforcement officers, right?
5      A   We use the combination of (B)(6) and
6  (7)(C) to protect their names, yes.
7      Q   But Theresa Carbonaro is not a -- she
8  wasn't -- she isn't and wasn't law enforcement?
9      A   She is a pharmacologist, as far as I
10  know, but we still, depending on the type of
11  document, would protect her name under (B)(6) and
12  (7)(C).
13      Q   Which --
14      A   Not in this circumstance.
15      Q   So -- but -- and 7 is records or
16  information compiled for law enforcement
17  purposes?
18      A   Uh-huh.
19      Q   But only to the extent the production
20  of such law enforcement records or information --
21  and then getting down to C -- could reasonably be
22  expected to constitute an unwarranted invasion of
Page 214

1  personal privacy; is that fair?
2      A   That is correct.
3      Q   Now, when a person is serving as a
4  government servant, what expectation of personal
5  privacy is there?
6      A   So, again, if -- in the -- this has
7  been the policy across the department.  If --
8  generally, employees that are not at the SES
9  level, we don't consider to be public facing at
10  the same level, and so they have a right to
11  privacy, and we want to protect the names of
12  those employees.
13          Obviously, they work in very
14  sensitive -- sensitive matters for the DEA, and
15  so our general practice is to redact their names
16  below SES level.
17      Q   Okay.  So -- but -- and we can
18  certainly agree that there are many, many
19  individuals at DEA who do very sensitive law
20  enforcement tasks.
21          We can agree on that, right?
22      A   Yes.
Page 215

1      Q   But we can also agree that not everyone
2  at DEA is working on law enforcement or sensitive
3  tasks with respect to everything that they do; is
4  that fair?
5      A   That is fair.
6      Q   Okay.  And, you know, for example, a
7  pharmacologist is not performing law enforcement
8  functions in everything that he or she does; is
9  that fair?
10      A   Fair.
11      Q   But it is the agency's policy, per the
12  Department of Justice, not -- not -- this is not
13  DEA policy.  This is DOJ policy.
14          Do you follow me?
15      A   Uh-huh.
16      Q   That -- that that person's name needs
17  to be redacted regardless of the function they're
18  performing?
19      A   That is correct.
20      Q   And do you know when this policy
21  started?
22      A   I want to say it was sometime during
Page 216

1  2019.
2      Q   Do you know who created the policy?
3      A   This was captured in a memo that was
4  issued from the former director of Office of
5  Information Policy.
6      Q   And what's that person's name?
7      A   Melanie Pustay.
8      Q   Okay.  And was that signed off on by
9  Ms. -- this would have been during the Trump
10  administration, right?
11      A   Yes.
12      Q   And who was -- do you know who the DOJ
13  chief FOIA officer was in 2019?
14      A   That I do not.
15      Q   Okay.  So we're getting a little far
16  field.  So let me --
17          MR. RODRIGUEZ:  Yeah.  And we'll go off
18  the record?
19          MR. ZORN:  Yeah.
20          (Brief off-the-record discussion.)
21          MR. ZORN:  Okay.  So there's no
22  question pending, so why don't I introduce
Page 217

55 (Pages 214 - 217)

1 Exhibit 9. And it's in the folder.
2      (Deposition Exhibit Number 9
3      was marked for identification.)
4 BY MR. ZORN
5      Q   And if you could tell me when you have
6 it up.
7      A   I have it up.
8      Q   Okay. Now, this is a letter dated
9 August 17th, 2022, from America First Legal.
10      Do you see that?
11      A   Yes.
12      Q   And this is not a document you've seen
13 before, is it?
14      A   No.
15      Q   And what I'd like to do is, if we could
16 go a little bit farther into the document,
17 there's -- you'll see page 4 is blank, and then
18 there is a page 5.
19      A   Yes.
20      Q   And do you see page 5?
21      A   Uh-huh.
22      Q   And there's a bunch of black boxes on

1 the page that's redacting information, including
2 e-mail addresses. You can see that, right?
3      A   Yes.
4      Q   And because this isn't a document
5 you've seen before, I'm not going to ask you why
6 those e-mail addresses are redacted, although I
7 suspect we covered it in the last module.
8      What I'd like for you to do is if you
9 could just scroll down to -- this is -- if you
10 could scroll down to the April 14th, 2022,
11 3:17 p.m. e-mail. And it's to Elizabeth Wood,
12 and it begins with "Hi Elizabeth."
13      A   Number 14. There we go. Okay. I'm
14 there.
15      Q   Now, on the next page, I've highlighted
16 in this paragraph, "Secondarily, I understand the
17 Civil Division has a policy of not conducting a
18 FOIA search on employee e-mails without first
19 getting their permission or consent."
20      Did I read that correctly?
21      A   You did.
22      Q   Now, we're not here to talk about DOJ

1 civil. I'm here -- we're here to talk about DOJ
2 writ large and DEA.
3      So my first question is: Does DEA have
4 a -- have a policy or even capability to search
5 employees' e-mails without getting consent?
6      A   Yes.
7      Q   And does it have a policy one way or
8 the other on doing that?
9      A   We have -- we have two standard
10 operating procedures that cover this topic, and
11 we -- our practice is not to rely on the owner of
12 the e-mails to do their own search.
13      The only additional thing that we do
14 is, if they involved, like, higher level
15 officials, as a courtesy, we let them know that a
16 FOIA request has come in, we would like to go to
17 the Information Systems Division to do the
18 search, you know, and so as a courtesy, we notify
19 them of that.
20      Q   But -- but you're talking about notice.
21 There's no policy of consent or permission that
22 you're aware of, is there?

1      A   No. And I do not seek employees'
2 permission.
3      Q   And you mentioned these -- the two
4 standard operating procedures.
5      Were those both produced?
6      A   Yes. Yes.
7      MR. ZORN: Are we sure about that?
8      THE WITNESS: So we're talking about
9 two --
10      MR. ZORN: If not, we can just --
11      THE WITNESS: Sorry.
12      MR. RODRIGUEZ: They were either
13 produced or identified on the privilege log.
14      There were -- there were at least a
15 couple of SOPs that were withheld. I know one of
16 them concerned, like, the national background
17 information system and how you access that, and
18 another one involved the investigative files,
19 maybe.
20      THE WITNESS: Uh-huh.
21      MR. RODRIGUEZ: And if there -- you
22 have a particular interest in those, we can talk

1   about it, but they -- they also seemed not really
2   relevant to the claims, but they were withheld
3   for law enforcement privilege.
4          I'll double check on this one, but --
5          MR. ZORN:  Yeah.
6          THE WITNESS:  I think we did.
7          MR. RODRIGUEZ:  It sounds familiar, so
8   it should --
9          THE WITNESS:  Yeah.
10         MR. RODRIGUEZ:  -- either be identified
11  in the privilege log or -- or it was produced.
12         THE WITNESS:  And they would reference
13  e-mail searches on the front page of both.
14  BY MR. ZORN
15     Q   Okay.  And then the next -- let's look
16  at the next paragraph here.
17         "Thirdly, I asked about the unusual
18  circumstances determination.  I asked if we were
19  somehow able to identify even 20 of the correct
20  custodians who had communications, could this be
21  a simple request processed in the normal course.
22  The short answer was no, it cannot be, because

Page 222

1   bit.  There's -- there's a little -- there's --
2   there's some text highlighted here about the
3   policy of getting consent from employee to a FOIA
4   search.  That's a written policy.
5          Do you see that?  It's April 14th.
6      A   I see the April 15th one.  Let me go
7   down.  Getting consent from employees --
8      Q   Yes.
9      A   -- prior to a FOIA search?  Okay.
10     Q   And this is not a policy DEA has,
11  right?
12     A   We -- we don't have a policy that tells
13  the vast majority of employees that we are not
14  going to go to you for your own searches, no.
15  That does not exist.
16     Q   Right.  And my real question here is --
17  we see that Ms. Wood says it's not a written
18  policy.  Do you see that?
19     A   Yes.
20     Q   And I guess my -- my question here is,
21  you know, the DEA has produced a number of
22  written policies.  You know, how are -- are there

Page 224

1   assuming there are records, the Civil Division's
2   FOIA office would still have to contact the
3   custodians, perform the search (or have the
4   custodian do so), compile the records, and review
5   them for responsiveness and redactions.  My
6   understanding is that, short of there being no
7   responsive records, there is no way to obtain a
8   determination of anything other than unusual
9   circumstances despite the request being for
10  communications with one specific non-governmental
11  e-mail address."
12         Did I read that correctly?
13     A   You did.
14     Q   And this -- this is not -- again, this
15  is talking about the Civil Division, but, again,
16  this is a department-wide understanding of the
17  unusual circumstances exception, which is, if you
18  have to contact someone else, that's unusual
19  circumstances, someone else outside the FOIA
20  office; fair?
21     A   Yes.
22     Q   Okay.  And I want to scroll up a little

Page 223

1   unwritten policies that weren't produced
2   regarding FOIA processing, or was what was
3   produced -- does that -- that -- those are the
4   FOIA policies?
5      A   What is produced -- what we produced to
6   you is all we have in place as of right now.
7      Q   Okay.  Are there unwritten policies at
8   DEA for FOIA processing or --
9      A   I mean, I can't -- I can't really speak
10  to those or think of those in the moment, but I
11  can tell you, I have a list of things I would
12  like to put into writing.  So, you know, there's
13  how to process certain types of cases.
14     Q   Okay.
15     A   Yeah.
16     Q   But those aren't, like, really DEA
17  policies; those are more just like best
18  practices?
19     A   Internal for my staff, right, that's
20  what that would be for.
21         MR. ZORN:  Okay.  I definitely don't
22  have much more than an hour, so if we go off the

Page 225

57 (Pages 222 - 225)

1  record and come back, I think that will just
2  be it.
3          THE WITNESS:  Okay.
4          MR. ZORN:  All right.
5          MR. RODRIGUEZ:  Off the record.
6          VIDEO TECHNICIAN:  Going off the
7  record, the time is 15:09 p.m.
8          (Recess 3:09 p.m. to 3:20 p.m.)
9          VIDEO TECHNICIAN:  Going back on the
10  record, the time is 15:20 p.m.
11          MR. ZORN:  Welcome back, Ms. Miller.
12          THE WITNESS:  Thank you.
13          MR. ZORN:  Also, in the marked exhibits
14  folder, you've got Exhibit 4, and I've just got a
15  couple of quick questions about it.  So if you
16  can tell me when you have it pulled up.
17          (Deposition Exhibit Number 4
18          was marked for identification.)
19          THE WITNESS:  Okay.
20  BY MR. ZORN
21      Q    And again I'll represent for the
22  record, I made the blue highlights.  The document

Page 226

1  to me, you can see at the top it's "Intake Team
2  Procedures," and then in parenthesis, "needs to
3  be put into SOP."
4          So this is essentially something that
5  needs to be put into an SOP, but hasn't been put
6  into one yet?
7      A    Just haven't put it into the nice SOP
8  format yet, yeah.
9      Q    All right.
10      A    This was typed up, and we're trying to
11  get all our SOPs --
12      Q    All right.  And several of those SOPs
13  were produced, such as the spaces required
14  between sentences?
15      A    Yes.
16      Q    Yeah.  And then there was -- there's an
17  SOP on -- on processing requests, which was
18  produced, an SOP on -- on TC searches.
19          What are TC searches?
20      A    So that -- TC is the acronym for the
21  Information System Division, so that SOP covers
22  how we handle searches for e-mails agency-wide.

Page 228

1  was produced without that.
2          And so -- so at the very top, it says
3  "FSRN meeting agenda."
4          Do you see that?
5      A    I do.
6      Q    And so what is FSRN again?
7      A    So, again, this is one of our former
8  acronyms.  It used to be the acronym for the
9  intake unit.
10      Q    All right.  And my first question is:
11  What is this document I'm looking at?
12      A    Let me see here for one moment.
13          So this is part of the training for the
14  new -- new staff members on the intake unit.
15  This is giving them instructions on how to load
16  certain documents into our case management
17  system.
18          I'm just kind of skimming this for one
19  moment.  Yeah, this is -- it's basically
20  providing instruction on how we handle certain
21  types of FOIA matters in the office.
22      Q    Okay.  And the PDF as it was produced

Page 227

1      Q    Okay.  And -- and that's a good
2  question, which is:  How are e-mails kept at DEA?
3      A    How are they kept?
4      Q    How are they stored?
5      A    So this an IT question that I can't
6  really articulate for you.  I mean, my -- what I
7  could articulate is how we initiate a search for
8  e-mail records --
9      Q    Well --
10      A    -- and how it's collected.
11      Q    Well, let's start there.
12      A    Okay.
13      Q    So how -- let's -- well, there was a
14  request.  One of my requests was for e-mails, but
15  let's just take a hypothetical request.
16          I want -- I give you two employees.  I
17  want their e-mails, and I give you search terms.
18  Just walk me through the steps of collecting
19  and -- and reviewing and producing --
20      A    Sure.
21      Q    -- those e-mails.
22      A    We would review that request.  We would

Page 229

58 (Pages 226 - 229)

1  draft up what we call a search memo.  We would
2  send the memo along with a request letter to our
3  point of contact that sits in the office of --
4  the Information Technology Division.
5        We would have them -- they reach out to
6  another unit within that division to actually
7  conduct this -- the e-mail search.  They use a
8  particular tool called Intela to capture these
9  responsive e-mails.
10       And then once the search is done -- we
11  give the offices five days to complete a search.
12  So once we get those records or we're notified
13  that the records are ready, my team will go into
14  that Intela site and take -- take the e-mails and
15  load them into our own case management system,
16  FOIAXpress, to begin processing.
17    Q   So -- and what -- do you have any
18  conception of what percentage of FOIA requests
19  are for e-mails?
20    A   I do not have the percentage, no.  I
21  wouldn't be able to tell you off the top of my
22  head.

Page 230

1  might not be a fair question, but is there any
2  specialized training required to operate this --
3  this other system?
4    A   For Intela, there was.  I had to take
5  my team out to the office where -- I had to take
6  them to that part of Virginia where the
7  intelligence -- I'm sorry -- the Information
8  Systems Division sits to train them how to use
9  the tool to pull those e-mails and bring them
10  into our case management system.
11       And there was an SOP written on this,
12  and so, yes, there was some training for my staff
13  in how to utilize that system.
14    Q   And -- wait.  So the staff knows how to
15  use -- the FOIA staff --
16    A   So --
17    Q   -- knows how to use --
18    A   -- let me --
19    Q   -- that system?
20    A   -- clarify.  So the experts -- the
21  subject matter experts that sit in our IT
22  division are the ones that actually do the search

Page 232

1    Q   And so is it your understanding -- and
2  maybe you don't know, but -- but that there is a
3  centralized server with DEA e-mails?
4    A   Probably.  I don't know exactly how
5  it's all kept.  You know, I'm not -- I admit I'm
6  not an IT expert, so --
7    Q   Okay.  And I'm not saying it is or
8  isn't the case, but let's just assume there is a
9  single server that has all DEA e-mails or some
10  database that allows a centralized repository.
11       Do you follow me?
12    A   Yes.
13    Q   It's still the position of DEA and DOJ,
14  for that matter, that because that server isn't
15  in the FOIA office, unusual circumstances
16  every -- every time?
17    A   Correct.  And the unit that runs the
18  e-mails -- does the e-mail searches for us sits
19  in another city in Virginia.  They're not located
20  in our headquarters buildings in Arlington where
21  the FOIA office is located.
22    Q   Could -- is it possible -- I mean, it

Page 231

1  for the e-mails, and they load them into a tool
2  called Intela.  Once that process is done, they
3  notify my team it's complete, and then we have to
4  log into Intela to pull those responsive records
5  out.
6        So they're not searching for records,
7  my team.  They're basically retrieving the
8  material that's already been placed into Intela
9  for them, if that makes sense.
10    Q   And the accessing Intela by the FOIA
11  staff is done remotely, right?
12    A   It's -- right.  It's done in Arlington
13  where we sit, right.
14    Q   And then you're saying that this IT
15  staff is in some other -- and we don't want to
16  talk about the location --
17    A   Sure.
18    Q   -- but we're just saying it's some
19  other location, right?
20    A   Correct.
21    Q   Does this process change at all if,
22  instead, the FOIA office were on the third floor

Page 233

59 (Pages 230 - 233)

1   and the IT office is on the first floor?
2       A   No.  It would be the same process.
3       Q   So it's unusual circumstances -- well,
4   if it were the first and third floor, it would
5   still be unusual circumstance, right?
6       A   It would be, again, because we just
7   simply don't have access to the e-mail records.
8   We don't have access to the tool to retrieve
9   employees' e-mail records.  We have to rely on
10  someone else to do that for us.
11      Q   Well, now, retrieving e-mail records is
12  a -- it's certainly a function to search and
13  produce for FOIA purposes, right?
14      A   Yes.
15      Q   I imagine a congressional subpoena
16  might be another instance where e-mails had to be
17  searched and produced?
18      A   Uh-huh.  Yes.
19      Q   Are you aware of any other reason that
20  the agency would search and produce e-mail
21  records other than to respond to a FOIA request
22  or subpoena?

Page 234

1       A   I mean, I can't speak to that.  I can
2   only speak to my functions in FOIA.
3       Q   It seems to me that a large part of the
4   job of -- of -- if not the predominant part of
5   the job of searching this in Intela or --
6   sorry -- even gathering the e-mails is FOIA, like
7   that -- would you agree?
8       A   Could you rephrase that question?  I'm
9   sorry.
10      Q   This particular function that we've
11  been discussing of collecting e-mails to produce,
12  it seems to me that a major reason one would do
13  that is to respond to a FOIA request.
14          MR. RODRIGUEZ:  Objection.  Foundation.
15  You can try to answer.
16          THE WITNESS:  It -- I mean, it
17  represents a percentage, yes, of all FOIA
18  requests I receive per year.  I wouldn't say
19  every request requires us to pull e-mails.
20  BY MR. ZORN
21      Q   And do -- well, no, and I'm talking
22  sort of from the IT side of things, which is, you

Page 235

1   know, let's say they get a request to collect all
2   the e-mails belonging to so and so, that there's
3   a good chance that that's because of a FOIA
4   request.
5           MR. RODRIGUEZ:  Objection.  Foundation.
6           THE WITNESS:  Yes, it could be.  Yes.
7   BY MR. ZORN
8       Q   Okay.  And there are other
9   circumstances in which that -- that employee
10  might be searching for and producing e-mails,
11  fair?
12      A   Yes.
13      Q   Like I said, a court subpoena or even
14  in this case, we had requests for production.
15  This wasn't a FOIA request, fair?
16      A   Fair.
17      Q   But a FOIA request is one of the
18  situations?
19      A   Yes.
20      Q   Okay.  And, in fact, it's not an
21  uncommon situation?
22      A   It's not uncommon.

Page 236

1       Q   In fact, I would venture to say that
2   happens multiple times a month that your office
3   is asking for e-mails to respond to FOIA
4   requests, right?
5       A   Yes.
6       Q   What about on a weekly basis?  How many
7   times a week?
8       A   So, again, I don't have those
9   statistics to tell you, I mean, and it varies
10  week to week.
11      Q   And you know -- you know the folks over
12  there by their names.  I'm not going to ask them,
13  but you do know them --
14      A   I do.
15      Q   -- right?
16          Because you -- you interface with them
17  fairly regularly, right?
18      A   We do.
19      Q   Okay.  And, in fact, you've met these
20  people, right?
21      A   I have.
22      Q   They don't work in your office, but you

Page 237

60 (Pages 234 - 237)

1   work closely with them, right?
2      A   Yes.
3      Q   Okay.  Okay.  Fair enough.  Let's see.
4   Let me -- let me move -- so let's just move back
5   to this exhibit.
6          There -- I highlighted this AINS
7   Manual.  What is the AINS Manual?
8      A   So AINS is the company that owns the
9   case management system that we use, FOIAXpress.
10     Q   Okay.  And then there's "Third Party
11  Checklist" in all caps.
12         What is that?
13     A   So the team put together a checklist.
14  And I admit I don't have the particulars
15  memorized, you know, on that checklist, but,
16  again, these guidance documents were created to
17  help them walk through the process of how you
18  handle certain types of FOIA requests related to
19  third-party individuals.
20         MR. ZORN:  Okay.  All right.  I think
21  we're done with that exhibit.  And let's move
22  to -- I think this is Exhibit 6 now.

Page 238

1          (Deposition Exhibit Number 6
2              was marked for identification.)
3   BY MR. ZORN:
4      Q   Just let me know when you have it up.
5      A   Yes, we have it up.
6      Q   Okay.  So -- and I've annotated this
7   document as well, but looking at the first page,
8   this is the Department of Justice Chief FOIA
9   Officer Report; is that correct?
10     A   Yes, it is.
11     Q   Okay.  And just turning to the second
12  page, I highlighted "Decentralized Nature of FOIA
13  Processing at Department of Justice."
14         Did I read that correctly?
15     A   You did.
16     Q   And that -- that's just describing what
17  I -- what we discussed earlier about there are
18  separate FOIA offices for each component, and
19  they all process FOIA requests separately; is --
20     A   Correct.
21     Q   -- that right?  Okay.
22         But there are -- there are agency-wide

Page 239

1   policies with respect to FOIA at the Department
2   of Justice that are Department of Justice
3   policies that all of these decentralized
4   components all follow?
5      A   Correct.
6      Q   Okay.  And we've discussed one of
7   those, which is this unusual circumstances
8   policy, right?
9      A   Yes.  That's part of the FOIA
10  regulations, the department's FOIA regulations.
11     Q   The department's FOIA regulations?
12     A   Correct.
13     Q   And that's how it views the statute?
14     A   Correct.
15     Q   Okay.  And so looking now at page 3.
16  And -- and so you see "FOIA Leadership," but
17  we're not -- we don't need to talk about the
18  chief FOIA officer anymore.  I think we got that.
19         I just want to look at the last line of
20  that, which is that "Associate Attorney General
21  Vanita Gupta, the third-ranking official at the
22  Department of Justice, serves as the Department's

Page 240

1   Chief FOIA Officer."
2          Did I read that correctly?
3      A   You did.
4      Q   And -- and you've never spoken to
5   Ms. Gupta?
6      A   No.
7      Q   Has she -- has she spoken to DEA about
8   FOIA, like, outside of your presence to your
9   knowledge?
10     A   No.
11     Q   Do you know if she's spoken to any of
12  the components about FOIA?
13     A   I don't have any knowledge of that,
14  unfortunately.
15     Q   Okay.  And this document says that she
16  is the Department of Justice's chief FOIA
17  officer, correct?
18     A   Correct.
19     Q   And we went through the statute
20  discussing the responsibilities of the chief FOIA
21  officer, right?
22     A   Yes.

Page 241

61 (Pages 238 - 241)

1    Q    And that describes you as well as her,
2    correct?
3    A    Yes.
4    Q    And all of those responsibilities are
5    her responsibilities as well, right?
6    A    For the department, yes.
7    Q    And including the department's
8    compliance with -- with the FOIA statute; is --
9    A    Yes.
10   Q    -- that fair?  Okay.
11       And so -- and, you know, we don't need
12   to -- the first -- first line in the next
13   paragraph is, you know -- we see the training,
14   and we see 552(j), and we see, "A proper
15   understanding of the FOIA, including the correct
16   application of the statute's provisions, is the
17   first step towards any successful FOIA
18   operation."
19       Did I read that sentence correctly?
20   A    Yes, you did.
21   Q    And that's the Department of Justice in
22   this document saying that a proper understanding

Page 242

1    of the FOIA, including the correct application of
2    the statutes provision, is the first step towards
3    any successful FOIA operation?
4    A    Correct.
5    Q    Okay.  And -- and -- and the federal
6    office that's responsible for encouraging
7    government-wide compliance with FOIA is OIP,
8    right?
9    A    Correct.
10   Q    And we discussed what OIP is earlier,
11   right?
12   A    Correct.
13   Q    OIP is one of the components of the
14   Department of Justice, right?
15   A    Yes.
16   Q    And OIP is responsible, according to
17   this, for the entire federal government's
18   compliance with FOIA, as far as supervising it,
19   right?
20   A    Correct.  For the department, though,
21   for the Department of Justice.
22   Q    Well, no, this is saying that the --

Page 243

1    that the federal office responsible for
2    encouraging government-wide compliance with the
3    FOIA, so --
4    A    Yes.
5    Q    So what --
6    A    Okay.
7    Q    So what this is saying is that the
8    Department of Justice's Office of Information
9    Policy is setting policy for the entire
10   federal -- or is -- is encouraging government
11   compliance -- I don't want to misstate what this
12   is saying.
13   A    Yes.
14   Q    It's encouraging government compliance
15   with the Freedom of Information Act.  That's --
16   that's what OIP is doing, among other things?
17   A    Correct.  But they set the regulations
18   for just the Department of Justice.  Other
19   federal agencies have their own FOIA regulations,
20   if that makes sense.
21   Q    Right.  And that does make sense,
22   but -- but the Office of Information Policy is

Page 244

1    ensuring compliance with, and we can all agree
2    that all government agencies are working off the
3    same statute?
4    A    Uh-huh.
5    Q    Different regulations, same statute,
6    right?
7    A    Correct.
8    Q    And the authority for the unusual
9    circumstances regulation is the statute?
10   A    The statute.
11   Q    Yeah.  So I want to just go to page 6
12   quickly.  And just for the record, I've found
13   this to be kind of very educational today, and
14   I've learned a lot and, frankly, gained some
15   appreciation for the work that the FOIA
16   department does.
17       And my question -- I've highlighted
18   this with respect to ATF about sort of
19   stakeholder engagement, frequent FOIA litigants.
20   And I'm not going to read it, but, you know --
21   and it says these efforts have improved
22   relationship with the requester community

Page 245

62 (Pages 242 - 245)

1  overall.
2      And are you aware of anything that
3  either DO -- DOJ kind of writ large or DEA has --
4  has done to try to engage the stakeholder
5  community and to maybe improve relationships?
6      A  Yes.  So I can speak for my office --
7  and, again, we have a very small staff right now,
8  but we have done a lot of work in engaging with
9  requesters to talk about their request to try to
10  work with them.
11      Sometimes we're -- we actually will
12  reach out just to have a conversation about the
13  possibility of narrowing the scope, because we
14  try to be as transparent as possible.  We're very
15  open, and we tell requesters we have -- you know,
16  we're operating with a small staff.  We have a
17  very large backlog, but we'd like to move forward
18  with your request.  Would you consider maybe
19  narrowing the scope or the topics?  And then that
20  will generally help us get the records out to the
21  requester community quicker.
22      So we've done a lot of work in the

1  space.  Particularly our intake unit is doing a
2  lot of that outreach, as well as our unit chiefs.
3  You know, we're picking up the phone.  We're
4  talking to requesters, seeing how we can work
5  with them, seeing if we can negotiate on certain
6  types of requests.
7      Q  Okay.  And then looking at page 14
8  here, go to -- it's right before the "Requester
9  Services" and the "FOIA Public Liaison."
10      A  14, page 14?
11      Q  Yeah.
12      A  Okay.
13      Q  Page 14.  I mean, we see, "For
14  instance" -- and this is the highlighted text, so
15  this is the second sentence of the -- that
16  paragraph.
17      "For instance, the DEA's Chief FOIA
18  officer" -- that's you?
19      A  Correct.
20      Q  -- "along with the FOIA Unit Chiefs,
21  conducted a self-assessment of the FOIA Program
22  and made several changes to increase efficiency

1  of internal procedures."
2      Let me just stop there.  Well, let me
3  keep -- keep going.
4      "This included the updating templates
5  and several DEA SOPs to assist FOIA staff carry
6  out routine operations, such as processing
7  certain types of record.  In addition, the DEA
8  Chief FOIA Officer, FOIA Unit Chiefs, and Office
9  of Chief Counsel attorneys met to review and
10  discuss complex records, which allowed the team
11  to formulate plans of action to address difficult
12  requests."
13      My first question is:  So -- so there's
14  a self-assessment of the FOIA program.  Is that
15  like done in writing somewhere?
16      A  It is.  There's actually a template
17  that the Department of Justice OIP developed that
18  we've used twice to evaluate, you know, all areas
19  of the FOIA administration to see how we're
20  doing.  And we've used that document to actually
21  create goals for the year and things that we'd
22  like to improve or tighten up in our business

1  processes.
2      Q  Okay.  And what are some of the
3  improvements or the efficiencies that this
4  paragraph is referring to that you implemented?
5      A  Sure.  So one of the very first ones
6  was completely restructuring the office to be
7  successful, in my opinion.  When I arrived in
8  2017, I didn't feel like we were structured for
9  success, so we changed that.
10      The other thing that we changed is we
11  created some new positions.  We have what we call
12  an expert government information specialist
13  position now.  That's a GS-14 position.  I have
14  four of them.  They're all vacant right now.  I'm
15  trying to hire and fill that role, because I want
16  to be able to delegate final signature authority.
17      So we were doing that with one of the
18  13s that we had.  We were granting them final
19  review and signature authority, again in an
20  effort to really tackle our backlog issues.
21      We've changed a lot of our templates,
22  so we have many request letter templates for the

1    various types of requests that we handle.  This
2    is again --
3            (Brief interruption.)
4            We've done a lot of work to basically
5    give our staff all the resources that they need
6    to be effective and efficient in their job.  So
7    those are just some of the top ones.
8            The other thing is appeals.  We worked
9    heavily to see what we could do to reduce appeal
10   rate, and that effort's been going on since 2018.
11   And so we've reduced -- basically, by changing
12   internal process and procedures, have been able
13   to reduce the number of appeals filed to the
14   department by 67 percent in the last three years.
15           MR. ZORN:  Okay.  I'm going to
16   introduce my last exhibit, and then we'll be
17   done.  And this is Exhibit 7.
18           (Deposition Exhibit Number 7
19           was marked for identification.)
20           THE WITNESS:  I'm here.
21   BY MR. ZORN
22       Q    And have you seen this Exhibit 7

Page 250

1    before?
2        A    I have.
3        Q    Do you know what Exhibit 7 is?
4        A    Yes.
5        Q    What is Exhibit 7?
6        A    This is a memo that was written by the
7    attorney general, Merrick Garland, in early --
8    early 2022 -- I think it was March -- that talks
9    about the Freedom of Information Act and
10   expectations of federal agencies in complying
11   with the act.
12       Q    And is it fair to describe this as a
13   Department of Justice priority?
14       A    Yes.
15       Q    And since March 2022 -- well, do you
16   know what Sunshine Week is?
17       A    Yes.
18       Q    And this came out during 2022, Sunshine
19   Week, right?
20       A    It did.
21       Q    And since the publication of this memo,
22   what -- what has the DOJ FOIA staff -- I'm not

Page 251

1    talking about DEA now -- the DOJ FOIA staff done
2    to promote the principles set forth in this memo?
3        A    So, again, I think it would be
4    difficult for me to talk about what the
5    department has done with regard to this memo.  I
6    can certainly articulate what we have done.
7            The department shared this memo with
8    us, and they have communicated with us on certain
9    parts of this memo to make sure that we are doing
10   certain things.  But beyond that, I really can't
11   articulate specifically what they've done on each
12   aspect of this memo.
13       Q    Well, who at the department has worked
14   with DEA on implementing the principles or
15   guidelines in the memo?
16       A    We had -- his name is Patrick Austin.
17   I communicated with earlier, maybe around May of
18   2022, with regard to one aspect of this memo.
19           And, in fact, I -- we implemented a
20   change, and it has to do with (A)(4), the
21   foreseeable harm standard.  We made sure that all
22   of our determination letters contained language

Page 252

1    that basically told the requester that we
2    consider the foreseeable harm standard when
3    reviewing records and applying exemptions.  That
4    language was not necessarily in the letter in
5    this manner previously, so we adjust -- we made
6    that adjustment.
7        Q    And -- and -- okay.  So that was --
8    that was getting to my next question, which was:
9    What has the DEA done to -- has DEA done anything
10   since March 2022, specifically in light of
11   this -- this memo, to update --
12       A    Yes.
13       Q    -- its processes or determinations or
14   whatnot?
15       A    Yes.  So beyond (A)(4), with regard to
16   removing barriers to access and reducing FOIA
17   request backlogs, C, we are doing a lot of work
18   in the space to try to figure out how we are
19   going to aggressively tackle our backlog going
20   forward.  We have a growing backlog.  Again, it's
21   due to staff shortages.  I am delegating
22   signature authority on certain types of cases

Page 253

64 (Pages 250 - 253)

1  right now to two GS-13s that are helping us move
2  certain cases forward.
3      I've also made a change -- it's here
4  on -- it has to do with -- one of the points in
5  here talks about making records more accessible
6  to first-party requesters.  So, for example --
7  and I made a change this year.
8      Looking for ways that we would release
9  material outside of the FOIA, that is very
10 difficult for DEA because the vast majority of
11 our records are highly sensitive, right, but
12 there is a type of record that I felt fell into
13 this category, and that has to do with former
14 agents or task force officers that request access
15 to their training records for the time that they
16 worked at DEA.  I felt that that should not be
17 FOIA function.  It's going to get caught, likely,
18 in our backlog.  We've got to find a way to
19 release that quicker.
20     So I had a conversation with the Office
21 of Training, and we are now allowing them to make
22 those releases.  So that is being handled outside

Page 254

1  the FOIA process, and that is one of the bullets
2  here.  I can point out the number if you'd like.
3      Q   And I'm just kind of musing on the
4  record here, but what about -- making the
5  administrative proceeding -- proceeding records
6  available on some sort of online platform would
7  probably take -- take some of the weight off your
8  shoulders as well, right?
9      A   I mean, that is certainly a
10 conversation I'd be willing to entertain with the
11 administrative law judge office.  As of right
12 now, the only information that is publicly
13 available, like I said, is their final decisions
14 and orders online.  That's all on DEA.gov, but
15 that is something that we could take into
16 consideration.
17     MR. ZORN:  I'm going to pass the
18 witness.  I have no further questions.
19     MR. RODRIGUEZ:  I just have a very few.
20     EXAMINATION BY COUNSEL FOR DEFENDANTS
21 BY MR. RODRIGUEZ
22     Q   Ms. Miller, do you remember talking

Page 255

1  earlier with Mr. Zorn about -- about fees?
2      A   Yes, I do.
3      Q   And in particular when the DEA
4  estimates the amount of fees that are owed and
5  that the requester has to pay prior to the DEA
6  processing the request?
7      A   Yes.
8      Q   Does the requester -- if they disagree
9  with the DEA's estimate, do they have an
10 opportunity to appeal that?
11     A   They do.
12     Q   And as part of that appeal, can they
13 also challenge their categorization as, say, a
14 commercial requester?
15     A   They can.
16     MR. RODRIGUEZ:  For the record, the
17 witness would like an opportunity to review and
18 sign the transcript.  And I have no further
19 questions.
20     MR. ZORN:  I have no -- no further,
21 either.
22     VIDEO TECHNICIAN:  We are off the

Page 256

1  record at 15:49 p.m.  This concludes today's
2  testimony of Kelleigh Miller.  The total number
3  of media units used was eight and will be
4  retained by Veritext.
5      (Whereupon, at 3:49 p.m., the
6      deposition of KELLEIGH MILLER
7      was concluded.)
8
9          * * * * *
10
11
12
13
14
15
16
17
18
19
20
21
22

Page 257

65 (Pages 254 - 257)

CERTIFICATE OF NOTARY PUBLIC

1  CERTIFICATE OF NOTARY PUBLIC
2  I, ERICK M. THACKER, the officer before whom
3  the foregoing deposition was taken, do hereby
4  certify that the witness whose testimony appears
5  in the foregoing deposition was duly sworn by me;
6  that the testimony of said witness was taken by
7  me in stenotype and thereafter reduced to
8  typewriting under my direction; that said
9  deposition is a true record of the testimony
10  given by said witness; that I am neither counsel
11  for, related to, nor employed by any of the
12  parties to the action in which this deposition
13  was taken; and, further, that I am not a relative
14  or employee of any counsel or attorney employed
15  by the parties hereto, nor financially or
16  otherwise interested in the outcome of this
17  action.

18  ERICK M. THACKER
19  Notary Public in and for the
20  District of Columbia
21  My commission expires:
22  June 30, 2024

Page 258

1  jimmy.rodriguez2@usdoj.gov
2  January 19, 2023
3  RE: AIMS Institute, PLLC, Et Al. v. Garland, Merrick, Et Al.
4  DEPOSITION OF: Kelleigh Miller 5645328
5  The above-referenced witness transcript is
6  available for read and sign.
7  Within the applicable timeframe, the witness
8  should read the testimony to verify its accuracy. If
9  there are any changes, the witness should note those
10  on the attached Errata Sheet.
11  The witness should sign and notarize the
12  attached Errata pages and return to Veritext at
13  errata-tx@veritext.com.
14  According to applicable rules or agreements, if
15  the witness fails to do so within the time allotted,
16  a certified copy of the transcript may be used as if
17  signed.
18  Yours,
19  Veritext Legal Solutions
20
21
22

Page 260

1  AIMS Institute, PLLC, Et Al. v. Garland, Merrick, Et Al.
2  Kelleigh Miller 5645328
3  ACKNOWLEDGEMENT OF DEPONENT
4  I, Kelleigh Miller, do hereby declare that I
5  have read the foregoing transcript, I have made any
6  corrections, additions, or changes I deemed necessary as
7  noted above to be appended hereto, and that the same is
8  a true, correct and complete transcript of the testimony
9  given by me.
10
11  _____   _____
12  Kelleigh Miller                 Date
13  *If notary is required
14  SUBSCRIBED AND SWORN TO BEFORE ME THIS
15  _____ DAY OF _____, 20___.
16
17
18  _____
19  NOTARY PUBLIC
20
21
22

Page 259

1  AIMS Institute, PLLC, et al. vs. Merrick Garland, et al.
2  Kelleigh Miller (#5645328)
3  E R R A T A   S H E E T
4  PAGE____LINE____CHANGE_____
5  _____
6  REASON_____
7  PAGE____LINE____CHANGE_____
8  _____
9  REASON_____
10  PAGE____LINE____CHANGE_____
11
12  _____
13  REASON_____
14  PAGE____LINE____CHANGE_____
15  _____
16  REASON_____
17  PAGE____LINE____CHANGE_____
18  _____
19  REASON_____
20
21  _____
22  KELLEIGH MILLER                 Date

Page 261

66 (Pages 258 - 261)

1  RE: COST CERTIFICATE
2  DEPOSITION OF: Kelleigh Miller
3  5645328
4  1/5/2023
5  Cause No:
6  AIMS Institute, PLLC, Et Al. v. Garland, Merrick, Et Al.
7      Enclosed for filing, please find the
8  required certification pages and witness
9  signature pages for the deposition referenced
10 above was/was not returned.
11     Please note that $_____ is the
12 deposition officer's charges to the
13 _____for preparing the original
14 deposition and any copies of exhibits.
15     Thank you for your prompt attention to this
16 matter.
17
18 Sincerely,
   Veritext Legal Solutions
19 Firm Registration No. 571
   300 Throckmorton Street, Suite 1600
20 Fort Worth, Texas  76102
   cs-tx@veritext.com
21
22
                                    Page 262

**[00592 - 200]**

**0**

**00592**   191:4
**02396**   1:5 3:8
   5:16
**0770**   3:12
**08**   21:9

**1**

**1**   3:7 5:10
   13:16,18 14:17
   14:19 15:11
   20:20 24:16
   39:16 41:22
   42:2,3 45:14
   53:18,21
   118:22 181:2
   190:3
**1,215**   181:16
**1,600**   188:19
**1,936**   177:8,9
   177:10
**1/30/2019**   3:18
**1/5/2022**   3:7
**1/5/2023**   4:13
   262:4
**10**   71:4 118:16
**100**   104:6
   139:12,22
**1000**   2:10
**101**   3:13
**10:24**   52:18,19
**10:47**   52:19,21
**10a**   3:20 126:6
   126:9 142:9
   149:3

**10b**   4:4 190:17
   190:18,20
**10c**   4:5 207:17
   207:18
**10th**   192:16
   195:21
**11**   20:6 141:14
**112**   3:11
**116166**   165:14
**11:39**   112:5,6
**11:55**   112:6,8
**11:56**   112:21
   112:22
**11:59**   112:22
   113:2
**12**   141:14
**1250**   1:21
**126**   3:20
**12:31**   149:12
   149:13
**13**   3:7
**13397**   258:17
**13:42**   150:4
**13s**   249:18
   254:1
**14**   26:4,15
   84:13 219:13
   247:7,10,10,13
   249:13
**14:12**   180:2
**14:23**   180:5
**14th**   219:10
   224:5
**15**   4:7 150:16
   150:18 151:3,5

151:9,16,19,21
   169:10,18
   176:21
**150**   62:3 76:12
   80:16 121:11
**151**   4:7,9
**15:09**   226:7
**15:20**   226:10
**15:49**   257:1
**15th**   224:6
**16**   4:9 68:11
   150:16,19
   151:3,5,9
   176:18,20
   188:11,15,18
   188:19,20
**1600**   262:19
**161**   166:14
**16150**   158:9,11
   158:14
**16167**   165:22
   166:15
**17**   4:10 165:13
   180:7,9
**17.5**   181:22
**172**   160:17,18
**17218**   160:16
   160:19,20
**17th**   218:9
**18**   64:10,11
   66:8 80:15
   188:13
**18-00070**
   158:13

**18-0070**   158:14
**18-00710**   165:7
   166:21
**180**   4:10
**19**   260:2
**190**   4:4
**1975**   82:9
**1:42**   150:2

**2**

**2**   3:9 15:16
   31:12 32:12,20
   39:16 42:1
   45:13 53:5,8
   53:11,13 54:1
   54:3
**2,190**   127:7
**20**   58:14 64:13
   119:9 127:21
   131:21 132:19
   133:21 134:4
   135:16 139:3,7
   153:20,22
   154:2,3,11
   159:12 168:20
   168:21 171:9
   172:10,10,14
   172:17 177:16
   183:4,8 187:5
   187:17 192:3
   199:6,7 222:19
   259:15
**20-00682**
   160:15
**200**   68:22

**[20005 - 571]**

| | | | |
|---|---|---|---|
| **20005**   1:22 | **207**   4:5 | 155:11,13,14 | **4** |
| **2016**   90:8 | **21**   209:11 | 177:17 178:11 | **4**   3:13 55:13 |
| 194:20 | **2100**   1:14 5:18 | 178:11,12,13 | 194:2,6 195:16 |
| **2017**   24:4 51:7 | **213**   181:16 | 240:15 | 218:17 226:14 |
| 67:5,12 249:8 | **218**   3:19 | **3/15/2022**   3:16 | 226:17 252:20 |
| **2018**   159:14 | **22**   3:8 207:21 | **30**   3:9 4:11 | 253:15 |
| 163:20 164:13 | **22-00585**   3:20 | 8:15 16:6 21:8 | **40**   126:3 |
| 165:2,4,15 | 126:20 | 46:8 52:1 54:3 | 133:17 |
| 167:4,13 168:6 | **22-0059**   191:3 | 54:19 55:1,14 | **4100**   2:4 |
| 178:5 250:10 | **22-00592**   4:4 | 58:14,14 59:7 | **44**   4:12 111:18 |
| **2019**   24:14 | **22-00845**   4:5 | 59:8 73:2 87:4 | **46**   3:17 |
| 52:3 118:13 | 207:22 | 88:12 89:20 | **491**   177:8,9 |
| 165:4 217:1,13 | **22314**   1:15 | 90:10 110:18 | **4:22**   1:5 5:16 |
| **2020**   24:10,11 | 5:19 | 111:1,5 153:19 | **5** |
| 24:16 102:4 | **226**   3:13 | 154:1,7,12 | **5**   1:12 4:11 |
| 118:13 | **22nd**   204:4 | 169:13 171:17 | 30:15 45:12 |
| **2021**   4:7,9 24:9 | **23**   69:1 | 172:11 183:15 | 194:2 195:13 |
| 102:4 150:18 | **2300**   2:10 | 184:6 189:6 | 195:17 196:2,3 |
| 177:17 178:1,2 | **239**   3:14 68:22 | 192:3,14 | 197:7,11,18 |
| 178:8,10 | 121:9 | 194:11 209:12 | 198:7,11,15 |
| 179:15 | **25**   30:12 31:10 | 258:22 | 218:18,20 |
| **2022**   3:15 4:10 | 31:11 143:12 | **300**   262:19 | **5,000**   91:22 |
| 14:7,11 15:8 | 177:8,10 | **31st**   191:21 | 148:1 |
| 20:21 102:4 | **250**   3:16 | **35**   21:7 | **500**   138:2,9 |
| 127:21 179:10 | 193:20 | **350**   1:21 | 184:5 |
| 179:20 180:18 | **255**   3:4 | **371**   3:21 | **52**   168:11 |
| 188:19 192:16 | **28**   68:10,11 | **376**   4:4 | **53**   3:9 |
| 195:21 204:4 | **2:12**   180:3 | **3:09**   226:8 | **552**   4:11 30:16 |
| 218:9 219:10 | **2:23**   180:3 | **3:17**   219:11 | 31:4 45:13 |
| 251:8,15,18 | **2:27**   195:21 | **3:20**   226:8 | 242:14 |
| 252:18 253:10 | **3** | **3:49**   257:5 | **5645328**   259:2 |
| **2023**   1:12 5:4 | **3**   3:11 55:9 | **3c**   101:13 | 260:4 261:2 |
| 14:13 260:2 | 92:1 112:12,14 | | 262:3 |
| **2024**   258:22 | 113:5 154:16 | | **571**   262:19 |
| | 154:18,19 | | |

**[592 - actually]**

**592**   191:5
**5th**   5:4 14:7,10
   14:13

**6**

**6**   3:9,14 8:15
   16:6 46:8 52:1
   54:3,19 55:1
   55:14 210:8,19
   212:22 214:5
   214:11 238:22
   239:1 245:11
**67**   166:16
   250:14

**7**

**7**   3:3,16 178:19
   210:9 214:6,12
   214:15 250:17
   250:18,22
   251:3,5
**76102**   262:20
**77002**   2:5,11

**8**

**8**   3:17 45:22
   46:1 50:21
   53:22
**8/17/2022**   3:19
**80**   135:20,20
   136:21,21
   139:16
**811**   2:4

**9**

**9**   3:19 141:14
   218:1,2

**90**   57:14 88:21
   89:17 121:10
**9:32**   54:19
**9:37**   1:13 5:3
**9:53**   23:15,16
**9:56**   23:16,18

**a**

**a.m.**   1:13 5:3
   23:15,16,16,18
   52:18,19,19,21
   54:19 112:5,6
   112:6,8,21,22
   112:22 113:2
**a1**   55:21
**ability**   80:21
   90:9,20 111:4
   188:4 194:21
   195:1 200:14
**able**   27:2 59:7
   80:10 90:10
   94:10 110:22
   116:20 118:5
   136:9,10 140:6
   157:3 184:8
   189:13,17
   222:19 230:21
   249:16 250:12
**above**   21:8
   42:1 259:7
   260:5 262:10
**absolutely**
   203:7,22
**abuse**   17:17
**accept**   186:19

**accepted**   13:6,7
   156:21
**access**   17:13
   57:15 59:22
   60:7,9,11,13,15
   61:9,12,14
   62:8 63:7,11
   63:15 65:14,19
   69:2 72:10
   74:20 75:3,7
   76:11,22 77:2
   77:18 80:16
   83:4 86:8,12
   86:21 98:10
   102:20 103:18
   106:8 184:4
   189:22 202:13
   208:20 221:17
   234:7,8 253:16
   254:14
**accessible**
   86:17 116:8,9
   116:14 254:5
**accessing**
   233:10
**accomplish**
   35:8
**accuracy**   260:8
**accurate**   99:22
   100:11,14
   101:2 104:20
   106:15 139:19
   182:3 199:20
**accurately**
   100:5

**acknowledge...**
   259:3
**acknowledg...**
   103:21,22
**acronym**   119:2
   119:4,5 227:8
   228:20
**acronyms**
   227:8
**act**   3:12 29:19
   51:18 56:21
   90:8 114:1
   119:11 158:21
   244:15 251:9
   251:11
**action**   1:5 5:16
   22:20 248:11
   258:12,17
**actions**   205:18
**active**   184:9
**actors**   17:15
**actual**   58:7
   85:19 104:9
   108:17,19
   141:7 173:2
**actually**   34:11
   36:2 47:16
   57:1 64:20
   72:18 78:18
   93:16 99:9
   100:12 118:9
   129:22 143:6
   156:12 166:1
   168:10 169:10
   170:19 171:2

Page 3

**[actually - aiming]**

183:18 184:16
193:4,8,9,10
195:11 205:12
211:6,19 230:6
232:22 246:11
248:16,20
**addition** 248:7
**additional**
74:15 75:10
220:13
**additions** 259:6
**address** 16:18
17:16 72:19,20
223:11 248:11
**addressed**
17:18
**addresses**
219:2,6
**adequate** 66:19
**adjust** 253:5
**adjustment**
51:15 253:6
**adjustments**
34:4 132:9,10
133:6
**admin** 114:22
115:1
**administration**
3:10 8:9 12:12
29:18 32:18
48:19 55:3
58:6 114:9
119:4 217:10
248:19

**administrative**
17:6,9 18:5
37:3,6,11 83:3
83:15,16 84:2
84:4,20 86:5
86:16 87:14,17
87:22 88:15,19
91:9 92:12
94:8,16 97:5
114:21 116:7
117:12 131:17
198:18 205:5
255:5,11
**administrativ...**
170:14
**administrator**
15:6,7 19:9
29:13
**admit** 231:5
238:14
**adopted** 76:14
**advance** 113:19
**advanced**
193:20
**adversariness**
17:19
**advised** 144:3
**affairs** 25:7
56:19
**affect** 115:22
188:8
**affiliations** 6:4
**affirmatively**
212:9

**afford** 200:5
**afield** 100:18
**agencies** 52:1
69:8 152:2
154:18 177:3
178:15 179:1
212:13 244:19
245:2 251:10
**agency** 2:14
6:16 12:19
15:20 16:22
17:4,20 18:3
18:10,19 20:9
22:4,9 27:1
31:15,16 32:9
32:11,18 33:1
33:10,11,12,22
34:4,22 35:7
38:12,21 39:7
42:5,7 45:12
51:13 70:15
71:22 78:4
80:10 81:5
82:15,19 91:6
100:4 104:15
106:14,19
109:15 116:8
117:3 118:21
127:14 133:16
152:19 153:8
158:6 159:2,3
160:3,5,7
182:10 183:3
186:4 190:9
196:6 203:20

211:12 228:22
234:20 239:22
**agency's** 18:21
19:21 33:13
35:2 38:8,9
110:9 201:10
216:11
**agenda** 3:13
227:3
**agent** 20:22
**agents** 41:17
213:21 254:14
**aggregating**
170:10
**aggressively**
253:19
**ago** 12:22 19:9
211:11
**agree** 5:9 18:19
32:17 92:12
106:11 115:13
141:3 143:1
187:3 215:18
215:21 216:1
235:7 245:1
**agreed** 16:11
130:8
**agreements**
260:14
**agrees** 21:2
**ahead** 9:13
164:1
**aim** 48:16
**aiming** 186:5

Page 4

[aims - argumentative]

| | | | |
|---|---|---|---|
| **aims**  1:3 3:7 5:13 202:3,7,9 259:1 260:3 261:1 262:6 | **analysts**  213:21 | **anyone's**  72:10 | 212:18,19 |
| | **angela**  26:16 | **apiece**  169:8,10 | **applying** 135:11 253:3 |
| **ains**  238:6,7,8 | **anne**  34:1 204:12 | **apologize** 155:15 211:18 | **appointed** 49:11 |
| **al**  1:3,6 5:13,14 259:1,1 260:3 260:3 261:1,1 262:6,6 | **annotated** 126:5 239:6 | **appeal**  37:6,11 250:9 256:10 256:12 | **appointee** 40:18 |
| | **annotation** 208:3 | **appealed** 198:16 | **appreciate** 147:2 |
| **alexandria** 1:15 5:19 | **annual**  4:7 35:8 35:10,14 38:10 58:10 151:22 177:22 182:6 | **appeals**  37:3 250:8,13 | **appreciation** 245:15 |
| **alignment** 187:1 | | **appear**  17:4 | **approach** 173:4 |
| **alj**  84:1 86:6 96:1 147:10,15 148:12 | **answer**  42:17 43:2 57:18 63:3 64:8 65:20 69:12 71:13 74:2 80:13 93:3 145:14 165:19 213:10 222:22 235:15 | **appearance**  6:3 | **appropriate** 33:2 38:11 108:4 |
| | | **appearances** 6:4 | **appropriately** 33:12 |
| **alj's**  83:13,17 83:20 89:8,10 91:21 96:7,14 | | **appears**  18:22 156:5,7 182:9 205:21 258:4 | **approximately** 168:20 |
| | | **appended** 259:7 | **april**  159:14 163:20 164:13 219:10 224:5,6 |
| **allegation** 12:16 | | **applicable** 260:7,14 | |
| **allocated**  66:16 | **answered**  93:3 | **application** 242:16 243:1 | **area**  130:17 165:14 202:19 |
| **allotted**  260:15 | **answering** 145:18 | **applied**  110:5 142:9 | **areas**  248:18 |
| **allow**  100:22 | | | |
| **allowed**  153:14 159:12 248:10 | **answers**  7:14 9:11 22:12 97:2 160:13 | **applies**  71:21 77:10 119:18 200:8 | **argue**  49:18 145:4 |
| **allowing** 254:21 | **anthony**  2:8 20:22 | **apply**  38:13 72:1 77:20 91:17 94:7 109:16 134:6 147:8 194:10 199:9 212:16 | **arguing**  50:3,6 50:16 |
| **allows**  231:10 | **antithetical** 20:12 | | **argument** 125:1 |
| **amendment** 194:20 | **antitrust**  165:1 165:7 | | **argumentative** 71:11 144:19 145:13 |
| **america**  3:19 6:14 218:9 | **anymore** 240:18 | | |
| **amount**  183:10 189:2 256:4 | | | |

Veritext Legal Solutions
346-293-7000

**[arlington - back]**

**arlington** 70:10
74:8 231:20
233:12
**armour** 20:22
21:1,4,10
**arrival** 24:19
**arrived** 75:19
129:11 249:7
**articulate**
201:20 229:6,7
252:6,11
**aside** 145:6
205:22
**asked** 16:7
48:13 88:11
93:2,18 103:7
148:8 163:1
192:1 222:17
222:18
**asking** 46:19
49:13 59:14
62:14 66:12
67:18 83:22
93:9 97:18
102:21 107:20
108:10 109:11
122:16 145:9
164:6,10 165:1
165:10 237:3
**aspect** 252:12
252:18
**assert** 63:5
103:1
**asserting** 130:4

**assess** 90:20
**assessed** 191:19
192:17 204:22
205:8
**assessing**
131:16 147:21
**assessment**
203:13 206:11
247:21 248:14
**assign** 131:12
**assigned** 25:12
26:3,14 153:1
**assist** 248:5
**assistant** 2:8
40:20 41:1
42:7,12 43:3
49:19 51:16
**associate** 35:18
240:20
**assume** 29:12
42:20,21 88:18
161:1 206:3
209:22 231:8
**assuming** 36:12
199:18,20
223:1
**assumption**
43:2
**atf** 79:1,20
177:7,10
245:18
**atf's** 79:14
**atmospherics**
204:7

**attached** 4:22
260:10,12
**attempt** 46:9
**attend** 37:13
**attended** 37:16
**attending** 7:9
**attention**
262:15
**attorney** 2:8
3:16 6:5 33:12
34:21 35:1,15
35:18 122:2,11
124:6 134:20
240:20 251:7
258:14
**attorney's** 1:14
5:18 6:12
**attorneys** 248:9
**audio** 5:7
**august** 191:21
204:4 218:9
**austin** 252:16
**authority** 31:15
32:10 245:8
249:16,19
253:22
**authorize**
132:6 142:17
**authorized**
22:19 23:1
46:5,7 48:2
**authorizes**
47:12
**available** 58:10
61:2 93:15

145:20 146:2
210:6 211:20
211:21 212:9
255:6,13 260:6
**avenue** 1:14
5:19
**average** 128:10
128:12 129:12
129:15 131:3
**avert** 46:10
**avoid** 16:22
21:5
**aware** 10:22
11:8 12:18,20
13:4,5 81:5
97:4,16 123:1
145:22 158:4
220:22 234:19
246:2

**b**

**b** 3:5,9 4:2 8:15
16:6 33:9 46:8
52:1 54:3,19
55:1,14 101:13
195:13 196:2,3
197:7,11,18
198:7,11,15
210:8,19 214:5
214:11
**b6** 144:12,13
**back** 20:20
21:5 23:17
37:7 52:20
53:2 66:22,22
83:12 98:15

Page 6

**[back - brief]**

105:22 112:7,9
113:1 114:17
125:19 127:20
132:10 150:3
150:13 159:5
162:4,8 165:11
171:8 175:22
176:3 178:5
180:4 189:12
191:22 193:14
193:16 195:11
195:17,18
200:3 226:1,9
226:11 238:4
**backed** 205:14
**background**
37:8 221:16
**backlog** 168:16
246:17 249:20
253:19,20
254:18
**backlogs**
253:17
**barriers** 253:16
**base** 17:3
**based** 57:6 60:1
74:16 105:5,13
129:21 182:14
187:22 201:12
201:13 207:12
208:6
**baseline** 142:11
**basically** 61:9
67:20 78:3
85:6 103:13

105:5 154:19
159:3 162:8
163:13 171:15
175:4 178:4,6
179:14 191:13
192:1,2,21
198:13 213:18
227:19 233:7
250:4,11 253:1
**basis** 20:6
105:13 163:17
164:16 176:14
209:22 210:2
237:6
**batch** 169:12
170:2
**batched** 169:3
**bates** 113:15
118:15
**bear** 158:10
**beat** 120:7
**beginning** 6:5
81:17 103:12
106:18 192:9
**begins** 219:12
**begun** 204:21
**behalf** 2:2,7
6:13,15 8:8
11:1,9 44:16
55:19 80:7
171:20
**belief** 18:2
202:14
**believe** 10:13
17:18 18:17

19:22 26:21
38:1 40:12
49:11 62:2
82:4 84:8
87:21 89:3
99:21 100:11
101:13 118:13
129:16 178:1
191:17 192:8
210:11 213:22
**believed** 21:10
128:4
**belonging**
236:2
**benchmark**
186:5
**best** 59:1 80:12
111:7 205:17
225:17
**better** 17:18
19:4 24:22
41:13 54:17
96:11 153:8
207:2
**beyond** 21:20
44:1 86:18
197:1 252:10
253:15
**big** 63:20 64:7
187:12 198:12
**bill** 135:21
**binary** 104:4
**bit** 28:5 44:1
48:19 50:13,14
53:6 93:7

114:14 125:6
185:18 202:2
218:16 224:1
**black** 198:12
218:22
**blank** 155:18
156:5,7,11
158:5 218:17
**blanket** 198:21
199:8
**blue** 55:6
226:22
**bobby** 36:3,16
36:17
**bono** 17:12
**bottom** 30:13
113:9 181:2
194:2
**box** 73:20
198:12
**boxes** 92:1
148:16,18
218:22
**brakes** 205:7
**bray** 46:14
**break** 10:14,19
23:5 52:11
53:5 69:11
78:22 112:1
181:5 185:9,21
**breaking**
111:20
**brief** 217:20
250:3

**[bring - cbd]**

**bring** 232:9
**broader** 145:8
**broken** 175:5
**brooke** 27:12
**brought** 12:7
   166:9
**bucket** 70:4
   183:7,11 185:3
   185:5 187:2,2
**buckets** 105:18
   111:8 172:16
   172:21
**budget** 66:18
**building** 70:7
   71:20 72:17,21
   73:1 74:4
**buildings** 72:6
   231:20
**bulk** 137:13
   140:12
**bullet** 15:11,16
**bullets** 255:1
**bunch** 218:22
**burden** 104:9
**burdensome**
   104:16,21
**bureaucracy**
   18:4
**business**
   119:10 248:22

**c**

**c** 2:1,3 3:1 4:1
   5:1 33:21
   181:11 210:9
   214:6,12,21

253:17
**calculate**
   135:18 197:8
**calculated**
   125:7,9 197:10
   197:14
**calculating**
   128:1,3,20
   129:7
**calculation**
   125:20 149:1
   150:20
**call** 25:5 30:3
   64:19 90:3
   98:22 105:2
   162:1 172:4
   173:11 175:8
   206:14 230:1
   249:11
**called** 6:22 63:8
   150:7 200:1
   230:8 233:2
**calls** 42:15 63:2
   212:4 213:8
**capability**
   220:4
**capacity** 8:3
   51:22
**capital** 30:6
**caps** 192:18
   238:11
**capture** 230:8
**captured** 58:9
   68:9 211:10
   217:3

**carbonaro**
   208:18 214:7
**carbonaro's**
   99:12,15
**care** 202:10
**carry** 115:10
   248:5
**case** 12:19 13:3
   13:13 15:13,17
   16:5,10 18:17
   19:13,17,22
   20:1 21:20
   22:17 23:1,2
   27:1 34:1 47:6
   59:2 63:10
   78:22 84:1
   131:13,14
   135:4,5 138:11
   141:15 142:21
   144:4 146:10
   148:19 152:9
   154:5 155:21
   156:8 157:14
   157:15 158:6
   168:10 170:21
   174:9 177:7
   186:9,14 188:9
   188:9,11
   192:15 194:10
   194:17,19
   202:3 205:13
   227:16 230:15
   231:8 232:10
   236:14 238:9

**cases** 17:17
   18:10 26:8
   58:16 84:4
   93:17 106:3
   134:22 140:8
   140:10 171:18
   171:18 172:17
   172:18 173:4
   178:1,10,12
   182:15 188:12
   188:18 190:4,6
   205:18 225:13
   253:22 254:2
**categorical**
   183:13
**categories**
   38:12 105:5
   174:18 175:4
**categorization**
   256:13
**categorize**
   173:7 174:14
   189:7 203:17
**categorized**
   175:8 177:6,11
   177:16
**categorizes**
   178:21
**category**
   203:12 254:13
**caught** 254:17
**cause** 100:20
   262:5
**cbd** 21:3,15,19

Veritext Legal Solutions
346-293-7000

**[center - circumstances]**

| | | | |
|---|---|---|---|
| **center**  83:7 | **chance**  51:2 | **charges**  88:2 | 241:16,20 |
| 97:11,14 | 65:17 236:3 | 133:17 262:12 | 247:17 248:8,9 |
| **centralized** | **change**  140:7 | **charging** | **chiefs**  128:8 |
| 231:3,10 | 194:20 233:21 | 133:16 136:21 | 247:2,20 248:8 |
| **certain**  16:8 | 252:20 254:3,7 | 146:21 196:15 | **choice**  75:21 |
| 24:21 38:11 | 261:4,7,10,13 | **chart**  177:21 | **chron**  191:9 |
| 49:2 98:11 | 261:16 | **check**  100:4 | **circumstance** |
| 111:8 173:7,17 | **changed** | 191:20 194:7 | 98:6 107:14 |
| 186:5 211:12 | 112:19 249:9 | 209:9 222:4 | 154:8 210:10 |
| 225:13 227:16 | 249:10,21 | **checklist** | 214:14 234:5 |
| 227:20 238:18 | **changes**  247:22 | 238:11,13,15 | **circumstances** |
| 247:5 248:7 | 259:6 260:9 | **chief**  3:14,17 | 12:14 21:16 |
| 252:8,10 | **changing** | 6:10 23:21 | 50:12 57:3,8 |
| 253:22 254:2 | 250:11 | 24:2 26:4,15 | 58:1,5,9,15,18 |
| **certainly**  22:21 | **chapter**  114:19 | 27:3,9,16,18 | 58:20 60:12 |
| 23:4,6 85:11 | 117:3 | 28:1,8,11 29:3 | 62:21,22 63:5 |
| 111:6 147:2 | **chapters** | 29:7,8,10,16 | 67:2 68:8,12 |
| 182:21 202:14 | 187:15 | 31:14,17 32:7 | 68:14,20 69:10 |
| 202:19 215:18 | **character** | 32:9,14,20 | 70:16,17 71:21 |
| 234:12 252:6 | 147:4 | 33:4,11,18 | 74:10 76:15 |
| 255:9 | **characterizati...** | 35:10,13,14,17 | 77:3,10,19 |
| **certificate** | 127:2 | 35:22 36:4,5,9 | 81:14,15,20 |
| 258:1 262:1 | **characterized** | 36:10,11 37:16 | 82:16,19 87:2 |
| **certification** | 209:7 | 38:17,22 40:6 | 89:15 102:4,9 |
| 262:8 | **charge**  41:17 | 40:15 41:13,14 | 102:15 103:2,9 |
| **certified** | 90:2,3,5,9,13 | 41:14 42:5,9 | 103:20 104:2 |
| 260:16 | 90:18 91:7 | 42:22 46:20 | 105:3,22 106:6 |
| **certify**  258:4 | 125:11,12 | 51:7,14 52:3 | 106:12 108:2 |
| **cfr**  68:11 | 126:3 143:9,13 | 53:22 67:3,7 | 108:13 109:11 |
| **chain**  34:11,13 | 146:20 194:17 | 67:15 114:12 | 109:16 110:7 |
| 35:12 | 194:21 195:2,5 | 114:15 122:4 | 118:6 119:14 |
| **challenge** | 201:11 | 138:10 146:12 | 119:18 120:12 |
| 256:13 | **charged**  90:14 | 182:2 194:9 | 121:13,22 |
| **challenging** | 125:14 | 217:13 239:8 | 122:10 123:6 |
| 111:11 168:13 | | 240:18 241:1 | 123:22 153:19 |

**[circumstances - community]**

154:4,12,13
160:1,6 171:5
189:9 190:1,3
190:6 208:15
222:18 223:9
223:17,19
231:15 234:3
236:9 240:7
245:9
**citation** 30:20
156:8
**city** 231:19
**civil** 1:5 5:16
219:17 220:1
223:1,15
**claim** 12:8
**claims** 12:11
22:18 222:2
**clarification**
22:14 23:9
123:10 179:4
191:9
**clarify** 28:4
59:13 203:10
232:20
**clarity** 123:5
**clear** 13:2
15:10 22:17
27:21 39:5
64:4,15 84:15
102:7 124:4
126:16,19
138:1 143:18
149:4 154:10
176:4 183:7

198:14,19
201:16 212:15
**clearer** 179:6
**clearly** 202:10
203:4 213:4
**clerk** 96:1,7
204:12
**click** 151:14
**client** 17:3 87:9
88:1 89:4,22
91:7
**clients** 18:11
**clinic** 202:10
**clock** 162:1,4,8
191:15,17,21
192:12
**clocks** 192:6
**close** 58:21
102:10 144:3
169:2 172:20
183:15
**closed** 157:14
157:15 158:6
170:14 183:10
192:15
**closely** 195:13
196:1 238:1
**closing** 170:19
**closure** 161:18
**code** 4:11 30:15
31:1,6 130:5,5
**codes** 129:18
132:14 133:10
**colborn** 44:11

**coleman** 2:3
6:7
**collect** 97:19
106:19 125:18
236:1
**collected** 90:19
105:4 109:2
208:12 229:10
**collecting**
106:13 229:18
235:11
**collection**
101:4
**columbia**
258:20
**column** 58:13
152:12 153:13
153:20 154:15
155:3,7,9,12
156:4,7 157:9
160:22 177:4
181:10
**columns**
156:11
**combination**
214:5
**combining**
142:14
**come** 37:7 62:1
66:10 125:19
127:18 136:11
148:9 220:16
226:1
**comes** 98:16
103:11 129:9

137:2 189:12
197:19
**comfortable**
145:17 146:16
**coming** 137:22
**command**
34:11,14 35:12
**comment**
195:20,21
196:22
**commercial**
90:1,15,16
91:7 110:1
125:15,17
174:21 175:6
200:8,17,20,22
201:3,3,6,7,12
201:17,19
202:4,21 203:6
256:14
**commission**
258:21
**communicate**
157:5
**communicated**
252:8,17
**communication**
17:20 124:6,8
**communicati...**
222:20 223:10
**communities**
18:2
**community**
245:22 246:5
246:21

[company - contained]

**company** 238:8
**compelling**
 162:18,22
**compile** 223:4
**compiled**
 214:16
**complete** 35:11
 100:1 114:18
 128:5 146:12
 189:17 209:1
 230:11 233:3
 259:8
**completed**
 24:13 105:9
 157:12,18,19
 161:15,17
**completely**
 24:15 118:12
 214:3 249:6
**completion**
 192:3
**complex** 58:17
 58:19,22 59:2
 59:9 102:8
 105:6 111:2
 117:21 159:19
 160:10 162:13
 167:15 168:12
 168:18 169:13
 171:8,11,16
 172:1,7,22
 176:3,8,21
 179:11 181:11
 182:12,16,18
 183:5,21

184:11 185:5
186:6,10,21
187:2,20
188:10,16,21
189:2 209:7
248:10
**complexity**
 88:11 182:14
 188:8
**compliance**
 33:3 242:8
 243:7,18 244:2
 244:11,14
 245:1
**complying**
 251:10
**component**
 27:14 79:8
 152:15 239:18
**components**
 76:18 78:13
 79:1,2 80:1
 121:11 177:3
 178:22 240:4
 241:12 243:13
**computer**
 13:17
**conceal** 20:10
**concede** 108:8
**concept** 61:22
**conception**
 230:18
**concern** 74:21
 145:8 210:7

**concerned**
 148:15 221:16
**concerns** 16:9
 117:4 210:14
 210:17
**concise** 38:7
**concluded**
 257:7
**concludes**
 257:1
**conclusion**
 42:16 45:12
 63:3 107:21
 212:5 213:9
**conduct** 107:4
 230:7
**conducted**
 93:12 247:21
**conducting**
 219:17
**conducts** 37:13
**confidential**
 19:22 117:6
**confirm** 14:6
 15:3 30:14
 55:10 118:19
 209:10
**confirmed**
 123:14
**conflict** 47:1
**confront** 17:5
**confusion**
 54:10
**congress**
 111:12

**congressional**
 234:15
**consent** 219:19
 220:5,21 224:3
 224:7
**consider** 40:6,8
 40:10 41:3
 78:20 104:21
 117:18 124:7
 163:10,12
 215:9 246:18
 253:2
**considerably**
 19:13
**consideration**
 203:20 255:16
**considered**
 111:1
**consistent**
 128:20
**constituencies**
 19:10
**constitute**
 213:4 214:22
**construct** 87:8
**consult** 69:7
**consultation**
 108:1 153:4,12
 159:8,10
**consulted**
 77:15
**contact** 46:13
 223:2,18 230:3
**contained**
 143:4 144:6

**[contained - counteroffer]**

| | | | |
|---|---|---|---|
| 252:22 | 94:20 123:4 | 71:3,5,7 74:14 | 20:14 21:22 |
| **containing** | 130:14 186:14 | 75:5,9 77:11 | 22:6 32:12 |
| 45:12 | 205:4,16 | 88:7 95:11 | 38:14 39:10,18 |
| **contains** | 206:10 210:14 | 96:2,18,22 | 51:19 52:5 |
| 153:12 | 246:12 254:20 | 97:20 98:1 | 56:7 114:13 |
| **content**  9:18 | 255:10 | 99:7 100:2 | 126:22 181:19 |
| 66:7 118:15 | **conversations** | 101:5 115:12 | 206:18 219:20 |
| **contention** | 5:6 9:19 10:12 | 115:15,16 | 223:12 239:14 |
| 213:15 | 207:10 | 119:11 121:4 | 241:2 242:19 |
| **contentions** | **convoluted** | 127:5,10 132:1 | **correspond** |
| 50:9,11,11,14 | 18:4 | 133:5,19 134:8 | 181:7 |
| **contents**  56:5 | **copies**  262:14 | 135:13 140:4 | **cost**  18:20 |
| 114:7 122:13 | **copy**  62:14 | 140:15 154:6 | 74:15 262:1 |
| 124:22 | 99:1 101:18 | 154:14 155:2 | **cotter**  95:22 |
| **context**  208:6 | 260:16 | 160:9 162:14 | 96:3,5 148:9 |
| **contingent** | **cornell**  31:1 | 166:20 167:14 | 204:12,18 |
| 16:10 | **correct**  8:4,11 | 176:10,17 | **council**  37:17 |
| **continue**  5:8 | 8:12,16 11:3 | 182:9 185:6 | **counsel**  2:14 |
| 16:2 18:8 38:4 | 13:14 15:3 | 207:22 208:1 | 3:3,4 5:12 6:3 |
| 125:17 | 16:1 17:22 | 208:20 213:11 | 6:16,19 7:2,21 |
| **continued**  4:1 | 24:7,8,9 26:17 | 215:2 216:19 | 27:16,18 28:9 |
| 150:7,11 | 27:6,7 29:5,13 | 222:19 231:17 | 28:11 29:3,8 |
| **continues** | 29:14,22 30:19 | 233:20 239:9 | 29:11 41:15 |
| 15:19 | 31:9 32:15,16 | 239:20 240:5 | 43:7,14,17,18 |
| **continuing** | 32:18,22 33:5 | 240:12,14 | 43:21 44:5 |
| 205:9 | 33:6,8,16,20 | 241:17,18 | 114:12,15 |
| **contrary**  43:1 | 34:2,3,9 36:16 | 242:2,15 243:1 | 122:5 150:10 |
| **contrasting** | 39:13,14,21 | 243:4,9,12,20 | 248:9 255:20 |
| 201:22 | 42:11,22 43:3 | 244:17 245:7 | 258:10,14 |
| **controlled** | 44:16 45:17 | 247:19 259:8 | **counsel's**  42:21 |
| 17:13 | 47:19 51:7,8 | **corrections** | **count**  183:16 |
| **convenient** | 55:6,20 56:2 | 132:18 259:6 | **counted**  147:19 |
| 74:3 | 58:2 60:17,21 | **correctly**  15:22 | **counteroffer** |
| **conversation** | 61:7 65:5,9,12 | 16:16,17 17:21 | 13:8,9 16:13 |
| 10:5,8,11 | 65:16 70:13 | 18:13 19:5,18 | |

Veritext Legal Solutions
346-293-7000

**[counting - dea]**

counting   162:5
  183:17
countries   57:14
  121:11
country   21:4
  68:22 70:3
couple   10:2
  14:18 157:6
  161:12 194:2
  203:3 211:11
  221:15 226:15
course   10:13
  49:17 163:12
  222:21
court   1:1 5:15
  5:21 6:18
  15:20 16:5
  17:2 49:17
  236:13
courtesy
  210:12 220:15
  220:18
cover   138:14
  220:10
covered   101:14
  172:3 219:7
covers   228:21
create   24:21
  75:13 76:8
  248:21
created   152:3,4
  172:16 176:19
  181:5 217:2
  238:16 249:11

creating   78:4
  182:19
creation   182:22
creative   30:3
criteria   162:20
crosses   186:21
cs   262:20
cubic   92:1
cubicles   64:17
  64:19
culpable   17:15
curious   57:2
  59:15 204:3
  206:2
currently   42:22
  64:13
custodian
  63:12 93:21
  100:5 223:4
custodians
  57:16 83:9,10
  222:20 223:3
cut   39:3 103:3
cutoff   183:5
cutting   107:11
  184:17
cv   1:5 3:8 5:16
cyberspace
  71:19

**d**

d   5:1 34:20
  102:13 118:16
  118:18
d.c.   1:22

dangers   21:14
dash   158:17
  167:1
data   4:7,9,10
  58:8 150:18
  152:1,20 166:2
  176:20 177:20
  177:22 178:12
  178:22 179:3
  180:18,22
  181:6 182:5,8
  182:9
database
  117:16 231:10
date   1:12 14:10
  14:12 156:17
  156:20,22
  157:2,7,8,8,9
  157:10,12,13
  157:18,18,19
  161:15,18,19
  191:11,14
  192:10 259:12
  261:22
dated   3:7,16,17
  3:19 4:13 14:7
  218:8
day   62:19
  110:13 118:4
  140:10,10
  167:5 192:14
  208:18 211:22
  259:15
days   14:18
  58:14,14 59:7

59:8 87:5
  88:13,21 89:18
  89:20 90:10
  110:18 111:1,5
  119:10 120:5
  153:14 154:1
  157:7 159:12
  161:20 171:17
  172:11 183:15
  184:6 189:6,13
  192:4 194:11
  195:7 209:11
  209:12 230:11
de   35:22
dea   3:11 6:10
  6:15 11:2,9,12
  11:18,19,21
  16:4,8 20:22
  21:1,12,16
  24:3,6 25:2,16
  25:17 27:10,21
  27:22 28:13,16
  29:8,11,16,19
  31:8 32:14,21
  33:19 36:11
  38:17 39:20
  40:4,10,15
  41:1,9 42:9,22
  43:19 46:20
  47:18 50:9
  52:7 55:15,19
  55:22 56:11,22
  57:7 59:22
  61:9,21 62:3
  62:12 65:13,15

Veritext Legal Solutions
346-293-7000

**[dea - department]**

| | | | |
|---|---|---|---|
| 65:18 66:1,10 | 225:8,16 229:2 | **deciding** | **definition** |
| 67:11 68:1,17 | 231:3,9,13 | 201:11 | 58:19 122:9 |
| 70:8,9,11,17 | 241:7 246:3 | **decision** 15:18 | 123:6 171:15 |
| 75:7,22 76:13 | 248:5,7 252:1 | 86:15 198:20 | 172:9 190:2 |
| 77:4,19,22 | 252:14 253:9,9 | **decisional** | **definitions** |
| 78:14 79:1 | 254:10,16 | 196:9,12,19 | 102:11 172:2 |
| 80:2 81:5 | 256:3,5 | **decisionmakers** | **delegate** 249:16 |
| 83:19 84:4,10 | **dea's** 15:8,14 | 18:3 | **delegating** |
| 86:19 87:14 | 15:18 18:16 | **decisions** | 253:21 |
| 88:2 90:4 | 20:8,22 23:21 | 255:13 | **deliberate** |
| 92:22 93:11 | 28:8 29:3 | **declare** 88:20 | 203:19 |
| 97:5 98:3 | 46:18 51:7 | 259:4 | **deliberative** |
| 102:3,22 108:2 | 56:3 57:10 | **deem** 59:9 | 196:4,8,12 |
| 113:9,11,19 | 66:21 107:22 | 157:10 182:17 | **deliver** 18:5,7 |
| 114:4,10,10 | 114:1 118:20 | 188:9 189:13 | 19:4 87:5 |
| 115:8 117:3 | 121:1 141:18 | **deemed** 21:16 | **denial** 183:22 |
| 121:7,9,14 | 153:12 202:6 | 159:19 182:11 | 184:10 |
| 127:3 136:11 | 247:17 256:9 | 184:11 188:16 | **denials** 183:13 |
| 139:4 141:13 | **dea.gov** 86:16 | 196:18 209:10 | **department** 2:9 |
| 148:20 159:4 | 255:14 | 259:6 | 3:9,14 4:7 8:6 |
| 164:15 165:2,8 | **dea000097** 3:13 | **deep** 17:8 | 11:18 12:12 |
| 166:19 170:1 | **dea000370** 3:21 | **defendants** 1:7 | 35:12 36:9 |
| 171:21 172:11 | **dea000372** 4:4 | 2:7 3:4 255:20 | 37:7 43:10 |
| 173:3 174:13 | **dea000385** 4:6 | **deferred** | 44:5,16 45:3 |
| 177:15 178:6 | **dead** 120:8 | 108:12 | 47:3 48:18 |
| 178:20 180:18 | **deadlines** 162:6 | **define** 59:1 | 51:21 55:2 |
| 187:9 192:22 | **deal** 36:3 37:10 | 68:13 117:21 | 58:11 77:5,6,8 |
| 193:4,8,17 | 49:3 141:12 | 171:10 | 77:12 79:7,11 |
| 196:15 197:8 | **dealing** 19:1 | **defined** 120:12 | 79:12 121:6,16 |
| 199:15,18 | **dear** 15:5,7 | 172:6 | 121:21 123:13 |
| 201:1 205:16 | **death** 163:1 | **defines** 68:11 | 123:15 152:1 |
| 210:4 215:14 | **december** 15:8 | **definitely** 89:19 | 152:19 172:13 |
| 215:19 216:2 | 20:21 | 116:16 117:1 | 213:2,14 215:7 |
| 216:13 220:2,3 | **decentralized** | 165:3 168:12 | 216:12 223:16 |
| 224:10,21 | 239:12 240:3 | 225:21 | 239:8,13 240:1 |

Veritext Legal Solutions
346-293-7000

**[department - director]**

240:2,22
241:16 242:6
242:21 243:14
243:20,21
244:8,18
245:16 248:17
250:14 251:13
252:5,7,13
**department's**
123:8 240:10
240:11,22
242:7
**depending**
88:10 202:1
214:10
**depends**  184:1
**depicted**
177:20
**depo**  54:3
**deponent**  52:1
259:3
**deposed**  7:10
9:2
**deposition**  1:10
3:7,9,9,11,13
3:14,16,17,19
3:20 4:4,5,7,9
4:10,11,12
5:11,17 7:9
8:15 9:5,8,13
9:16 10:15
13:18 16:6
22:8,11 30:7
44:20 45:7
46:1,5,7,11,13

47:13 50:7,10
51:10 53:7,8
55:1 112:14
113:20 126:9
142:19 151:3
180:9 190:18
207:18 218:2
226:17 239:1
250:18 257:6
258:3,5,9,12
260:4 262:2,9
262:12,14
**deputy**  29:7
**derived**  152:9
**describe**  46:14
251:12
**described**
212:12
**describes**  242:1
**describing**
82:22 198:3
239:16
**description**  3:6
4:3 56:3 174:1
**descriptions**
38:7
**desheila**  40:2
**design**  75:21
**designate**  39:16
42:5 105:4
**designated**
45:2 51:16
**designation**
51:14

**designations**
52:2
**designee**  46:8
**despite**  15:11
223:9
**detail**  98:9
**details**  124:7
**determination**
37:4 57:3,5
93:10 103:9
104:5,17,19
106:12,18
108:16 109:19
127:17 163:4
201:2 222:18
223:8 252:22
**determinations**
253:13
**determine**
93:11 94:3
95:14 103:16
107:4 125:21
183:3 184:7
197:17 200:16
200:20,22
**determined**
125:16 127:21
153:18
**determines**
99:9
**determining**
103:14 109:5
128:10
**detriment**
18:11

**developed**
248:17
**device**  185:16
**dialogue**  17:20
**difference**
130:19 135:10
141:7 189:1
**different**  19:3
27:14 45:21
47:10 50:13
56:15 58:20
62:3 70:2 79:1
82:22 102:12
106:17 109:3
152:12 157:7,9
177:2,2 180:15
181:6,10
186:22 190:15
193:13 202:1
214:3 245:5
**differently**
84:12 93:8
**difficult**  88:12
111:11 166:5
188:6 248:11
252:4 254:10
**diligently**  15:14
**direct**  35:2
182:22
**direction**  258:8
**directly**  18:3
19:11 89:10
93:8 159:6
**director**  217:4

Page 15

**[disagree - doing]**

**disagree** 108:4
256:8
**discharge**
21:17
**disclose** 184:16
**disclosing**
154:21
**disclosure** 20:1
20:5 213:4
**discover** 50:14
**discovery**
49:20
**discrepancies**
157:4
**discretion**
176:15
**discuss** 9:10
11:16 36:22
96:6 248:10
**discussed** 9:1
95:4 121:20
122:2,7,10,14
122:15,17
162:9 208:17
239:17 240:6
243:10
**discussing**
119:17 121:15
123:21 235:11
241:20
**discussion**
154:11 217:20
**discussions**
122:5,13

**dismiss** 16:11
22:17 23:2
**dismissal** 22:19
**dismissing**
22:18
**dispose** 16:5
**disputes** 21:10
**disregards**
18:10
**disseminated**
114:9,11
**disseminating**
117:2
**district** 1:1,1
2:9 5:15,15
6:13 12:1
258:20
**diversion** 21:1
21:18 62:5
66:3
**divesting** 78:4
**divide** 24:22
**divided** 170:3
**division** 1:2
5:16 24:6
41:14 63:13
71:1 72:9,12
73:7,16 75:7
99:20 100:9
219:17 220:17
223:15 228:21
230:4,6 232:8
232:22
**division's** 223:1

**divisions** 41:9
69:2 70:11
177:2
**document** 14:7
15:4,8 16:6
30:13 45:11
47:10 51:2,4,5
51:9,11,13
55:10 61:3
93:12,13,14
95:13 96:9,20
98:4 102:5,16
104:6 113:7,11
113:18,22
114:7,18,19
116:2 117:7
128:17 129:19
130:5 131:20
133:1,4 142:4
142:9,11
144:10 145:19
145:21 146:1
147:5,8,9
153:10,11
175:10,16
180:17 187:12
196:11,16,17
196:18 197:17
198:9,9,13,22
199:5 205:17
206:12 207:2
208:2,4,7
210:2,4,5,15
214:11 218:12
218:16 219:4

226:22 227:11
239:7 241:15
242:22 248:20
**documents**
9:12 21:14
58:3 59:16
61:10,13 65:15
69:8 74:16
78:21 92:20
94:7,18 95:12
95:21 98:5
102:6 104:7,11
110:8,22
138:12 141:5
144:2,6 145:1
145:17 146:1
148:5,9 149:2
169:6,7 170:3
174:1 187:3,4
196:7 199:11
209:4,19
227:16 238:16
**doing** 7:7 19:3
109:9 110:9
118:5 132:8,17
132:20,21
135:1 137:5
138:19 139:8
139:15 140:7
141:5 168:9
176:20 184:10
192:1 220:8
244:16 247:1
248:20 249:17
252:9 253:17

Veritext Legal Solutions
346-293-7000

**[doj - elizabeth]**

| | | | |
|---|---|---|---|
| **doj** 11:2,11,12 16:4,8 20:7 27:14,20 28:1 28:12 31:7 35:13,17 36:12 36:19,22 40:10 43:19,21 50:10 55:15,19 68:9 76:17,18 78:12 78:15,17,17,17 79:1,18 122:8 126:2 171:21 171:22 172:3 179:8 211:6 216:13 217:12 219:22 220:1 231:13 246:3 251:22 252:1 | **drafts** 195:12 196:1,22 | **e** | **effect** 24:16 |

**doj** 11:2,11,12
16:4,8 20:7
27:14,20 28:1
28:12 31:7
35:13,17 36:12
36:19,22 40:10
43:19,21 50:10
55:15,19 68:9
76:17,18 78:12
78:15,17,17,17
79:1,18 122:8
126:2 171:21
171:22 172:3
179:8 211:6
216:13 217:12
219:22 220:1
231:13 246:3
251:22 252:1
**doj's** 35:22
36:5
**dollars** 135:19
**door** 111:10
173:8
**double** 146:9
191:20 222:4
**download**
150:21,21
151:5
**dozen** 167:12
**draft** 195:9
196:6,21 197:1
197:4,6 199:6
230:1
**drafted** 128:7

**drafts** 195:12
196:1,22
**drill** 103:8
**drive** 73:21
195:10
**drop** 16:10
**dropped**
101:17
**drug** 3:10 8:9
12:11 17:14
21:12 32:17
48:18 55:2
58:5 114:8
205:20
**dubois** 27:12
28:12 29:3,6
**due** 112:18
116:19 125:12
188:10 194:14
253:21
**duly** 6:22 150:8
258:5
**dump** 168:21
**duplicate**
160:22 161:2,7
**duplication**
195:4,4
**duration** 9:22
**duties** 46:22
115:11
**dwell** 84:8
156:16

**e**

**e** 2:1,1 3:1,5 4:1
4:2 5:1,1 38:5
72:10,11 73:22
84:5 99:13,16
99:20 101:6
103:21 124:12
124:13 150:1,1
181:11 195:10
212:17,18
219:2,6,11,18
220:5,12
222:13 223:11
228:22 229:2,8
229:14,17,21
230:7,9,14,19
231:3,9,18,18
232:9 233:1
234:7,9,11,16
234:20 235:6
235:11,19
236:2,10 237:3
261:3,3,3
**earlier** 15:17
56:9,10 125:10
147:11 187:10
188:12 239:17
243:10 252:17
256:1
**early** 127:21
251:7,8
**easier** 150:22
**edited** 4:9
**educational**
175:7 245:13

**effect** 24:16
**effective** 47:16
250:6
**effectively**
137:2,9 141:5
141:7 183:17
199:17
**efficiencies**
249:3
**efficiency**
247:22
**efficient** 18:20
18:22 33:2
250:6
**effort** 128:18
173:7 249:20
**effort's** 250:10
**efforts** 245:21
**eight** 257:3
**either** 20:7
195:5 221:12
222:10 246:3
256:21
**electronic** 31:5
59:16 60:6
73:18 74:17
97:4,8,17
**electronically**
74:12,13 83:5
195:8
**element** 101:4
**elicited** 19:21
**elizabeth**
219:11,12

**[ellen - excel]**

| | | | |
|---|---|---|---|
| **ellen** 2:15 5:20 | 222:3 | **errata** 260:10 | **evaluated** |
| **else's** 70:22 | **engage** 246:4 | 260:12,13 | 104:10 |
| **employed** | **engagement** | **error** 21:9 | **evaluating** |
| 258:11,14 | 245:19 | 170:18 | 202:20 |
| **employee** 21:17 | **engages** 192:22 | **escape** 88:1 | **evans** 204:5 |
| 219:18 224:3 | **engaging** 246:8 | **esq** 2:14 | **event** 198:16 |
| 236:9 258:14 | **enormous** | **esquire** 2:3,8 | **eventually** |
| **employees** | 15:19 | **essentially** | 117:11 |
| 21:14 26:7 | **ensure** 51:15 | 36:19 120:5 | **everyone's** |
| 56:5 64:10,11 | **ensuring** | 139:16 228:4 | 175:20 |
| 64:16 210:4 | 134:15 245:1 | **established** | **evidence** 88:20 |
| 211:1 215:8,12 | **enter** 191:13 | 86:22 107:21 | **evident** 15:13 |
| 220:5 221:1 | **entertain** | **establishment** | **exact** 23:2 |
| 224:7,13 | 255:10 | 121:2 | 63:18,18 81:11 |
| 229:16 234:9 | **entertaining** | **establishments** | 161:7 170:9 |
| **empty** 165:16 | 23:6 | 69:15,18 | **exactly** 85:2 |
| **enclosed** 262:7 | **entire** 22:19 | **estimate** 131:1 | 100:7 108:12 |
| **encourages** | 51:2 77:7 | 131:2,2 148:22 | 139:14 231:4 |
| 170:4 | 115:5 121:5,7 | 149:1 193:13 | **examination** |
| **encouraging** | 121:16 133:1 | 197:22 199:16 | 3:2 7:2 150:7 |
| 243:6 244:2,10 | 196:17,18 | 200:2,6 207:7 | 150:10 255:20 |
| 244:14 | 243:17 244:9 | 207:11,11 | **examined** 7:1 |
| **endeavors** 17:7 | **entitled** 85:21 | 256:9 | 150:8 |
| **ended** 35:4 | **entries** 157:17 | **estimate's** | **example** 17:16 |
| 125:9 | **entry** 164:8,12 | 129:21 | 62:2 66:2 |
| **endowed** 19:10 | 192:10 | **estimated** | 68:21 72:2,8 |
| **ends** 184:4 | **epidemic** 17:15 | 131:21 134:4 | 81:15 102:17 |
| **energy** 19:13 | **equities** 69:8 | **estimates** | 103:1 105:1 |
| **enforcement** | 141:19 153:12 | 148:20 256:4 | 153:9 162:22 |
| 3:10 8:9 12:11 | **equivalent** | **et** 1:3,6 5:13,14 | 177:7 184:2 |
| 32:18 48:18 | 40:21 41:2 | 259:1,1 260:3 | 216:6 254:6 |
| 55:2 58:5 | 42:8,13 43:4 | 260:3 261:1,1 | **examples** |
| 114:8 213:20 | 49:19 51:17 | 262:6,6 | 201:22 |
| 214:4,8,16,20 | **erick** 1:17 5:22 | **evaluate** | **excel** 150:19 |
| 215:20 216:2,7 | 258:2,18 | 104:15 248:18 | 151:1 158:12 |

**[excel - fact]**

165:22
**except** 88:6
104:10
**exception** 58:1
86:14 109:19
119:18 178:15
211:2 223:17
**exceptions**
90:12
**exchange** 16:9
**exclusively**
65:3
**exculpate** 89:4
**excuse** 25:11
68:10 210:7,20
**executives** 41:6
**exempt** 197:18
198:7
**exemption**
91:17 130:4,5
133:10 144:11
154:16,18,19
155:10,13,14
207:3 210:19
210:21 211:1
212:22 214:3
**exemptions**
38:6,8,13 93:1
94:4 148:15
197:18 210:8
253:3
**exhibit** 13:16
13:18 14:2,17
14:19 30:3,6,7
44:20 45:17,21

45:22 46:1
50:20 53:5,8
53:11,13,16,18
53:21,22 54:1
54:3 55:11
84:9 107:17
112:12,14
113:5 126:5,9
142:9 149:3
150:16 151:19
151:21 176:18
176:20,21
180:7,9 190:15
190:17,18
207:18 218:1,2
226:14,17
238:5,21,22
239:1 250:16
250:17,18,22
251:3,5
**exhibits** 4:22
53:21 112:12
150:15,16
151:3 226:13
262:14
**exist** 138:17
224:15
**existed** 173:19
**exists** 124:10
**expanding**
120:5
**expectation**
215:4
**expectations**
251:10

**expected**
214:22
**expecting** 85:7
**expedited**
105:6,7 162:13
162:15,16,17
163:3,5,9,11,14
167:22 172:1
173:1 176:9,22
181:11
**experience**
100:13 130:16
182:1
**experiment**
130:13
**experiments**
130:12
**expert** 88:17
231:6 249:12
**expertise**
202:19
**experts** 62:6,12
65:22 66:4,12
95:17,18 99:22
232:20,21
**expires** 258:21
**explain** 16:3
28:3 153:8
206:15
**explained**
111:8
**express** 114:11
**expressed** 20:4
**extended**
109:14,18

**extending**
110:7,9,13
**extent** 44:22
84:19 214:19
**external** 25:7
26:11,12 56:18
**extra** 120:4
189:16,19
**extracted** 182:8
**eye** 1:21
**eyes** 105:20
111:9 168:4
169:1,21
172:19

| **f** |
| --- |

**f** 3:20 4:4,5
30:6 38:20
126:20 150:1
155:10 167:1
207:22
**f13** 84:13
**face** 95:14
143:1 196:11
**facilitate** 38:5
**facing** 215:9
**fact** 17:16 43:6
61:12 82:7,18
88:14 91:21
100:3 108:20
118:20 121:6
125:17 154:3
182:22 236:20
237:1,19
252:19

Veritext Legal Solutions
346-293-7000

**[facts - final]**

**facts**  50:9
203:21
**fails**  260:15
**fair**  8:15 13:8
45:5 56:1
61:13 65:4,15
70:18 71:6
74:18,19 76:2
78:13 79:20
85:1,21 91:12
96:17 99:6
120:15 121:3
127:2 131:22
133:22 135:8
135:16 136:1
136:22 139:11
140:1 147:16
164:18 176:11
183:19 189:3
191:3 193:2
199:7 201:8
203:1 204:9
214:2 215:1
216:4,5,9,10
223:20 232:1
236:11,15,16
238:3 242:10
251:12
**fairly**  66:19
97:9 208:13,22
237:17
**faith**  16:22
22:5 128:4
**fall**  16:4

**falls**  119:13
**familiar**  31:8
43:22 44:12
88:15 97:7
116:11 143:6
173:12 222:7
**far**  50:11 71:18
100:18 148:15
168:12 202:5
214:9 217:15
243:18
**farm**  78:16
**farms**  78:13
**farther**  218:16
**fast**  103:4
166:3 186:19
**faster**  105:21
111:10 169:2
169:22 172:20
173:8
**fbi**  79:1,19
153:10
**feasible**  66:8
111:6
**federal**  18:4
20:9 83:6
97:11,14
110:19 153:7
154:20 160:3,4
243:5,17 244:1
244:10,19
251:10
**fee**  90:11,18,20
126:1 131:1,16
193:19 195:2,3

197:14 199:15
200:1 204:22
205:9,14
**feel**  48:4,10,15
48:20 50:2,5
50:15 59:2
145:17 162:18
163:15 189:6
190:2 201:19
249:8
**fees**  90:4,4,5,9
90:14 91:3
110:5 125:6,7
125:9,11,12,14
128:1,21 129:8
142:14 143:8
143:10,13
146:20,21
147:21 191:18
192:13,17
194:13,14,17
194:22 195:2
200:9,14
201:11 256:1,4
**feet**  71:4 92:1
**fell**  254:12
**felt**  254:12,16
**fewer**  17:19
**field**  41:18
57:13 69:1,21
106:1,5 120:14
120:15 121:10
184:3,13
189:12 217:16

**fields**  152:8
**figure**  148:2
253:18
**file**  20:7 37:6
46:12 53:21
86:10 89:12
125:20 211:18
213:19
**filed**  5:14 11:17
85:7 86:3,4
91:9,18 94:7
94:11,21 95:19
96:21 122:17
122:21 123:10
127:4 143:7
147:15 148:1,6
148:13,19
164:2 169:15
169:17 250:13
**files**  97:15
213:3,3,16,18
221:18
**filing**  60:1 85:8
86:13 95:14
97:4 147:7,10
262:7
**filings**  84:4
92:12,16,19
95:6
**fill**  66:18 152:9
155:17 249:15
**filled**  64:14
**final**  39:15
53:22 132:8
133:12 135:2

**[final - foia]**

| | | | |
|---|---|---|---|
| 136:14 137:14 | 198:10 208:5 | 36:5,9,10,12,19 | 107:17 108:16 |
| 139:11 140:7 | 218:9 219:18 | 37:5,16 38:2 | 109:7 111:4 |
| 145:3 249:16 | 220:3 227:10 | 38:17,22 39:16 | 114:1,12 |
| 249:18 255:13 | 234:1,4 239:7 | 39:20 40:15 | 115:14,15,17 |
| **finalize** 132:11 | 242:12,12,17 | 42:6,9,22 | 115:21 116:12 |
| **finally** 19:20 | 243:2 248:13 | 44:18 46:4,8 | 116:21 117:7 |
| **financially** | 249:5 254:6 | 46:18 47:13 | 119:10 122:4 |
| 258:15 | **fiscal** 58:16 | 48:20 51:7,14 | 125:1 126:2 |
| **find** 80:17 | 179:8,10 | 52:3 53:14,21 | 134:22 135:4 |
| 147:14 172:4 | **five** 25:12 | 53:22 55:22 | 141:1,21 |
| 211:15 254:18 | 113:12,12 | 56:4,6,11,21 | 142:15 151:22 |
| 262:7 | 137:3,16,18 | 57:19,20,22,22 | 153:2,6,7 |
| **fine** 49:13 | 230:11 | 58:10 59:10,12 | 155:1 156:21 |
| 52:14 85:13 | **fix** 111:13 | 59:19,20 60:4 | 157:3,5 159:3 |
| 107:12 212:21 | **fixed** 140:17 | 61:1,8 62:15 | 160:7 164:1,15 |
| **finer** 176:7 | **flag** 168:4 | 63:10 65:3,7 | 167:1 170:8 |
| **finish** 63:10 | **floor** 233:22 | 65:13,18 66:10 | 171:1 172:3 |
| **finished** 131:14 | 234:1,4 | 66:14,15 67:3 | 182:2,6 188:15 |
| **fired** 21:1 | **focus** 116:20 | 67:11,12,15,20 | 189:20 191:14 |
| **firm** 262:19 | **focusing** | 68:9 69:13 | 207:1 208:19 |
| **first** 3:19 6:22 | 120:12 | 70:8,17 71:2 | 210:8 211:18 |
| 15:11 19:14 | **foia** 3:15,17 4:7 | 71:18,20 72:6 | 211:22 212:3,7 |
| 30:14,15 55:21 | 4:11,12 6:10 | 72:9 76:11,17 | 217:13 219:18 |
| 68:16 69:5 | 15:12,14,14 | 77:9 78:4,18 | 220:16 223:2 |
| 105:9,13,13 | 20:4,8,11,12 | 78:20 79:4,13 | 223:19 224:3,9 |
| 107:8,9 114:6 | 23:21 24:2,6 | 80:2,3,10 | 225:2,4,8 |
| 120:14 127:6 | 24:15 25:2 | 83:22 84:18,21 | 227:21 230:18 |
| 134:13 152:14 | 26:8,20 27:1 | 85:19 86:10,13 | 231:15,21 |
| 158:19 163:17 | 27:10,16,22 | 86:19,22 88:6 | 232:15 233:10 |
| 163:17 164:16 | 29:16,18,21 | 89:12 90:7 | 233:22 234:13 |
| 164:16 167:21 | 30:4,7,18 | 91:17 92:22 | 234:21 235:2,6 |
| 167:21 173:4,4 | 31:14,18 32:9 | 95:7 96:4,4 | 235:13,17 |
| 176:14,14 | 32:14,20 33:4 | 97:12 98:16 | 236:3,15,17 |
| 180:17 191:8 | 33:19 35:10,10 | 99:8 100:13 | 237:3 238:18 |
| 192:10 196:12 | 35:14,17,22 | 102:2 106:17 | 239:8,12,18,19 |

Page 21

**[foia - gathering]**

240:1,9,10,11
240:16,18
241:1,8,12,16
241:20 242:8
242:15,17
243:1,3,7,18
244:3,19
245:15,19
247:9,17,20,21
248:5,8,8,14,19
251:22 252:1
253:16 254:9
254:17 255:1
**foiaxpress** 63:9
63:16 65:4,8
65:11 81:8
102:16 117:15
175:12 230:16
238:9
**folder** 13:20
30:6 54:15
126:6 150:16
180:8 218:1
226:14
**folks** 25:21
26:10,12
237:11
**follow** 70:4
76:17 79:12
87:9,10,15,19
88:3,22 89:5
98:17 99:13
126:1 139:13
155:17 169:8
177:13 181:13

184:22 186:16
187:18 193:6
196:13 211:8
216:14 231:11
240:4
**following** 61:4
76:3,16,18
95:8 104:13
110:17 138:15
140:11 201:5
211:13 212:13
**follows** 7:1
150:9
**footnote** 16:19
20:18,20
**force** 254:14
**foregoing**
258:3,5 259:5
**foreign** 57:14
121:10
**foreseeable**
252:21 253:2
**forget** 36:5
**forgetting** 36:2
86:2 155:16
**form** 47:22
**format** 228:8
**formats** 35:1
**former** 20:22
217:4 227:7
254:13
**formulate**
248:11
**fort** 262:20

**forth** 207:4
213:22 252:2
**forward** 21:21
103:15 157:3
157:11 246:17
253:20 254:2
**found** 68:10
114:20 245:12
**foundation**
44:4 78:6,11
235:14 236:5
**foundational**
151:17
**four** 25:11 26:2
113:12 131:6,7
131:8 136:9
137:5,17
163:22 249:14
**frankly** 50:9
104:17 109:16
145:5 245:14
**freedom** 3:11
51:18 119:7
244:15 251:9
**frequency** 17:4
**frequent**
245:19
**front** 113:5
176:2 193:18
199:16 206:2
222:13
**fs** 119:4
**fsr** 118:22
119:5,7

**fsrn** 3:13 227:3
227:6
**fulfill** 116:21
**full** 93:16 94:5
118:2 132:20
138:6 196:19
198:7,15
210:16
**function**
216:17 234:12
235:10 254:17
**functions** 46:22
216:8 235:2
**funding** 34:5
**further** 114:10
150:9 255:18
256:18,20
258:13
**furthering** 17:2
**future** 124:5
**fy** 4:9,10 102:5
150:18 180:18

**g**

**g** 5:1 38:9 39:7
155:7
**gain** 77:2 80:16
**gained** 245:14
**game** 71:8
**garland** 1:6 3:8
5:14 20:13
251:7 259:1
260:3 261:1
262:6
**gathering**
235:6

Page 22

**[general - going]**

| | | | |
|---|---|---|---|
| **general**   3:16 | 219:19 220:5 | 184:12,13 | 106:1,19 |
| 33:12 34:22 | 224:3,7 253:8 | 189:19,21 | 107:19 112:4,7 |
| 35:2,16,18 | **give**   7:13 22:12 | 197:1 199:11 | 112:20 113:1 |
| 38:12 56:5 | 41:12 44:18 | 217:17 218:16 | 124:22 125:2 |
| 91:5 142:15 | 47:18 51:2 | 219:13 220:16 | 125:21,22 |
| 176:5 215:15 | 95:3 98:9 | 224:6,14 | 128:5 132:10 |
| 240:20 251:7 | 165:18,20 | 225:22 230:13 | 132:22 133:4 |
| **generally**   34:18 | 166:1 181:21 | 245:11 247:8 | 133:21 136:6 |
| 41:8 57:4 90:5 | 229:16,17 | **goal**   48:22 | 137:4,8 138:5 |
| 90:12 94:9 | 230:11 250:5 | 117:1,11 118:3 | 139:2 141:16 |
| 95:16 96:13 | **given**   93:19 | **goals**   248:21 | 143:9,11,13 |
| 98:7,10 99:11 | 148:16 163:8 | **goes**   146:8 | 146:13,17,17 |
| 99:18 105:8,12 | 258:10 259:9 | 178:5 197:8 | 147:7,19 |
| 131:11 132:12 | **giving**   153:9 | 203:20 207:6 | 149:11 150:3 |
| 134:21 157:2 | 227:15 | **going**   5:3 7:12 | 150:22 153:18 |
| 163:6,18 164:8 | **glean**   202:22 | 9:10 11:2 | 153:22 158:8 |
| 164:11 171:18 | **glenn**   2:14 6:15 | 13:15 14:20 | 171:13,16 |
| 173:3 176:7,13 | **go**   5:9 7:12 | 15:2,5 16:2 | 172:8,19 180:1 |
| 183:14 188:10 | 20:17 23:10,12 | 23:14,17 30:2 | 180:4 183:9,18 |
| 196:6 206:13 | 31:4,5 55:9,13 | 30:2,3 32:7 | 184:5,8,12,21 |
| 210:3,7 215:8 | 63:6,12 66:2 | 44:2,13,18 | 185:4,17 188:2 |
| 246:20 | 77:1 81:11,19 | 45:5,6,18,21 | 189:3 190:15 |
| **generated** | 83:2,12 92:3 | 46:3 47:16 | 191:18 196:7 |
| 191:12,13 | 98:17 99:17,18 | 48:6 51:1 | 197:15,21 |
| **gentleman** | 100:8 103:17 | 52:11,17,20 | 198:1,7 199:10 |
| 36:15 67:8 | 104:3 107:13 | 53:4 58:17 | 199:22 202:7 |
| **genuinely** | 108:20 112:17 | 59:2,6 60:13 | 206:6,13 |
| 85:17 | 124:22 125:2 | 61:1 63:4 | 207:13,16 |
| **gesture**   16:21 | 134:5 138:11 | 73:19 74:17 | 210:11 219:5 |
| **getting**   89:3,3 | 140:15 148:2 | 81:19 84:2 | 224:14 226:6,9 |
| 97:18 100:17 | 149:6 158:9 | 87:8 88:8 89:4 | 237:12 245:20 |
| 109:13 116:22 | 159:22 160:20 | 89:14,17,19,21 | 248:3 250:10 |
| 138:10 144:3 | 161:9 162:4 | 90:1,22 99:15 | 250:15 253:19 |
| 168:8 186:18 | 166:17 174:11 | 101:19 102:5 | 253:19 254:17 |
| 214:21 217:15 | 179:19 184:3 | 102:15 103:1,2 | 255:17 |

**[good - high]**

good   5:2 7:4,5
  16:22 21:18
  22:5 32:5
  101:16 128:4
  185:10,18
  229:1 236:3
gotten   63:16
  81:10
government
  26:2,5,8,13
  39:8 40:16
  110:20,21
  137:8 140:9
  215:4 243:7
  244:2,10,14
  245:2 249:12
government's
  243:17
governmental
  223:10
grade   40:16
  49:14
grand   176:22
grant   163:3,5
granted   105:7
granting
  249:18
grasp   141:3
gray   2:14 6:15
  6:15 9:21 10:4
  54:4
grew   76:2
grievances   17:8
  18:20

ground   7:12
grouped   174:3
groupings
  176:7
groups   17:7
  207:1
growing   253:20
gs   26:4,15
  141:14 249:13
  254:1
guess   23:1
  26:19 81:2
  84:11 112:12
  129:11 135:20
  147:3 161:9,11
  175:12 183:2
  186:7,17
  191:16 206:1,1
  209:21 224:20
guidance   21:13
  128:17 238:16
guidelines
  211:14 252:15
gupta   35:18
  36:1,12 240:21
  241:5
guys   28:10
  111:21 130:8

**h**

h   3:5 4:2 39:16
  261:3
half   89:2
hallie   29:10
hallway   70:16
  70:21

handbook   38:8
handle   24:21
  98:10 141:14
  159:5,6 227:20
  228:22 238:18
  250:1
handled   105:12
  254:22
handles   37:2
  79:2 103:12
  173:3
hanging   106:3
happen   76:13
  80:1 106:21
  133:21
happened
  191:16
happens
  157:16 170:11
  198:2 237:2
happy   48:7
harass   46:10
  47:22 48:17
harassed   48:10
hard   101:18
  113:7 186:19
harm   252:21
  253:2
head   31:16
  32:10 33:10,21
  34:22 124:5
  189:10 230:22
header   55:6
  115:4

headers   152:12
  161:14
headquarters
  57:13 70:9,12
  72:5,14 73:3
  74:8 121:11
  231:20
health   10:21
hear   92:11
  142:3
heard   18:2
  19:11 124:17
  185:14
hearing   87:18
  88:9,21
hearings   88:15
heavily   37:10
  250:9
heavy   92:8
hebert   2:15
  5:20
held   21:2
help   66:15 88:1
  126:19 172:19
  238:17 246:20
helpful   105:17
  206:22 207:15
helping   254:1
helps   168:22
hereto   258:15
  259:7
hertel   26:16
hi   219:12
high   21:15 59:5
  134:17 146:11

**[high - increasing]**

159:20,20
160:12 184:14
188:17
**higher** 142:1
185:2 220:14
**highlighted**
127:7,12
209:20 219:15
224:2 238:6
239:12 245:17
247:14
**highlighting**
126:15,18,18
**highlights**
226:22
**highly** 18:22
141:13 182:15
182:16 254:11
**hire** 249:15
**hired** 67:21
**hiring** 66:21
**hoffman** 29:10
29:12
**hold** 18:18
31:19 62:4
68:4
**holds** 46:21
**honorable** 34:1
**hope** 18:18
**horse** 120:8
**hosts** 37:14
**hot** 21:19
**hour** 111:18
126:3 133:17
225:22

**hours** 10:2
125:22 137:3,5
137:16,17,18
139:16 147:19
**housed** 81:8
83:6 106:8
**houses** 63:9
**houston** 1:2 2:5
2:11 5:16
10:10
**hughes** 46:5,13
48:2,7
**hughes's** 79:17
**huh** 69:17 71:3
73:4 79:5,16
87:11 89:1,16
107:18 120:16
135:22 137:1
139:9 147:17
159:13 162:11
164:17 170:16
176:12 181:3
185:1 187:13
187:16 193:7
194:12 197:3
204:14 214:18
216:15 218:21
221:20 234:18
245:4
**human** 101:2,4
**hundreds** 59:5
59:22 62:9,13
111:2 168:14
186:12

**hypothetical**
87:8 88:19
89:5 91:7
229:15
**hypothetically**
196:20

**i**

**idea** 181:21
207:2
**identification**
13:19 30:8
44:21 46:2
53:9 112:15
126:10 151:4
180:10 190:19
207:19 218:3
226:18 239:2
250:19
**identified** 46:6
47:12 221:13
222:10
**identify** 94:10
94:10,13 173:6
222:19
**illustrate**
108:12
**imagine** 234:15
**immediately**
21:12
**impact** 188:4
**implementati...**
20:8 33:9 34:6
48:20
**implemented**
249:4 252:19

**implementing**
33:14 35:3
252:14
**implication**
212:16
**important** 7:13
155:20 156:13
175:19,22
**impossible**
80:15,19
**improve** 34:6
246:5 248:22
**improved**
17:19 245:21
**improvement**
90:8
**improvements**
249:3
**inbox** 84:5
**inches** 71:8
**include** 19:16
183:22
**included** 132:8
248:4
**includes** 178:1
**including** 17:1
38:7 56:4
64:11 136:9
219:1 242:7,15
243:1
**incorrectly**
132:15
**increase** 247:22
**increasing** 17:3

**[incumbent - interprets]**

**incumbent**
163:13
**indicate**   158:5
**indicates**   58:14
154:17 159:1
**indication**   48:6
**individual**   36:7
60:10 100:10
131:12,13
134:19 135:1
170:7 187:4
**individuals**
41:8 174:14
215:19 238:19
**inform**   103:4
**information**
3:11 19:21
26:2,5,9,13
27:10,16 36:4
36:18 37:1
39:8,9,13 50:8
51:18 58:12
72:8,12 73:6
78:19 85:5
86:17 92:7
99:19 100:8
119:8 123:14
130:4 140:9
141:20 143:2
145:11 152:8
155:3 156:3
162:19 163:8
184:17 201:15
203:16 214:16
214:20 217:5

219:1 220:17
221:17 228:21
230:4 232:7
244:8,15,22
249:12 251:9
255:12
**informed**   33:13
123:3
**inherently**
115:17
**initial**   18:21
99:9 103:13
109:9 131:22
133:8,12,17,20
135:8,12,21
136:4,22 137:4
137:12,17,19
138:17 139:11
139:17,22
140:1,3,21
141:6
**initially**   23:9
156:17
**initiate**   229:7
**initiated**   24:14
**inmate**   163:1
**inquire**   47:3
**ins**   80:21
**inside**   74:7,13
208:19
**instance**   100:19
100:22 148:8
234:16 247:14
247:17

**institute**   1:3
5:13 259:1
260:3 261:1
262:6
**institutional**
19:2
**institutions**
175:6,7
**instruct**   20:10
115:10
**instructing**
192:22
**instruction**
155:17 156:6
156:11 227:20
**instructions**
227:15
**intake**   25:5,9
25:12,15,19
56:14,17 57:4
103:11,11
106:21 109:9
163:6 170:15
170:18 227:9
227:14 228:1
247:1
**intel**   213:21
**intela**   230:8,14
232:4 233:2,4
233:8,10 235:5
**intelligence**
41:13 232:7
**intensive**   92:8
**intentionally**
77:22 78:2

**interact**   36:8
36:11,15
**interaction**
36:6,20
**interest**   18:11
19:21 20:2,4
90:17 200:21
202:11,15
221:22
**interested**
85:17 125:6
156:3 173:20
258:16
**interesting**
147:2 160:13
**interestingly**
26:22 81:21
**interests**   17:3
**interface**   96:14
166:6 237:16
**internal**   114:2
114:3 118:21
127:3 225:19
248:1 250:12
**internally**
205:16
**internet**   73:16
**interpretation**
76:14,20,21
123:7,8,19
124:1
**interpreted**
84:18
**interprets**
70:15

**[interruption - kelleigh]**

interruption 250:3
intimate 148:4
intimately 97:7
introduce 8:22 13:16 30:2 45:22 207:17 217:22 250:16
introduced 23:20 30:5 53:16 112:12 126:5
introducing 14:18 180:7
invasion 213:5 214:22
invested 205:13
investigation 184:9 206:8
investigative 67:16,22 98:7 98:11 221:18
invoke 57:7 58:9 68:16,19 69:5 77:3 81:14 82:15 103:19 105:21 153:18 159:22 171:6 189:19
invoked 58:15 105:3 108:13 109:19 154:18
invokes 82:19 108:2

invoking 60:11 74:10 81:20 104:1 109:10 120:4 190:1
involve 59:4 111:2 146:11
involved 137:11 182:14 184:14 220:14 221:18
involves 148:1 159:20 168:13
issue 11:6 15:13 21:13 47:6 77:16 95:4 124:5,20 142:21 162:3
issued 38:9 217:4
issues 16:9 17:17,18 20:4 100:16,16 122:3 249:20
items 15:9

**j**

j 31:12 32:12 32:20 39:16 41:22 42:1,2,3 45:13,14 242:14
jamieson 1:14 5:18
january 1:12 5:4 14:7,10,13 260:2

jenrette 193:22
jimmy 2:8 6:11 49:7 85:2 95:3
jimmy.rodrig... 2:11 260:1
job 136:19 139:15 141:1,2 235:4,5 250:6
jobs 115:11
journalism 203:5
journalist 163:7
judge 46:5,13 48:2,7 79:17 84:3 86:16 87:17 88:19 204:12,18 205:5 206:3 255:11
judge's 94:17
judges 83:3
judicial 96:1,7 204:12
jump 192:6
jumpy 166:8
june 258:22
justice 2:9 3:10 3:14 4:8 8:6 12:12 35:13 36:9 43:10 44:5,16 45:3 47:3 48:18 51:22 55:2 58:11 77:5,8

77:13 79:8,11 79:12 121:6,16 121:21 123:13 123:15 152:1 152:19 172:13 178:19 213:2 216:12 239:8 239:13 240:2,2 240:22 242:21 243:14,21 244:18 248:17 251:13
justice's 213:15 241:16 244:8
justification 20:9

**k**

keep 33:10 64:20 66:9 95:5 105:20 111:9 168:4 169:1 172:19 193:4,8 197:12 248:3,3
keeping 19:21 81:6 169:21
keeps 65:15 75:22
kelleigh 1:10 5:11 6:9,21 32:15 36:10,14 75:21 150:6 257:2,6 259:2 259:4,12 260:4 261:2,22 262:2

Page 27

**[kept - leadership]**

**kept** 83:17,19
86:6 229:2,3
231:5
**killers** 21:6
**kind** 54:9 74:21
87:7 91:5
130:7,11
186:18 202:2
203:4,9 204:6
205:7 206:1
227:18 245:13
246:3 255:3
**kindly** 165:20
**know** 9:18
10:16 25:14
38:3 43:13
44:4,7,10
48:16,21 49:3
50:6,17,22
51:3 54:20
58:22 59:16,17
60:1,3 62:12
64:5,6,8,8
65:17,18,20
66:6,13 68:2,7
74:1 76:13
77:1 79:22
80:1,8,9,9,16
80:17 81:16
83:12 84:1,12
85:9 88:1
90:21 91:6
92:4,9,17
93:14,17 95:2
97:8 99:2

100:3 101:12
102:19 103:5
103:12,14
106:1 107:15
109:6,10
110:10 111:21
116:2 120:5,7
125:22 126:13
128:4 130:15
130:22 131:1
134:1,18
135:19 137:21
138:11 141:12
141:15,20
142:5 144:2
145:1 148:4,12
153:22 156:8
162:6 163:2
165:6 167:9
170:4,6,17
171:21 172:6
172:22 173:1,1
173:6,16 174:8
174:16 175:14
176:5 179:22
183:13 184:12
185:21,22
186:8,22 187:8
188:3 192:11
197:9,16 199:5
200:8 201:4,18
202:10 206:4,5
209:6,18
210:14,16,22
211:12,15,19

212:20 214:10
216:6,20 217:2
217:12 220:15
220:18 221:15
224:21,22
225:12 231:2,4
231:5 236:1
237:11,11,13
238:15 239:4
241:11 242:11
242:13 245:20
246:15 247:3
248:18 251:3
251:16
**knowledge**
13:1,7,10 62:8
83:21 84:6
85:12 91:15
95:2 148:5
158:3 241:9,13
**knowledgeable**
85:8
**known** 37:2
**knows** 232:14
232:17

**l**

**labels** 181:10
**labor** 25:1 92:8
125:22
**lack** 66:20
116:19 200:13
**laid** 20:13
203:4
**lanes** 140:6

**language**
252:22 253:4
**large** 45:4
61:10 64:9,12
97:10 182:16
220:2 235:3
246:3,17
**larger** 80:20
114:19
**latest** 14:15
**latitude** 95:3
**law** 18:9 27:10
27:17 31:1
81:4 83:3 84:2
86:16 87:17
88:19 94:17
96:1,7 202:16
202:19 204:12
205:5 213:19
214:3,8,16,20
215:19 216:2,7
222:3 255:11
**lawfully** 47:4
**lawsuit** 11:17
49:21 122:18
122:21 123:2
123:10
**lawyers** 17:19
**lay** 78:10
**layer** 136:14
146:9
**layers** 131:9
**leadership**
19:11 240:16

Page 28

**[leading - look]**

**leading** 113:12
140:7,7
**leaning** 146:21
**learn** 48:19
50:8 80:21
**learned** 38:2
245:14
**learning** 85:17
101:9,9
**leeway** 85:21
**left** 25:16,17
177:3
**legal** 1:21 3:19
20:5 21:8,11
25:7 26:11,12
33:11 42:16
43:7,14,16,18
43:21 44:4
49:12,15 50:11
56:18 63:3
107:20 108:8
108:10 212:5
213:9 218:9
260:19 262:18
**legally** 17:13
**legitimately**
186:9 188:14
**length** 171:13
172:7 188:1
**letter** 3:7,19
14:21 15:2
22:3,14 53:22
81:18 99:1
103:3 110:10
138:14 170:20

184:17 197:4,7
200:19 202:22
218:8 230:2
249:22 253:4
**letters** 195:10
252:22
**letting** 101:2
**level** 40:16,21
41:2 42:8,13
43:4 49:14,20
51:17 133:3
134:13,15
139:11 142:1
142:11 146:15
198:18 215:9
215:10,16
220:14
**levels** 132:2
134:9,13 135:3
**liaison** 39:8,20
247:9
**liaisons** 39:17
**lifting** 132:16
**light** 253:10
**likelihood** 88:8
**likely** 143:9
144:9 146:17
254:17
**limit** 195:1
**limitation**
79:18
**limited** 90:8
188:6 194:21
**limits** 21:11
118:17 125:13

**line** 10:18 76:4
127:12 135:7,7
137:6,7,7
141:5,5 142:4
142:5 144:2,2
165:10 168:1
176:8,8,9
191:22 197:10
197:10 199:12
199:12 202:15
240:19 242:12
261:4,7,10,13
261:16
**list** 55:14
116:17 225:11
**listing** 175:15
**litigants** 245:19
**litigate** 15:18
18:9
**litigating** 19:17
**litigation**
117:15 134:18
**little** 15:1 26:21
28:5 44:1
48:19 50:13,14
53:6 82:21
93:7 100:17
114:14 125:6
125:20 140:11
150:19 176:15
179:18 185:18
202:2 217:15
218:16 223:22
224:1

**lives** 17:14
**llp** 2:3 6:7
**load** 227:15
230:15 233:1
**loaned** 114:10
**localized**
121:14
**locate** 62:13
80:17 120:3
**located** 59:20
61:1 72:5,7,13
73:7 74:7,16
231:19,21
**location** 1:14
5:17 56:4 64:6
233:16,19
**locations** 64:17
70:2 120:18
121:3
**lodge** 46:3
**log** 97:21 98:4
221:13 222:11
233:4
**long** 9:22 10:3
67:10 111:16
125:21 128:5
128:10 129:22
207:13
**longer** 59:8
90:5,13 125:11
171:17,17
173:19 184:6
**look** 21:21 23:7
31:4,11,12
41:22 95:13

**[look - management]**

101:12,20
113:8,10
118:16 148:6
150:22 160:15
164:11 170:2,6
175:17 178:16
180:19 191:5
191:18 192:4
200:18 204:3
204:19 222:15
240:19
**looked**   163:20
164:11,22
177:21
**looking**   13:21
99:3 101:10
118:14 127:6
131:19 142:8
143:8 149:3
163:19 165:6,6
166:2 167:10
178:4,9,14
187:10 192:16
197:14 208:2
227:11 239:7
240:15 247:7
254:8
**looks**   155:18
159:18 181:15
191:20 197:6
**losing**   164:4
**loss**   130:7
**lot**   25:10 36:20
80:22 91:20
98:9 130:20,20

130:21 132:10
133:11 157:17
160:11 175:2
178:20,21
213:19 245:14
246:8,22 247:2
249:21 250:4
253:17
**louisiana**   2:10
**low**   188:3
**lower**   178:20
**lumped**   179:13
**luncheon**
149:14

**m**

**m**   1:17 258:2
258:18
**made**   12:18,21
13:2 16:4,22
19:14 61:2
75:21 92:16
93:15 103:9,10
115:18 146:1
147:6,6 155:10
161:3 170:18
193:6 203:3
208:3 210:5,13
212:8 226:22
247:22 252:21
253:5 254:3,7
259:5
**magistrate**
46:14
**mail**   72:10,11
73:22 84:5

99:20 101:6
103:21 124:12
124:13 212:17
219:2,6,11
222:13 223:11
229:8 230:7
231:18 234:7,9
234:11,20
**mailing**   72:19
**mails**   99:13,16
195:10 212:18
219:18 220:5
220:12 228:22
229:2,14,17,21
230:9,14,19
231:3,9,18
232:9 233:1
234:16 235:6
235:11,19
236:2,10 237:3
**main**   2:4
**mainstream**
20:3
**maintain**   90:11
97:10 102:22
103:5
**maintained**
83:5
**major**   235:12
**majority**   26:10
61:14 132:4
188:21 190:4,6
190:10,11
224:13 254:10

**make**   35:4
45:18 49:1
51:14 56:21
76:3 80:22
93:21 104:13
104:17 123:7
137:21 138:12
141:18 142:13
142:19 149:9
164:3 168:8
169:5 183:6
185:17 201:1
203:12 206:16
210:17 244:21
252:9 254:21
**makes**   57:2
60:14 117:7
163:4 168:17
204:2 233:9
244:20
**making**   95:5
132:8,13 133:5
133:6,13
136:15 140:15
144:4 163:7
198:20 254:5
255:4
**manageable**
111:9
**management**
21:16 67:15,19
105:19 119:8
131:20 136:8
140:5 152:9
169:1 174:9

**[management - member]**

205:1,7 227:16
230:15 232:10
238:9
**manager** 40:7
131:14 132:5
132:12,17,19
133:7,18,22
134:4,5,10
135:6,11,16,19
136:5 137:13
137:16,18
139:3,7,10,21
141:4 142:17
**manager's**
136:19 137:4
138:12,19
139:8 141:1,2
**managers**
129:13 132:7
136:9 140:21
140:22
**manner** 198:14
253:5
**manual** 114:21
114:22 115:2,5
115:14 116:7
121:15 175:12
187:9 238:7,7
**manuals** 115:6
115:9
**march** 24:4
251:8,15
253:10
**margin** 21:9

**marijuana**
142:21
**mark** 198:13
**marked** 13:19
14:1,2 30:8
44:21 46:2
53:9 102:3
112:15 126:10
151:4 180:10
190:19 207:19
208:14 218:3
226:13,18
239:2 250:19
**marker** 94:17
94:19
**marking** 12:13
**material** 20:7
62:16,17 63:13
66:3,13 69:4
76:11 77:18
83:11 91:18
92:4 106:8
107:6 184:6
233:8 254:9
**materials** 37:8
72:16
**matter** 5:12
15:9,19 16:12
62:12 65:22
66:11 71:18
81:18 95:18
134:18 213:13
231:14 232:21
262:16

**matters** 16:9
20:2 36:22
98:8,12 215:14
227:21
**matthew** 2:3
4:12 6:6 12:5
13:3 45:13
174:12
**max** 199:17
**maximal**
199:17
**mean** 11:3 40:5
41:12 49:12
52:11 57:18
59:17 66:3
70:16 84:17,19
84:21 85:10,20
88:11 95:3
105:15 123:12
123:18 136:6
140:22 152:17
153:5,16 155:5
156:19 157:20
158:1,20 165:3
165:7 182:7
187:3 188:17
196:20 198:5
202:18 205:16
206:5 225:9
229:6 231:22
235:1,16 237:9
247:13 255:9
**meaning** 36:10
43:18 57:9
63:6 74:7

129:17 153:8
162:3 196:18
197:16
**means** 73:18
121:13 135:19
153:6,17 154:4
154:11,12,19
155:16 156:20
157:1,10,21
158:6,21,22
159:19 161:1
161:20 175:14
213:18
**measure** 19:16
**mechanism**
100:4
**media** 5:10
89:22 175:5
203:16 257:3
**medical** 213:3
213:17
**meet** 52:2
143:11 146:22
162:21 163:15
190:2 203:16
**meeting** 3:13
19:9 204:11
227:3
**meetings** 16:12
37:14 122:8
128:8 130:15
**melanie** 217:7
**member** 86:11
102:21 115:18
135:1 138:6

**[member - name]**

142:16
**members** 25:12
115:10 188:11
188:18 227:14
**memo** 3:17
20:13 54:1
62:15 98:22
107:5 199:6
211:10,16
217:3 230:1,2
251:6,21 252:2
252:5,7,9,12,15
252:18 253:11
**memorandum**
3:16
**memorized**
238:15
**mentioned** 81:8
81:9 117:11
125:10 141:12
221:3
**merit** 20:6
**merits** 15:16
18:17
**merrick** 1:6
5:13 251:7
259:1 260:3
261:1 262:6
**met** 52:7
162:21 237:19
248:9
**microcosmic**
19:1
**microphones**
5:5

**middle** 21:16
**milgram** 15:6,7
34:1,12,16
**mill** 134:22
**miller** 1:10
5:11 6:9,21 7:4
17:1 23:20
32:15 36:10,15
46:19 48:4,10
50:2,15 53:2
75:3,21 112:9
113:4 150:6,13
226:11 255:22
257:2,6 259:2
259:4,12 260:4
261:2,22 262:2
**mind** 197:12
**mindful** 79:17
**mine** 124:2
**minor** 100:16
132:18
**minus** 21:9
**minute** 166:1
197:21 207:7
**minutes** 73:2
111:19 127:13
127:15 128:12
129:9,11,16,19
130:8,18,20,20
131:3 199:1,11
199:20
**misdirect**
183:12
**missing** 204:16

**misstate** 244:11
**mistake** 140:17
155:10
**misunderstan...**
205:22
**misunderstood**
43:19
**module** 219:7
**moment** 9:1
20:17 23:2
53:12 58:4
119:16 145:7
158:10 208:5
225:10 227:12
227:19
**money** 15:20
66:16 130:21
193:13,18
200:3
**monitor** 33:9
**month** 59:3
89:2 138:9
171:19 237:2
**months** 12:21
19:9 87:18
**morning** 5:2
7:4,5
**morrissette**
72:17
**motion** 46:12
**mouse** 166:10
**move** 45:21
103:15 124:3
157:3,11
161:11 166:3

190:15 238:4,4
238:21 246:17
254:1
**moved** 164:4
165:9
**moves** 109:2
131:14
**moving** 167:3
191:22
**multi** 105:2
**multiple** 20:3
54:17 131:9
182:21 183:1
237:2
**multiply**
130:21
**multitrack**
172:4
**museum** 68:1,2
**musing** 255:3
**mute** 5:7
**mystifying**
21:20
**mzorn** 2:5

**n**

**n** 2:1 3:1,1 4:1
4:1 5:1 150:1,1
150:1 161:1
**name** 5:20
26:16 36:1,5
41:10 67:8
194:1 214:11
216:16 217:6
252:16

**[named - nutshell]**

**named**   36:15
44:11
**names**   143:4,22
144:5,10 145:6
208:4 209:19
210:2,4,12,18
210:22,22
211:2,12 213:2
213:13,21
214:6 215:11
215:15 237:12
**narrow**   186:15
187:8
**narrowed**
187:14
**narrowing**
246:13,19
**national**   64:5
221:16
**native**   151:1
**nature**   239:12
**necessarily**
75:10 87:2
102:8,10
119:21 120:1
134:12 253:4
**necessary**
21:17 34:6
51:15 74:11
189:16 203:15
259:6
**need**   10:14,19
22:11,12 59:13
66:17,18 68:17
73:10 75:6

90:20 91:1
93:1 94:3
95:16 96:21
98:17 106:2,9
109:20 112:13
118:5 120:13
127:22 133:6
140:3 142:3
145:2,3,5
156:13 162:18
175:11 185:9
185:20 195:12
195:15 196:1
201:20 212:20
240:17 242:11
250:5
**needed**   54:14
54:16
**needs**   93:12
95:12 140:17
147:18 162:22
193:1 199:16
216:16 228:2,5
**negotiate**   17:9
247:5
**neither**   258:10
**never**   9:1 68:2
198:2 241:4
**new**   97:9
227:14,14
249:11
**news**   20:3
89:22
**nice**   228:7

**nodding**   11:20
91:11 120:19
175:1
**noise**   185:17
**non**   20:1,5 90:1
175:6 201:7
203:6 223:10
**noncommercial**
174:22
**nonprofit**   90:1
**normal**   222:21
**normally**   45:7
**northern**   72:22
73:1
**notarize**   260:11
**notary**   1:17
258:1,19
259:13,19
**note**   5:4 206:11
260:9 262:11
**noted**   161:16
259:7
**notes**   3:20 4:4,5
95:21 126:21
127:3 170:22
171:3,4 191:3
204:11 205:17
207:22
**notice**   3:9 8:14
8:17,20,22
46:17 53:7
55:1 84:9
101:19 220:20
**notice.pdf**   54:3

**noticed**   82:1
84:7 95:20
128:2 171:7
173:15,22
174:19
**noticing**   6:5
**notified**   230:12
**notify**   220:18
233:3
**notion**   19:2
20:11 197:22
**nowadays**
188:5 194:19
**number**   3:6,12
4:3 13:18 46:1
53:8 64:12
81:9 97:10
112:14 113:9
113:16 126:9
127:18,19
146:11 151:3
152:22 153:1
159:20 165:15
165:20 168:3
177:1 178:13
180:9 188:1
190:18 207:18
218:2 219:13
224:21 226:17
239:1 250:13
250:18 255:2
257:2
**numbers**   188:3
**nutshell**   120:22

**[nw - oftentimes]**

**nw**   1:21

**o**

**o**   3:1 4:1 5:1
  30:6 150:1,1,1
**oath**   77:14
**object**   7:21
  44:22 107:19
**objection**   42:15
  42:21 46:4
  63:2 71:10
  78:6 93:2
  101:21 145:12
  212:4 213:8
  235:14 236:5
**objections**   6:1
  6:8
**objective**   49:4
**obnoxious**   15:2
**obtain**   62:8
  202:13 223:7
**obtaining**
  73:15
**obviously**
  46:20 47:5
  123:9 132:9
  152:8 162:20
  215:13
**occasion**
  170:11
**occur**   41:19
  92:9
**occurred**   46:14
  197:19
**october**   24:16

**offer**   12:18,21
  13:3,6 14:15
  15:18 16:5,10
  16:14,20 18:22
  19:7,14,15
  22:5,9,19 23:6
  38:20 39:1
**offered**   16:10
**office**   1:14 5:18
  6:12 25:1,2
  26:10,21 27:15
  27:18,22 28:8
  28:11 29:4,8
  35:14 36:4,18
  36:19,20 37:1
  39:8,9,13 43:6
  43:13,14,16,18
  43:21 44:4
  46:18,22 47:5
  55:22 56:4,6
  56:11,14,15
  57:9,15,18,19
  57:20,22 58:11
  59:10,12,20,21
  60:15 61:2,9
  62:5 63:6,20
  64:17 65:3,8
  65:13,18 66:3
  66:16 68:19
  69:19 70:8,18
  70:22 71:2,18
  71:20 72:6,15
  76:11 77:2,9
  77:17,22 78:1
  78:4,18,19,20

  80:10,14 83:2
  83:9,11,14,17
  83:20 84:2
  89:9,10,12,14
  91:21 92:2,22
  94:17 95:12
  96:7,13,14
  97:13 98:2,17
  98:20 99:4,5,8
  99:18 103:17
  104:3 107:5
  109:1 114:12
  114:14 119:3,3
  120:3 121:2
  123:14 127:16
  128:18 131:12
  148:17 152:15
  152:18 156:21
  159:5 160:7
  168:3 171:2
  178:19 189:12
  189:20 208:19
  217:4 223:2,20
  227:21 230:3
  231:15,21
  232:5 233:22
  234:1 237:2,22
  243:6 244:1,8
  244:22 246:6
  248:8 249:6
  254:20 255:11
**office's**   100:13
**officer**   3:15,17
  6:10 23:21
  24:3 29:16

  31:14,18 32:9
  32:14,20 33:4
  33:11,19 35:10
  35:14,17 36:1
  36:5,9,11,12
  38:17,22 40:15
  42:6,9 43:1
  51:7,14 52:4
  53:22 67:3
  122:4 182:2
  217:13 239:9
  240:18 241:1
  241:17,21
  247:18 248:8
  258:2
**officer's**   262:12
**officers**   37:17
  214:4 254:14
**offices**   57:12,13
  60:2 61:16
  62:13 64:21
  66:5 68:21,22
  69:21 72:4
  77:19 80:2,3
  86:6 120:14,15
  121:10,10
  230:11 239:18
**official**   40:3,9
  40:11 42:6
  51:16 240:21
**officials**   16:8
  220:15
**oftentimes**   60:5
  97:12 132:7

**[oh - open]**

| | | | |
|---|---|---|---|
| **oh**   28:14 45:14 | 44:10,13,18 | 146:6,19 147:1 | 219:13 222:15 |
| 53:15 116:6 | 45:16,17,19,20 | 147:1 151:8,11 | 223:22 224:9 |
| 123:12 130:2 | 46:16 48:15 | 151:12,16 | 225:7,14,21 |
| 155:8,9 170:3 | 50:5,20 51:6 | 152:11,21 | 226:3,19 |
| 192:5 210:20 | 52:10,16 53:12 | 153:13 154:2,7 | 227:22 229:1 |
| **oil**   21:3 | 54:7,13,22 | 154:15,22 | 229:12 231:7 |
| **oip**   37:2,13,14 | 55:13 57:5 | 155:22 156:8 | 236:8,20 |
| 39:12 58:11 | 64:15 65:17 | 156:12,15,22 | 237:19 238:3,3 |
| 77:15 108:1 | 66:22 68:4 | 157:16 158:1 | 238:10,20 |
| 122:11,21 | 70:11,20 71:4 | 158:16 159:7 | 239:6,11,21 |
| 123:1 124:6 | 71:8,12 73:8 | 160:4,13 161:6 | 240:6,15 |
| 211:11,15 | 74:1 77:7 | 161:9,13,20 | 241:15 242:10 |
| 243:7,10,13,16 | 79:14,22 84:7 | 162:9,15 163:4 | 243:5 244:6 |
| 244:16 248:17 | 85:4 86:2 88:5 | 163:7,16 165:5 | 247:7,12 249:2 |
| **oip's**   76:20 | 88:18 89:21 | 165:9 166:11 | 250:15 253:7 |
| **ojp**   178:18 | 90:6 92:19 | 167:3 169:9,11 | **olc**   4:12 44:7,11 |
| **okay**   8:13 9:4 | 97:1,2,16 | 170:22 171:20 | 44:19,20 45:11 |
| 9:22 10:3,7,14 | 98:14 101:3,7 | 174:6 176:1,2 | 47:7,17,17,17 |
| 11:5,7,11,15 | 101:10 102:13 | 176:18 179:19 | **old**   119:2 |
| 12:21 13:15 | 104:14 107:13 | 180:22 181:9 | **omitted**   100:19 |
| 14:3,4,22 | 109:20 110:4 | 181:21 185:7,8 | **once**   109:1 |
| 20:19 23:3 | 111:20,22 | 185:12,19 | 125:19 162:7 |
| 24:5 25:8,14 | 113:18 114:6 | 186:4,18 | 184:15 192:14 |
| 26:11 27:11,13 | 115:1,4,7,9,13 | 188:14 189:5,8 | 230:10,12 |
| 28:10 29:2,9 | 116:9,11 117:2 | 190:5,13,20,20 | 233:2 |
| 29:20 30:10 | 117:6 118:10 | 191:2 192:8 | **one's**   73:19 |
| 31:10 32:7 | 118:14,22 | 193:17,22 | **ones**   109:10 |
| 33:1,21 34:15 | 119:6,9,21 | 194:4 195:19 | 232:22 249:5 |
| 34:19 36:8,14 | 121:8,20 | 197:2 199:4 | 250:7 |
| 36:21 37:19 | 122:20 123:1 | 203:1,2,18 | **online**   117:13 |
| 38:16,20 39:3 | 124:3,16 125:5 | 204:2,3 206:17 | 255:6,14 |
| 39:15 40:3,13 | 126:4,7 127:6 | 206:20 207:6,9 | **open**   35:4 |
| 40:18 41:1,5 | 127:11 128:16 | 207:16 215:17 | 91:15 125:9 |
| 41:10,16 42:20 | 129:5,9,20 | 216:6 217:8,15 | 157:22 158:2,7 |
| 43:6,16 44:7 | 131:9,19 145:4 | 217:21 218:8 | 159:17,18 |

**[open - pages]**

165:3,4 167:7
167:8,13,19
176:18 178:7
178:10 179:15
180:13,14
181:4 246:15
**opened** 167:4
**operate** 62:7
80:17 232:2
**operating**
128:14 129:6
220:10 221:4
246:16
**operation**
46:18 55:22
80:19 242:18
243:3
**operations**
41:14 80:4
248:6
**opinion** 43:7
44:8,11,19
45:12 47:17
117:5 249:7
**opioid** 17:15
**opioids** 21:6,20
**opportunity**
16:7 145:16
256:10,17
**order** 46:12
54:10 86:15
90:11 162:21
191:9
**ordered** 16:6

**orders** 255:14
**organizations**
20:3
**original** 262:13
**outcome** 16:12
258:16
**outdated** 17:5
**outline** 70:21
**outreach** 247:2
**outs** 80:21
**outside** 57:9
63:6 68:18
71:2,18,20
72:13 74:12
77:1,9,17
83:19 101:6
103:17 104:3
109:1 114:10
114:10 117:3
120:3 175:8
189:20 223:19
241:8 254:9,22
**overall** 15:13
25:1 29:18
246:1
**overcharged**
200:2
**overestimated**
200:3
**oversee** 29:17
56:16
**overview** 38:11
**owe** 200:3
**owed** 256:4

**own** 57:15
61:16,20,21
62:5 63:7
68:19 77:17
79:2,3 99:16
100:10 103:17
104:3 107:6
109:1 118:8
120:3 220:12
224:14 230:15
244:19
**owner** 206:14
220:11
**owners** 61:16
69:3 83:9
**ownership** 62:1
**owns** 63:13
238:8

**p**

**p** 2:1,1 5:1
**p.m.** 149:12,13
150:2,4 180:2
180:3,3,5
195:21 219:11
226:7,8,8,10
257:1,5
**pa** 119:10,10
**pad** 166:9
**page** 3:2,6 4:3
20:20 30:12,15
31:10,11,22
55:5,7,9,11,13
105:15 113:10
114:7 126:16
127:6,13,15

128:11,11
129:17,17,19
129:22 130:3
133:4 140:16
140:16 142:4,4
167:10 168:19
172:10,14,17
174:13 191:8
194:2,6 195:15
195:16,17
196:12 197:21
198:1,6 199:3
199:5,6,19,20
218:17,18,20
219:1,15
222:13 239:7
239:12 240:15
245:11 247:7
247:10,13
261:4,7,10,13
261:16
**pages** 59:5,6
105:22 106:5
111:3 127:7
130:21 138:2,9
146:12 148:2
159:20,21
168:7,14,20,21
169:13,18
171:9 183:4,8
184:5 186:12
186:17 187:5
187:17 188:1
189:12 197:15
198:6 199:7,9

**[pages - personally]**

200:12 260:12
262:8,9
**paid**   147:19
191:19 192:14
193:14 199:16
200:9
**pain**   21:5,5
**palliative**
202:10
**paper**   60:1,5
97:14
**paragraph**
16:18,20 18:1
18:13 19:7
219:16 222:16
242:13 247:16
249:4
**paragraphs**
16:15
**pardon**   101:15
**parenthesis**
228:2
**part**   13:11
26:20 27:15
28:1,8,10
50:10 61:21,22
68:11 69:1
70:9 72:4,14
74:8 94:14,14
94:22 116:16
119:3 120:14
120:17 130:6
134:2 138:1
184:9 191:6
206:7,9 227:13

232:6 235:3,4
240:9 256:12
**partially**   10:9
**participate**
37:12
**particular**
58:16 105:18
117:2 143:7
144:4 153:2
168:22 172:18
203:8,14
204:20 205:11
221:22 230:8
235:10 256:3
**particularly**
190:3 247:1
**particulars**
238:14
**parties**   5:9
13:12 22:22
143:20 148:10
258:12,15
**parts**   72:7
106:17 252:9
**party**   20:7 92:6
143:4 144:5
238:10,19
254:6
**pass**   255:17
**passed**   192:14
**password**
112:18
**past**   14:18
81:11 100:16
194:11

**patently**   15:12
**patience**   180:7
**patients**   17:10
202:13
**patrick**   252:16
**pattern**   11:16
12:7
**paul**   44:11
**pause**   33:22
**pausing**   119:16
**pay**   109:20
193:15,17
199:22 256:5
**payment**   193:1
193:20
**payment's**
193:6
**pdf**   227:22
**pending**   85:20
217:22
**people**   25:8
80:15 131:4
137:11 140:7
188:14,15,20
237:20
**percent**   21:7
131:21 132:19
133:21 134:4
135:16,20
136:21 139:3,7
139:12,16,22
168:11 177:8
177:10,17
178:11,13,17
178:19 181:22

250:14
**percentage**
58:4,8 102:2
177:4,5 179:11
181:22 185:2
186:6 230:18
230:20 235:17
**perfected**
156:22 157:8
157:11,19
162:2,7 167:4
**perform**   223:3
**performance**
33:13 35:2
**performing**
216:7,18
**performs**   46:21
**period**   178:7
179:16
**permission**
114:12 219:19
220:21 221:2
**permit**   182:21
**person**   10:7
44:11 70:22
138:8 146:15
184:3 215:3
**person's**
216:16 217:6
**personal**   8:3
85:11 95:2
144:14 210:21
213:5 215:1,4
**personally**
74:22 93:20

**[personally - practice]**

144:7
**personnel** 34:5
41:4 64:1,3
66:20 211:2
213:2,15,17
**perspective**
47:22
**petition** 143:15
144:16 145:10
**petitions**
142:22 143:19
143:20
**pharmacologist**
214:9 216:7
**phone** 206:14
210:13 247:3
**phones** 5:7
**phrase** 93:7
**physical** 64:16
70:2 72:20
**physically**
59:11 63:20
64:7 68:18
70:12 71:19
72:5,13 73:19
74:7 77:1
**pick** 5:5 206:13
**picked** 210:12
**picking** 73:20
247:3
**picture** 179:7
**pivot** 176:20
177:11 181:5
**place** 5:8 67:2
75:17,19 94:3

128:11 129:18
129:18 133:9
136:18 137:20
197:18 198:9
199:8 225:6
**placed** 105:14
198:22 233:8
**placing** 109:7
130:3,5 132:22
**plaintiff** 5:12
**plaintiffs** 1:4
2:2 3:3,9 6:7
7:2 12:4,5
150:10 202:1
**plans** 248:11
**platform** 255:6
**please** 5:4,6 6:2
6:18 7:18
10:15 42:4
48:16,21 53:12
262:7,11
**pllc** 1:3 5:13
259:1 260:3
261:1 262:6
**plus** 21:9 76:12
121:11
**pockets** 17:8
**pods** 64:19
**point** 10:15
15:11,16,22
16:3 17:21
23:9 24:6
39:15 46:15
48:11 94:2
108:9 111:21

146:7 148:11
161:4 191:17
192:12 230:3
255:2
**points** 254:4
**policies** 15:12
34:5 47:6
116:22 117:12
224:22 225:1,4
225:7,17 240:1
240:3
**policy** 3:12
12:13 16:9
36:4,18 37:2
39:9,13 58:12
77:4 78:19
79:7,8,15,19,19
79:20 114:2,2
114:4,20 118:9
118:11,12,20
118:21 120:9
121:13,14,15
121:15,21,22
123:14,17
211:4,6 212:8
212:12,16
213:13 215:7
216:11,13,13
216:20 217:2,5
219:17 220:4,7
220:21 224:3,4
224:10,12,18
240:8 244:9,9
244:22

**political** 40:18
**polk** 25:15
**populate** 152:8
**portion** 115:14
**position** 24:19
46:9 49:13,15
49:16 77:8,13
77:16 201:11
202:7 213:1
231:13 249:13
249:13
**positions**
249:11
**positive** 21:12
**possession**
57:10
**possibility**
246:13
**possible** 103:4
231:22 246:14
**possibly** 19:3
**post** 60:21
**posted** 60:19
86:16 116:22
**potentially**
99:17 100:1
127:8 179:18
186:22 201:9
**pr** 158:13,17,20
158:21
**practice** 11:17
12:7,13 107:22
130:17 193:17
198:2 215:15
220:11

Veritext Legal Solutions
346-293-7000

[practices - processes]

**practices** 15:12 34:4 47:6 225:18
**pre** 54:9 196:9 196:12,19
**precise** 165:18 170:5
**precisely** 138:15
**precludes** 81:4
**predicated** 197:22
**predominant** 235:4
**predominantly** 201:2
**preference** 100:7
**prepare** 9:4,6,7 9:15 35:13 84:21
**prepared** 8:19 9:11,20 23:1 48:14 55:18,18 85:17
**preparing** 7:8 262:13
**presence** 241:8
**present** 2:13 6:3 19:11
**presentation** 94:1
**presentations** 208:8

**presented** 203:21
**presenting** 21:21
**presents** 20:2 58:1
**presumably** 117:7 164:21
**prevent** 10:22 11:8
**previous** 177:21
**previously** 60:10,16 63:17 63:19 65:11 81:9 150:8 253:5
**primarily** 36:3 36:17 68:16 69:4
**primary** 39:7 116:20
**principles** 20:12 252:2,14
**prior** 43:2 51:10 87:22 178:2 179:14 224:9 256:5
**priorities** 116:17
**prioritize** 105:8
**prioritized** 163:17
**priority** 251:13

**privacy** 3:12 29:19 56:21 114:1 119:11 144:15 158:21 210:6,21 213:5 214:1 215:1,5 215:11
**private** 5:6
**privilege** 27:2 122:3 196:4 221:13 222:3 222:11
**privileged** 124:8,15,21
**pro** 17:12
**probably** 41:12 88:12 94:19 107:20 159:19 167:16 231:4 255:7
**problems** 19:1
**procedures** 128:15 220:10 221:4 228:2 248:1 250:12
**proceed** 6:19
**proceeding** 6:2 82:9 87:14,22 91:9,19 92:13 94:8 147:15 148:13 173:18 205:2 206:4 255:5,5
**proceedings** 83:15,17,22

84:10,20 86:5 91:14 92:13 97:5
**process** 17:6 20:11 26:8 37:11 59:3 61:18 74:6,11 75:14,15 85:8 91:1 92:9 94:7 94:15,22 101:5 103:13 106:17 107:8 111:11 127:22 128:19 129:17 131:13 134:21 136:10 137:12 138:7 142:8,15,16 146:9 147:7 153:22 168:16 171:14,17,19 172:8 184:6 186:11 188:2 192:18 196:4,8 196:13 197:16 200:10 203:19 205:6 225:13 233:2,21 234:2 238:17 239:19 250:12 255:1
**processed** 74:13 132:14 163:22 173:19 222:21
**processes** 18:5 18:9 20:10

**[processes - public]**

78:12 164:15
249:1 253:13
**processing**   25:6
25:20 26:1
56:4,6,15,18
69:19 105:2
106:10 109:4
115:15 121:2
132:4,21
133:12 134:14
135:2,12
140:10 141:2,8
168:10 169:19
170:22 171:3,4
172:5 176:16
188:15 195:2,3
204:21 205:10
206:18 207:14
225:2,8 228:17
230:16 239:13
248:6 256:6
**processor**
132:11 137:12
**produce**   59:7
88:12 90:10
104:16,18
106:14 110:8
110:22 111:5
117:10 188:5
189:6 234:13
234:20 235:11
**produced**   9:13
78:22 102:6
113:19 126:17
129:1 150:18

175:13 179:3
180:17 184:21
198:11 208:12
209:11 221:5
221:13 222:11
224:21 225:1,3
225:5,5 227:1
227:22 228:13
228:18 234:17
**produces**
199:15
**producing**
109:17 110:17
229:19 236:10
**product**   21:3,4
21:7,11,19
**production**
15:9 16:7
18:16 91:8
108:17,19
119:22 120:1
183:18 185:5
214:19 236:14
**productive**
18:19 50:16
**products**   21:15
**professional**
131:17
**profile**   134:17
**profit**   90:16
200:21 202:11
202:15
**program**
247:21 248:14

**programs**
178:19
**prohibits**
154:20,20
**promote**   252:2
**prompt**   262:15
**prompted**
112:18
**prong**   68:16
69:5 190:3
**prongs**   68:15
69:6
**pronounce**
194:1
**proper**   20:1
46:10 47:2,18
132:15 136:15
203:13 242:14
242:22
**properly**   49:11
132:14 133:14
136:16 141:19
**property**   114:8
**proportion**
102:2
**proposal**   67:18
**protect**   141:21
210:6 213:20
214:6,11
215:11
**protected**
130:4 137:10
141:19
**protecting**
211:12

**protective**
46:12
**protects**   144:14
210:21
**provide**   45:1
61:17 62:16
66:12,13 69:4
72:15 83:11
106:9 203:15
**provided**   18:9
92:2 160:2
201:15
**provides**   160:5
182:20
**providing**
38:10 85:3
227:20
**provision**
119:18 126:1
243:2
**provisions**
242:16
**proxy**   58:21
102:10
**psilocybin**   96:6
202:13 204:9
205:20
**psychedelic**
205:20
**public**   18:11,12
20:2 38:5
39:16,20 61:2
61:15 86:8,11
86:12,17 91:14
91:16,18 92:13

**[public - reached]**

92:19,19 93:13
95:14 96:17
102:21 105:17
115:19,22
116:9,15 117:8
117:10 132:6
133:15 140:19
142:2 143:14
143:15,19
144:16 145:10
147:6,6,8,9
148:12 215:9
247:9 258:1,19
259:19
**publication**
251:21
**publicly** 21:2
60:20 93:15
94:1,8,11,21
95:18 145:19
146:2 148:5,18
210:1,5 211:19
211:21 255:12
**publish** 117:12
134:16
**published**
116:3,7,18
118:13
**pull** 13:16 30:1
50:20 53:5
66:3 97:13
100:10 102:5
107:15 112:11
126:8 175:11
212:21 232:9

233:4 235:19
**pulled** 182:7
226:16
**purely** 207:12
**purpose** 46:7
46:11 48:1
49:21 50:7
114:16 133:20
136:3,4
**purposes** 38:6
214:17 234:13
**pushed** 138:10
**pushers** 17:14
**pustay** 217:7
**put** 19:12 39:6
53:7,16 59:1
70:3,22 94:17
128:17 150:15
169:19 179:16
182:6 190:17
191:14 199:1
205:7 211:11
225:12 228:3,5
228:5,7 238:13
**puts** 27:1
**putting** 47:8
130:15

**q**

**qc** 136:18,20
137:5,17 139:8
139:15 140:14
**qualify** 49:16
69:9 122:1
**question** 7:18
7:20,21 28:22

35:20 49:12
61:5 65:21
71:15 75:2
78:8 80:8 81:2
84:11 93:5
95:9 103:7
108:11 134:2
142:7 143:18
145:18 158:8
158:19 164:4
165:18 170:12
201:5 208:5,6
209:17 217:22
220:3 224:16
224:20 227:10
229:2,5 232:1
235:8 245:17
248:13 253:8
**questioning**
10:18 76:4
126:19
**questions** 7:14
22:11 37:9
46:19 48:12
151:18 160:14
226:15 255:18
256:19
**queue** 105:13
105:16 106:1
168:22 172:18
173:9,11
**queues** 105:19
168:3 169:20
172:16 173:2,6

**quick** 204:19
226:15
**quicker** 98:12
168:9 246:21
254:19
**quickly** 20:17
179:20,21
188:5 189:15
208:13 245:12
**quite** 19:3
**quiz** 85:16

**r**

**r** 2:1 5:1 150:1
158:22 261:3,3
**raise** 16:8
49:17 58:4,18
87:2 102:15
117:3 143:2
189:8
**raised** 186:21
**raising** 12:14
102:3
**ranking** 240:21
**rare** 125:11
**rate** 250:10
**rather** 137:16
**raw** 4:7,9,10
150:18 151:22
180:18,20
182:9
**reach** 75:6
98:20 143:12
230:5 246:12
**reached** 123:9
209:3

**[read - recorded]**

| | | | |
|---|---|---|---|
| **read** 14:20 15:2 | **realized** 205:1 | 142:20 143:21 | **reconciling** |
| 15:22 16:15,17 | **really** 24:22 | 147:11 203:8 | 140:18 |
| 17:21 18:13 | 47:18 60:22 | 208:14 | **reconsider** 22:4 |
| 19:5,18 20:14 | 66:11 74:1 | **receipt** 81:17 | 22:9 |
| 20:16 21:22 | 90:8 122:3 | 102:19 | **record** 5:3,9 |
| 22:2,6 32:8,12 | 134:13 137:12 | **receive** 60:4 | 6:5 13:2 20:18 |
| 38:14 39:10,18 | 142:6 147:3 | 81:10 83:22 | 23:10,13,15,18 |
| 42:2,3 43:8,11 | 155:20 159:4 | 107:2 125:15 | 27:21 39:4 |
| 45:9 51:1,3,3,5 | 168:22 171:11 | 138:2 153:10 | 52:18,21 57:16 |
| 51:19 52:5 | 182:13 187:20 | 184:2,15 | 57:21 60:9,9 |
| 56:7 69:12 | 189:1,16 | 235:18 | 61:21 62:6 |
| 114:13 115:1 | 192:10 194:19 | **received** 16:13 | 63:12,16,17 |
| 126:22 129:22 | 194:21 195:8 | 91:22 153:7,11 | 65:7,10 76:6 |
| 181:18 197:17 | 197:1 201:17 | 156:18 157:18 | 77:9 80:4 83:9 |
| 198:1,8 199:11 | 207:11 222:1 | 159:1,3,14 | 87:22 88:9 |
| 212:22 219:20 | 225:9,16 229:6 | 178:2 179:9 | 93:21 112:5,8 |
| 223:12 239:14 | 249:20 252:10 | 181:8 188:19 | 112:17,21 |
| 241:2 242:19 | **reask** 75:2 | 191:14 192:5,8 | 113:2 118:8 |
| 245:20 259:5 | **reason** 10:21 | 205:6 | 126:17 136:15 |
| 260:6,8 | 10:22 13:11 | **recent** 15:8 | 149:3,7,12 |
| **reading** 15:3 | 59:4 60:8 94:2 | **reception** 18:21 | 150:4 176:4 |
| 85:2 130:2,3 | 95:10,11 134:3 | **recess** 23:16 | 179:20 180:2,5 |
| 133:4 206:10 | 134:9 145:5,9 | 52:19 112:6,22 | 183:12 201:22 |
| 206:12,15 | 166:13 189:18 | 149:14 180:3 | 202:7 205:19 |
| **reads** 110:12 | 234:19 235:12 | 226:8 | 206:14 208:11 |
| **ready** 103:14 | 261:6,9,12,15 | **recognize** | 217:18,20 |
| 133:14 134:16 | 261:18 | 113:15 151:19 | 226:1,5,7,10,22 |
| 136:16 138:11 | **reasonably** | 184:16 | 245:12 248:7 |
| 138:13 157:11 | 214:21 | **recognized** | 254:12 255:4 |
| 230:13 | **recalcitrant** | 24:18 | 256:16 257:1 |
| **real** 135:10 | 17:6 | **recollection** | 258:9 |
| 145:8 204:19 | **recalculating** | 146:11 | **record's** 61:1 |
| 224:16 | 192:2 | **recommend** | **recorded** 1:10 |
| **reality** 110:19 | **recall** 82:3,12 | 33:21 | 5:11 |
| 137:6 | 82:13 96:8,10 | | |

Veritext Legal Solutions
346-293-7000

**[recording - related]**

| | | | |
|---|---|---|---|
| **recording** 5:8 | 108:17,21 | **redacted** | **reflection** |
| **recordkeeping** | 109:2,7,17,18 | 132:16 133:14 | 199:21 |
| 84:20 | 109:22 110:11 | 136:16 137:9 | **reflects** 58:8 |
| **records** 38:12 | 110:18 119:8 | 143:5,22 198:2 | **reflexive** 19:2 |
| 57:9,11,15,17 | 119:22 120:2,4 | 213:14 216:17 | **refresh** 54:4,6 |
| 59:3,4 60:6,15 | 120:13 125:18 | 219:6 | 54:14 112:13 |
| 60:18 61:15,17 | 125:19 127:8 | **redacting** | **regard** 212:2 |
| 61:20 62:4,8 | 132:9 138:3 | 219:1 | 252:5,18 |
| 63:7,11 64:21 | 141:13 143:4 | **redaction** | 253:15 |
| 65:2,3 66:5,7 | 147:15,22 | 132:14 138:6 | **regarding** |
| 67:13,15,16,22 | 148:17 154:21 | 141:8 198:9,21 | 38:21 225:2 |
| 67:22 68:18 | 157:15 159:4 | 198:21 | **regardless** |
| 69:3 72:10,11 | 160:2,5,8 | **redactions** 92:6 | 142:10 216:17 |
| 73:15,20,22 | 163:2 168:14 | 109:7 128:11 | **registration** |
| 75:4,7,22 | 171:1 182:17 | 129:18 130:3 | 262:19 |
| 76:22 77:2 | 184:3,4,4,8,14 | 132:13,16 | **regular** 134:22 |
| 78:5 80:11,18 | 184:15,18 | 133:1,5,10 | **regularly** |
| 81:6,7,12,16,18 | 189:21 192:18 | 134:6,11 | 237:17 |
| 82:2,6,7,14,20 | 195:7 200:21 | 135:12 223:5 | **regulation** |
| 83:4,4,6,6,16 | 201:14 202:11 | **reduce** 186:13 | 245:9 |
| 84:3,10 85:6 | 204:8,22 205:5 | 250:9,13 | **regulations** |
| 86:3,4,9,12 | 207:12 208:21 | **reduced** 168:10 | 68:10 76:17,19 |
| 88:5 89:3,8,18 | 212:19 213:19 | 250:11 258:7 | 79:13 126:2 |
| 90:10,17,19,22 | 214:15,20 | **reducing** | 172:3,5 182:21 |
| 91:8,20 92:1,7 | 223:1,4,7 | 253:16 | 240:10,10,11 |
| 93:18 94:11,21 | 229:8 230:12 | **refer** 156:6,10 | 244:17,19 |
| 95:5 97:10,11 | 230:13 233:4,6 | **reference** | 245:5 |
| 97:14,18,19,22 | 234:7,9,11,21 | 222:12 | **reimbursing** |
| 99:10 100:5,5 | 246:20 248:10 | **referenced** | 19:16 |
| 100:6,10,19 | 253:3 254:5,11 | 260:5 262:9 | **relate** 84:18 |
| 102:22 103:5 | 254:15 255:5 | **referral** 158:22 | **related** 20:7 |
| 103:18 104:16 | **redact** 144:9 | **referred** 159:4 | 82:7,8 85:20 |
| 104:18,19 | 145:20 210:8 | **referring** 72:22 | 173:17 206:4 |
| 105:4 106:13 | 210:22 211:3 | 249:4 | 238:18 258:11 |
| 106:14,20 | 215:15 | | |

**[relates - request]**

**relates** 47:5
115:14
**relating** 120:15
204:8
**relationship**
245:22
**relationships**
246:5
**relative** 93:18
258:13
**relatively**
183:10
**releasable** 92:5
109:6 148:3
**release** 60:13
61:19 81:12
132:6 133:14
134:16 136:16
138:13,14
141:16 142:17
144:4,9 145:21
146:17 184:8
210:2,3 254:8
254:19
**released** 94:4
140:18 142:1
157:14 184:19
210:16
**releases** 254:22
**releasing** 93:16
208:3 209:18
**relevant** 222:2
**rely** 57:16
61:16 62:11
66:11 69:3

72:11 77:18
83:8 95:17
100:9 106:9
141:14 220:11
234:9
**remain** 15:17
**remainder**
119:15
**remained** 178:7
179:15
**remains** 19:8
**remedial** 21:13
**remember** 52:9
123:4 255:22
**remotely**
233:11
**removing**
253:16
**reopened**
170:19
**reopening**
170:20
**reorganization**
24:5
**repeat** 65:6
**rephrase** 235:8
**replace** 140:20
**report** 3:15 4:7
4:9 27:8,9,18
28:11 29:2
34:21 35:11
38:10 52:2,7
151:22 177:22
179:7 182:6
239:9

**reported** 1:17
**reporter** 1:17
5:22 6:18
28:17,20,22
**reporting** 35:9
178:7 179:16
**reports** 29:6,9
29:13 35:10,14
35:15 52:4
58:10
**repository**
231:10
**represent** 6:7
8:5,13 14:14
17:7 20:21
44:15 51:22
87:9 176:19
180:16 181:4
208:11 226:21
**representations**
17:12
**representative**
45:3 48:17
**representatives**
175:5
**representing**
5:20 27:20
89:22 123:13
**represents**
235:17
**reproduce**
81:12
**request** 3:20
4:4,5,12 20:1,5
24:14 37:5,9

44:19 45:10,11
46:4 47:13
57:22 58:17
60:5 62:15
63:18 69:19
72:9 74:11
81:11,17 83:22
86:10,13,19
87:1,5 89:12
95:6 98:16
99:1 102:14,20
103:10,14
104:21 107:2,3
108:16 115:17
115:18 117:14
117:18 119:13
119:13,19
121:3 125:16
126:21 127:3,4
137:2 143:7,8
143:10 146:8
147:5,5 148:1
152:21 153:2,7
156:20 157:5
157:10,21
158:2,12,22
159:1,3,11
160:22 161:3
161:15 162:2,3
162:7 163:8,11
163:12,20
165:2,8 166:19
167:1,17,22
168:6 169:7
170:7,8 171:8

**[request - response]**

171:16 174:2
181:7 183:8,13
184:2 187:8,9
187:14,21
188:8,16,22
189:17 191:2
191:14 192:5,9
193:19 200:19
202:4,20,22
204:7,17,20
205:11 207:21
207:22 208:7
209:1 211:18
220:16 222:21
223:9 229:14
229:15,22
230:2 234:21
235:13,19
236:1,4,15,17
246:9,18
249:22 253:17
254:14 256:6
**requested**
57:21 60:10,16
60:18 61:3,15
65:11 104:10
107:6 117:9
142:10 145:5
146:4
**requester**  37:4
61:19 81:19
90:15 103:3,22
109:6 110:10
136:17 157:6
157:15 159:6

162:4,16
163:13 170:2
174:3,17 175:4
184:18 186:15
198:17 200:4
200:17 201:16
201:18 202:21
203:21 245:22
246:21 247:8
253:1 256:5,8
256:14
**requester's**
204:1
**requesters**
90:13,15
125:15 170:4
175:15 200:8
246:9,15 247:4
254:6
**requesting**
51:13
**requestor**
201:19 203:12
**requests**  12:14
15:15 20:11
24:22 46:8
58:4 66:10,14
78:12 79:4
81:10 82:1,2,8
85:19 87:1
91:22 96:6
97:13 98:11
102:3,18 105:5
105:9,12,14
111:1,5 115:14

115:15,21
116:21 136:11
142:15,18,21
154:3 162:17
163:16 164:1
164:15 165:3
165:15 167:12
168:1,8 169:3
169:5,16
170:10,13,13
173:7,12,16,17
173:18,21
174:2,12 177:1
177:4,5,10,17
178:21 179:9
179:14 181:16
182:11 183:9
183:14,17
185:2 187:1
188:19 203:3,7
228:17 229:14
230:18 235:18
236:14 237:4
238:18 239:19
247:6 248:12
250:1
**require**  52:1
92:6 183:18
185:4
**required**  51:17
157:5 179:13
193:21 228:13
232:2 259:13
262:8

**requirement**
52:3,8
**requirements**
203:15
**requires**  88:20
141:22 212:3,7
235:19
**reread**  45:18
**rescheduling**
142:22
**research**  17:13
**researchers**
17:10
**reserve**  46:11
**resistance**  19:2
**resolution**
18:20
**resources**
15:20,21,21
17:1 66:20
110:22 111:15
116:19 188:6
200:13 250:5
**respect**  216:3
240:1 245:18
**respond**  119:10
189:3 234:21
235:13 237:3
**responding**
115:18,21
119:19
**response**  16:13
16:14 96:5
105:16 110:13
120:6 183:12

Page 45

**[response - right]**

192:15
**responsibilities**
29:15,17,20
33:5,15 38:21
40:17 241:20
242:4,5
**responsibility**
33:2 38:17
204:1
**responsible**
243:6,16 244:1
**responsive**
62:16 66:13
72:16 82:2
83:11 92:5
99:10 127:8
206:19 207:3
223:7 230:9
233:4
**responsiveness**
99:5 109:5
223:5
**rest**   196:16
**restarted**
192:13
**restricts**   80:9
80:13
**restructure**
24:15
**restructuring**
249:6
**results**   19:4
**retained**   257:4
**retrieve**   57:17
61:17 83:10

234:8
**retrieving**
233:7 234:11
**return**   260:12
**returned**
262:10
**reverse**   191:9
**review**   34:21
51:13 59:6
60:13 90:3,4
90:14,18 91:3
91:8 92:8,10
93:1,11 94:3
94:15,22 95:12
109:21 110:5
125:14,21
127:13,17
128:1,6,11,20
129:8 131:10
131:15,16,20
132:2,8,17
133:7,8,13,18
133:18,20,22
134:4,10,13,15
134:20 135:2,4
135:16 136:4
136:14,22
137:7,14,17,18
137:19 138:6
138:17 139:7
139:11,17,22
140:1,4,8,16,21
142:1,4,12,17
145:3,16 146:9
146:13,14,16

146:18 147:7
148:14 149:2
168:15 183:18
185:4 192:17
193:1,12,18,19
195:2,4 197:8
197:13,16,17
200:12 201:20
204:22 205:9
205:14 207:13
223:4 229:22
248:9 249:19
256:17
**reviewed**   8:17
9:9,12 51:10
107:3 132:5
134:19 142:10
144:7,22
147:18 164:20
184:21 195:13
196:2 197:10
198:1 199:19
**reviewer**   135:8
137:3,4 141:6
197:6
**reviewer's**
131:22 193:9
**reviewing**   15:8
18:16 103:13
109:4,17
129:17 135:7
138:12 141:4
193:9 196:16
229:19 253:3

**rewritten**
118:12
**right**   11:19
12:2,16,22
13:13 14:8
25:11,11 26:3
26:14,16,19
29:21 30:5,13
34:8 35:19
36:1 37:5
41:22 43:11
46:12 50:18
54:17 55:9
56:20 62:20
64:9,11,13
65:8 66:17,20
67:10 69:13,16
70:12 71:2,9
73:2,5,11,13,21
74:5,9,22 75:4
75:8,11,20,22
76:8,9 78:18
78:21 80:11
81:6 82:20
84:10 88:6,9
90:2 91:10
92:14,20 94:2
94:6,18 95:15
95:16,20 97:19
97:22 98:13
99:4,16 100:1
100:6 101:3
104:7,11
105:10,16
106:14,20

Veritext Legal Solutions
346-293-7000

**[right - saw]**

| | | | |
|---|---|---|---|
| 107:1,7,10 | 191:15 192:3 | 23:8 30:9 | **rounded**   177:9 |
| 108:16,22 | 194:11,15,16 | 31:19,21 32:2 | **routine**   248:6 |
| 109:22 110:2,6 | 195:6 197:19 | 32:4 42:15 | **row**   158:9,12 |
| 110:11,15,16 | 198:4 199:13 | 44:22 46:3 | 160:16,19 |
| 111:13 112:3 | 199:14,16,22 | 47:9,11,19,21 | 163:1 164:5 |
| 113:4 115:22 | 202:4,16 203:6 | 48:5 49:8,10 | 165:22 |
| 116:20 117:4,8 | 204:8 207:7,15 | 52:12,14 53:13 | **rude**   107:11 |
| 117:16,18,22 | 207:16 208:15 | 53:18,20 54:7 | **rule**   20:6 90:12 |
| 118:2,4,7 | 208:22 209:4,8 | 54:12,14 63:2 | 172:12,14 |
| 120:18 132:6 | 209:15 211:9 | 71:10,13 78:6 | 186:19 |
| 132:22 134:7 | 212:1,9,13 | 84:14,17 85:4 | **rulemaking** |
| 134:11 135:6 | 213:6 214:1,4 | 85:10,14,18 | 143:15,20 |
| 135:14 136:11 | 215:10,21 | 93:2 101:8,18 | 144:16 145:10 |
| 136:13,19 | 217:10 219:2 | 107:19 108:7 | **rules**   7:13 |
| 137:5 138:9,22 | 224:11,16 | 112:2,16 124:4 | 18:10 260:14 |
| 140:13 141:10 | 225:6,19 226:4 | 124:12,16,19 | **run**   37:19 41:9 |
| 141:22 143:2 | 227:10 228:9 | 145:12 149:6,9 | 67:22 122:3 |
| 143:15 145:22 | 228:12 233:11 | 151:9,11,13 | 134:22 |
| 147:8 148:3 | 233:12,13,19 | 166:4,6,8,12 | **running**   26:15 |
| 149:4 153:14 | 234:5,13 237:4 | 185:8,12,14,16 | 191:15 |
| 156:2 159:9,15 | 237:15,17,20 | 185:19 212:4 | **runs**   231:17 |
| 162:12 164:12 | 238:1,20 | 213:8 217:17 | **s** |
| 166:16,17 | 239:21 240:8 | 221:12,21 | **s**   2:1 3:1,5 4:1,2 |
| 167:4,5,7,18 | 241:21 242:5 | 222:7,10 226:5 | 5:1 150:1,1,1 |
| 168:1,7 169:14 | 243:8,11,14,19 | 235:14 236:5 | 181:12 261:3 |
| 170:5,6 171:2 | 244:21 245:6 | 255:19,21 | **sa**   21:1,10 |
| 171:9 173:2,10 | 246:7 247:8 | 256:16 | **safety**   18:12 |
| 174:15,18,22 | 249:14 251:19 | **role**   40:14 | **sandra**   29:7 |
| 175:3,15 178:3 | 254:1,11 255:8 | 67:17 249:15 | **sat**   128:9 |
| 178:14 179:8 | 255:11 | **roll**   205:13 | 129:14 |
| 180:6 182:5 | **rodriguez**   2:8 | **rolled**   207:10 | **satisfied**   18:8 |
| 183:11 184:5 | 6:11,11 9:20 | **room**   77:14 | **save**   17:14 |
| 187:5,11,15 | 10:1,10 13:20 | 128:9 | 133:21 136:4 |
| 188:4 189:9,17 | 14:1,3 17:2 | **roughly**   182:2 | **saw**   179:8 |
| 189:21 190:16 | 22:13,16 23:3 | | 182:6 |

[saying - senior]

**saying**  27:22
　70:15 92:11
　94:6 109:12
　110:11 117:17
　134:3 138:16
　139:15 153:22
　176:6 178:11
　231:7 233:14
　233:18 242:22
　243:22 244:7
　244:12
**says**  31:14 39:5
　43:1 47:2
　51:21 55:10
　114:7 118:22
　126:2 160:22
　181:2 195:9
　196:1 224:17
　227:2 241:15
　245:21
**sc**  194:7,8
**scenario**  163:3
**scientific**  175:6
**scope**  44:1 53:6
　186:15 246:13
　246:19
**screen**  167:9
　175:14
**scroll**  31:10
　219:9,10
　223:22
**se**  130:13 195:3
**seal**  20:8 92:17
　148:13

**search**  57:8
　62:15 68:17
　72:13 75:15
　83:2 90:4,5,9
　90:13 98:22
　99:5,20,21
　103:15 106:19
　107:4,5 108:20
　109:21 120:3
　120:13 125:11
　125:12,18
　160:2 189:11
　194:14,17,21
　219:18 220:4
　220:12,18
　223:3 224:4,9
　229:7,17 230:1
　230:7,10,11
　232:22 234:12
　234:20
**searched**
　110:11 234:17
**searches**  82:5
　222:13 224:14
　228:18,19,22
　231:18
**searching**  60:5
　99:16 106:12
　233:6 235:5
　236:10
**second**  15:16
　16:3 25:6
　53:15 56:3
　61:3 113:10
　117:10 120:17

　134:15 152:21
　160:17 191:6,6
　191:7 205:8
　239:11 247:15
**secondarily**
　219:16
**secondary**
　146:13,18
**secretary**  40:21
　41:2 42:7,12
　43:3 49:19
　51:16 188:14
**section**  27:9,10
　27:17 30:16
　33:3,10,14
　34:7 35:3 38:7
　38:10 39:5
　40:6 67:14,19
　67:20 119:8,9
　172:5 194:9
**sections**  27:17
**security**  64:5
**see**  30:4,13
　54:22 55:5,14
　55:15 58:14
　84:9 90:20
　92:4 100:4
　113:8,9,11,13
　151:17 152:14
　153:19,20
　154:2 159:7
　160:14 167:10
　174:8 177:15
　177:19 186:15
　192:4,17,19

　194:6 195:14
　195:15 204:15
　207:16 209:18
　218:10,17,20
　219:2 224:5,6
　224:17,18
　227:4,12 228:1
　238:3 240:16
　242:13,14,14
　247:13 248:19
　250:9
**seeing**  205:3,15
　247:4,5
**seek**  221:1
**seem**  47:1
　145:9
**seemed**  222:1
**seems**  179:4
　235:3,12
**seen**  51:11
　124:13 218:12
　219:5 250:22
**selected**  95:22
**self**  247:21
　248:14
**send**  35:11
　62:14 98:22
　103:21 107:5
　152:7 230:2
**sending**  97:12
**senior**  16:8
　40:3,7,9,10
　41:6 42:6
　146:15

Veritext Legal Solutions
346-293-7000

**[sense - site]**

| | | | |
|---|---|---|---|
| **sense**  60:14 | **services**  39:9 | **shared**  252:7 | 117:14,19,21 |
| 81:1 104:5 | 247:9 | **shaved**  205:12 | 159:11 162:13 |
| 204:2 233:9 | **serving**  46:4,8 | **sheer**  66:9 76:6 | 167:16 168:5,9 |
| 244:20,21 | 47:4 51:6 | **sheet**  155:17 | 168:10,18 |
| **senses**  13:11 | 215:3 | 156:6,11 | 169:20 171:10 |
| **sensitive**  5:5 | **ses**  41:3 211:2,2 | 180:17 181:1,2 | 171:18 172:1,6 |
| 64:4 98:8 | 215:8,16 | 182:9 260:10 | 172:22 176:3,8 |
| 141:13 143:2 | **set**  99:9 100:6 | **sheets**  180:15 | 176:22 177:6 |
| 145:11 213:20 | 105:18 111:7 | **shoot**  53:16 | 177:12,18 |
| 215:14,14,19 | 135:12 145:6 | **short**  183:10 | 178:12,12 |
| 216:2 254:11 | 168:3 173:2,5 | 222:22 223:6 | 179:11 181:12 |
| **sent**  170:19 | 204:6 205:22 | **shortages** | 181:17 182:11 |
| 209:3 | 244:17 252:2 | 253:21 | 183:5,7,9,16 |
| **sentence**  18:6 | **sets**  87:17 | **shorter**  142:19 | 185:3 186:6,21 |
| 20:16 22:2 | **setting**  244:9 | **shortly**  24:19 | 187:1 188:22 |
| 196:3 242:19 | **settle**  12:19 | **shoulders** | 189:1,7,9,14 |
| 247:15 | 13:3 | 255:8 | 208:22 209:2,7 |
| **sentences**  51:12 | **settled**  13:13 | **show**  174:13 | 209:11 222:21 |
| 228:14 | **settlement** | **showing**  179:5 | **simply**  17:12 |
| **separate**  69:18 | 14:15 15:18 | 192:11 | 60:6 102:22 |
| 121:2 169:16 | 16:14 18:22 | **side**  88:20 | 103:2 108:20 |
| 182:5 183:11 | 19:7,14,15,15 | 235:22 | 110:21 111:6 |
| 239:18 | **seven**  127:12 | **sign**  138:14 | 145:21 197:14 |
| **separately** | 127:14 128:12 | 256:18 260:6 | 234:7 |
| 239:19 | 129:9,11,16,19 | 260:11 | **sincere**  16:21 |
| **series**  127:19 | 130:8,17,19 | **signature** | **sincerely** |
| **serious**  17:7 | 131:3 197:21 | 249:16,19 | 262:18 |
| 23:5 | 199:1,10,20 | 253:22 258:17 | **single**  187:4 |
| **servant**  215:4 | 207:7 | 262:9 | 198:1 199:3,19 |
| **serve**  39:7 | **several**  128:7 | **signed**  45:13 | 231:9 |
| 47:12 | 130:14 228:12 | 217:8 260:17 | **sit**  128:8 |
| **server**  231:3,9 | 247:22 248:5 | **silence**  16:14 | 208:19 232:21 |
| 231:14 | **severe**  21:5 | **similar**  213:3 | 233:13 |
| **serves**  49:20 | **share**  72:1 | **simple**  58:19 | **site**  230:14 |
| 240:22 | 105:1 195:10 | 105:6,14 | |

Page 49

**[sits - stacey]**

sits   230:3
231:18 232:8
sitting   59:12
105:16
situation   82:21
83:1 236:21
situations
82:18 236:18
six   130:20
size   64:1,10
186:13 188:10
skewed   179:18
skimming
227:18
skip   57:1
102:13
slight   132:9
slim   88:9
sliver   21:8
small   19:16
106:3 111:4
168:15 246:7
246:16
software
174:19
solutions   1:21
260:19 262:18
someone's
200:16
something's
207:3
somewhat   98:8
sop   128:7,13
129:3,15
130:15 228:3,5

228:7,17,18,21
232:11
sops   221:15
228:11,12
248:5
sorry   11:22
14:13 18:6
19:15 28:19,21
30:9 31:5 32:4
35:9,21 43:20
45:14 61:4
75:1 78:8 93:4
95:9 96:4
99:19 104:12
107:10 109:21
112:17,19
116:6 118:1
128:14 134:2
139:6,14
143:15 144:9
155:8,9 158:10
160:20 164:3
165:9,12 166:7
171:12 177:2
182:16 184:7
191:5,7 192:7
195:16,17
201:4 212:2
221:11 232:7
235:6,9
sort   8:14 79:17
122:8 126:19
154:11 171:22
172:10,12
174:1,3 176:3

176:6,15
182:10 183:4
186:5,20 187:1
191:10 197:9
197:22 201:21
206:8 207:7
235:22 245:18
255:6
sought   162:19
200:21 202:12
sounds   95:10
111:12 124:18
124:21 209:13
212:12 222:7
southern   1:1
2:9 5:15 6:12
12:1
space   247:1
253:18
spaces   228:13
speak   9:19 10:1
10:3 16:7
28:18 34:12,15
80:4 84:19
202:18 225:9
235:1,2 246:6
speaking   174:7
176:7,14 194:9
196:6
special   20:22
41:17
specialist   26:6
26:9 140:9
249:12

specialists   26:3
26:14
specialized
232:2
specific   24:21
25:4 46:6
100:21 119:5
164:6 173:5
223:10
specifically
52:9 72:9
73:12 80:5
99:2 252:11
253:10
spending   137:5
spends   137:4
spent   19:17
split   67:19
170:1
spoke   23:10
56:10 93:20,20
95:22 96:3,5
169:20 203:9
spoken   241:4,7
241:11
spreadsheet
150:17 155:19
160:16 161:10
163:19 175:22
177:17,22
178:5,22 180:8
180:16 181:18
squad   21:1
stacey   67:9
68:5

Page 50

**[stacks - subject]**

| | | | |
|---|---|---|---|
| **stacks** 64:21 | 253:2 | **statute** 29:21 | **sticker** 113:8 |
| **staff** 15:14 | **standardize** | 31:7 47:1 | **stood** 119:7 |
| 20:10 25:10,12 | 127:22 128:6 | 49:12,16 53:14 | **stop** 31:17 |
| 36:18 38:21 | 128:19 | 54:1 69:13 | 46:13 78:3 |
| 64:10,12 66:8 | **standing** 21:18 | 76:21 107:14 | 162:1,4 192:6 |
| 66:17 80:20 | **standpoint** | 107:16 108:5 | 248:2 |
| 96:4 98:9 | 20:5 | 108:11 110:12 | **stopped** 191:17 |
| 107:2 115:10 | **stands** 119:6 | 110:17 111:12 | 191:21 192:12 |
| 116:8 118:2,5 | **star** 192:18 | 116:12 120:15 | **stored** 229:4 |
| 125:20 128:3 | **start** 15:5 | 121:1,19 | **story** 203:5 |
| 132:3,21 | 17:11 18:6 | 154:18,20,22 | **straightforward** |
| 133:11 135:1 | 63:9 81:22 | 182:20,20 | 95:6 |
| 136:11 138:5 | 125:8 148:21 | 212:21 240:13 | **strayer** 67:9 |
| 142:16 186:11 | 151:16 229:11 | 241:19 242:8 | 68:6,7 |
| 187:9 188:11 | **started** 51:6 | 245:3,5,9,10 | **street** 1:21 2:4 |
| 188:18 204:21 | 123:4 216:21 | **statute's** | 262:19 |
| 205:4 207:1 | **starting** 28:17 | 242:16 | **strike** 75:1 |
| 211:13 225:19 | **starts** 152:6 | **statutes** 154:16 | 142:6 |
| 227:14 232:12 | **stat** 179:12 | 155:11,13,14 | **strong** 15:17 |
| 232:14,15 | 182:4 | 243:2 | **stronger** 18:17 |
| 233:11,15 | **state** 6:2,4 17:9 | **statutory** 33:7 | **strongly** 108:3 |
| 246:7,16 248:5 | 22:16 73:13,14 | 38:6 52:3,8 | **structure** 46:17 |
| 250:5 251:22 | 83:7 189:21 | 110:13 118:16 | 55:22 56:11 |
| 252:1 253:21 | **statements** | 120:6 125:12 | 78:2 |
| **staff's** 131:17 | 212:8 | 153:21 162:6 | **structured** |
| **staffing** 188:3,7 | **states** 1:1,14 | **stenotype** | 24:20 25:3 |
| **stage** 106:22 | 2:8,9 5:14,18 | 258:7 | 75:17 77:22 |
| **stakeholder** | 6:14 8:5 31:6 | **step** 98:14 | 249:8 |
| 245:19 246:4 | 60:2 69:1 | 107:9 114:17 | **struggle** 116:21 |
| **stand** 119:1 | 77:12 213:1 | 242:17 243:2 | **struggling** 66:9 |
| **standard** | **statistics** | **stephanie** | 66:19 186:7 |
| 127:14 128:14 | 179:17 185:3 | 204:5 | **subject** 31:15 |
| 129:5 162:22 | 237:9 | **steps** 229:18 | 32:10 62:11 |
| 163:14 220:9 | **status** 203:16 | **stevens** 29:7,9 | 65:22 66:11 |
| 221:4 252:21 | | | 95:17 176:5,14 |

**[subject - take]**

232:21
**submit**  45:6,7
47:16 86:19
**submitted**
35:15 143:20
148:10,11,12
152:1,20 170:8
174:13 200:19
210:1
**subordinate**
132:3,21
133:11 135:1
138:5 142:16
**subordinates**
140:12
**subpoena**
234:15,22
236:13
**subscribed**
259:14
**subscribes**
121:16
**subsection**  38:9
114:22
**subsequent**
21:13
**substance**
17:17
**substances**
17:13
**substantially**
19:8
**substantive**
212:8,12

**subunit**  25:5,6
25:7 56:17,18
56:19
**subunits**  25:4
**success**  249:9
**successful**
24:20 242:17
243:3 249:7
**sued**  11:19,21
198:16
**suggest**  44:3
**suggesting**
77:21
**suit**  16:11
**suite**  1:21 2:4
2:10 262:19
**summarize**
120:22
**summing**
176:21
**sunshine**
251:16,18
**supervise**  27:5
**supervises**  26:4
**supervising**
243:18
**supervisor**
131:18
**supervisors**
128:3
**supposed**  60:21
193:15
**sure**  28:2 32:1
32:3 37:1
59:18,21 72:3

76:3 78:7
80:12 93:21
95:8 104:13
105:11 120:10
123:7 132:13
133:5,13
136:15 137:22
138:13 140:15
141:18 142:13
149:8,10 164:3
165:22 168:8
174:7,10
175:17,19
183:6 203:13
206:16 210:13
210:17 221:7
229:20 233:17
249:5 252:9,21
**surely**  16:20
**surprisingly**
61:12
**suspect**  219:7
**swear**  6:18
**switching**
54:10
**sworn**  7:1
150:8 258:5
259:14
**system**  63:7,8
63:11 81:12
97:4,8,22
98:4,13 103:18
106:8 112:18
152:9 167:22
171:22 174:9

174:11 191:12
192:2 209:10
221:17 227:17
228:21 230:15
232:3,10,13,19
238:9
**systems**  59:22
60:1 62:3,6,7,9
62:10 65:14,19
66:5 76:6,12
80:4,16,22
99:19 220:17
232:8

| **t** |
|---|

**t**  3:1,1,5 4:1,1,2
150:1 261:3,3
**table**  176:20
177:11 181:5
**tackle**  249:20
253:19
**tactical**  21:1,18
**take**  5:8 10:14
10:19 52:10
59:3 89:17,20
98:14 109:17
112:1 114:17
125:22 128:5
128:10 129:22
139:3 149:2
157:6 171:13
171:16,18
172:8 184:5
185:9,20 188:2
189:3 199:10
200:18 204:19

Page 52

**[take - theresa]**

207:13 229:15
230:14,14
232:4,5 255:7
255:7,15
**taken** 5:12
17:11 149:14
258:3,6,13
**takes** 59:8
75:10,12
129:16 131:2
138:8 139:6,6
139:16 199:1
203:20
**talebian** 36:3
36:16,17 37:20
**talk** 22:21,22
48:7 91:2,3
125:5 196:22
219:22 220:1
221:22 233:16
240:17 246:9
252:4
**talked** 129:14
**talking** 22:18
39:12 53:6
59:11 63:21
76:5 79:18
80:14 83:13
85:6 86:3 87:4
89:2 97:18
121:12 122:4,9
147:11 182:15
186:16 198:6
199:4 200:11
220:20 221:8

223:15 235:21
247:4 252:1
255:22
**talks** 69:21
172:6 207:1
251:8 254:5
**target** 182:10
191:10
**task** 141:6
254:14
**tasks** 215:20
216:3
**taxpayer** 15:20
**tc** 228:18,19,20
**team** 26:3,14
105:19 109:8
111:5 136:8
140:5,21
168:15 169:1
173:13 205:7
206:11 228:1
230:13 232:5
233:3,7 238:13
248:10
**teams** 128:2
**tease** 202:2
**technician** 2:15
5:2 6:17 23:14
23:17 52:17,20
111:18 112:4,7
112:20 113:1
149:11 150:3
180:1,4 226:6
226:9 256:22

**technology**
72:8,12 73:7
100:8 230:4
**tell** 31:12 60:22
64:9 65:21
95:18 99:2
104:1,2 137:9
163:14 165:17
170:10 177:19
180:12 194:3
201:18 208:7
218:5 225:11
226:16 230:21
237:9 246:15
**telling** 81:19
170:20 184:18
198:5
**tells** 224:12
**template** 152:6
152:7 248:16
**templates**
248:4 249:21
249:22
**ten** 26:21
110:13 120:4
169:8 189:13
**teresa** 204:13
**terminally**
17:10
**terms** 64:10
176:15 184:20
229:17
**terribly** 175:21
**test** 21:12,15

**tested** 21:7
**testified** 7:1
56:13 61:7,8
107:22 150:9
**testify** 8:19
55:18 80:6
**testifying** 11:1
11:9 74:22
79:7
**testimony** 45:1
257:2 258:4,6
258:9 259:8
260:8
**texas** 1:1 2:5,9
5:15 6:13 12:1
262:20
**text** 224:2
247:14
**thacker** 1:17
5:22 258:2,18
**thank** 6:17 7:7
7:8 10:20 53:3
101:22 112:10
150:14 185:10
186:2 190:13
226:12 262:15
**thanks** 18:15
180:6
**thc** 21:7
**themself** 163:2
**theory** 110:16
118:4 135:15
**theresa** 99:12
99:15 208:18
214:7

Page 53

**[thing - today]**

**thing** 141:11
158:4 220:13
249:10 250:8
**things** 19:4
37:14 48:13
49:2 54:17
66:1 86:14
101:6 111:9
116:17,22
137:10 168:4
173:14 176:16
183:9 206:19
225:11 235:22
244:16 248:21
252:10
**think** 10:19
15:1 30:22
40:14 47:2,15
48:12 49:9
66:18 85:3,18
85:20 91:3,22
100:21,22
101:8,20 103:8
104:20 106:15
107:21 108:5
124:5,14,14
131:6 143:17
145:2 148:17
151:1,13
156:12 165:13
175:21 178:5,9
178:18 179:6
179:17 182:22
184:1 190:13
191:19 201:21

203:8 222:6
225:10 226:1
238:20,22
240:18 251:8
252:3
**thinking** 102:7
147:22
**thinks** 47:4
**third** 25:7
60:19 92:6
134:19 143:4
144:5 233:22
234:4 238:10
238:19 240:21
**thirdly** 222:17
**thorough** 66:6
**thoroughly**
107:3 206:12
**thought** 9:10
**thousands** 59:6
111:2 168:14
186:12,17
200:12,12
**three** 10:12,13
12:5 25:4 27:5
27:5 39:3
53:20 56:16,16
67:20 68:15
87:18 92:1
105:5 113:12
129:13 131:4,4
143:19 148:16
162:12 187:15
250:14

**threshold** 21:8
93:10 143:11
143:12 146:22
168:18 172:11
186:20
**throckmorton**
262:19
**throwing**
173:20
**thumb** 172:12
**thursday** 1:12
**tighten** 248:22
**time** 1:13 5:7
6:2 17:1 19:13
19:17 23:15,18
37:3 52:18,21
57:8,21 59:2
60:19,22 61:3
63:4 65:7,10
68:17 69:7
71:17 74:16
75:11,12 76:2
102:14 107:4
109:17 110:8,9
110:14 112:5,8
112:17,21
113:2 118:16
120:6 125:13
125:21 127:17
129:12 131:17
131:18,20,22
134:4 135:16
135:19 136:5
136:22 139:3,7
139:12 140:1

149:12 150:4
161:22 162:16
168:11 171:13
172:8 173:18
175:20 180:2,5
183:10 188:1
189:3,16,19
193:10,11,12
197:9 205:12
207:5 226:7,10
231:16 254:15
260:15
**timed** 87:18
**timeframe**
260:7
**timeline** 63:18
109:13 192:2
192:14
**timelines**
153:21
**timely** 208:12
**times** 35:1
237:2,7
**title** 26:9 54:16
**titled** 54:9
129:5,7
**titles** 41:12
**today** 5:3 8:2
9:10,11 11:1
11:13,15 19:8
23:21 25:3
44:15 48:6,14
49:4 51:22
55:18 77:14
79:7 82:1

**[today - tweaking]**

95:22 138:3
245:13
**today's** 7:9
8:15 9:4,7,13
9:15 14:10,12
51:10 257:1
**together** 10:6
128:9,18
129:14 130:15
169:2,4,12
174:3 179:16
182:7 238:13
**told** 144:5
146:22 253:1
**tolled** 161:20
**took** 24:15
70:20 160:21
**tool** 101:1,1
129:18 137:8
230:8 232:9
233:1 234:8
**top** 14:7 55:5,7
55:11 114:6
126:20 161:10
164:5 165:11
191:7 227:2
228:1 230:21
250:7
**topic** 47:11
55:21 56:10
83:14 84:7
85:2,6 101:13
103:6 134:17
170:9 220:10

**topics** 8:14,20
9:9 44:2 45:2
46:6,17 48:1
55:14,17 81:22
84:18 85:19
91:4 246:19
**total** 176:22
177:1 178:13
188:12 257:2
**totally** 104:4
203:1
**touch** 122:20
**towards** 55:11
146:21 162:5
242:17 243:2
**track** 58:7
105:2 162:9,15
162:16 164:4
179:13 181:6
182:5 193:5,8
**tracks** 162:12
182:21 183:1
**trade** 90:16
200:20
**train** 232:8
**training** 38:20
39:1 93:19
227:13 232:2
232:12 242:13
254:15,21
**trainings** 37:12
**transcript** 4:22
256:18 259:5,8
260:5,16

**transcripts** 259:8
82:9 84:1
**transfer** 74:17
**transmitted**
74:4,12
**transparent**
128:19 246:14
**treat** 21:4
170:7 202:13
**treated** 169:6,7
203:6
**treatment**
105:7 162:17
163:3,5,9,11,14
**triage** 171:22
**trial** 202:16
**trouble** 34:16
140:11
**true** 8:6,17
12:8 13:6 35:5
37:22 38:18
42:10 43:1,5
55:19 61:10,11
73:17 84:5
86:6,13 87:2
89:15,18 95:16
110:3 113:20
113:21 114:4
115:19,20
119:19 131:10
142:12 144:8
146:9 164:13
164:21 166:21
189:11 196:4
209:1 258:9

259:8
**trump** 217:9
**truncated**
120:17
**truthfully** 11:1
11:9
**try** 103:2 108:8
111:8 112:16
145:14 168:4
173:13 204:8
213:10 235:15
246:4,9,14
253:18
**trying** 17:16
64:14 65:6
108:11 120:7
123:3 141:3
144:17 146:7
147:4 166:2
169:22 202:12
205:6 228:10
249:15
**tryptamine**
205:19,21
**tucker** 170:13
**tucker's** 204:7
**turn** 30:12
67:20 118:15
124:9 162:8
195:11
**turning** 171:8
239:11
**tweaking**
132:12

**[twice - units]**

**twice**   147:18,20
248:18

**two**   12:4 15:9
16:15 20:2
26:13 56:15
67:17 69:6
82:4 105:15,22
106:5 113:12
113:13 131:11
132:2 134:9,12
135:3,11
137:11 150:15
168:7,11 169:5
169:5,16
180:15 189:12
198:6 199:5
208:8 220:9
221:3,9 229:16
254:1

**tx**   260:13
262:20

**type**   122:5
163:17 164:16
174:11 214:10
254:12

**typed**   228:10

**types**   24:22
36:21 98:11
102:18 111:8
173:7 175:15
183:8 206:19
225:13 227:21
238:18 247:6
248:7 250:1
253:22

**typewriting**
258:8

**typically**   31:3
168:2

**typo**   14:14

**u**

**u.s.**   3:9,10 4:11
6:12 30:15
31:1,1 55:1,2

**uh**   69:17 71:3
73:4 79:5,16
87:11 89:1,16
107:18 120:16
135:22 137:1
139:9 147:17
159:13 162:11
164:17 170:16
176:12 181:3
185:1 187:13
187:16 193:7
194:12 197:3
204:14 214:18
216:15 218:21
221:20 234:18
245:4

**ultimately**
184:20

**uncomfortable**
48:15 49:1

**uncommon**
236:21,22

**under**   20:8
21:15 38:9
39:5 43:2
49:11,16 69:9

76:18 77:13
92:17 108:4
109:6 118:22
125:1 141:21
144:11 148:13
163:14 172:4
195:13 196:2
198:7,15
202:16 209:12
210:8 211:1
214:11 258:8

**underpaid**
41:20

**understand**
7:15,17,18,22
8:3 11:3 19:20
49:5 70:6,14
78:7 108:3
137:22 152:13
179:2 189:2
191:8 202:5
206:13 207:1
210:15 219:16

**understandably**
49:1 50:12

**understanding**
11:13 38:5
66:6 67:1 68:8
190:14 202:9
202:12 223:6
223:16 231:1
242:15,22

**understood**
12:17 14:16
46:16 49:6

50:19 134:1
197:20

**undertake**
139:21

**unfiltered**   18:4
19:12

**unfortunately**
21:6 200:7,13
241:14

**unfulfilled**
164:12

**unintentionally**
21:19

**unit**   5:10 24:15
25:5,9,13,15,19
25:20 26:1,4
26:15,15 56:22
57:4 103:11
109:3,4 128:8
138:10 146:12
163:6 170:15
170:18 227:9
227:14 230:6
231:17 247:1,2
247:20 248:8

**united**   1:1,14
2:8,9 5:14,18
6:14 8:5 31:6
60:2 69:1
77:12 213:1

**units**   24:21
27:5,6 56:16
56:17 67:21
257:3

**[university - view]**

| | | | |
|---|---|---|---|
| **university** | 119:14,17 | 202:21 205:17 | **various**  37:14 |
| 93:19 | 120:11 121:13 | 214:5 230:7 | 66:1,5 80:22 |
| **unlawful**  12:13 | 121:22 122:10 | 232:8,15,17 | 152:2 250:1 |
| 15:12 17:5 | 123:6,21 | 238:9 | **vast**  76:5 |
| **unorthodox** | 153:18 154:4,7 | **used**  21:4,7,19 | 190:11 224:13 |
| 18:21 44:14 | 154:12,13 | 67:14 119:3 | 254:10 |
| **unprepared** | 160:1,6 171:5 | 227:8 248:18 | **veering**  48:21 |
| 44:3 | 171:6 189:8 | 248:20 257:3 | **venture**  71:17 |
| **unreasonable** | 190:1,2,5 | 260:16 | 237:1 |
| 16:21 | 208:15 222:17 | **useful**  87:21 | **verbal**  7:14 |
| **unrelated** | 223:8,17,18 | **uses**  20:10 60:1 | **verify**  260:8 |
| 84:21 | 231:15 234:3,5 | 69:15 127:16 | **veritext**  1:21 |
| **unsatisfied** | 240:7 245:8 | 172:1 | 5:21,22 257:4 |
| 37:4 | **unwarranted** | **using**  21:2,14 | 260:12,19 |
| **unsure**  43:12 | 213:5 214:22 | 129:18 | 262:18 |
| **unusual**  12:14 | **unwritten** | **usms**  178:16 | **veritext.com** |
| 50:11 57:2,7 | 225:1,7 | **usually**  26:22 | 262:20 |
| 58:1,5,9,15,18 | **update**  253:11 | 166:9 | **veritext.com.** |
| 58:20 60:12 | **updating**  248:4 | **utilize**  60:3 | 260:13 |
| 62:18,20 63:5 | **uploaded**  54:5 | 63:8 97:9 | **versus**  74:12 |
| 67:1 68:8,11 | **upper**  67:18 | 232:13 | 179:11 182:12 |
| 68:13,19 69:9 | **ups**  17:11 | | 186:6 187:2 |
| 70:15,17 71:21 | **urge**  22:4,9 | **v** | **veterans**  17:10 |
| 74:10 76:14 | **usb**  73:21 | **v**  3:8 5:13 | **video**  1:10 2:15 |
| 77:3,9,19 | **usc**  45:13 | 259:1 260:3 | 5:2,7,11 6:17 |
| 81:15,20 82:15 | **usdoj.gov**  2:11 | 262:6 | 23:14,17 52:17 |
| 82:19 87:2 | 260:1 | **vacancies** | 52:20 111:18 |
| 89:15 102:4,8 | **use**  18:9 21:5 | 25:10 64:12,13 | 112:4,7,20 |
| 102:15 103:2,9 | 90:15,17 105:2 | 66:18 | 113:1 149:11 |
| 103:19 104:1 | 108:11 110:1 | **vacant**  249:14 | 150:3 180:1,4 |
| 105:3,21 106:6 | 125:15,17 | **vanita**  35:18 | 226:6,9 256:22 |
| 106:11 107:14 | 166:9 200:8,17 | 36:1,12 240:21 | **videographer** |
| 108:2,13 | 200:22 201:3,3 | **variability** | 5:21 |
| 109:10,16 | 201:7,7,12,17 | 128:2 | **view**  15:17 |
| 110:6 118:6 | 201:19 202:7 | **varies**  237:9 | 49:20 121:1,5 |

**[view - withhold]**

| | | | |
|---|---|---|---|
| 121:7,17 | 31:4,11,11,17 | **waste** 15:19 | **weekly** 237:6 |
| **views** 240:13 | 39:4 52:10,13 | 175:20 | **weeks** 10:13 |
| **violation** | 57:1 64:5,6 | **wasting** 16:22 | **weight** 255:7 |
| 211:22 | 69:11 76:3 | **way** 19:3 59:1 | **welcome** 53:2 |
| **virginia** 1:15 | 83:12 84:8,19 | 63:15 70:14 | 85:11 112:9 |
| 2:11 5:19 | 87:7,7 101:12 | 74:5 75:16,22 | 150:13 179:3 |
| 70:10 72:7,14 | 102:6 103:8 | 78:1,2,12 | 226:11 |
| 72:22 73:1 | 104:13 105:15 | 86:11 88:6 | **went** 123:5 |
| 231:19 232:6 | 106:3 107:13 | 89:7 94:12 | 185:16 192:6 |
| **virtual** 10:9 | 107:15,15 | 95:7 96:12 | 199:18 241:19 |
| **volume** 59:5 | 108:7,8 112:1 | 97:21 110:12 | **whatnot** 175:13 |
| 66:10 76:6 | 118:19 122:3 | 139:4 169:21 | 253:14 |
| 88:10 90:21 | 124:9 126:16 | 171:10 187:7 | **whichever** |
| 159:20 160:11 | 142:13 145:1 | 200:6 220:7 | 107:5 |
| 160:12 167:15 | 149:9 161:11 | 223:7 254:18 | **whispering** 5:6 |
| 171:11,12,12 | 162:5 164:3 | **ways** 254:8 | **wide** 33:1 77:6 |
| 172:7 182:14 | 168:8 179:21 | **we've** 52:11 | 223:16 228:22 |
| 182:16 184:14 | 183:6 191:5 | 81:10 86:22 | 239:22 243:7 |
| 188:17 | 198:18,19 | 90:19 105:3,4 | 244:2 |
| **vs** 1:5 261:1 | 202:2 206:15 | 105:14 107:21 | **willing** 255:10 |
| **w** | 212:22 213:20 | 110:11 116:21 | **wise** 9:22 |
| | 215:11 216:22 | 123:21 125:16 | 168:19 181:22 |
| **wait** 7:20 28:20 | 223:22 229:16 | 162:7,9 168:10 | **withdraw** |
| 198:10 205:8 | 229:17 233:15 | 179:13 188:16 | 71:14 |
| 232:14 | 240:19 244:11 | 208:17 211:13 | **withdrawn** |
| **waive** 200:14 | 245:11 249:15 | 235:10 240:6 | 161:16 |
| **walk** 152:11 | **wanted** 24:21 | 246:22 248:18 | **withdrew** |
| 189:10 229:18 | 38:3 53:7 | 248:20 249:21 | 173:16 |
| 238:17 | 67:19 99:12 | 250:4,11 | **withheld** 155:4 |
| **walked** 70:21 | 123:7 128:6,17 | 254:18 | 156:4 198:15 |
| **wallace** 40:2 | 203:4,9 210:17 | **website** 31:6 | 199:12 221:15 |
| **wallbaum** 96:1 | **warnings** 21:13 | 58:12 211:17 | 222:2 |
| 96:8 204:13,18 | **washington** | **week** 237:7,10 | **withhold** |
| 206:3 | 1:22 | 237:10 251:16 | 210:11,18 |
| **want** 9:18 | | 251:19 | |
| 17:12 27:21 | | | |

Page 58

**[withholding - zorn]**

**withholding**
196:19 197:7
197:11 198:11
**withholdings**
198:3,20
**witness**  6:9,18
6:22 14:4 27:1
28:19,21 30:10
42:18 46:10
47:14,22 49:18
52:13,15 54:13
63:4 78:7 93:4
101:19,22
111:22 112:10
126:7 145:15
151:5,8,12
166:5,7,11,14
166:16 185:10
185:13,15,17
185:22 186:2
190:20 213:11
221:8,11,20
222:6,9,12
226:3,12,19
235:16 236:6
250:20 255:18
256:17 258:4,6
258:10 260:5,7
260:9,11,15
262:8
**wood**  219:11
224:17
**word**  69:15
**words**  39:4
108:18 120:18

142:6 174:4
**work**  6:6 25:1,8
25:21 26:12
62:4 67:13
88:16 101:1
132:17 133:11
136:12 137:7
137:13 138:20
138:21 139:4
140:6,13 141:2
141:22 148:19
169:1 173:5,9
188:12,15,18
188:20 215:13
237:22 238:1
245:15 246:8
246:10,22
247:4 250:4
253:17
**workaround**
186:13
**worked**  15:14
71:1 128:9
250:8 252:13
254:16
**working**  21:17
26:18 56:5
67:11 105:9
166:13 173:13
216:2 245:2
**works**  141:17
**worksheet**
150:20
**worried**  156:1

**worry**  177:20
**worth**  164:1
262:20
**wrapped**  172:8
**writ**  61:9 220:2
246:3
**write**  118:10
203:5
**writing**  225:12
248:15
**written**  114:11
120:9 211:9
224:4,17,22
232:11 251:6
**wrong**  61:8
95:11 192:7
**wrote**  14:17
67:18 118:9

| x |
|---|

**x**  3:5 4:2
**xeroxing**  195:7

| y |
|---|

**yeah**  11:19
23:12 28:7
32:5 47:9
52:12 79:6
82:21 84:14,16
85:1,14 96:10
100:12 109:12
112:2 114:15
118:1,2 124:11
124:19 130:2
136:8 138:4
139:1,20 149:8

158:12,18
160:19 165:12
165:14,15
166:4 175:16
179:6 185:13
185:15 186:1
196:20 203:11
206:21 209:15
209:16 212:7
217:17,19
222:5,9 225:15
227:19 228:8
228:16 245:11
247:11
**year**  35:11
37:13 58:16
105:16 152:2
179:8,10,14
235:18 248:21
254:7
**years**  26:19,21
67:18 130:16
164:1 168:11
181:6,7 211:11
250:14
**yetter**  2:3 6:7
**yettercolema...**
2:5
**yielded**  82:5

| z |
|---|

**zero**  178:17
**zeros**  113:12
**zorn**  2:3 4:12
6:6,6 7:3 12:5
13:3,15,22

Page 59

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.