UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| MATTHEW C. ZORN, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 4:22-cv-02396 |
| | § | |
| U.S. DEPARTMENT OF JUSTICE, ET AL. | § | **Oral Hearing Requested** |
| | § | |
| | § | |
| Defendants. | § | |

**RESPONSE TO GOVERNMENT'S MOTION TO DISMISS AND
CROSS-MOTION FOR SUMMARY JUDGMENT ON
WHETHER DEA IS AN AGENCY UNDER 5 U.S.C. §§ 552(f) AND (j)**

TABLE OF CONTENTS

Table of Contents .................................................................................................. i

Table of Authorities ............................................................................................. ii

Preliminary Statement .......................................................................................... 1

Key Background ................................................................................................... 3

Legal Background ................................................................................................. 4

Legal Standards .................................................................................................... 5

Argument .............................................................................................................. 6

    I.    Standing ............................................................................................... 6

    A.    Chief FOIA Officer Claims ................................................................ 7

        1.    Structural Standing and Standing Based on Lack of Supervision. ............. 7

        2.    Stating Based on Failure to Produce Records That a Lawfully Designated Chief FOIA Office Would Necessarily Have Under 5 U.S.C. § 552(j)(2). .................................................................................................... 14

        3.    Standing Based on Record Balkanization ............................................... 16

    B.    First Amendment Right-of-Access Claim ......................................... 19

    II.    Merits ................................................................................................. 27

    A.    Chief FOIA Officer Claims .............................................................. 27

        1.    DEA Is An "Agency" Under § 552(f) ................................................... 28

        2.    DEA is an "Agency" Under § 552(j) ..................................................... 33

    B.    First Amendment ............................................................................... 35

        1.    The Experience and Logic Test Applies ................................................ 35

        2.    The Government Mischaracterizes the Relief I Seek .............................. 38

        3.    The Experience and Logic Test Is Plausibly Met .................................. 39

Conclusion ......................................................................................................... 46

# TABLE OF AUTHORITIES

## Cases

*Alliance for Hippocratic Medicine v. FDA*, 78 F. 4th 210 (5th Cir. 2023)....................................9

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ...........................................6

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) .........................................6

*Borough of Duryea, Pa. v. Guarnieri*, 564 U.S. 379 (2011) ........................................37

*Brown & Williamson Tobacco Corp. v. FTC*, 710 F.2d 1165 (6th Cir. 1983) ............................43

*Burgess v. United States*, 553 U.S. 124 (2008)...........................................29

*Calder v. IRS*, 890 F.2d 781 (5th Cir. 1989)...........................................37

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013) ..........................................12

*Collins v. Yellen*, 141 S. Ct. 1761 (2021) ...........................................18

*Courthouse News Serv. v. Planet*, 750 F.3d 776 (9th Cir. 2014)...........................................24

*Courthouse News Serv. v. Planet*, 947 F.3d 581 (9th Cir. 2020)...........................................43

*Courthouse News Serv. v. Quinlan*, 32 F.4th 15 (1st Cir. 2022) ...........................................21

*Courthouse News Serv. v. Schaefer*, 2 F.4th 318 (4th Cir. 2021) ...........................................21

*Department of Commerce v. New York*, 139 S. Ct. 2551 (2019)...........................................12

*Detroit Free Press v. Ashcroft*, 303 F.3d 681 (6th Cir. 2002) .........................................36, 38, 43

*Digital Realty Tr., Inc. v. Somers*, 138 S. Ct. 767 (2018)...........................................34

*DOC v. U.S. House of Representatives*, 525 U.S. 316 (1999) ........................................15

*Doe v. Public Citizen*, 749 F.3d 246 (4th Cir. 2014) ...........................................24

*El Vocero de Puerto Rico (Caribbean Int'l News Corp.) v. Puerto Rico*, 508 U.S. 147 (1993).. 40, 42

*FEC v. Akins*, 524 U.S. 11 (1998)...........................................9, 15

*FEC v. Cruz*, 596 U.S. 289 (2022)...........................................7

*Flynt v. Rumsfeld*, 355 F.3d 697 (D.C. Cir. 2004)...........................................22

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477 (2010)....................................11

*Gill v. Whitford*, 138 S. Ct. 1916 (2018)..............................................................26

*Globe Newspaper Co. v. Superior Court*, 457 U.S. 596 (1982) ....................................35

*Grand Cent. P'ship, Inc. v. Cuomo*, 166 F.3d 473 (2d Cir. 1999)................................32

*Hajro v. U.S. Citizenship and Immigration Services*, 811 F.3d 1086 (9th Cir. 2016)...................6

*In re Bos. Herald, Inc.*, 321 F.3d 174 (1st Cir. 2003)..............................................42

*In re Certification of Questions of L. to Foreign Intel. Surveillance Ct. of Rev.*, 2018 WL 2709456 (FISA Mar. 16, 2018)...........................................21

*In re Nat'l Prescription Opiate Litig.*, 1:17-md-02804 (Jul. 14, 2023 N.D. Ohio)......................46

*In re Nat'l Prescription Opiate Litig.*, 927 F.3d 919 (6th Cir. 2019)................................45

*In re Opinions & Ords. of this Ct. Addressing Bulk Collection of Data under the Foreign Intel. Surveillance Act*, 2017 WL 5983865 (FISA Nov. 9, 2017)....................................20

*In re Orders of this Court Interpreting Sec. 215 of the Patriot Act*, 2013 WL 5460064 (FISA 2013) ..............................................................20

*Jarkesy v. SEC*, 34 F.4th 446, 461 (5th Cir. 2022), cert. granted, 143 S. Ct. 2688 (2023)...........40

*Judicial Watch, Inc. v. DHS*, 895 F.3d 770 (D.C. Cir. 2018) ......................................7

*Kentucky Press Ass'n, Inc. v. Kentucky*, 355 F. Supp. 2d 853 (E.D. Ky. 2005) ..........................21

*Kinetica Partners, LLC v. DOI*, 505 F. Supp. 3d 653 (S.D. Tex. 2020).....................11, 14, 15

*Lane v. Halliburton*, 529 F.3d 548 (5th Cir. 2008)..................................................6

*Lucia v. SEC*, 138 S. Ct. 2044 (2018).............................................................35

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) .........................................6, 11, 12

*Meyer v. Bush*, 981 F.2d 1288 (D.C. Cir. 1993) ....................................................32

*Missouri v. Biden*, 83 F.4th 350, 398 (5th Cir. 2023), cert. granted 2023 WL 6935337 (U.S. Oct. 20, 2023) .......................................................................27

*New Jersey Media Grp., Inc. v. Ashcroft*, 308 F.3d 198 (3d Cir. 2002) ...............................36

*New York C.L. Union v. New York City Transit Auth.*, 675 F. Supp. 2d 411 (S.D.N.Y. 2009)....21

*New York C.L. Union v. New York City Transit Auth.*, 684 F.3d 286, 300 (2d Cir. 2012).....36, 41

*Northeastern Florida Chapter of the Associated Gen. Contractors of America v. City of Jacksonville*, 508 U.S. 656 (1993) ........................................................................... 10

*Parker v. District of Columbia*, 478 F.3d 370 (D.C. Cir. 2007) ...................................... 7

*Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37 (1983) ........................ 37

*Press-Enterprise Co. v. Superior Court*, 478 U.S. 1 (1986) .................................... 35, 39

*Pub. Health & Med. Pros. for Transparency v. FDA*, 2023 WL 3335071 (N.D. Tex. May 9, 2023) ........................................................................................................... 30

*Public Citizen v. DOJ*, 491 U.S. 440, 449 (1989) ........................................................ 25

*Ramming v. United States*, 281 F.3d 158 (5th Cir. 2001) ............................................... 6

*Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980) ...................................... 35

*Rutila v. DOT*, 72 F.4th 692 (5th Cir. 2023) ................................................................. 14

*Sackett v. EPA*, 598 U.S. 651 (2023) ............................................................................ 34

*SanMedica Int'l v. Amazon.com Inc.*, 2015 WL 6680222 (D. Utah Nov. 2, 2015) ....... 22

*Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2196 (2020) .............................................. 11

*Sonnier v. State Farm Mut. Auto. Ins. Co.*, 509 F.3d 673 (5th Cir. 2007) ..................... 6

*Soucie v. David*, 448 F.2d 1067 (D.C. Cir. 1971) ........................................................ 32

*Stenberg v. Carhart*, 530 U.S. 914 (2000) ................................................................... 34

*Sullo & Bobbitt, P.L.L.C. v. Milner*, 765 F.3d 388 (5th Cir. 2014) ............................. 38

*Summers v. Earth Island Inst.*, 555 U.S. 488 (2009) ...................................................... 7

*Sure–Tan, Inc. v. NLRB*, 467 U.S. 883 (1984) .............................................................. 37

*Texas v. United States*, 524 F. Supp. 3d 598 (S.D. Tex. 2021) .................................... 32

*United States v. Edwards*, 823 F.2d 111 (5th Cir. 1987) .............................................. 35

## Statutes and Constitutional

21 U.S.C. § 882(a) ......................................................................................................... 41

5 U.S.C. § 551(1) ........................................................................................... 2, 28, 29, 33

5 U.S.C. § 552(e)(2) ................................................................................................ 30, 31

5 U.S.C. § 552(f) .................................................................................... *passim*

5 U.S.C. § 552(j) .................................................................................... *passim*

87 Stat. 1091 .................................................................................................. 28

U.S. Const. Amend. VI ................................................................................. 40

**Rules**

21 C.F.R. §§ 1316.41-68 ............................................................................... 36

21 C.F.R. §§ 1308.41-44 ............................................................................... 36

Rule 12(b)(1) .................................................................................................... 6

Rule 12(b)(6) .................................................................................................... 6

**Regulations**

21 C.F.R. § 1316.31-34 ................................................................................... 5

21 C.F.R. § 1316.41-68 ................................................................................... 5

28 C.F.R. § 0.1 .............................................................................................. 31

**Other Authorities**

H. Rep. No. 93-876 (Mar. 5, 1974) .............................................................. 33

Jennifer D. Oliva, Opioid Multidistrict Litigation Secrecy, 80 Ohio St. L.J. 663, 667 (2019) .... 45

S. Rep. No. 93-854 (May 16, 1974) ............................................................. 33

## PRELIMINARY STATEMENT

This is a case about unlawful and unconstitutional policies and practices that frustrate disclosure. These policies and practices it impossible for me (and anyone else) to timely access agency records, including important adjudicatory materials that develop the working law of adjudications and are necessary to understand an agency's enforcement decisions and policies.

The lawsuit involves three central claims:

1. **Unusual Circumstances.** Whether Defendants have an unlawful policy/practice of invoking the "unusual circumstances" exception to defer decisions on FOIA requests any time a FOIA request requires searching for records outside the FOIA office.

2. **Chief FOIA Officer.** Whether DEA has unlawfully refused to designate a Chief FOIA Officer under 5 U.S.C. § 552(j)(1).

3. **Timely Access to DEA Adjudicatory Records.** Whether the First Amendment provides a right of access to the agency's administrative adjudicatory records.

The Government portrays these as a rag-tag of unrelated grievances. They are not. In brief, they stem from a root grievance: Defendants have adopted policies/practices that thwart FOIA and allows DEA to operate opaquely and without accountability that harms me as an attorney, journalist, speaker, and expert in matters relating to DEA and drug policy. This agency adjudicates and decides public rights using secret law in secret proceedings, which is detrimental to public understanding of matters within DEA's purview, integrity, and accountability.

The Government's motion doesn't contest my first central claim but seeks dismissal of the second two. With both, it asserts lack of standing and failure to state a claim. It is wrong all around.

On standing, the Government says I fail to show concrete, injuries-in-fact traceable to the violation that would be redressed by court ordered relief. With the Chief FOIA Officer claim, I have three independent bases for standing: (1) structural/procedural standing; (2) failure to produce important records relating to FOIA implementation and process; and (3) structural deprivation of timely access to records due to a "balkanization" of DEA's FOIA Office. The Government's

motion either ignores or mischaracterizes these standing theories and rarely engages with my concrete, particularized, and detailed allegations laid out over numerous documents.

The Government's First Amendment standing attack has less merit. As an attorney/journalist in the controlled substances area, there should be no serious dispute that I am presently injured by my inability to access DEA's adjudications and adjudicatory records. Nor should there be a serious dispute over whether ordering DEA to disclose the existence of adjudications and making adjudicatory records timely accessible would remediate my harm. Rather than directly address the relevant points, the Government's motion relies on mischaracterizing my claim and the relief I seek, claiming I seek immediate and "unfettered" access to all DEA proceeding records, without qualification. It also confuses what "particularity" or "particularized" means as part of the standing inquiry.

Turning to the merits, the Government says I do not state a plausible claim because the United States Drug Enforcement Agency is not an "agency" under FOIA. This argument is as meritless as it seems. DEA is an agency under 5 U.S.C. § 551(1) of the APA, which is inherited by FOIA by 5 U.S.C. § 552(f). Every court of appeals has read the statute that way, and the Government cites no case to the contrary. Instead, it asks the Court to be the first to embrace a bizarre reading that turns the ordinary meaning of words on their head and would result in component agencies across government being improper FOIA defendants, contrary to decades of past practice. Not surprisingly, this reading also flies in the face of the legislative history.

Last, the Government says that the First Amendment right-of-access does not apply to DEA adjudications. Again, however, it finds no on-point precedent for its argument, instead inflating a Fifth Circuit case beyond its actual holding and once again, the relief I seek. Because I state a plausible right of access, the Court should deny the Government's motion on this point as well.

## KEY BACKGROUND

The following background comes from the Fourth Amended Complaint ("4AC") (Dkt. 82), my July 2023 declaration ("July Decl.") (Dkt. 82 at 75-82), my August 2023 declaration ("Aug. Decl.") (Dkt. 82 at 84-88), and the deposition of Defendants ("Dep.") (Dkt. 28-2).

- I'm an attorney, journalist, and recognized public speaker on drug policy issues. In my law practice, I work with clients in the controlled substances space, including in proceedings involving DEA and the federal Controlled Substances Act. In my journalistic work, I publish essays and articles relating to controlled substances and controlled substances regulation. I have used and continue to use FOIA both for my work and writing. In both capacities, I monitor, review, and distill cases and DEA agency actions for clients and the public. 4AC ¶¶ 9, 46 & n.12, 115 & n.67, 118; Feb. Decl. ¶¶ 4-6; July Decl. ¶¶ 3-7.

- I have filed multiple FOIA requests for filings from administrative proceedings/adjudications and intend to request such filings. I have, in fact, been actually or constructively denied access. I would make more requests, but I cannot even identify what proceedings exist. Even more, when I can identify records in proceedings, because of the way DEA processes FOIA requests, those records cannot be produced in a timely manner. DEA's FOIA Office does not have access to filings in DEA adjudications. 4AC ¶¶ 118; Dep. 81-83; *see generally* July Decl.

- Adjudicatory materials from them are important to anyone that practices before DEA or otherwise seeks to understand the working law of the agency. The Administrative Conference of the United States has stated: "Materials generated throughout the course of any given adjudicatory proceeding—the aforementioned orders, pleadings, briefs, and other adjudication records—take on special significance." 4AC ¶¶ 111; Dep. 92.

- The agency testified that DEA adjudications are public and filings in DEA adjudications are public filings. In fact, they are secret because their existence is not disclosed. Most other federal agencies that exercise significant enforcement (perhaps all) such as the FTC or SEC have public dockets. In contrast, filings in DEA adjudications are done through the "DEA Judicial Mailbox" – an e-mail inbox – and kept by DEA's Office of Administrative Law Judges. Those filings are not published and can only be obtained through a FOIA request. Moreover, DEA appears to have a policy of treating adjudications as FOIA exempt. 4AC ¶¶ 110-11; July Decl. ¶¶ 9, 38-42.

- Defendants have a policy of deeming all requests *outside* the FOIA Office as raising "unusual circumstances" and its electronic files. The FOIA Office does not have access to the "hundreds of IT systems" DEA uses.  Dep. 57-60.

- Congress charged each agency Chief FOIA Officers with maintaining "efficient and appropriate compliance," "monitor[ing] [FOIA] implementation," keeping agency heads "appropriately informed," recommending "adjustments to agency practices, policies,

personnel, and funding" to improve implementation, reviewing and reporting agency FOIA performance, and offering staff training. To better understand DEA's implementation of FOIA, I have filed multiple FOIA requests seeking records that would be in the custody/control of DEA's Chief FOIA Officer—if it had one. This is because DEA has not produced these requests because it does not have a Chief FOIA Officer. 4AC ¶¶ 119, 120.

- DEA has engaged in a panoply of unlawful FOIA and secrecy practices, including arbitrarily closing my FOIA requests for processing notes. 4AC ¶¶ 121, 124-25. Similarly, the person performing Chief FOIA Officer duties has developed and implemented DEA FOIA policies. *See* Dep. 118:6-21, 127:11-142:17.

- DOJ's Chief FOIA Officer is the Associate AG, who's outside DEA's chain of command.

Additional facts are weaved into the Argument.

### LEGAL BACKGROUND

I generally agree with the Government's legal background, Mot. 2-4. A few more notes.

**Mandatory Duties of the Chief FOIA Officer.** The Motion correctly notes that the statutory commands of the Chief FOIA Officer in 5 U.S.C. § 552(j)(2) are "subject to the authority of the head of the agency." While it highlights 5 U.S.C. § 552(j)(2)(C) regarding the Chief FOIA Officer's duty to "recommend to the head of the agency such adjustments to agency practices, policies, personnel, and funding as may be necessary to improve its implementation of this section," it omits the two preceding mandatory duties, which duties immediately relevant to this action: the Chief FOIA Officer has (A) "agency-wide responsibility for efficient and appropriate compliance with this section recommend to the head of the agency such adjustments to agency practices, policies, personnel, and funding as may be necessary to improve its implementation of this section" and (B) to "monitor implementation of this section throughout the agency and keep the head of the agency, the chief legal officer of the agency, and the Attorney General appropriately informed of the agency's performance in implementing this section."

In addition, an agency's Chief FOIA Officer must "review and report to the Attorney General, through the head of the agency, at such times and in such formats as the Attorney General

may direct, on the agency's performance in implementing this section," *id.* § (D); "facilitate public understanding of the purposes of the statutory exemptions of this section by including concise descriptions of the exemptions in both the agency's handbook issued under subsection (g), and the agency's annual report on this section, and by providing an overview, where appropriate, of certain general categories of agency records to which those exemptions apply," *id.* § (E); and "offer training to agency staff regarding their responsibilities under this section," *id.* § (F).

**DEA Administrative Proceedings.** My First Amendment claim relates to *adjudicatory* proceedings and seeks *adjudicatory* records to hearings under Subpart D of DEA's regulations entitled "Administrative Hearings." 21 C.F.R. § 1316.41-68.[1] These regulations provide procedures for administrative hearings such as the filing of an answer (*id.* § 1316.47); notices of appearance (*id.* § 1316.48); prehearing conferences (*id.* § 1316.54); evidentiary submissions and burdens (*id.* § 1316.56-60); *id.* § 1316.56-60. They also outline the duties of a presiding ALJ (*id.* § 1316.52). Filings in DEA adjudications occur through an inbox. 4AC ¶ 109.

Non-adjudicatory administrative proceedings—for example, enforcement proceedings conducted under Subpart C (21 C.F.R. § 1316.31-34)—are outside the scope of my complaint.

## LEGAL STANDARDS

**Rule 12(b)(1).** Rule 12(b)(1) allows dismissal for lack of jurisdiction. The Court may consider the complaint, undisputed record facts, and the resolution of disputed facts. *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001).

---

[1]   Contrary to the Government's urgings, my complaint is limited to *adjudications* and *adjudicatory records*. *See, e.g.*, 4AC ¶ 169 ("an injunction ordering DEA to make adjudicatory records from DEA proceedings timely available"). The APA defines "adjudication" as the "agency process for the formulation of an order." 5 U.S.C. § 551(7) and provides procedures for adjudications in 5 U.S.C. § 554.

As plaintiff, I bear the burden of showing standing. *Id.* at 161. To assess whether I have met this burden, the court must "take the well-pled factual allegations of the complaint as true and view them in the light most favorable to [me]." *Lane v. Halliburton*, 529 F.3d 548, 557 (5th Cir. 2008). "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss courts presume that general allegations embrace those specific facts that are necessary to support the claim." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (cleaned up).

To show FOIA injury, I need not have "personal connection" to the information I am requesting. *Hajro v. U.S. Citizenship and Immigration Services*, 811 F.3d 1086, 1105 (9th Cir. 2016) (cite omitted). A failure to get timely information is injury, "even if the requester's injury may be shared with the public at large." *Id.* at 1106 (cites omitted). Even a "delayed FOIA request may serve as a basis for individual standing." *Id.*

**Rule 12(b)(6).** To defeat a motion to dismiss under Rule 12(b)(6), a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009). In assessing plausibility, the court must accept all well-pleaded facts in the complaint as true and view them in the light most favorable to the plaintiff. *Sonnier v. State Farm Mut. Auto. Ins. Co.*, 509 F.3d 673, 675 (5th Cir. 2007).

ARGUMENT

## I.    Standing

The Government argues that I lack standing to pursue my second two claims. In both cases, Article III requires I show concrete, particularized injury; that is actual, current, or imminent; fairly traceable to the Defendants' action; and redressable by a favorable ruling.

Standing doctrines exist to ensure a party "has alleged such a personal stake in the outcome of the controversy as to warrant his invocation of federal-court jurisdiction." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009) (quotation omitted). But it must not be confused with the merits. To assess standing, courts must assume claims have merit. *See Parker v. District of Columbia*, 478 F.3d 370, 377 (D.C. Cir. 2007) ("[A] federal court must assume arguendo the merits of his or her legal claim."); *e.g.*, *FEC v. Cruz*, 596 U.S. 289, 298 (2022).

### A. Chief FOIA Officer Claims

I assert three standing theories: (1) structural standing and standing based on lack of supervision; (2) standing based on DEA's failure to produce records a lawfully designated Chief FOIA Officer would necessarily have under 5 U.S.C. § 552(j); and (3) standing based on the structure of the office and the "unusual circumstances" policy. Each is discussed below.

#### 1. Structural Standing and Standing Based on Lack of Supervision.

Congress established the Chief FOIA Officer position to ensure FOIA compliance and create an interface for FOIA requesting public and the agency. The Chief FOIA Officer has many responsibilities to ensure the proper functioning of FOIA, including "agency-wide responsibility" for efficient and appropriate compliance with [FOIA]" and "monitor[ing] implementation of [FOIA] throughout the agency." 5 U.S.C. §552(j). As the D.C. Circuit explained in *Judicial Watch, Inc. v. DHS*, 895 F.3d 770, 775-76 (D.C. Cir. 2018), the Chief FOIA Officer statute is an important structural bulwark among others that ensures compliance with FOIA's dictates. It is part of a "two-part scheme" that Congress implemented to ensure agencies make records "promptly available."

Put simply, I am an intended beneficiary of these protections and have been injured by their disregard, so I have standing to complain.

### a.    I have standing because the structural/procedural standing.

As a quintessential member of the regulated and protected class, I complain about a regulatory scheme that lacks oversight. This structural complaint attacks the legitimacy of DEA's FOIA processing apparatus. Congress mandated knowledgeable, politically accountable officials in the agency and in contact with the agency head serve—not disconnected high-ranking Department officials or, at the other extreme, lower-level middle managers. The lack of an accountable Chief FOIA Officer that has no direct line to the agency head cannot be divorced from issues I raise in this case, including FOIA policies made up on the fly.

My pleading lays sets forth specific facts and real-world anecdotes that show a panoply of particularized, concrete injuries, and establish ongoing and future harm from the unsupervised regulatory regime ranging from economic type "diverting resources" type harms to classic informational injuries including: obscene and arbitrary review fees; unlawful delays which make it impossible to write timely stories on current events involving DEA; structuring the FOIA Office and depriving it of the tools to make obscene delays automatic; unlawful FOIA practices of treating records from administrative proceedings as exempt; affirmative disclosure violations; routine misapplication of exemptions; unlawful redactions to documents; and "expedited" requests still awaiting determinations, including one from at least a year ago.

With a proper FOIA sheriff in place responsible for implementing FOIA at the agency, as the statute requires, these violations would be less likely to occur. Not having a statutory compliant supervisor that works in the agency—as opposed to one in the Department that isn't anywhere in DEA's chain of command—increases risk of non-compliance, improperly denied FOIA requests, policies that violate the statute, etc. That is why Congress created the Chief FOIA Officer provision and mandated that every agency that is an "agency" under FOIA must have one. Moreover, the

fact an agency might reach the same result exercising discretionary powers differently does not undermine redressability. *FEC v. Akins*, 524 U.S. 11, 25 (1998).

*Alliance for Hippocratic Medicine v. FDA*, 78 F. 4th 210 (5th Cir. 2023) confirms the propriety of failure to supervise or enforce-type standing by a member of the regulated community. In *Hippocratic Medicine*, the Fifth Circuit explained that doctors and medical organizations had standing to challenge, among other items, FDA's 2021 decision "not enforce an agency regulation requiring mifepristone to be prescribed and dispensed in person," which the decision calls the "2021 Non-Enforcement Decision." *Id.* at 222.

*First*, as to imminent injury, the court identified that a definite percentage of women who take mifepristone would require ER care and that doctors would continue treating women who experience severe complications after taking mifepristone. *Second*, on cognizable injury, among other items, the court noted classic cognizable economic harm by having to divert resources away from regular patients. *Third*, the court traced the injury to the 2021 Non-Enforcement Decision because removing the in-person dispensing requirement allowed women to request and take mifepristone without doctor supervision. That "supervision," according to the court, was "necessary to ensure patients' safety," and the absence of supervision would cause "additional severe complications." The court also explained that without an in-person examination, a prescriber would be less likely to "accurately determine gestational age." *Id.* at 226-240.

The correct decision here traces the reasoning of the Fifth Circuit's *Hippocratic Medicine* decision. Here, there is injury that arises out of the absence of supervision required by law. I'm a quintessential member of two FOIA classes for whom FOIA's structural protections exist to protect. I'm harmed via non-enforcement of a mandatory duty, i.e., designating a senior agency official in charge of "agency-wide responsibility for efficient and appropriate compliance" of

FOIA or "monitor[ing] implementation." While the Government emphasizes that the Chief FOIA Officer can only recommend policy changes, it never addresses the other important statutory supervisory and implementation functions of the Chief FOIA Officer that are designed to prevent or at least mitigate some of the issues that directly impact me.[2] And, there can be no doubt that I've suffered informational and diverting resource-type harm because of them.

The *Hippocratic Medicine* reasoning on standing from a lack of regulatory supervision is consistent with the longstanding view of how courts assess Article III standing with structural and procedural claims. The Government's view is that I must engage a counterfactual and show that a hypothetical Chief FOIA Officer **would** recommend different policies/practices and that those that injury. But Article III standing has never been construed so stringently with process/structural oriented challenges. For example, in *Northeastern Florida Chapter of the Associated Gen. Contractors of America v. City of Jacksonville*, 508 U.S. 656, 666 (1993), the Court explained:

> When the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the barrier need not allege that he would have obtained the benefit [to] establish standing. The "injury in fact" ... is the denial of equal treatment from the imposition of the barrier, not the ultimate inability to obtain the benefit.

Thus, where an unlawful process denies a party an opportunity to participate in that process on valid terms, there is injury-in-fact.

The Supreme Court made this clear in *Lujan* too. It explained that there is "much truth to the assertion that 'procedural rights' are special" and that a "person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal

---

[2]     Moreover, the fact that 5 U.S.C. § 552(j)(2) makes policy changes "subject to the authority of the head of the agency" is not a remarkable observation and qualification. A subordinate or delegee's actions are always subject to the authority of a superior officer. A recommendation from a senior official undoubtedly carries substantially more weight than a recommendation from middle management.

standards for redressability and immediacy." *Lujan*, 504 U.S. at 573 n.7. So, "one living adjacent to the site for proposed construction of a federally licensed dam has standing to challenge the licensing agency's failure to prepare an environmental impact statement, even though he cannot establish with any certainty that the statement will cause the license to be withheld or altered, and even though the dam will not be completed for many years." *Id.* In these cases, "so long as the procedures in question are designed to protect some threatened concrete interest of his that is the ultimate basis of his standing." *Id. See also Kinetica Partners, LLC v. DOI*, 505 F. Supp. 3d 653, 671 (S.D. Tex. 2020) (explaining that procedural injury can suffice "even where the plaintiff does not prove that adherence to the proper procedure would have produced a different outcome").

In the context of structural claims, the Supreme Court has stated similarly. Standing "does not require precise proof of what the [agency's] policies might have been in that counterfactual world." *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 512 n.12 (2010). *See also Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2196 (2020).

As a frequent FOIA customer with concrete, particularized interests in a functioning FOIA at this agency, I live next to the broken dam. Congress put in place structural Chief FOIA Officer bulwarks to protect the FOIA dam from breaking and flooding the concrete interests of mine, namely, timely production of non-exempt records concerning its activities. In fact, as I next explain, the record shows concretely how FOIA policies developed by the person who performs the duties and functions of the absent Chief FOIA Officer for DEA has written and applied FOIA policies and procedures to me or my requests without any approval by the head of the agency.

Put simply, I'm being deprived a structural protection put in place to protect me from the very harms I'm now facing. *See Lujan*, 504 U.S. at 573 n.8 (explaining that individual can enforce a procedural right in court "so long as the procedures in question are designed to protect some

threatened concrete interest of his that is the ultimate basis of his standing"). Because DEA's violation of the Chief FOIA Officer statute has impaired and will continue to impair concrete interests of mine apart from a naked procedural right, I have clear standing to assert a structural/process-oriented claim, without having to prove any counterfactual.

    **b.**  **Under the Government's counterfactual theory, there are disputed issues of fact.**

   Even if the Government were correct in stating that I cannot show, with certainty, that the designation of a Chief FOIA Officer would cause policy changes—a point which I discuss above is neither necessary for the Court to reach nor the correct question to ask—there are clear factual disputes that preclude embracing its argument at the pleading stage.

   The Government relies on *Lujan* and *Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013). Importantly, ***these are summary judgment cases***, not pleadings cases. In *Lujan*, the Court opined that the issue of "choices made by independent actors" and "whose exercise of broad and legitimate discretion the courts cannot presume either to control or predict" is a ***factual issue***. *Lujan*, 504 U.S. at 562. And, more recently, *Department of Commerce v. New York*, 139 S. Ct. 2551, 2565 (2019) makes clear that standing issues can raise triable issues of fact and chains of causation can be permitted if proven. There, the Court opined that the evidence at trial defeated the Government's argument and "established that noncitizen households have historically responded to the census at lower rates than other groups," thus showing causality.[3]

---

[3]  The "objectively reasonable likelihood" statement relates to injury-in-fact that is "certainly impending." *See Clapper*, 568 U.S. at 410. Here, however, the argument the Government advances is really about traceability/redressability: whether the relief I am requesting will redress the injuries I've alleged.

The Government's Rule 12(b)(1) attack improperly relies on resolving disputed facts and inferences in its favor. Even more, it makes little to no attempt to engage undisputed facts. I have established, among other items, that

- There is *no* Chief FOIA Officer at DEA. The person who allegedly performs the duties and functions of Chief FOIA Officer for DEA is the Associate Attorney General, who is not in DEA's Chain of Command at all. Dep. 35:17-36:12

- The person held out to be DEA's Chief FOIA Officer at the time of the deposition "reorganized the FOIA division at DEA by initiating a request during 2019 to completely restructure the FOIA unit, which recommendation took effect on October 1 if 2020." Dep. 6:9-10, 23:20-25:13.

- The person held out to be DEA's Chief FOIA Officer at the time has developed *and implemented* internal DEA FOIA policies that directly affect me and have been applied against me, including an arbitrary and capricious fee policy that amounts to thousands of dollars up front. *See* Dep. 118:6-21, 127:11-142:17.

- The person held out to be DEA's Chief FOIA Officer at the time of the deposition carries out the statutory responsibilities under the Chief FOIA Officer statute, including overseeing the overall administration of FOIA at DEA. Dep. 27:8-34:14, 38:4-39:2.

- The person held out to be DEA's Chief FOIA Officer at the time of the deposition— who is a GS-14 and not a "senior official"—does not get to ***speak*** to the head of the agency. Rather, she reports through an attenuated chain of command through the section chief, deputy chief counsel, chief counsel, and then Administrator. *Id.*

- The person held out to be DEA's Chief FOIA Officer at the time of the deposition could not recall who DOJ's Chief FOIA Officer was and doesn't interact with DOJ's Chief FOIA Officer. Dep. 36:8-13.

- DEA's FOIA policy manual is marked "This document and its contents are the property of the Drug Enforcement Administration and may not be disseminated outside DEA (or if loaned outside of DEA, further disseminated) without the express written permission of the Office of Chief FOIA counsel." Due to an alleged "lack of resources," DEA has struggled to make its FOIA processing policies public, despite the agency's legal obligation to do so. Dep. 114:1-117:13; *see also* 5 U.S.C. § 552(a)(1), (2) (mandating making them available to the public).

Again, I have standing to raise a structure/process violation regardless. But even under the Government's incorrect framing, it is not implausible (indeed, it is likely) that I can prove that having a senior official who is Chief FOIA Officer reporting to the Administrator would redress

at least some of my harm and result in a different or favorable policy/practice changes. Indeed, according to Defendants, the person held out to be DEA's Chief FOIA Officer at the time of the deposition managed to reorganize the entire FOIA division less than five years ago. And it is clearly a reasonable inference that a lawfully designated Chief FOIA Officer would follow the statute. *Cf. Kinetica Partners*, 505 F. Supp. 3d at 671 (distinguishing *Clapper* where the chain of speculation was five links from a case where standing hinged on the government enforcing "its own regulations").

Under the proper standard of review, the Government's argument is woefully premature, and so its motion must be denied.

### 2. Stating Based on Failure to Produce Records That a Lawfully Designated Chief FOIA Office Would Necessarily Have Under 5 U.S.C. § 552(j)(2).

The Motion correctly notes that, generally, FOIA can't compel an agency to create agency records in response to a FOIA request. Mot. 11 (citing *Rutila v. DOT*, 72 F.4th 692, 697 (5th Cir. 2023)). But this holding speaks to whether FOIA can require an agency to create records in response to a FOIA request. It says nothing about whether FOIA's statutory commands would have necessarily resulted in the agency having the requested records. Therefore, it says nothing about the standing and causality issue in this case.[4]

The statute requires the Chief FOIA Officer to carry out the specific tasks enumerated in 5 U.S.C. § 552(j)(2). For a Chief FOIA Officer to do any of these mandatory duties without creating responsive records is impossible. These records do not exist or cannot be accessed, however, and the reason that is so is because DEA has no Chief FOIA Officer. *See DOC v. U.S. House of Representatives*, 525 U.S. 316, 332 (1999) ("virtual certainty" plaintiff would suffer

---

[4]   Again, resolving any inferences in Defendants favor are simply improper on a motion to dismiss.

injury due to Commerce Department's statistical sampling plan). *See also Kinetica Partners*, 505 F. Supp. 3d at 671 (government will likely follow the law).

The Government concedes informational injury is "a kind of injury that the Supreme Court has recognized can be concrete and particular where the "plaintiff fails to obtain information which must be publicly disclosed pursuant to a statute." Mot. 10. That should end the inquiry, because this case is not different from *Akins*, where the Supreme Court held that voters had standing under the Federal Election Campaign Act to seek information the statute required be made public. FECA imposed "extensive recordkeeping and disclosure requirements upon groups that fall within the Act's definition of a 'political committee." 524 U.S. at 14. Voters sought lists of donors and information about campaign-related contributions/expenditures related to an organization that, according to the voter's view of the law, had to be made public. They argued the information would help them assess candidates in elections. The FEC had determined, however, that the committee at-issue was not a "political committee" under the statute, so it refused to make the required statutory disclosures. *See id.* at 15-16.

This case is not different in a material way. Like FECA, FOIA contains certain recordkeeping and disclosure requirements related to FOIA, which records are available upon a FOIA request. Like the voters argued in *Akins* as to "political committee," I argue that Defendants have nullified these requirements by misconstruing the meaning of "agency" in 5 U.S.C. § 552(j)(1). Because of that misconstruction, DEA has no Chief FOIA Officer and so the records that must be created by a Chief FOIA Officer never come into existence. As a result, the agency's misconstruction of § 552(j)(1) deprives me of information that would assist me in my FOIA and reporting endeavors and to which I am entitled. As in *Akins*, there is "no reason to [my] claim that

the information would help [me] (and others to whom [I] would communicate it) to evaluate [DEA]." *Akins*, 524 U.S. at 21.

Nor is my need for these records hypothetical. As my August Declaration states, Aug. Decl. ¶¶ 7-8, concerned about the deletion of records in response to a request (that is now more than a year old and pending a determination), I sought DEA's current record retention policy. I heard nothing except that somehow, requesting an agency's record retention policy from its FOIA Office raised "unusual circumstances." The Government asserts that my requests would require the creation of records, but there is little doubt that a document retention policy is something a Chief FOIA Officer would have and should be posted to an agency's website per FOIA. Without a response, I reached out to the Government to make sure the records were preserved, which told me that I need "through the normal FOIA channels at DEA." Not even Kafka could make this up.

Taken to its logical end, under the Government's theory, when Congress makes an official the lightning rod for a public disclosure regime, an agency can avoid disclosing ever having to disclose records about its public disclosure regime by never designating anyone as that official— and nobody has standing to say otherwise. That's nonsense, particularly when the statute itself guards against this potential loophole by instructing that each agency "*shall* designate" the official. The remedy is straightforward and exactly what I seek: instruct DEA to designate a Chief FOIA Officer as the statute unambiguously requires.

### 3.      Standing Based on Record Balkanization

Under the "unusual circumstances" policy, DOJ components deem all records outside of FOIA processing offices as raising "unusual circumstances." Because DEA's FOIA staff has access to almost no records, that policy results in nearly all requests raising unusual circumstances because DEA's FOIA Office has access to virtually no agency records. This appears to be intentional. For example, the entire FOIA Office has access to *no* employee e-mail records

because, inexplicably, the agency doesn't give *anyone* in its FOIA office "the tool" to retrieve e-mails, thus resulting in an automatic delay for all requests that implicate e-mails under the unlawful unusual circumstances policy, even though the FOIA staff has received some training on the online tool. Dep. 231:13-233:9, 234:6-10 ("[W]e just simply don't have access to the e-mail records. We don't have access to the tool to retrieve employees' e-mail records. We have to rely on someone else to do that for us.").

This indefensible balkanization situation starts at the top: DEA has no Chief FOIA Officer. Instead, the Associate AG—a senior DOJ official outside of DEA's chain of command—serves as the Chief FOIA Officer for all DOJ. In tandem with the "unusual circumstances" policy, the lack of a Chief FOIA Officer contributes to processing delay. To understand why, consider how the "unusual circumstances" is applied. The frequency of its application is a function of the size of DEA's FOIA Office, the number of records DEA's FOIA Office, and when DEA invokes the unusual circumstances exception. DEA invokes the exception any time its FOIA Office cannot access records. Dep. 57:5-17, 58:2. Delay thus occurs "any time a record that is requested in a FOIA request that is not in the FOIA office." *Id*. Because the DEA FOIA Office is balkanized from the rest of the agency with no senior official at its helm—it is middle management and below—the office has access to practically no records. Delay is automatic.

If DEA structured its FOIA Office differently and had an official "at the Assistant Secretary level or its equivalent," that official necessarily would have access to at least some important agency records—certainly more than virtually no records at all. Because the unlawful unusual circumstances policy adds delay to requests seeking records *outside* the FOIA Office, having a Chief FOIA Officer of sufficient seniority *inside* the FOIA office would preclude DEA from invoking the unusual circumstances exception as a matter of course. Thus, by enforcing § 552(j),

this Court can remediate at least part of my harm because it would limit the scope of the "unusual circumstances" exception; at least some of my requests (e.g., for the Administrator's outlook calendar) won't be incessantly delayed. Partial relief is enough to show standing. *See, e.g., Collins v. Yellen*, 141 S. Ct. 1761, 1778 (2021) ("[A] decision in the shareholders' favor could easily lead to the award of at least some of the relief that the shareholders seek.").

The Government mischaracterizes my argument. It says  I do presume that "(1) a Chief FOIA Officer would be appointed from a DEA office having records responsive to one of Plaintiff's requests, (2) that such Officer would be personally involved in responding to such request or that DEA would adopt an organizational structure that merged the FOIA Office with any preexisting office of the hypothetical Chief FOIA Officer, and (3) that the unusual circumstances provision of FOIA would not otherwise be appropriately invoked as to whatever hypothetical request of the Plaintiff passed hurdles 1 and 2." Mot. 9.

But whether Chief FOIA Officers are responsible for responding to FOIA requests is beside the point. My point is again structural: If a senior official were Chief FOIA Officer, it necessarily follows that her FOIA office would at least include that senior official and the records her office can access. Accordingly, *whomever* responds to FOIA requests wouldn't be able to defer determinations based on the claim that nobody in the FOIA Office can access records. DEA has intentionally balkanized its FOIA Office with no senior official so that the office has *no* access to agency records of any kind, except those previously requested by the FOIA Office, resulting in extreme overapplication of the "unusual circumstances" exception.

Speaking concretely illustrates my point. If DEA designated either an executive like its GC or Deputy Administrator as Chief FOIA Officer, then even under the unlawful "unusual circumstances" policy, either the GC or front office is no longer an "establishment" that is

"separate from the office processing the request." Records within the reach of that executive's office could be requested and accessed without unnecessary delays. This shows us the problem. An agency's most important records are often within the possession, custody, or control of a front office. Certainly, those are records I am interested in: records related to rulemakings, adjudications, and big picture policy decisions. With the insular and unlawfully structured FOIA Office, the Department has found a clever way to put important records beyond the reach of the FOIA Office and the FOIA requesting public.

The Governments chain drastically overcomplicates my point, which is why it is absurd. My point is simply that if DEA designated a senior official as the Chief FOIA Officer as the statute commands, not every FOIA request would be deferred into oblivion under the "unusual circumstances" exception as records wouldn't always be in an establishment separate from the office processing the request.

### B.      First Amendment Right-of-Access Claim

The Government argues that as an attorney and journalist working closely in the niche controlled substances regulation area, I lack First Amendment standing to bring a First Amendment right-of-access claim with respect to DEA's adjudications. According to the Government, I lack standing because the injury I allege is not "certainly impending" injury; (2) I do not identify a particular proceeding I need records from and (3) the remedy is too broad.

As an initial matter, courts have dealt with similar right-of-access claims in other contexts. In none of those cases, did the courts conclude that a practitioner and journalist covering the relevant subject area lacked standing to contest secrecy practices of tribunals in that area.

Start with the FISA court in *In re Orders of this Court Interpreting Sec. 215 of the Patriot Act*, 2013 WL 5460064 (FISA 2013), which concluded that the ACLU had standing to challenge secrecy practices of the FISA court. The ACLU complained that withholding Section 215 FISA

Opinions from the public violated their First Amendment right of access. The court rejected an Article III standing challenge concluding (1) that the claimed injury was actual, rather than imminent, because the Section 215 Opinions were not "now available to the public" (2) there was not "any real question that this claimed injury was fairly traceable to the government's decision not to make the Section 215 Opinions public … and that it would be redressed by this Court's directing that those opinions be published"; and (3) on the "more substantial question." whether the ACLU had an injury "sufficiently concrete and particularized," that the lack of access to Section 215 Opinions impeded the ACLU's activities in a concrete, particular way—"or to put the point differently, if public access to the Section 215 Opinions would be of concrete, particular assistance to them in their own activities."

Years later, in *In re Opinions & Ords. of this Ct. Addressing Bulk Collection of Data under the Foreign Intel. Surveillance Act*, 2017 WL 5983865 (FISA Nov. 9, 2017), an en banc FISA court revisited the Section 215 holding. It too concluded that journalists and interest groups had standing to assert a right-of-access claim writ large. Specifically, it concluded that the ACLU and Yale Law School's Media Freedom and Information Access Clinic had First Amendment standing to bring a First Amendment claim for access to redacted portions of certain of the FISA court's secret opinions. Indeed, it "readily conclude[d]" that the plaintiffs injury was "actual" and "concrete" because the judicial opinions were not available to them. And that injury was particularized to them because of their "active participation in ongoing debates about the legal validity of the bulk-data-collection program," which was the subject matter of the tribunal issuing the withheld opinions. Relevant here, it did not conclude that the ACLU and Yale clinic lacked standing because they did not limit their grievance to a particular proceeding. Instead, they had standing to pursue a First Amendment right-of-access claim to challenge a practice.

The FISA court then took the issue up one more time on a certified question, which also concluded that the public interest groups had standing. *In re Certification of Questions of L. to Foreign Intel. Surveillance Ct. of Rev.*, 2018 WL 2709456, at *4 (FISA Mar. 16, 2018) ("the asserted injury is the denial of access to the entirety of the four FISC opinions sought by the movants" and "causation and redressability requirements are clearly met").

In many cases across all circuits, the media company Courthouse News Service (CNS) has challenged docketing practices of courts without naming particular proceedings as the Government argues. *E.g.*, *Courthouse News Serv. v. Quinlan*, 32 F.4th 15, 17 (1st Cir. 2022); *Courthouse News Serv. v. Schaefer*, 2 F.4th 318, 322 (4th Cir. 2021). I am not differently situated. *See Courthouse News Serv. v. Schaefer*, 440 F. Supp. 3d 532, 537 (E.D. Va. 2020) (describing CNS); *see also Kentucky Press Ass'n, Inc. v. Kentucky*, 355 F. Supp. 2d 853, 858 (E.D. Ky. 2005) (Kentucky Press Association had standing to seek/obtain access to juvenile court proceedings).

Other cases abound. In *New York C.L. Union v. New York City Transit Auth.*, 675 F. Supp. 2d 411, 426 (S.D.N.Y. 2009), the district court concluded that the organization had Article III standing to challenge a policy precluding public access to hearings conducted by Transit Adjudication Bureau (TAB) based on a "lost opportunity to attend certain governmental proceedings." The defendant there argued as the Government does here: "that Plaintiff has suffered is too conjectural or hypothetical to constitute an injury in fact" because the asserted injury amounted to nothing more than it "may someday wish to observe a particular TAB [H]earing (of special interest to the NYCLU)—as yet unknown and unidentified—but will not be able to because the respondent ... objects." This argument was unmerited, however, because the plaintiff had introduced that it had been denied access and would monitor proceedings if the court granted a preliminary injunction—just as I have done here.

In *Flynt v. Rumsfeld*, 355 F.3d 697, 702 (D.C. Cir. 2004), the court concluded that Hustler had standing to raise a First Amendment rooted access claim. In so holding, the court did not look at whether Hustler had a particularized interest in covering a particular operation, only whether Hustler had asked for access to accompany U.S. troops in combat and been denied, which it had.

If these parties have First Amendment access standing in these cases, certainly I do too here as an attorney that practices in the area *and* a journalist attorney that writes essays for his newsletter. The information I seek is indisputably of "particular assistance to [me] in [my] own activities," different from the general public. *SanMedica Int'l v. Amazon.com Inc.*, 2015 WL 6680222, at *3 (D. Utah Nov. 2, 2015) (professor had Article III standing to argue that but for a protective order, she would be able to gather the information from the public opinion and disseminate her opinion on it through her blog). Likewise, there is no dispute I have been repeatedly delayed or denied access to adjudicatory records that I am interested in and are related to my activities. That should end our inquiry.[5]

The Government's counterarguments are unavailing.

---

[5]    The *Hartford Courant Co. v. Pellegrino*, 380 F.3d 83, 93 (2d Cir. 2004) opinion does not address standing. But it is instructive neither party nor the court raised standing in response to a very similar complaint. In *Pellegrino*, newspapers sued the chief justice of the Connecticut supreme court and chief administrator of state courts for an injunction on First Amendment and state constitutional grounds requiring disclosure of sealed docket sheets and case files. The Second Circuit explained, "the ability of the public and press to attend civil and criminal cases would be merely theoretical if the information provided by docket sheets were inaccessible." *Id.* at 93. "[D]ocket sheets provide a kind of index to judicial proceedings and documents," "endow the public and press with the capacity to exercise their rights guaranteed by the First Amendment," and "provides effective notice to the public that [proceedings] may occur." The court also correctly recognized that sealed dockets "frustrate the ability of the press and the public to inspect [judicial] documents, such as transcripts, that [are] presumptively open." *Id.* at 94. Relevant here, it didn't engage in a pedantic exercise demanding the newspapers show a particular journalistic interest in a particular state proceeding or docket—proceedings that the newspapers couldn't identify in any event because of the very sealing policy at issue. Rather, the newspapers took issue with the "longstanding Connecticut state court practice of sealing certain docket sheets, as well as entire case files."

*First*, it appears to argue that appears to argue that I have failed to allege an ongoing or "certainly impending" violation or injury. Mot. 12. This is not a serious issue. An allegation of current injury avoids the need to discuss whether a violation is "certainly impending," and my pleadings and other papers are replete with instances of current and ongoing injury. *E.g.*, Dkt. 76 at 4-5 (requesting I provide "docket number" or "case name" for undisclosed adjudication before it can process my FOIA request). That DEA's adjudications are *currently* secret and that I am *currently* being denied access to know about those hearings and the adjudicatory records from is not capable of being seriously disputed.

*Second*, the Government argues my injury "is not sufficiently concrete and particularized … in the absence of any specific allegations about the proceedings to which he needs access and the basis for such need a First Amendment access-to-records claim fails." Mot. 12. It cites no case that has ever construed standing to assert a right-of-access this narrowly, and as discussed above, courts uniformly do not construe standing in this manner.

The Government's argument appears to confuse what "particularized" means in a standing inquiry. "Particularized" does not mean that a plaintiff must show interest in a particular proceeding. Rather, it means is that the asserted injury is particularized to me, as opposed to the general public. It does not mean *detailed* but *individualized*—different for me than everyone else.

That standard is easily met. I have, for example, articulated a particularized need for *adjudicatory* records writ large to use as precedents.[6] *See, e.g.*, Dkt. 57-1 at 32:12-21 (seeking essential precedent during proceeding, which request was met with thousand-dollar up-front

---

[6]   Case law suggests no special status or interest is required to pursue a right-of-access First Amendment claims. *See, e.g., Press–Enterprise Co. v. Superior Court of California for Riverside County*, 478 U.S. 1 (1986) (members of the public seeking to unseal criminal proceedings). But since I am both an attorney and journalist in this precise subject area, that debate can be saved for another day.

charge). The public can't say that. Also, I allege and explain that, as a journalist, I am seeking documents and information related to CSA proceedings, particularly those against opioid pharmaceutical companies, to report on them. The public can't say that either. My "informational interests, though shared by a large segment of the citizenry, became sufficiently concrete to confer Article III standing when [I] sought and was denied access to the information that they claimed a right to inspect." *Doe v. Public Citizen*, 749 F.3d 246, 262-265 (4th Cir. 2014). The right of access protects me from this very harm because I advocate "directly on the issues" to which the underlying proceedings relate. *Id.*

"The Supreme Court has repeatedly held that access to public proceedings and records is an indispensable predicate to free expression about the workings of government." *Courthouse News Serv. v. Planet*, 750 F.3d 776, 785 (9th Cir. 2014). My free expression about the workings of DEA is being thwarted. And like any news organization, I can't possibly know which ones are worth writing about when all adjudications are secret. By the same token, as a lawyer, I cannot understand the working law of the agency or find the right precedents when the adjudications are all secret. This complaint rightfully is not limited to a particular proceeding because my injury is not limited to a particular proceeding.

*Public Citizen v. DOJ*, 491 U.S. 440, 449 (1989) is likewise relevant. There, a watchdog sought compliance with the Federal Advisory Committee Act, which stipulates that advisory committee records be made available to the public. Standing was contested on (1) generalized grievance and (2) redressability grounds. The Court rejected both objections. First, a plaintiff for asserting injuries rooted in information deprivation for standing purposes need only show that information was sought and denied. *Id.* at 449. Second, on redressability, the Court found that if the plaintiff prevailed on its claims, the committee would at least have to give notice of meetings.

-24-

*Id.* at 450. So too here with DEA adjudications. As to standing, there is no meaningful difference between Public Citizen and this case.

It is hard to imagine a pleading with more concrete, particularized injuries. The record shows how the injury has concretely played multiple times. In paragraphs 22 to 25 of my July Declaration, I describe how my inability to locate prior precedents from secret DEA adjudications in fact interfered with an actual representation and perhaps, resulted in an unfavorable outcome on a motion for that client. In paragraphs 30 and 36 of same, I describe how I requested an ALJ decision and hearing transcript for my journalistic enterprises. In a recent filing, I explained another instance where I used FOIA to request a record and did so in considerable detail; the agency refused my request until I could provide the name of the proceeding. Dkt. 76 at 4-5. This played out in an actual DEA hearing. *See* Dkt. 57-1 at 32-33. None of this is hypothetical, abstract, or contingent.

Despite providing lurid details about Zorn's adventures in the bowels of DEA's administrative adjudication and FOIA processes, barely addressing any of these allegations, the Government portrays this as an academic debate over the First Amendment divorced from any real cognizable harm. Not so. My pursuit of this claim arises out of a harrowing, Kafka like experiences. Me and my clients (apparently others too) were, in fact, concretely harmed by DEA's Star Chamber-like adjudications where agency precedents and exculpatory evidence are *unavailable* and *hidden*. (Indeed, I'm not alone in asserting that these adjudications are Constitutional trash. *See* Aug. Decl. ¶¶ 9-10 (explaining how former DOJ Deputy Attorney General argued that DEA proceedings violate due process because the accused *can't obtain exculpatory information*.)) And after experiencing this process firsthand, I want to write and educate about this process, as I do on countless other matters involving DEA or the CSA. *See id.*

¶ 11. But of course, I can't, because these proceedings operate in secret—a point the Government conspicuously never denies.[7]

Indeed, the route to cognizable injury and First Amendment standing in this case can run through the Government's own dismissal arguments. It says I lack standing because I have not identified a *particular* proceeding that I have a journalist or attorney interest in. Mot. 12. That's not true, but in any event, why is that so? *Because DEA adjudications are secret*. If they were not secret, I could identify with precisions which proceedings I sought records from. Indeed, in the record, there is one example where my failure to have information on a case captioned blocked my ability to get timely access to records under FOIA. It is simply beyond dispute that DEA's failure to disclose the existence of these adjudications causes me injury-in-fact.

**Third**, the remedy I seek is tailored to the injury. The Government correctly argues that the remedy "must be limited to the inadequacy which produced the injury in fact." *Gill v. Whitford*, 138 S. Ct. 1916, 1930 (2018). Put simply, a plaintiff can only seek redress for their own injuries, and not the injuries of a broader class.

The Government thus appears to be arguing that because the public might also benefit from a remedy, I lack standing. This is wrong. For example, in *Gill*, voters had standing to obtain relief regarding revision of the boundaries of the individual's own district, despite the obvious consequence that other voters would benefit as well. *Gill*, 138 S. Ct. at 1930. As the Fifth Circuit recently explained, the maxim that a remedy must line up with injury does not mean injunctive relief can't go beyond the parties in suit "if such breadth is necessary to give prevailing parties the relief to which they are entitled." *Missouri v. Biden*, 83 F.4th 350, 398 (5th Cir. 2023), cert. granted

---

[7]   The full transcript, Dkt. 57-1, is worth a close read. *E.g.*, Dkt. 57-1 at 11:19-13:15, 16:10-18:12, 31:6-32:10 (explaining that someone "above Chief Counsel" instructed attorney for DEA to disregard ALJ's order regarding publication of a notice to inform public of hearing).

2023 WL 6935337 (U.S. Oct. 20, 2023) (quotation omitted). In *Biden*, the Fifth Circuit concluded that while an injunction targeted to the government's coercive behavior and proscribing certain illicit content-moderation activities reached beyond communications "not specifically targeted to particular content posted by plaintiffs themselves." But the broader injunction was necessary because the harms radiating from the government misconduct extended "far beyond just the Plaintiffs; it impacts every social-media user." *Id.* at 398.[8]

That's the case here. As I've explained, my *own* injuries extend to the secrecy of the DEA adjudications writ large. Those injuries can only be remedied by a Court order that makes the existence of DEA adjudications public and records from them timely accessible. And, in any event, even if my requested injunction may have elements that render it overbroad, that is no basis to dismiss the cause of action. Rather, it would be a reason to limit the scope of injunctive relief.

## II.      Merits

### A.        Chief FOIA Officer Claims

There is no genuine dispute of material fact that DEA is an "agency" under all of FOIA. This is purely a matter of statutory construction that can be resolved on the papers.

---

[8]      Again, the Government mischaracterizes the relief I seek. I do not "sweepingly seek[ ]disclosure of and release of records concerning all DEA administrative proceedings." I seek relief making ***adjudicatory records*** available. *See* 4AC at ¶169 ("Plaintiff Zorn seeks a declaration that DEA has violated the First Amendment and an injunction ordering DEA to make ***adjudicatory*** records from DEA proceedings timely available or accessible to the public, for example, through an electronic docketing system or any other appropriate means, and all other appropriate relief."); Prayer for Relief No. 3 ("Order DEA to make ***adjudicatory records*** from its administrative proceedings reasonably accessible in a timely manner.").

### 1.   DEA Is An "Agency" Under § 552(f)

#### a.   Unambiguous Text

##### *(1)   My argument.*

Start with Section 551(1) of the APA establishes a default background definition of "agency" for all Subchapter II of Title 5, including FOIA, 5 U.S.C. § 552. That is what the prefatory text—"[f]or the purpose of this subchapter"—means.

DEA is quite clearly an agency under 5 U.S.C. § 551(1). The statute that created DEA, Reorganization Plan No. 2 of 1973 brands DEA as "an agency" within the Department:

> There is established in the Department of Justice an agency which shall be known as the Drug Enforcement Administration, hereinafter referred to as "the Administration."

87 Stat. 1091.

Next, according to 5 U.S.C. § 552(f), for the purposes of the FOIA statute, "agency *as defined in section 551(1) of this title* includes any executive department, military department, Government corporation, Government controlled corporation, or other establishment in the executive branch of the Government (including the Executive Office of the President), or any independent regulatory agency." By its terms, the FOIA definition of "agency" – § 552(f) – takes the definition of "agency" "as defined in section 551(1)" and includes more. Section 552(f) excludes nothing that "defined" as an agency under § 551(1). The text is unambiguous.

##### *(2)   The Government's Argument*

The Government never disputes that DEA is an "agency" under § 551(1) as an "authority of the Government of the United States." Mot. 18. Instead, it argues that DEA is not an agency under § 552(f), despite being an agency under § 551(1), because Congress overwrote the § 551(1) definition with § 552(f). According to the Government, Congress listed several items "include[d]"

in the definition, and everything else falls outside § 552(f)'s ambit. *Id*. The Government contends that § 552(f) adopts a "distinct, more specific definition" than § 551(1).

As a textualism matter, this is plainly wrong. Section 551(1) defines "agency" using "*means*." Section 552(f), in contrast, adopts the § 551 definition and then expands with "*includes*." Per the text, § 552(f) clarifies and expands the default § 551(1) "agency" definition for FOIA purposes. Indeed, § 551(1), after (D), acknowledges its incorporation and application in § 552.

The main textual problem with the Government's reading is that it writes out text. There is no difference between Defendants' reading and the following edits:

> "agency" ~~as defined in section 551(1) of this title~~ includes any executive department, military department, Government corporation, Government controlled corporation, or other establishment in the executive branch of the Government (including the Executive Office of the President), or any independent regulatory agency.

Their reading thus improperly eliminates text. *Burgess v. United States*, 553 U.S. 124, 130-31 (2008). Moreover, it also replaces the tenth word "includes" with "means." As a textual matter, it is doubly wrong.

Notably, my interpretation aligns with how appellate courts have long understood "agency" under § 552(f): it incorporates "agency" under § 551(1) and then expands coverage with "includes." *See, e.g.*, *Energy Rsch. Found. v. Def. Nuclear Facilities Safety Bd.*, 917 F.2d 581, 583 (D.C. Cir. 1990) ("Congress sought to encompass entities that might have eluded the APA's definition in § 551(1), which FOIA had incorporated by reference"); *Statton v. Fla. Fed. Jud. Nominating Comm'n*, 959 F.3d 1061, 1063 (11th Cir. 2020); *St. Michael's Convalescent Hosp. v. State of Cal.*, 643 F.2d 1369, 1373 (9th Cir. 1981); *Schmitt v. City of Detroit*, 395 F.3d 327, 329 (6th Cir. 2005). SCOTUS too. *DOI v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 9 (2001) ("Statutory definitions underscore the apparent plainness of this text.").

In light of the chorus of appellate courts that all read the statute the way I do, I stated in earlier filings state that I'd "be surprised" if any appellate court interpreted § 552(f) in a way that would exclude DEA as an "agency." Dkt. 28 at 9. Almost a year later, the Government has still cited nothing of consequence. The cases it cites relate to general propositions about statutory interpretation. There is no attempt to reconcile the above appellate cases.

The problem with the Government's reading runs even deeper. Because § 552(f)'s definition applies "for purposes of this section" – all FOIA – "agency" must have the same meaning everywhere. How courts interpret "agency" in other FOIA contexts is therefore quite relevant. Scalia & Garner, Reading Law: The Interpretation of Legal Texts 170 (2012) (presumption of consistent usage). Defendants' reading turns the rest of FOIA into mush. For example, under the Defendants' reading, courts lack subject matter jurisdiction to enjoin agencies within Departments under § 552(a)(4)(B); so, for decades, courts everywhere got (and still get) FOIA cases wrong by allowing plaintiffs to sue component agencies. *E.g., Pub. Health & Med. Pros. for Transparency v. FDA*, 2023 WL 3335071 (N.D. Tex. May 9, 2023). That's absurd.

The Government's only other textual support for its interpretation is 5 U.S.C. § 552(e)(2)'s reporting requirement. The Government says that (e)(2) acknowledges that "principal components" of agencies within an "agency" for purpose of the FOIA annual reporting requirement and thus, are not separate agencies themselves. Per the Government's argument, "if such components were separate agencies, Congress would not need to specify that data about these components should be highlighted in each agency's annual FOIA reports."

 "Component" or principal "component" is not a term of regulatory art that applies to departmental units. The term isn't even used to describe departmental units in DOJ regulations. *See, e.g.*, 28 C.F.R. § 0.1 (DOJ offices, divisions, bureaus, boards). "Component" just means part

of an agency, according to ordinary meaning. Some component agencies have principal components. *E.g.*, https://www.fda.gov/medical-devices/how-study-and-market-your-device/other-fda-components (FDA components). What § 552(e)(2) means, according to its plain language, is that agencies in annual FOIA reports must provide data about their main parts.

Defendants' argument peters out once one acknowledges that not ***all*** principal agency parts are agencies themselves. For example, OIP is a principal DOJ component. But unlike DEA/FBI, OIP is not an "authority of the Government," and thus, not an agency. The Administration for Community Living is a component of HHS. It too is not an agency.

The purpose and meaning of § 552(e)(2) is to make sure that aggregated FOIA data for agencies do not obscure the main agency parts, whether those components are agencies themselves (e.g., DEA) or not (e.g., OIP). A department might offer an annual FOIA report that includes a principal component, which in turn, issues its own FOIA report including data from its principal components. To make this concrete, HHS would issue a report that includes FDA, and FDA issues a report that includes its principal components. Does this result in *some* overlap/redundancy? Sure, as is necessary to generate the comprehensive data Congress sought in enacting these reporting requirements to enable meaningful oversight. *See* § 552(e)(4), (6) (report being made available for oversight). Some redundancy doesn't "render this aspect of the annual report requirement superfluous." It makes the statute effective.

Even if § 552(f) didn't "incorporate[ ] the definition of 'agency' contained in section 551(1) of the APA by reference," *Grand Cent. P'ship, Inc. v. Cuomo*, 166 F.3d 473, 484 (2d Cir. 1999)– and it does—Defendants do not adequately explain why DEA is not an "establishment in the executive branch of the Government" under § 552(f)'s catch-all clause. After all, DEA is an "establishment" clearly "in the executive branch."

With little appeal to authority or tools of construction, the Government says the catch-all provision does not encompass entities "already captured by one of the prior, more specific entities" and "refers" only to the "Executive Office of the President." But once again, this reading contradicts text. The parenthetical clarifies the preceding words. As discussed above, "including," like "includes," does not prescriptively limit meaning to the thing(s) enumerated. It expands. It illustrates. Especially inside parentheses. Moreover, case law (and legislative history) say this language codifies the *Soucie* test, under which an agency was subject to FOIA under if it had "substantial independent authority in the exercise of specific functions." *See Meyer v. Bush*, 981 F.2d 1288, 1291 (D.C. Cir. 1993) (citing *Soucie v. David*, 448 F.2d 1067, 1073 (D.C. Cir. 1971)).

Plainly, under the *Soucie* test, DEA is an agency.

### b.     Unambiguous Legislative History

Despite unambiguous "text, context, structure, and history" of the statute, in the event the Court turns to legislative history, it would find legislative history that is even less ambiguous. *See generally Texas v. United States*, 524 F. Supp. 3d 598, 637 (S.D. Tex. 2021).

The Senate Report from the 1974 FOIA Amendments[9] adding § 552(f) explains that the new subsection "expands on the definition of agency as provided in section 551(1)." S. Rep. No. 93-854 (May 16, 1974) at 185. The specific reason for the amendment had to do with the United States Postal Service's assertion that, as a publicly funded corporation, it didn't fall within the ambit of § 551(1). *Id.* Section 552(f) "incorporates an expanded definition of agency to apply under the FOIA." *Id.* The House Report speaks to the same point with the same clarity:

> For the purposes of this section, the definition of "agency" *has been expanded* to include those entities which may not be considered agencies under section 551(1) of title 5, U.S. Code, but which perform governmental functions and control

---

[9]     FOIA's             legislative           history              is              available             here: https://nsarchive2.gwu.edu/nsa/foialeghistory/legistfoia.htm..

information of interest to the public. The bill expands the definition of "agency" for the purposes of section 552, title 5, United States Code. Its effect is to insure inclusion under the Act of Government corporations, Government controlled corporations, or other establishments within the executive branch, such as the U.S. Postal Service.

H. Rep. No. 93-876 (Mar. 5, 1974) at 128-29 (emphasis added). And in case there were further doubt, the Conference Report states: "The conferees state that they intend to include within the definition of 'agency' *those entities encompassed by 5 U.S.C. § 551* and other entities including USPS …" H.R. Rep. 93-1380 (Sept. 25, 1974) (emphasis added).

The textual and extratextual evidence thus independently and overwhelming show that § 552(f) supplements the coverage of "agency" in § 551(1) and that an agency under § 551(1) is also an agency under § 552(f). And because there is no doubt that DEA is an agency under § 551(1), it also must be an agency under § 552(f).

## 2.    DEA is an "Agency" Under § 552(j)

The § 552(f) "agency" definition applies "for purposes of this section" – all FOIA. Because § 552(j) is in FOIA, the § 552(f) "agency" definition likewise applies to "agency" in § 552(j).

The Government nonetheless maintains that "agency" under § 552(j) has a meaning different from § 552(f) and the rest of FOIA under the congressional ratification canon. According to the Government, Congress in 2007 ratified DOJ's 2006 interpretation of a 2005 Executive Order and reupped that definition in 2016. Mot. 20-24.

The ratification canon has no place here. As just noted, the § 552(f) "agency" definition applies "for purposes of this section" – all FOIA. The ratification canon can never supersede express definition. *Stenberg v. Carhart*, 530 U.S. 914, 942 (2000) ("When a statute includes an explicit definition, we must follow that definition ...."). In *Digital Realty Tr., Inc. v. Somers*, 138 S. Ct. 767, 770 (2018), for example, the statute defined "whistleblower" as an individual who provides "information relating to a violation of the securities laws to the [SEC]." *Id.* at 777.

Another provision prohibited retaliation against a whistleblower "because of any lawful act done by the whistleblower … in providing information to the Commission …." *Id.* at 774. The Ninth Circuit declined to apply the express statutory definition of "whistleblower"—one who reports to the SEC—and instead concluded that the statute protected an employee who made disclosures to either the SEC *or* his employer. *Id.* at 776. The Supreme Court reversed, opining that "when a statute includes an explicit definition, we must follow that definition, even if it varies from a term's ordinary meaning" and that "[c]ourts are not at liberty to dispense with" to a specific meaning Congress assigned to the term in a definitional section. *Id.* at 776-78. Just so here.

But even if the ratification found application here—and it does not—it would falter on its own terms.

**First**, perhaps, Congress may be presumed to be aware of an administrative interpretation "*of a statute.*" Opp. 47. But here, the President issued an **Executive Order** in December 2005, and DOJ compiled a list of Chief FOIA Officers, which allegedly is an "interpretation." If DOJ interpreted anything, it interpreted an *Executive Order*, not a *statute*.

**Second**, as the Court just explained *Sackett v. EPA*, 598 U.S. 651, 683 (2023), ratification only applies with a "well settled" definition. This backdoor interpretation existed for less than two years, "a far cry" from "well settled." *Id.*

**Third**, Defendants dig deep, but cannot point to any interpretation that has the force and effect of law, like a rule, such that application of the ratification canon would be proper. Instead of a "long regulatory history," Defendants identify obscure testimony made to Congress and internet content (that is no longer there). Mot. 20-21.

**Finally**, that DOJ has misinterpreted the statute for decades shows nothing more than the government misreading law for bureaucratic expediency and gain for some time. *Cf. Sackett*, 598

U.S. at 683 (rejecting policy arguments "based on ecological importance"). Wouldn't be the first time. *See, e.g., Lucia v. SEC*, 138 S. Ct. 2044 (2018) (ALJ appointments).

### B.        First Amendment

In *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 880 (1980), the Court held that the right to attend criminal trials "is implicit in the guarantees of the First Amendment." Two years later, in *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 608-09 (1982), it explained that this qualified right requires a case-by-case approach. And in *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 8–10 (1986), the Court explained that whether the qualified right attaches depends on: (1) "whether the place and the process has historically been open to the press and general public," and (2) "whether public access plays a significant positive role in the functioning of the particular process in question." This is known as the "experience and logic" test. Once the qualified right attaches, "the presumption of openness can be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest." *United States v. Edwards*, 823 F.2d 111, 115 (5th Cir. 1987).

### 1.        The Experience and Logic Test Applies

While the Supreme Court has not decided whether the experience/logic test applies to administrative proceedings, circuit courts to address the question have concluded it can.

In *Detroit Detroit Free Press v. Ashcroft*, 303 F.3d 681, 695-96 (6th Cir. 2002) ("DFP"), for example, the court concluded that the qualified right to access applied to deportation proceedings because they are adversarial, adjudicative, and while deportation is not technically a criminal proceeding, it imposes a "great hardship on the individual and deprives him of the right to stay and live and work in this land of freedom." Similarly, in *New York C.L. Union v. New York City Transit Auth.*, 684 F.3d 286, 300 (2d Cir. 2012) ("NYCLU"), the court held that a qualified right of access attached to hearings conducted by a Transit Adjudication Bureau because the TAB

acted as an adjudicatory body, operated under procedures modeled on those of the courts, and imposed official and practical consequences upon members of society.

DEA adjudications, like in *DFP*, are adversarial and impose hardship on respondents. Similarly, like in *NYCLU*, DEA rulemaking and administrative proceedings are supposed to model court procedures. *See* 21 C.F.R. §§ 1308.41-44, 1316.41-68 (hearing rules). These hearings can impose significant consequences on respondents. The ALJs that preside over DEA proceedings have lifetime tenure, further highlighting their court-like nature. One need only skim a recommended findings of fact and conclusions of law to understand that DEA adjudications proceed like those of a court.

The decision in *New Jersey Media Grp., Inc. v. Ashcroft*, 308 F.3d 198, 201 (3d Cir. 2002), cited by the Government (Mot. 27), is hardly to the contrary. In that case, the Third Circuit did ***not*** conclude that the experience and logic test did not apply to agency adjudication records. In fact, it agreed with the Sixth Circuit and ***applied*** the test:

> *Richmond Newspapers* is a test broadly applicable to issues of access to government proceedings, including removal. In this one respect we note our agreement with the Sixth Circuit's conclusion in their nearly identical case. *See [DFP]*. ***We now employ that test to determine whether the press and public have a First Amendment right to attend deportation hearings***.

After agreeing with the Sixth Circuit, the court applied the test and concluded that the test did not attach. Thus, every circuit court of appeals to squarely consider the question has concluded that the experience and logic test applies to administrative adjudications.

That is the correct result here. Indeed, the qualified right of access is implicit in the First Amendment's text, which protects the freedom of the press and the right to petition. One cannot exercise these liberties with respect to an agency without access to its enforcement proceedings. "[T]he Petition Clause protects the right of individuals to appeal to courts and other forums

-36-

established by the government for resolution of legal disputes." *Borough of Duryea, Pa. v. Guarnieri*, 564 U.S. 379, 387 (2011). *See also Sure–Tan, Inc. v. NLRB*, 467 U.S. 883, 896–897 (1984) ("[T]he right of access to courts for redress of wrongs is an aspect of the First Amendment right to petition the government."). How can one petition in an agency forum without accessing precedents and materials from matters previously litigated in that forum? And as to the "freedom … of the press," the Government cannot unreasonably restrict access to public forums, *see generally Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 45 (1983), which is precisely what DEA does when it does not publish information about or records from its public administrative proceedings—and then treats materials from pending cases *as FOIA exempt*. How can anyone access a proceeding or records from a proceeding without knowing about it?

The Government's response to the consensus remains unavailing. Again, it relies on *Calder v. IRS*, 890 F.2d 781, 783 (5th Cir. 1989), a case about whether the First Amendment provided a right-of-access to Al Capone's IRS records. It says, "[t]he Fifth Circuit has rejected extension of the experience and logic test to administrative agency records." Mot. 25-26. That simply isn't the question presented. My claim is not about administrative agency records writ large but is narrower. I seek access to agency *adjudication records*—the type of agency records produced in adjudications that form and inform the working law of agencies that ACUS has described as having "special significance" and are of "immense public importance."

The Government admits that *Calder* does not address this narrower issue. *Calder* only "rejected any basis for a First Amendment right to the IRS *investigatory* records sought in that case." Mot. 26. But as the *DFP* court correctly explained, expressly distinguishing *Calder* and similar cases, that line of cases "concern[s] purported rights of access to, or disclosure of,

government-held *investigatory* information and not access to information relating to a governmental *adjudicative* process." *DFP*, 303 F.2d at 699 (citing cases). So too here.

At bottom, the Fifth Circuit has never addressed the question. The Government does not deny that other Circuits agree with me. The one case it cites as unfavorable authority is in fact favorable on the threshold question. And given recent Fifth Circuit trends vis-à-vis the modern administrative state, there no reason to believe it would not follow other appellate courts and side with the administrative state. *See Sullo & Bobbitt, P.L.L.C. v. Milner*, 765 F.3d 388, 393 & n.4 (5th Cir. 2014) ("Although neither the Supreme Court nor this circuit has explicitly held that the experience and logic tests apply to court records, other circuits have, and none has found that the experience and logic tests do not apply.").

### 2.    The Government Mischaracterizes the Relief I Seek

The Government next argues that I am asking the Court "to superintend the creation of an external docketing system and to compel DEA to proactively disclose, without regard to the content of such documents, all records of DEA administrative proceedings." Mot. 26. Not so. As it often does, the Government overstates my claim to defeat a strawman.

 In fact, I seek relief no greater than what is needed to allow me to intelligibly access DEA's adjudications and adjudicatory records relating to CSA enforcement. In my pleadings, I make plain that I am asking the Court to "[o]rder DEA to make adjudicatory records from its administrative proceedings reasonably accessible in a timely manner" and to "make the existence of its adjudications public." In my declaration, I have stated similarly. *See* Decl. ¶ 41-42 ("Records from all enforcement proceedings and rulemaking—and particularly those that result in a trial-like hearing involving opioid manufacturers or distributors, as is the case with DEA Docket No. 18-31—should be publicly disclosed or reasonably accessible today."). There is no basis to assert that I am seeking to force disclosure of all records of DEA administrative proceedings. That is not true.

Certainly, an external docketing system like PACER or the ones used by countless other federal agencies would suffice. Proactive disclosure of adjudicatory records would as well. But one could imagine many ways the agency could make records "reasonably accessible in a timely manner" and make "adjudications public" that fall well short of an external docketing system. For example, it could list pending and past proceedings on its website, list docket sheets from those cases, and then promptly produce FOIA requests for those filings.

### 3.   The Experience and Logic Test Is Plausibly Met

Under the experience and logic framework, a qualified First Amendment right of access plausibly[10] applies to the existence of administrative proceedings and at least some adjudicatory records therein, such as the charging instrument. First, there is a "history" of public access to proceedings similar to the DEA adjudicatory proceedings. Second, recognizing a right of access here would play a "significant positive role," including with respect to the functioning of the DEA itself. *Press-Enterprise II*, 478 U.S. at 8-9.

### a.   There is a history of public access to proceedings of similar "type or kind" to DEA adjudications.

Under the experience prong, the Supreme Court has instructed lower courts to look "to the experience in that type or kind of hearing throughout the United States," and not to the particular practice of any one jurisdiction. *El Vocero de Puerto Rico (Caribbean Int'l News Corp.) v. Puerto Rico*, 508 U.S. 147, 150 (1993) (quotation omitted).

DEA enforcement adjudications fit the bill. They closely resemble historically public criminal prosecutions and public agency adjudications throughout the United States. The overlap between DEA's enforcement proceedings and CSA proceedings is self-evident. The Controlled

---

[10]   Factual disputes are properly addressed after a short bench trial. *See CNS v. Schaefer*, 440 F. Supp. 3d 532 (E.D. Va. 2020) (findings of fact after four-day bench trial).

Substances Act (CSA), a putative criminal law, underlies both. Also, quite obviously, there is a openness tradition involved with enforcing criminal law. *See, e.g.*, U.S. Const. Amend. VI.

The procedures used, and the rights adjudicated also mimic ordinary federal court civil proceedings as well as other APA adjudicatory proceedings under 5 U.S.C. § 554 brought by other major federal agencies like the FTC and SEC. The First Amendment's right-of-access cannot be evaded based solely on a law enforcement agency's decision to enforce a criminal law in its own administrative courts as opposed to a presumptively public federal court. *Cf. Jarkesy v. SEC*, 34 F.4th 446, 461 (5th Cir. 2022), cert. granted, 143 S. Ct. 2688 (2023) (jury trial right cannot depend on SEC determination "which subjects of its enforcement actions are entitled to Article III proceedings with a jury trial, and which are not"). To accept this proposition is to reinvite the Star Chamber back to America.

The closest contemporary parallel to DEA enforcement adjudications are SEC enforcement adjudications. Like DEA and the CSA, SEC enforces securities laws both in its administrative process as well as in federal court. Like DEA and CSA registrants, with respect to the SEC regulated entities (e.g., brokers, dealers and investment advisers) and their employees, the Commission may institute administrative proceedings to, among other things, revoke or suspend registration, or to impose bars or suspensions from employment. Unlike DEA, however, SEC publishes adjudication materials. *See* https://www.sec.gov/litigation/admin. The FTC is another parallel. It also makes its adjudicatory records public. *See* https://www.ftc.gov/legal-library/browse/cases-proceedings.[11] So while not longstanding, there is a well-established contemporary tradition of major agency adjudications being publicly accessible.

---

[11] Same with DOL, CFPB, and FCC. *See* https://www.dol.gov/agencies/oalj, https://www.consumerfinance.gov/administrative-adjudication-proceedings/administrative-adjudication-docket/, https://www.fcc.gov/ecfs/search/search-proceedings.

The Government never disputes any of this, i.e., that court-like procedures govern DEA enforcement adjudications and what "goes on at [DEA administration] hearings is a determination of whether a respondent has violated [the CSA]" and DEA regulations. *NYCLU*, 684 F.3d at 301-02. In an earlier filing, it attempted to distinguish *NYCLU* decision by arguing that there, the agency "shared jurisdiction with a criminal court" so "the historical openness applicable to that criminal court was also applicable to the administrative agency proceedings." Dkt. 72 at 13. The Government appears to have abandoned that point—it does not even address *NYCLU*—because that argument swings my way: DOJ (which includes DEA) prosecutes both CSA violations in district court *and* before itself administratively. Jurisdiction is shared and often *interchangeable*. *See* 21 U.S.C. § 882(a). *E.g.*, *United States v. Walmart Inc. et al.*, 1:20-cv-1744, Dkt. 1 (D. Del.) (civil CSA enforcement action).

There are two key problems with the Government's claim that I have not shown "any tradition of openness in *all* DEA administrative proceedings, and the records thereof." Mot. 27.

First, again, the Government overstates my lawsuit to defeat a strawman. I'm not taking issue with or asserting "unfettered access" rights to all DEA administrative proceedings or "all records." Rather, I'm asserting a qualified right to reasonable/timely access to adjudicatory records from CSA adjudications presided over by ALJs—the proceedings and records ACUS describes as having "special significance," 4AC at ¶ 130, are of "immense public importance," *id.*, and that nearly every other major agency in the federal government makes publicly accessible. In a world where adjudications of rights are increasingly being outsourced to the administrative state, ACUS's description is particularly apt. It cannot be the case that major agencies can develop working law and practice in secret, known only in full by the agency's own attorneys.

Second, as important, the Government's incorrectly frames the experience question, which is not whether there is a tradition of openness in all *DEA administrative proceedings*, but whether there is a tradition of openness in proceedings of the type or kind similar to DEA administrative proceedings throughout the United States. *El Vocero*, 508 U.S. at 149; *In re Bos. Herald, Inc.*, 321 F.3d 174, 184 (1st Cir. 2003) (looking to how "analogous" courts have treated "documents of the same type or kind" (quotation marks omitted)).[12] The question is if DEA enforcement proceedings "walk, talk, and squawk" like an analogous proceeding, *DFP*, 303 F.3d at 702.

For the reasons stated above, there should be little doubt that the public has had and today has access to analogous proceedings brought by similar tribunals in similar contexts.

> ### b. Recognizing a qualified right of access to DEA adjudications would "play a significant positive role."

There should be no genuine dispute that public access "enhances the quality" of adjudications that involve enforcing drug laws and public rights. *DFP*, 303 F. 3d at 703. "[S]ecrecy eliminates one of the important checks on the integrity of the system." *Brown & Williamson Tobacco Corp. v. FTC*, 710 F.2d 1165, 1179 (6th Cir. 1983). As with civil cases in court, public access to agency proceedings permits the public to scrutinize government activity, evaluate and participate in robust public discussions about agency performance in enforcement, and enhances institutional integrity. *Courthouse News Serv. v. Planet*, 947 F.3d 581, 592 (9th Cir. 2020). None of these interests are furthered if "the very existence" of enforcement proceedings becomes available only after a "decision had been made." *Id.* at 592.

---

[12]   The *In re Boston Herald* court observes that to conclude a right of access attaches "to everything remotely associated with criminal trials, and would be contrary to precedent employing more finely honed classifications." 321 F.3d at 185. This Court may similarly conclude that only documents associated with an adjudication function are subject to access. That issue is not well-suited for the pleadings.

ACUS—an independent agency of the federal government whose mission is to "promote improvements in the efficiency, adequacy, and fairness of the procedures by which federal agencies conduct regulatory programs, administer grants and benefits, and perform related governmental functions"—has underscored the importance of making materials generated in a federal administrative adjudication accessible and how public accessibility plays a significant positive role in their functioning.

Indeed, this is a unique case where the record shows how public access enhanced the quality of adjudications, promoted justice, and will enhance integrity of the system. Twice, press may have *changed the outcome* of DEA proceedings. July Decl. ¶ 20 (terminating rulemaking involving my client after Newsweek caught wind of misconduct); ¶ 32 (agency action on years old case immediately after AP caught wind of potential conflict of interest involving "acting" Deputy Administrator). Where, as here, a law enforcement agency adjudicates public rights ***before itself***, "the government has nearly unlimited authority" and "the press and the public serve as perhaps the only check on abusive government practices." *DFP*, 303 F.3d at 704. That maxim is especially true here where the agency does not turn over exculpatory evidence and the executive branch agency head can overturn any ruling issued by an ALJ upon request by the agency. July Decl. ¶¶ 10-14; Aug. Decl. ¶ 10. Without public scrutiny, this is a modern-day Star Chamber.

The Government again argues against a strawman. It contends that I fail to "plausibly allege that *unfettered* access to *all records* of DEA proceedings would satisfy the logic prong of the test" and that I fail to account "for the variety of DEA administrative proceedings." Mot. 28. But, to repeat, I'm not asking for "unfettered access to all records of DEA proceedings." I want timely or reasonable access to ***adjudicatory*** records in ***adjudications***—the records ACUS correctly identifies as important to ensure fairness—subject to reasonable and conventional restrictions to

protect information that is confidential or sensitive. I want timely access pleadings and motions—not every administrative proceeding record under the sun.

The Government cites FOIA exemptions as a basis to conclude that providing the public qualified access to adjudications and records therein would disregard Congress's express decision "to exempt specific categories of information from public disclosure under FOIA." Mot. 28. Never mind the fact that Congress can't rewrite a First Amendment right-of-access via statute. Also, forget that the agency's binding position in this case is that these proceedings are "*public*" and that the filings in these cases are "*public documents*." Dep. 92. The Government's argument lacks merit on its own terms because taken to its logical conclusion, it argues that *law enforcement agencies* can conduct *secret administrative proceedings* because FOIA exempts "records or information compiled for law enforcement purposes." To state this proposition is to underscore its absurdity.

Instead, what the FOIA exemption illustrates that is that Congress believes agencies can balance public access against other interests that favor confidentiality—such as law enforcement or sensitive business information concerns—and that it is improper to categorically deny the public access to presumptively public information based on a concern that *some* information contained in *some* adjudicatory records may implicate these interests.

Finally, as previously discussed, there real-world public importance behind having non-secret DEA adjudications; "trust us" adjudications do not fight the opioid epidemic but instead harm its victims. These confidentiality practices—including unlawfully treating adjudicatory records as FOIA exempt—breed prosecutorial capture that serves DEA and the pharmaceutical industry, not the public. A qualified right-of-access to adjudicatory records from these proceedings would undoubtedly promote improvements in the efficiency, adequacy, and fairness of them.

In 2018, DEA joined with the opioid industry to oppose unsealing data sought by the press. They succeeded until the Sixth Circuit intervened, finding the data was of immense public interest. *In re Nat'l Prescription Opiate Litig.*, 927 F.3d 919, 934-38 (6th Cir. 2019). As one author wrote in a law review article, Jennifer D. Oliva, Opioid Multidistrict Litigation Secrecy, 80 Ohio St. L.J. 663, 667 (2019):

> If a September 2019 [DOJ IG] Report is any guide, the DEA also was motivated to intervene in the litigation to keep secret from the public its own massive failure to regulate the supply and distribution of prescription opioids. The DOJ IG Report levelled several damning accusations at the DEA, finding that the agency "was slow to respond to the significant increase in the use and diversion of opioids since 2000." The Report further found that "DEA did not use its available resources, including its data systems and strongest administrative enforcement tools, to detect and regulate diversion effectively," and "DEA policies and regulations did not adequately hold registrants accountable or prevent the diversion of pharmaceutical opioids."
>
> It is hardly any surprise, then, that the DEA robustly objected to any disclosure of its ARCOS data. In support of its data nondisclosure posture, the DEA pointed to the federal Privacy Act and Touhy regulations, which enumerate the factors that the agency must consider in response to requests for production of information…

*See also id.* at 693, 99 (explaining how "[l]ack of transparency in cases involving ongoing public health and safety issues can kill" and secrecy inures "to the benefit of negligent regulators and profit-driven corporations for no legitimate legal reason"). After reversal, the district court subsequently remarked that "requiring public production of the [data] was both wise and monumental." *In re Nat'l Prescription Opiate Litig.*, 1:17-md-02804, Dkt. 5115 (Jul. 14, 2023 N.D. Ohio). The disclosure of this information allowed States and opioid crisis victims to hold those that unleashed the crisis accountable.[13]

---

[13] The plaintiffs committee in that case has made the data useful by posting it here. https://www.slcg.com/opioid-data/. *See also In re Nat'l Prescription Opiate Litig.*, 1:17-md-02804, Dkt. 5183 (Sept. 12, 2023 N.D. Ohio).

Not surprisingly, the public disclosure of this information has helped victims of the opioid crisis understand the issue and obtain accountability. And yet, DEA fought disclosure there. *See id.* Here, it contends here that making the *existence* of adjudications public somehow compromises the public interest. It's telling. Nothing could be further from the truth.

## CONCLUSION

The Court should deny the Government's Motion the motion to dismiss and grant summary judgment on the issue that DEA is an "agency" under 5 U.S.C. §§ 552(f) and (j)(1).

Dated: November 20, 2023                        Respectfully submitted,

*/s/ Matthew C. Zorn*
Matthew C. Zorn
YETTER COLEMAN LLP
mzorn@yettercoleman.com
811 Main Street, Suite 4100
Houston, TX 77002
T: (713) 632-8000
F: (713) 632-8002

PLAINTIFF

## CERTIFICATE OF SERVICE

I hereby certify that on November 20, 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

*/s/ Matthew C. Zorn*
Matthew C. Zorn