UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| MATTHEW C. ZORN, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 4:22-cv-02396 |
| | § | |
| U.S. DEPARTMENT OF JUSTICE, ET AL. | § | |
| | § | |
| | § | |
| Defendants. | § | |

**PLAINTIFF'S REPLY IN SUPPORT OF SUMMARY JUDGMENT AND RESPONSE
OPPOSING CROSS-MOTION FOR SUMMARY JUDGMENT**

Matthew C. Zorn
YETTER COLEMAN LLP
811 Main Street, Suite 4100
Houston, Texas 77002

December 2, 2024                    PLAINTIFF

TABLE OF CONTENTS

Introduction.................................................................................................................. 1

Overview of Several Requests ..................................................................................... 3

Argument ...................................................................................................................... 5

    A.     Whether a PPP Claim is Cognizable ............................................................ 5

    B.     Whether I Have Standing to Raise a PPP Claim ...................................... 10

         1.     Injury ................................................................................................. 10

         2.     Redressability ................................................................................... 12

    C.     Whether I State an APA Claim in the Alternative .................................... 13

    D.     Merits ........................................................................................................... 15

         1.     "Only to the extent necessary to process a particular request" ................ 15

         2.     "Only to the extent necessary to process a particular request" ................ 21

         3.     Failure to include an expected date in "unusual circumstances" notices.. 23

Conclusion .................................................................................................................. 24

TABLE OF AUTHORITIES

**Cases**                                                              **Page(s)**

*Am. Soc'y for the Prevention of Cruelty to Animals v. Animal & Plant Health Inspection Serv.*,
60 F.4th 16 (2d Cir. 2023) ........................................................................................ 9

*Animal Legal Def. Fund v. United States Dep't of Agric.*,
933 F.3d 1088 (9th Cir. 2019) .................................................................................. 8

*Animal Legal Def. Fund v. Vilsack*,
110 F. Supp. 3d 157 (D.D.C. 2015) ........................................................................ 15

*Californians for Renewable Energy v. EPA*,
2018 WL 1586211 (N.D. Cal. Mar. 30, 2018) ........................................................ 15

*CREW v. FEC*,
711 F.3d 180 (D.C. Cir. 2013) ................................................................................ 12

*CREW v. HHS*,
387 F. Supp. 3d 33 (D.D.C. 2019) .......................................................................... 14

*CREW v. HHS*,
507 F. Supp. 3d 228 (D.D.C. 2020) ........................................................................ 14

*Del Monte Fresh Produce N.A. v. United States*,
706 F. Supp. 2d 116 (D.D.C. 2010) ................................................................... 14, 15

*Frost Brown Todd LLC v. Centers for Medicare & Medicaid Servs.*,
2024 WL 450056 (D.D.C. Feb. 5, 2024) ............................................................. 8, 11

*Gilmore v. DOE*,
33 F. Supp. 2d 1184 (N.D. Cal. 1998) ................................................................. 9, 11

*Hajro v. U.S. Citizenship & Immigr. Servs.*,
811 F.3d 1086 (9th Cir. 2016) ........................................................................ 6, 7, 10

*Judicial Watch, Inc. v. HHS*,
895 F.3d 770 (D.C. Cir. 2018) ............................................................................... 6, 7

*Lujan v. National Wildlife Federation*,
497 U.S. 871 (1990) ........................................................................................... 13, 14

*McGehee v. CIA*,
697 F.2d 1095 (D.C. Cir. 1983) ................................................................................ 9

*Muttitt v. U.S. Cent. Command*,
813 F. Supp. 2d 221 (D.D.C. 2011) ........................................................................ 15

*Nightingale v. U.S. Citizenship & Immigr. Servs.*,
   507 F. Supp. 3d 1193 (N.D. Cal. 2020) ................................................................ 8

*Open Am. v. Watergate Special Prosecution Force*,
   547 F.2d 605 (D.C. Cir. 1976) .......................................................................... 11

*Payne Enters., Inc. v. United States*,
   837 F.2d 486 (D.C. Cir. 1988) ............................................................................ 6

*Snell v. United Specialty Ins. Co.*,
   102 F.4th 1208 (11th Cir. 2024) ....................................................................... 16

*Thompson v. DOJ*,
   2023 WL 5493591 (W.D.N.C. Aug. 24, 2023) ................................................ 15

*Uzuegbunam v. Preczewski*,
   592 U.S. 279 (2021) ................................................................................... 12, 13

**Statutes**

5 U.S.C. § 552(a)(6)(B) ................................................................................. 23, 19

5 U.S.C. § 552(a)(B) ............................................................................................ 1

**INTRODUCTION**

The present dispute is not about Defendants extending "*by ten days* the timeline to make a FOIA determination if certain conditions are met" under 5 U.S.C. § 552(a)(B)(i). Rather, it's about a blanket pattern, practice, or policy (PPP) of issuing form letters declaring "unusual circumstances" in response to FOIA requests that seek records outside the FOIA Office to delay a determination by many *months* under 5 U.S.C. § 552(a)(B)(ii). The consequences of this misuse of the "unusual circumstances" exception are straightforward: it delays determinations, thus delaying the "prompt" disclosure FOIA mandates. It also thwarts timely administrative appeal and judicial review rights. Put another way, it eviscerates FOIA's timetables.

Predictably, the Government's begins by questioning jurisdiction. Now more 30 months into this case—and after a year of lengthy briefing on jurisdictional issues as to *other* claims—the Court should refuse the Government's latest ploy to avoid the merits.

It begins by questioning the viability of a PPP claim. As I noted—and the Government does not dispute—both the Ninth and D.C. Circuits recognize FOIA PPP claims. And they have done so in cases where, just like here, an agency implements a policy to delay disclosure. While the Government claims the other circuits recognize PPP claims only in "narrow circumstances that are unlike those presented here," it conspicuously omits meaningful discussion of these cases. In fact, the unlawful practice I've alleged—improperly invoking the "unusual circumstances" exception to delay determinations on FOIA requests according to FOIA's default timelines— squarely fits that mold cast by these other cases.

The Government also never takes on my textual argument, namely, that FOIA's jurisdictional statute, by its terms, vests jurisdiction in district courts to prevent the withholding of records. Because significantly delayed disclosure is withholding, there is jurisdiction.

Then the Government questions Article III standing. It says I can't show injury or that my injuries would be redressed. But again, comparing my delay claims to those recognized by other courts easily dispatches this jurisdictional argument.

Next, the Government takes on my alternative pleading: that if my claim is not cognizable under FOIA, it is cognizable under the APA. The Government says the APA does not permit "broad programmatic practices." But in so arguing, it misinterprets my claim and case law. I do not take on a "broad programmatic practice." Rather, my claim targets a specific, concrete policy of improperly invoking the "unusual circumstances" exception in form letters to delay determinations on FOIA requests. Also, the Government relies on overruled, inapposite cases.

On the merits, the Government quibbles with aspects of my argument. But it never takes on the thrust: under Defendants' reading, the statute simply makes no sense. It cannot be that Congress created a three-tiered system for processing FOIA requests, (1) a default 20-day timeline (2) an "unusual circumstances" exception and (3) an "extraordinary circumstances" exception, and of the three, the "unusual circumstances" exception applies ***nearly all the time***. Reading the statute the way the Government proposes—so an office down the hall is an "other establishment separate from the office processing the request"—makes no common sense, no structural sense, reads out several words in the statute, and defies contemporaneous legislative history.

Finally, the Government says that my argument about DEA failing to provide dates with its determinations is a new claim and untimely. Not so. DEA not providing a determination in its form letters—none of which contain dates as required by statute and DOJ regulations—is part-and-parcel to the unlawful "unusual circumstances" policy of unlawfully using the exception to postpone determinations on requests indefinitely.

### OVERVIEW OF SEVERAL REQUESTS

The Government claims I don't show injury traceable to the unlawful policy/practice at issue. Essentially, it says because I haven't discussed the details of any specific FOIA request, the Court can't conclude that I've been harmed or that a Court order would redress my harm.

Throughout this case, I've discussed and attached numerous FOIA requests and explained why delay has caused harm. *See, e.g.*, Mot. 8; Dkt. 65-1 ¶¶ 21-36, Exs. 2-4.  Nonetheless, this section walks through some to show how processing delays have impacted my practice and ability to timely produce journalism. Reference is made to the Declaration of Matthew Zorn and the table attached thereto ("Zorn Decl." and "Requests Table" respectfully).

In the beginning, in April 2022, there was my request for "The Spokane Medical Examiner's Office report discussed on page 14 of the DEA Report" among other documents to use in a rulemaking proceeding, which was ongoing. Eleven days later, the agency invoked the "unusual circumstances" exception with its form e-mail. Then, it delayed for two more months, past the statutory deadlines. Although not egregious in the grand scheme of things, the determination came too late. I needed the document to use in a DEA hearing scheduled for August. (Oddly, the determination came exactly one day after I raised DEA's non-production of the important documents in the rulemaking proceedings in which I was acting as an attorney.)

For the same rulemaking proceedings, I sought a presentation and a poster—two documents—one from 2021, the other from 2022. I gave the FOIA Office processing my request the exact citation and stated as follows: "Teresa Carbonaro has these records. They are two documents. This request is not complex and does not raise unusual circumstances. ***I need these documents for a hearing***." (emphasis mine). What happened? Days later, the agency issued an "unusual circumstances" letter because Teresa Carbonaro doesn't work in the FOIA Office. I

ended up receiving the documents in August 2022. But as I stated in my request, I needed those documents for a hearing. So, it was too late.

So too with other requests. Request 22-00560-F, sent in April 2022, sought records from a 2010 rulemaking that was precedent. I received an unusual circumstances determination. I got a response in September 2022—after the rulemaking had concluded.

Fast forward to December 2022. I filed 23-00213-F for the 2022 electronic calendar/scheduler of the Administrator and Deputy Administrator. This is a standard FOIA request. It is simple to collect. It is a 5-minute Outlook export. Days after I filed my request, DEA pleaded unusual circumstances. It did not issue a determination letter for more than a year, until April 2024, when it denied my request. An identical request is now on appeal at OIP. And I've just requested calendars for 2023 and 2024.

I submitted Request 22-00806-F in June 2022. Two days later, "unusual circumstances" determination. After a few back-and-forth with the FOIA Office to reformulate the request, I got a determination in February 2024.

In Request No. 23-00735-F, I sought a "[c]opy of DEA's current policy for retaining e-mails and/or its General Records Schedule 6.1." I sought this because I was concerned long delays would result in record destruction. DEA responded on June 15, 2023, stating the request raised "unusual circumstances." No determination. Nearly a year later, on May 13, 2024, it produced a determination. What did it say? "The information you are seeking is available to the public online at: grs06-1.pdf (archives.gov)." What DEA did between June 15, 2023, February 2024, and May 2024 remains unclear. What is clear is that, under the unusual circumstances policy, it successfully pushed back the timeline of responding to a FOIA request for more than a year, even though the responsive document was simply online.

Request No. 23-01116-F, made in September 2023, sought e-mails in a publicly filed complaint. DOJ expedited the request on public integrity grounds. More than a year later, DEA stated it was unable to locate the records. That means (1) DEA didn't perform an adequate search, (2) Morris & Disckson quoted or referenced an illusory e-mail, or (3) in the more than one-year between when I made the request and when DEA responded, DEA spoliated the e-mails. I'm pursuing an administrative appeal of this "expedited" case—and may pursue other remedies.

In June 2023, I sought the transcript of the Morris & Dickson proceeding with the intention of writing a timely story on the case for my newsletter. DEA invoked the unusual circumstances exception, and then delayed processing the request for a transcript of more than six months. I only recently got the transcript.

On August 15, 2023, in Request 23-00952-F, I sought "Emails between DEA's Chief FOIA Officer and Administrator Anne Milgram recommending any adjustments to agency practices, policies, personnel or funding to improve FOIA functioning from January 1, 2023 to August 15, 2023." Incredibly, on September 5, 2023, DEA stated the request raised "unusual circumstances." Six days later, however, it reversed course and issued a determination stating that it does not have a Chief FOIA Officer, so it did "not have any responsive records."

On February 21, 2024, I requested documents in the administrative record of the Morris & Dickson matter (24-00507-F). DEA issued an unusual circumstances determination the very next day. My request is still pending.

## ARGUMENT

### A.    Whether a PPP Claim is Cognizable

My Motion explains that the Ninth and D.C. Circuits recognize a PPP claim under FOIA. Mot. 9. A plaintiff states a policy or practice claim when it alleges (1) prolonged, unexplained delays in producing non-exempt records that could signal the agency has a policy or practice of

- 5 -

ignoring FOIA's requirements, amounting to a persistent failure to adhere to FOIA's requirements and (2) the pattern of delay will interfere with its right under FOIA to promptly obtain non-exempt records from the agency in the future. *See Hajro v. U.S. Citizenship & Immigr. Servs.*, 811 F.3d 1086, 1103 (9th Cir. 2016) (stating elements as "(1) the agency's FOIA violation was not merely an isolated incident, (2) the plaintiff was personally harmed by the alleged policy, and (3) the plaintiff himself has a sufficient likelihood of future harm by the policy or practice.").

My Motion, further supported by this filing, shows these elements namely, (1) Defendants persistently fail to issue timely determinations in producing non-exempt records in part due to an unlawful pattern or practice of issuing "unusual circumstances" determinations to push back the processing timeline and (2) I have been harmed by this policy because I have not gotten timely determinations on my requests, which results in delays and denies me timely access to an administrative appeal or judicial forum to resolve my grievances. These delays interfere and will continue to interfere with my right to *promptly* obtain non-exempt records under FOIA.

The Government does not dispute that other courts recognizes PPP claims but instead attempts to distinguish these cases stating, "only in narrow circumstances that are unlike those presented here." Gov't Mot. at 8. Unfortunately, its discussion is limited and does not discuss recent case law. It cites only one case in support of its proposition, *Payne Enters., Inc. v. United States*, 837 F.2d 486, 490-91, 494 (D.C. Cir. 1988), and even in that, doesn't explain how or why the circumstances here differ from to *Payne* in a material way.

More recent cases refute the Government's position. *Judicial Watch, Inc. v. HHS*, 895 F.3d 770 (D.C. Cir. 2018), discussed in my Motion, is instructive. The D.C. Circuit explained, "it is settled law that informal agency conduct resulting in long delays in making requested non-exempt records available may serve as the basis for a policy or practice claim." *Id.* The plaintiff alleged

that HHS had "a policy and practice of violating FOIA's procedural requirements" by "regularly failing or refusing to produce requested records or otherwise demonstrate that [they] are exempt from production within the time period required by FOIA or at least within a reasonable period of time." *Id.* at 776. Notably, like here, the plaintiff took issue with the fact that the Secret Service "made no determinations, timely or otherwise, whether it would make any of the records available." *Id.* at 779.

In particular, in strong terms, the *Judicial Watch* court squarely rejected the Secret Service's argument—and the Government's argument here—that "failures to adhere to FOIA's pre-litigation requirements, including response deadlines and records management provisions needed to enable 'prompt' determinations, do not establish a FOIA violation and consequently cannot be the basis for a policy or practice claim." *Id.* at 780. It deemed this argument "untenable" for several reasons, including that it would render "FOIA's mandate of 'prompt' response superfluous." *Id.* In other words, "precedent on policy or practice claims disposes of any suggestion that Congress intended the repeated filing of lawsuits to be a practical requirement for obtaining records from an agency flaunting the statute." *Id.*

This discussion encompasses my PPP claim precisely: a "failure[ ] to adhere to FOIA's pre-litigation requirements, including response deadlines and records management provisions needed to enable 'prompt' determinations." If anything, my claim is more specific: it hones in on a specific and conceded way Defendants "flout[ ]" the statutory scheme to "regularly fail[ ]" to produce requested records in a timely manner as FOIA contemplates.

The Government also says that a PPP claim is simply an exception to mootness, not a claim in itself. Gov't Mot. at 9. The cases, however, speak of PPP claims as separate specific requests claims, not just as exceptions to mootness. Consider *Hajro*, 811 F.3d at 1103. *Hajro*, like *Judicial*

*Watch*, discusses a standalone "pattern or practice" claim. In *Frost Brown Todd LLC v. Centers for Medicare & Medicaid Servs.*, 2024 WL 450056, at *6 (D.D.C. Feb. 5, 2024), the trial court dismissed all claims directed to specific FOIA requests but the PPP claim directed at agency delay survived—necessarily, not just as an exception to mootness. Or in *Nightingale v. U.S. Citizenship & Immigr. Servs.*, 507 F. Supp. 3d 1193, 1195–96 (N.D. Cal. 2020), the court granted summary judgment for the plaintiff who brought a PPP claim to enjoin the systemic failure of DHS and component agencies to respond to FOIA requests for Alien Registration Files. It addressed a standalone PPP claim, not just as an adjunct to a FOIA request-centered claim for specific records or as an exception to mootness. And in *Animal Legal Def. Fund v. United States Dep't of Agric.*, 933 F.3d 1088, 1093 (9th Cir. 2019), the Ninth Circuit opined that "[i]n a 'pattern or practice' claim seeking declaratory or injunctive relief, the district court is not reviewing a particular denial of expedited processing. Instead, it is reviewing the agency's anticipated denial of expedited processing requests under similar circumstances in the future."

My claim directed at systematic delay due to an unlawful policy or practice falls squarely within this mold cast by these other cases. To be sure, I've made FOIA requests in the past, have FOIA requests still pending. Some are ripe for judicial intervention, too. These have been stymied by the unusual circumstances policy, and my lawsuit brings a PPP claim because I want current and future requests to be handled without unlawful delay.

Although the Fifth Circuit has not recognized a PPP claim, beyond case law in other circuits, my Motion also pointed to the text. Mot. 10. The text of the jurisdictional statute vests jurisdiction in district courts to prevent agencies "from withholding agency records." And "a system adopted by an agency for dealing with documents of a particular kind constitutes 'withholding' of those documents if its net effect is significantly to impair the requester's ability

to obtain the records or significantly to increase the amount of time he must wait to obtain them." *McGehee v. CIA,* 697 F.2d 1095, 1110 (D.C. Cir. 1983). *See also Gilmore v. DOE*, 33 F. Supp. 2d 1184, 1188 (N.D. Cal. 1998) (denying motion to dismiss for lack of subject matter jurisdiction because failure to make a timely determination constituted "an improper withholding of those documents in violation of the FOIA"). The Government offers no response to the textual argument.

But it does cite the Second Circuit's decision in *Am. Soc'y for the Prevention of Cruelty to Animals v. Animal & Plant Health Inspection Serv.*, 60 F.4th 16, 22 (2d Cir. 2023). Gov't Mot. 7-8. It correctly notes that the Second Circuit in that case rejected a FOIA policy or practice claim. But the suggestion that the Second Circuit's rejected that claim was *because* it did not recognize the viability of a PPP claim as a matter of law or because the also did not ask the court to also adjudicate specific FOIA requests is misleading. In fact, the opinion is clear that the court assumed, *without deciding*, that a "policy or practice" claim is cognizable. 60 F.4th at 21. Under that assumption, the court held that the specific claim presented still failed because the alleged policy was no longer operative due to a change in governing law. *Id.* at 23. The opinion's conclusion states the holding clearly: "ASPCA cannot state a policy or practice claim that the agencies systematically violated the FOIA *after an intervening statutory enactment required the restoration of the databases that underpinned the ASPCA's claim.*" *Id.* (emph. added).

My complaints have not been resolved. There's no intervening statutory enactment that changes what underpins my claim. Neither has there been an indication Defendants will change or abandon their policy or practice absent Court intervention. It continues unabated. And since I continue to make requests, I continue to confront the unlawful policy—now and in the future.[1]

---

[1] The Government's extended discussion of the one-vote concurrence, Mot. 8, only shows that its discussion that "a 'policy or practice' claim is not cognizable under the FOIA" did not get more than one vote and is not the law. In any event, under the logic of the concurring opinion, I have an APA claim.

### B.    Whether I Have Standing to Raise a PPP Claim

#### 1.    Injury

The Government says that there is no cognizable injury. Gov't Mot. at 9-11. But page 11 all but concedes the point. "Extending the determination date by ten days," it says, "simply defers the date by which the requestor can file a lawsuit to compel disclosure of the records sought."

Even if this were right (it is not), because "a delayed FOIA request may serve as a basis for individual standing," *Hajro v. U.S. Citizenship & Immigr. Servs.*, 811 F.3d 1086, 1106 (9th Cir. 2016), and the Government concedes its pattern/practice causes at least some delay, there's injury for the purposes of Article III standing. Indeed, there can no dispute. The very purpose of the "unusual circumstances" exception is to allows delay in processing FOIA requests to the detriment of the requestor. Abuse of that exception necessarily causes injury.

But the Government isn't right, of course. Again, our issue and unlawful policy is not DEA's widespread use of (B)(i) extensions, i.e., 20 days → 30 days but its reflexive use of (B)(ii) to extend the determination date indefinitely without stating any date by which the agency expects to process the record, i.e., 20 days → indefinite, simply because a responsive record falls outside the FOIA Office, perhaps down the hall.

The Government's argument also glosses over the fact that any delay in a determination also means delay in being able to seek an administrative appeal under (6)(A)(i)(III)(aa). That's important for a variety of reasons I need not belabor here. Suffice to say, it delays processing times in disclosure, especially when DEA makes arbitrary and capricious redactions or decisions on FOIA requests (as it often does), that requires an initial appeal.

A delay in issuing a determination also increases the risk of document loss. DOJ FOIA regulations require agencies to "preserve all correspondence pertaining to the requests that it receives under this subpart, as well as copies of all requested records, until disposition or

destruction is authorized." 21 C.F.R. § 16.9. That means "[r]ecords shall not be disposed of or destroyed while they are the subject of a pending request, appeal, or lawsuit under the FOIA." *Id.* This duty precluding agencies from spoliating records once an agency has processed a request. But by delaying a determination, DEA delays processing, sometimes by many months, DEA increases the risk of records being deleted or lost. As illustrated above, that isn't a hypothetical concern—it appears to have happened with at least one important request, possibly more.

Delay is as straightforward of an Article III injury as they come, which is why not surprisingly, courts have long recognized delay as cognizable injury. *See, e.g.*, *Frost Brown Todd*, 2024 WL 450056, at *5-*6 (sustaining PPP claim of unreasonable delay); *Gilmore v. DOE*, 33 F. Supp. 2d 1184, 1189 (N.D. Cal. 1998) (rejecting standing challenge noting that "failure to process Gilmore's FOIA request in a timely manner was itself an injury"). The examples of my FOIA requests discussed above illustrate why.

First, in the information game, it is well established that delayed disclosure is "tantamount to denial." *See Open Am. v. Watergate Special Prosecution Force*, 547 F.2d 605, 617 (D.C. Cir. 1976) ("[E]xcessive delay by the agency in its response is often tantamount to denial"). This is especially true in journalism where stale information is of little value. When DEA delays disclosing information about Morris & Dickson, it causes harm because it interferes with the timely disclosure of information and my journalism. The delayed determination delays processing. Second, as noted above, in my line of work as an attorney, delay can mean being without documents for use in advocacy and hearings. This is not hypothetical, either. It has happened. Third, as Request No. 23-01116-F shows, significant delays can result in not being able to obtain records at all. That too is not hypothetical, and makes the injury is obvious.

### 2.    Redressability

For the same reasons, the Government's redressability argument fails. Mot. 11-12. Even if, as the Government erroneously argues, all I accomplish is that I can now file a lawsuit in federal court 10 days sooner, that concession alone establishes redressability. *Uzuegbunam v. Preczewski*, 592 U.S. 279, 291 (2021) ("True, a single dollar often cannot provide full redress, but the ability "to effectuate a partial remedy" satisfies the redressability requirement").

But again, as I've discussed, the Government's notion is mistaken. It is the Government, not I, that misapprehends how FOIA operates here both in theory and practice. The dispute is not about a ten-day extension under (B)(i) but indefinite extensions under (B)(2), which necessarily affects processing times. As the *CREW* court explained, from the date of the determination, an agency must release records "within days or a few weeks" not "months or years." *CREW v. FEC*, 711 F.3d 180, 188 (D.C. Cir. 2013).

The Government is simply wrong that determination dates don't affect the timeline. They do. They are key to ensure timely processing and production of records. The following image crudely illustrates the difference between the statutory timetables and how FOIA should work (top) and what can result under the unlawful "unusual circumstances" policy of delaying determinations (bottom)—and why the determination date is important:



The Government also claims I have not shown that I am "likely to submit FOIA requests to DEA that meet the criteria for the unusual circumstances provision under current DEA practices but would not if those practices were to change." This argument is not merited. One of my declarations avers that aside for processing notes requests, nearly all my FOIA requests have been met with an "unusual circumstances" determination. That statement is unrebutted. Dkt. 108-1. Over the past 30 months, I've made dozens FOIA requests of all shapes and sizes, ranging from posters to administrative records to e-mails. *See* Requests Table. And I intend to make more. Because nearly all requests seek records outside the FOIA Office, the "unusual circumstances" exception nearly always applies under the unlawful policy, except when records do not exist.

If the policy changed, could some future request call for voluminous records and therefore still be eligible for the "unusual circumstances" exception? Sure. But that's not how standing works. Provided not every one of my future requests isn't for voluminous records or requires consultation with another agency—the other two "unusual circumstances" conditions—it is certain at least one request will no longer meet the unusual circumstances criteria if DEA's policy changed. Indeed, I have requests pending for non-voluminous records (e.g., DEA official Outlook calendars) that the unlawful policy will likely ensnare. Because enjoining the policy would at least partially redress ongoing and future harms, there is standing. *Preczewski*, 592 U.S. at 291.

C.    **Whether I State an APA Claim in the Alternative**

After contending that my claim is not cognizable as a PPP claim, the Government states that my grievance also cannot be recognized as an APA claim in the alternative because it is as a "broad programmatic attack." Gov't Mot. 12-14. Not so.

The Supreme Court in *Lujan v. National Wildlife Federation*, 497 U.S. 871 (1990) explained that a "broad programmatic challenge" to the entirety of the Bureau of Land Management's ("BLM's") land withdrawal review program could not be brought under the APA.

Because the challenge did not "refer to a single BLM order or regulation, or even to a completed universe of particular BLM orders and regulations," it did not challenge a "final agency action."

A plaintiff brings a "broad programmatic attack" when it "lumps" together a host of violative agency actions under one claim, not where, as here, a plaintiff targets a single, specific policy. *CREW v. HHS*, 507 F. Supp. 3d 228, 242 (D.D.C. 2020). This *CREW* court explained the difference: "[T]he Supreme Court in *Lujan* held that plaintiffs did not meet the agency action requirement because they brought a multifaceted attack on a 'land withdrawal review program' comprised not of 'a single ... order or regulation' but rather '1250 or so individual classification terminations and withdrawal revocations.'" *Id.* n.5. Applying this understanding, the *CREW* court allowed an APA claim directed to DHS's recordkeeping policies to proceed. *See also CREW v. HHS*, 387 F. Supp. 3d 33, 49 (D.D.C. 2019), amended, 2019 WL 11307644 (D.D.C. July 22, 2019) (explaining that *Lujan* court claimed the "whole program was unlawful").

Although I have many complaints, my APA claim is not an amalgamation of grievances culminating in a claim that the entirety of DEA's FOIA program is unlawful like the petitioners in *Lujan* claimed about the land withdrawal review program. Rather, my APA claim is a far narrower enterprise. I simply claim Defendants' policy and near-automatic practice of issuing "unusual circumstances" determination based on a snap-determination that a requested record lies outside the FOIA Office, without providing any expected date of determination, is contrary to law and should be enjoined. That policy is a discrete "final agency action" – i.e., "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act" that is reviewable under the APA if it cannot be reviewed under FOIA.

Nothing the Government cites or argues is to the contrary. Start with *Del Monte Fresh Produce N.A. v. United States*, 706 F. Supp. 2d 116, 120 (D.D.C. 2010). The D.C. Circuit overruled

that one in *Judicial Watch. See Frost Brown Todd LLC*, 2024 WL 450056, at *6 ("[T]his court is bound by *Judicial Watch*—a D.C. Circuit case that overrules any inconsistent aspects of the earlier district court opinions upon which Defendant relies."). *Accord Thompson v. DOJ,* 2023 WL 5493591, at *4 (W.D.N.C. Aug. 24, 2023) (similar).[2] Also, *Del Monte* is distinguishable. *Del Monte* it is a "failure to act" case under § 706(1), but here, I'm asking the court to declare the agency policy and practice to be unlawful, set aside, and enjoined under § 706(2).

The Government cites *Animal Legal Def. Fund v. Vilsack*, 110 F. Supp. 3d 157, 161 (D.D.C. 2015). That case is also unhelpful. It does not in fact say, as the Government contends, that a "pattern and practice of licensing decisions" is not justiciable under the APA. Even if had, this case isn't about licensing decisions. And, the case cites *Del Monte*, which as noted above, is overruled. *Californians for Renewable Energy v. EPA*, 2018 WL 1586211, at *19 (N.D. Cal. Mar. 30, 2018) is no better. It too is fundamentally different because it is a § 706(1) case to compel agency action, not a § 706(2) case. And it too relies on the overruled *Del Monte*.

**D.    Merits**

**1.    "Only to the extent necessary to process a particular request"**

My Motion laid out several reasons, using traditional tools of statutory interpretation, why the "unusual circumstances" provision cannot be invoked any time a requested record is found outside the FOIA Office under the Government's policy, ranging from the statute's text to structure. Mot. 12-18. I also identified unambiguous, lucid legislative history. Mot. 18-20.

---

[2] The Government to cite D.C. Circuit and Ninth Circuit district court cases to argue that broad programmatic challenges cannot be brought under the APA without acknowledging that, in those same circuits, my claim would be cognizable as a FOIA PPP claim. In other words, to leave me without a claim, it asks the Court to embrace their law on the APA, but disregard them on the PPP issue. Indeed, courts in the D.C. Circuit refuse to recognize FOIA PPP claims under the APA ***because*** they can be brought under FOIA. *See Muttitt v. U.S. Cent. Command*, 813 F. Supp. 2d 221, 227 (D.D.C. 2011).

Let me now add one more tool—generative AI—which can help with discerning plain meaning. *See generally Snell v. United Specialty Ins. Co*., 102 F.4th 1208, 1225 (11th Cir. 2024) (Newsom, J. concurring) (discussing using large language models to discern plain meaning).

Start with Grok. He says, "field facilities" and "establishments separate from the office processing the request" are things like "field offices," "satellite offices," "remote sites," or "outsourced facilities." What do these have in common? They're places or facilities from the geographically separate main office.



Now type "field facilities other establishments separate from the office processing the request" into Google. Google's AI knows what we're talking about—FOIA—and says the phrase pertains to "locations or offices that are *geographically distinct* from the main office handling a Freedom of Information Act (FOIA) request, meaning documents related to the request might need to be gathered from these separate locations, potentially causing a delay in processing the request due to the need to collect information from different sites":



ChatGPT? Same thing.



  That AI powered large language models figure out this puzzle is unsurprising. It is basic. Interpreting "field facilities or other establishments separate from the office processing the request" to mean geographically distinct locations—i.e., separated as a matter of geography, not feet or inches—from the main office handling a FOIA request is the only interpretation that makes sense of FOIA's statutory structure, i.e., the fact that the "unusual circumstances" is an *exception*. It's the only interpretation that aligns the exception with the statutory purpose of making records

"promptly available" but providing additional time when there is a need to collect information from different sites. And it's clearly the only interpretation that accords with the legislative history.

The Government offers many critiques starting on page 15. Notably, however, it offers nothing girthy to affirmatively to support its interpretation. All it says is that its interpretation follows from the "plain language." Gov't Mot. at 14. If that were true, one would expect at least a dictionary definition or one of three AI engines to support its assertion. They do not.

The Government says courts must apply explicit definitions, even when those vary from ordinary meaning. Gov't Mot. at 15-16. Certainly. But to be clear, that's not exactly what the Government tries to do here. It isn't asserting that Congress established a definition that strays from the ordinary meaning of "unusual circumstances." It asks the Court to interpret the definition Congress created to flip the meaning of "unusual circumstances" on its head, so "unusual circumstances" means "circumstances that apply to nearly every FOIA request." Put another way, maybe Congress defines "black" to include other dark colors in a manner that deviated from ordinary meaning. But it taxes credulity to think it would define "black" to mean "white."

In any event, the Government's lexical quibbles are of little concern because it musters no substantive response to other potent interpretive arguments. Most important, it cannot escape the statutory structure, i.e., the unusual circumstances are an *exception* to default processing times. Mot. 13. Exceptions, by their very nature, can't apply more than 50% of the time let alone nearly all the time or they cease to be exceptions. That alone means the Government's preferred reading can't right. It can rhetorically and non-substantively hand waive away my structural arguments as "untethered to the statutory text" all it wants. Gov't Mot. 16. But an appeal to the structure of a statute is an argument about as rooted in the statutory text as they come.

Neither does the Government provide a robust answer to the fact that "*other* establishments*" is tied to the preceding "field facilities." The Government says this means Congress intended "other establishments" to be distinct from "field facilities." Gov't Mot. at 16. We can agree on that much. But the notion that Congress meant "*other* establishments" to be *untethered* to "field facilities" must be rejected. The two phrases cannot be read independently.

As I argued, basic canons of constructions suggest that "other establishments" means "establishments" with characteristics like field facilities. Mot. 16. Otherwise, the word "other" does no work. The statute might as well read: "the need to search for and collect the requested records from field facilities or ~~other~~ establishments that are separate from the office processing the request." 5 U.S.C. § 552(a)(6)(B)(iii)(I) (strikeout added). "Other," in this sentence, indicates that "*other* establishments" shares the distinguishing characteristics of the antecedent "field facilities," which is a term of art to refer to agency facilities in other locations aside headquarter like records warehouses or remote offices that may not be a "field facility," but are nonetheless similarly situated in relation to the office processing the request: geographically separate.

The Government's notion that "field facilities" "can include locations that are not in the field but rather are at headquarters," Gov't Mot. at 16, is without any support in the statute. And were that right—that "other establishments" is so broad that it could include locations at headquarters—the statute would not need to mention "field facilities" at all. It could just say "the need to search for and collect the requested records from ~~field facilities or~~ other establishments that are separate from the office." In fact, Congress included "field facilities" *first* and then "other establishments" *second* precisely so "other establishments" did not sweep so broadly.

The Government also says, "it would make little sense for Congress to have made the applicability of the provision turn only on the physical distance of the records." Gov't Mot. at 17.

It makes perfect sense. The whole point of the 1974 statute was to curb bureaucratic delay but provide for extra time when (as the Google AI surmised and as the legislative history confirms), there was delay due to the need to collect information from different sites, i.e., when records needed to be physically retrieved from a warehouse or another location away from the office processing the request. Whether such an exception is needed or should be changed to reflect the age of e-mails, centralized servers, and the internet to account for other difficulties is a topic for another day and the legislature. *See* Gov't 17. The point is that in 1974, it made perfect sense, and that's the statute we have today. The Government simply wants to backdoor rewrite the statute to do the opposite of what the 1974 legislators wanted: *enable* bureaucratic delay.

The Government also attempt to distract by misstating my position. Gov't Mot. at 16. The issue is not my interpretation but Defendants' misinterpretation, i.e., automatic invocation of the "unusual circumstances" exception whenever a record is outside the FOIA Office. In any event, my position is not that some minimum physical distance is required for an office and establishment to be separate but that the two must be geographically separate. An office down the hall isn't geographically separate. Similarly, "other establishment" does not allow the agency to invoke the exception merely because there is a "need to coordinate with personnel in other offices to collect the records." Gov't Mot. at 4. Again, that's the case with practically all FOIA requests.

The Government's discussion of how, perhaps, DEA's Office of Chief Counsel is an establishment separate from DEA's FOIA Office illustrates the absurdity of the position it defends. Gov't Mot. at 17. DEA's FOIA Office **exists within** DEA's Office of Chief Counsel. *See* Dkt. 28-2, Dep. 25-29 ("[W]e are part of the Office of Chief Counsel"). Boiled down, the Government appears to argue for an interpretation where the FOIA Office can be (1) the "office processing the request" (2) organizationally *part* of the Office of Chief Counsel but (3) separate from the Office

of Chief Counsel for the sole purposes of processing FOIA requests. The Government's position is like saying a produce aisle and dairy section in the same grocery store are separate "establishments" or places for transacting business. No. Same establishment. Different sections.

On the legislative history, the Government's tepid response is to say it doesn't matter. Gov't Mot. 19-20. And it probably shouldn't because the Government doesn't put forward much statutory interpretation to favor its reading. But the argument it does make is nonetheless telling.

The Government claims, "the two committee reports offer two distinct meanings—one finding unusual circumstances when records are located outside the country and the other when records are located outside the city." Gov't Mot. at 21. That's exactly the point. It says this disagreement "strongly undermines their usefulness as interpretive tools." *Id.* But while the two reports may differ on the scope of the exception, where they converge resolves the key issue in this case: "unusual circumstances" requires records be kept in ***some different geographical location***, just as the tools of interpretation, AI, and everything else indicates. Under nobody's understanding except the Government's in this case are records 10-feet outside the FOIA Office a proper basis to invoke the "unusual circumstances" "other establishments" exception. The 1974 reports speak powerfully to the plain meaning of "the need to search for and collect the requested records from field facilities or other establishments that are *separate from the office processing the request*" meant back then. It meant—and still means—some geographic separation.

### 2.       "Only to the extent necessary to process a particular request"

The Government also says that I cite no evidence that DEA does not conduct a particularized inquiry. Gov't 18-19. It points to the testimony of DEA's FOIA Chief Counsel who says FOIA requests are done on a case-by-case basis.

The evidence says otherwise. For example, in response to Request 23-00952-F, DEA invoked the "unusual circumstances" exception stating it needed to search another office, even

though the records did not exist. *See* Requests Table. That shows that DEA doesn't make any inquiry as the statute requires before invoking unusual circumstances. Indeed, one need not look farther than the unusual circumstances notice themselves which admit, "*We have not yet completed a search to determine whether there are records within the scope of your request.*" *See* Ex. 6 (compilation of unusual circumstances notices). In other words, DEA admits it invokes unusual circumstances **before** running any type of search. That's unlawful.

That Defendants' changed testimony in a post-deposition erratum to say that "unusual circumstances" only applies to "most of the time" instead of all the time a record is outside the FOIA Office hardly changes anything. In fact, scrutinizing the change reinforces the point. The erratum identifies two examples (1) *ahead of time*, the FOIA Office knows there are "no records" and (2) "investigative matters" on page 98 of the deposition. As to the first, where there are no records, there's no records outside the FOIA Office either. So that doesn't even count. Indeed, it admits the violation: the FOIA Office invokes unusual circumstances exception before it does any investigation at all, *even when there are no records*. As to the second, the witness provided no detail, so it is hard to discern the significance of her testimony and still, that one exception (where DEA's FOIA Office appears to have access) doesn't suggest DEA does a particularized inquiry.

In all events, the Government cites no evidence to support the notion that the agency does any meaningful inquiry before invoking the "unusual circumstances" exception, but there's plenty of evidence against. It isn't reasonably necessary to extend time to respond to a request for a poster and research paper. It isn't reasonably necessary to extend time to respond to a request for a letter. It certainly isn't reasonably necessary to make an attorney, litigant, or anyone wait more than a year for access to legal materials like transcripts of proceedings or ALJ orders in adjudications or

rulemakings. *See, e.g.*, Requests Table, Request 23-00911-F (request for administrative proceeding order made on 8/1/23, unusual circumstances date 8/2/23, closed Nov. 2024).

### 3. Failure to include an expected date in "unusual circumstances" notices

My claim is that Defendants have an unlawful policy and practice of invoking the "unusual circumstances" exception to avoid issuing timely delay timely determinations on claims. Part of the claim is that Defendants don't include an estimated date, contrary to statute and regulations.

This is not an "entirely new" claim. Gov't Mot. at 21. Indeed, back in 2022, the Government understood it to be part of my grievance, arguing "[e]ven if this Court determined that a viable PPP claim permitting equitable relief may be premised *solely on the failure to provide an estimated determination date after claiming unusual circumstances*, the Amended Complaint fails to do so sufficiently here." *See* Dkt. 8 at 17. My operative complaint still identifies the issue as earlier pleadings. *Compare* Dkt. 82 ¶ 46 *with* Dkt. 7 ¶ 41. That should end the inquiry. It's part of the kit and kaboodle of the challenged policy and practice of Defendants reflexively sending out "unusual circumstances" notifications any time a request calls for a record outside the FOIA Office to delay determinations to a date uncertain. Those notifications do not contain "the date by which processing of the request can be expected to be completed" as the statute and regulations plainly require. 28 C.F.R. § 16.5. *See also* 5 U.S.C. § 552(a)(6)(B)(i) (requiring "unusual circumstances" notices to state "the date on which a determination is expected to be dispatched").

In fact, there's deep intertwinement among the issues. Congress indicating that "unusual circumstances" notices must have a "date on which a determination is expected to be dispatched" shows the need to conduct case-by-case inquiries beyond superficially asking whether a record is in or immediately accessible by the FOIA Office. A proper "unusual circumstances" follows a basic inquiry that results in some idea of the universe of responsive records and how long it might

take to collect and review. It doesn't require great or even rough precision. It doesn't have to be right. But it does require an inquiry *before* invoking the unusual circumstances exception.[3]

The Government's remaining objections are also unpersuasive. Gov't Mot. 21-22. First, the notion I haven't shown instances in which DEA has failed to provide the expected determination date is easily disproven. The record is replete with examples of DEA's form e-mails or letters proving the point, i.e., that DEA issues the same form every time it invokes "unusual circumstances" and none have expected dates for determination. I attached one as an exhibit. Dkt. 108-2. They're the same. For good measure, I'm attaching many more. Ex. 6.

Second, the Government says the point is "inadequately briefed." But there simply isn't much to say. Every unusual circumstances notification looks the same, and none has a date for an expected determination. The statute and regulation are plain—an unusual circumstances notification must have an expected date. What more is there to say?

Finally, the Government pivots back to standing—that I cannot "show any injury resulting from the alleged absence of an expected determination date." Gov't Mot. 22. This argument is unexplained. Suffice to say, the absence of an expected determination date is information I am entitled to under the statute, is procedural injury, and connects to the other injuries described herein for example, knowing when a determination can be expected can play a role in whether and how to take an administrative or judicial appeal.

### CONCLUSION

My Motion should be granted and the Government's should be denied.

---

[3] As I noted in my Motion, federal directives require that records be retained in an appropriate electronic system that supports records management and litigation requirements. Mot. ¶ 14. That Defendants do not use such a system is no excuse to contort the statute.

Dated: December 2, 2024                    Respectfully submitted,

                                           */s/ Matthew C. Zorn*
                                           Matthew C. Zorn
                                           YETTER COLEMAN LLP
                                           mzorn@yettercoleman.com
                                           811 Main Street, Suite 4100
                                           Houston, TX 77002
                                           T: (713) 632-8000
                                           F: (713) 632-8002

### CERTIFICATE OF SERVICE

I certify that on December 2, 2024, a true and correct copy of the foregoing was electronically served on the counsel of record through the Court's electronic filing system.

                                           */s/ Matthew C. Zorn*
                                           Matthew C. Zorn